















AXR    1/13/03    9:40

3:02-CV-02460   LINDOWS.COM INC V. XANDROS INC

*3*

*AMDCMP.*

1  MICHAEL S. KAGNOFF, State Bar No. 167613
   COLBERN C. STUART, III, State Bar No. 177897
2  BROBECK, PHLEGER & HARRISON LLP
   12390 El Camino Real
3  San Diego, CA 92130-2081
   Telephone: (858) 720-2500
4  Facsimile: (858) 720-2555

5

6  Attorneys for Plaintiff LINDOWS.COM, INC.

7

**ORIGINAL**

8              UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10  LINDOWS.COM, INC., a Delaware          ) **Case No.  02 CV 2460 BTM(RBB)**
    corporation,                           )
11                                         ) **FIRST AMENDED COMPLAINT FOR**
                                           ) **VIOLATION OF THE SECURITIES**
12            Plaintiff,                    ) **EXCHANGE ACT OF 1934; FRAUD;**
                                           ) **NEGLIGENT MISREPRESENTATION;**
13      v.                                 ) **BREACH OF CONTRACT;**
                                           ) **RESCISSION**
14  XANDROS, INC., a Delaware corporation; )
    LINUX GLOBAL PARTNERS, INC., a         )
15  Delaware corporation; MICHAEL BEGO, an ) **DEMAND FOR JURY TRIAL**
    individual; WILLIAM JAY ROSEMAN,  an   )
16  individual.                            )
                                           )
17            Defendants.                   )
                                           )

18

19

20        Plaintiff LINDOWS.COM, Inc. ("Lindows.com") by and through its

21  undersigned attorneys, complains and alleges as follows:

22                         **THE PARTIES**

23        1.    Lindows.com is a corporation organized and existing under the laws of

24  the State of Delaware with its principal place of business at 9333 Genesee Drive, San

25  Diego, California, 92121.

26        2.    Defendant XANDROS, INC. (hereinafter "Xandros") is a corporation

27  organized and existing under the laws of the State of Delaware with a principal place of

28  business at 41 East 11th Street, 11th Floor, New York, New York 10003.

SDILIB1\CS05\
472805v01

3.     Defendant LINUX GLOBAL PARTNERS, INC. (hereinafter "LGP") is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 41 East 11th Street, 11th Floor, New York, New York 10003.

4.     Defendant MICHAEL BEGO ("Bego") is an individual residing at 241 W 13th Street, New York, New York 10011.

5.     Defendant WILLIAM JAY ROSEMAN ("Roseman") is an individual residing at 308 Hackensack Street, Carlstadt, New Jersey 07072.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the first claim for violation of The Securities Exchange Act of 1934 ("1934 Act"), pursuant to 15 U.S.C. §78aa. The claim arises under §10(b) of the 1934 Act, and Rule 10b-5. Pursuant to 28 U.S.C. §1367(a), this Court has supplemental jurisdiction over the second, third, fourth and fifth claims for breach of contract, rescission, and fraudulent and negligent misrepresentation.

7.     Venue is appropriate in the Southern District of California under §27 of the 1934 Act and under 28 U.S.C. §1391(b)(2) as a substantial portion of the acts and omissions on which the claims are based occurred in this district.

## COMMON ALLEGATIONS

8.     Plaintiff Lindows.com is a computer software company that is developing a new computer operating system called LindowsOS. LindowsOS is an easy-to-use Linux-based personal computer operating system.

9.     Defendant Xandros is a computer software company which develops and sells a Linux-based operating system which Xandros claims is compatible with both Microsoft Windows- and Linux-based applications.

10.     Defendant LGP is a company which owns a number of companies which develop, manufacture, or sell Linux-based applications or services. LGP is an owner of Defendant Xandros.

11.     Plaintiff is informed and believes and based thereon alleges that Defendant Bego was a Vice President, Director and agent of Xandros from August, 2001

2

1   up to and including the present date.

2      12.    Plaintiff is informed and believes and based thereon alleges that

3   Defendant Bego was a Vice President of Business Development, Director and agent of LGP

4   from August, 2001 up to and including the present date.

5      13.    Plaintiff is informed and believes that Defendant Roseman was a

6   Director and agent of LGP and Xandros from August, 2001 up to and including the present

7   date.

8              ## DEFENDANTS' MATERIAL MISREPRESENTATIONS

9      14.    Beginning in August, 2001, Plaintiff Lindows.com and Xandros began

10  negotiating a number of agreements whereby Lindows.com would assist in the financing of

11  the Xandros business operation by loaning Xandros cash in exchange for three convertible

12  promissory notes (the "Convertible Securities").

13     15.    Beginning on August 28, 2001, and on numerous subsequent

14  occasions during the negotiations for the issuance of the Convertible Securities and

15  continuing after their issuance, Xandros' President Bego represented to Lindows.com's

16  Founder/Chief Executive Officer and its President/Chief Operating Officer that Xandros

17  had secured ten million dollars in private equity financing from LGP.

18     16.    Xandros also represented to the general public, including its investors

19  and Lindows.com, through a press release dated August 29, 2001 that it had "secured a $10

20  million capital commitment from NY-based Linux Global Partners." A true and correct

21  copy of the entire August 29, 2001 press release is attached hereto as exhibit "A" and

22  incorporated herein by reference.

23     17.    During a telephone conversation on or about October 4, 2001,

24  Roseman represented to Lindows.com's Chief Executive Officer that LGP had agreed to

25  provide $10 million in equity financing to Xandros.

26     18.    During the October 4 telephone conversation reference above,

27  Roseman represented to Lindows.com that LGP was divesting itself of other companies in

28  which it owned minority positions, including Ximian and CodeWeavers, in order to

3

increase its funding and development of Xandros and its products.

19.     On October 29, 2001, Bego represented to Lindows.com's President that "Xandros' capital comes from a $10 million dollar (sic) commitment from Linux Global Partners and its partner VC companies. Thus far, LGP has given us approximately $1.2mm of the total commitment. LGP is in the process of closing on the remainder. I would be happy to put you in contact with them. As a result of LGP's stepped closings to date, Xandros has not keep (sic) large amounts of cash on hand. Additionally, through LGP and its partner venture companies, we plan to to (sic) raise and additional $15-25 million dollars (sic) to ensure longer term stability."

20.     Plaintiff is informed and believes and based thereon alleges that Defendants Bego, Xandros, Roseman and LGP were aware of and approved the aboverereferenced representations to Lindows.com and to the general public.

## THE CONVERTIBLE SECURITIES

21.     Relying on the above-referenced representations, Plaintiff Lindows.com agreed to enter into the following Convertible Securities:

a.     On or about November 20, 2001, Lindows.com and Xandros executed a Convertible Promissory Note requiring Defendant Xandros, inter alia, to pay to Plaintiff Lindows.com the amount of $250,000 (the "November 20 Note"). A true and correct copy of the November 20 Note is attached hereto as Exhibit "B" and incorporated by reference as if fully set forth at length herein.

b.     On or about December 6, 2001, Lindows.com and Xandros executed a Convertible Promissory Note requiring Defendant Xandros, inter alia, to pay to Plaintiff Lindows.com the amount of $250,000 (the "December 6 Note"). A true and correct copy of the December 6 Note is attached hereto as Exhibit "C" and incorporated by reference as if fully set forth at length herein.

c.     On or about December 21, 2001, Lindows.com and Xandros

4

1   executed a Convertible Promissory Note requiring Defendant Xandros, inter

2   alia, to pay to Plaintiff Lindows.com the amount of $250,000 (the "December

3   21 Note"). A true and correct copy of the December 21 Note is attached

4   hereto as Exhibit "D" and incorporated by reference as if fully set forth at

5   length herein.

6       22.    Plaintiff is informed and believes that Defendant Bego's and

7   Roseman's representations regarding LGP's financial commitments to Xandros detailed

8   above were material, false, and misleading.

9       23.    At the time that each of Bego, Xandros, Roseman and LGP made,

10   adopted or approved each of the above-referenced representations regarding LGP's

11   financial commitments to Xandros, each Defendant knew or recklessly disregarded that the

12   representations were in fact false and misleading.

13       24.    At the time that each of Bego, Xandros, Roseman and LGP made,

14   adopted or approved each of the above-referenced representations, each Defendant intended

15   or expected that Plaintiff would in fact rely on such representations in executing the

16   Convertible Securities.

17       25.    Plaintiff is informed and believes and based thereon alleges that the

18   true facts which were known to the defendants but concealed to Plaintiff were that, at the

19   time each of the above referenced representations were made, in truth and in fact:

20       a.    LGP had not committed ten million dollars to Xandros;

21       b.    LGP had no intention to commit ten million dollars to

22   Xandros;

23       c.    LGP and its Partner venture capital companies had not

24   committed ten million dollars to Xandros

25       d.    LGP had not undertaken any stepped closings of private

26   equity financings of Xandros

27       e.    LGP had no intention of undertaking any further stepped

28   closings of private equity financings of Xandros;

5

26.   Both prior and subsequent to execution of the Convertible Securities, Lindows.com requested information regarding relevant facts relating to the business prospects, direction, and financial health of Xandros, including information about financial commitments of LGP and its partner venture capital companies, which information Xandros failed and refused to provide to Lindows.com.

27.   Bego, Roseman, LGP and Xandros failed to fully and truthfully disclosure of all relevant facts to Lindows.com by:

    a.   failing to provide full and truthful disclosure of facts relating to the financial health of Xandros, including facts relating to the LGP financial commitment to Xandros as well as facts relating to Xandros accountings, business prospects, outside financing, and other relevant matters; and

    b.   making other and further misrepresentations or omissions.

28.   In making the misrepresentations and omissions described above, Defendants acted with oppression, fraud and malice toward Lindows.com and the general public.

## ALTER EGO ALLEGATIONS

29.   During the telephone conversation referenced in paragraph 17 above, Roseman represented to Lindows.com:

    a.   that LGP was the entity that formed Xandros after LGP negotiated a licensing agreement with Corel Corporation for a license of Corel's technology;

    b.   that LGP provided Xandros with early start-up capital and were the pre-incorporation organizers of Xandros;

    c.   that LGP selected the Xandros name, established Xandros' Ottawa offices, and conducted

6

1   other start-up organization of Xandros;

2       d.    and that LGP was also the majority shareholder

3   of Xandros and controlled Xandros and its Board of

4   Directors, but that LGP was planning on hiring

5   competent management team to begin running

6   Xandros as an independent entity.

7       30.    Plaintiff is informed and believes and based thereon alleges that LGP

8   failed to employ an independent Board of Directors and Officers, but continued to maintain

9   a unity of interest between LGP and Xandros.  LGP continued to dominate and control

10  Xandros, continued to manage Xandros on a day to day basis, and caused or allowed the

11  funds and other assets of Xandros to be commingled with those of LGP.

12      31.    Plaintiff is informed and believes and based thereon alleges that LGP

13  and Xandros maintained substantially identical directors and officers, utilized the same

14  office or business locations, employed the same employees and attorneys, and failed to

15  maintain an arm's length relationship between themselves in their business interactions.

16      32.    Plaintiff is informed and believes and based thereon alleges that LGP

17  further held out that LGP would be liable for the debts of Xandros and that LGP failed to

18  adequately capitalize Xandros with funds necessary to conduct business as a separate

19  entity.  LGP and Xandros caused or allowed the diversion of assets from LGP to Xandros,

20  and vice versa and manipulated the assets of Xandros for the benefit of LGP to the

21  detriment of the creditors of Xandros.

22      33.    Plaintiff is informed and believes and based thereon alleges that

23  Xandros and LGP each failed to maintain corporate formalities as distinct from those of the

24  other, including corporate minutes and adequate corporate records, but was a mere shell,

25  instrumentality or conduit for a single venture of LGP.

26      34.    Xandros and LGP concealed and misrepresented to Lindows.com and

27  the general public the commonality of the corporations' ownership, management, control,

28  and financial interest.

7

35.     Lindows.com is informed and believes, and based thereon alleges, that Defendants Xandros and LGP were at all relevant times the agents, principals, alter egos, and co-conspirators of one another such that adherence to the fiction of the separate existence of each corporation would sanction a fraud and promote injustice.

36.     Lindows.com is informed and believes, and based thereon alleges, that at all relevant times each Defendant was the agent, employee, principal, and co-conspirator of each other Defendant and was at all relevant times acting within the course and scope of such agency or co-conspiracy relationship in order to defraud Plaintiff and to cause Plaintiff to execute the Convertible Securities.

## FIRST CLAIM

### (FOR VIOLATION OF SECTION 10(B) OF THE 1934 ACT
### AND RULE 10B-5 AGAINST DEFENDANTS XANDROS AND LGP)

37.     Lindows.com hereby refers to and incorporates by reference paragraphs 1 through 36, inclusive, of this Complaint.

38.     Defendants acted knowingly or in such a reckless manner so as to intentionally or recklessly misrepresent the facts detailed above in paragraphs 15 through 19 to Plaintiff Lindows.com with the intent or expectation that Plaintiff Lindows.com would rely on such misrepresentations and enter into the Agreements.

39.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 by:

a.      Employing devices, schemes, and artifices to defraud Plaintiff Lindows.com;

b.      Making untrue statements of material facts or omitting material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

c.      Engaging in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff Lindows.com in connection with Lindows.com's agreement

8

1    to enter into the Convertible Securities and continue its

2    business relationship with Xandros;

3         40.    As a direct and proximate result of these Defendants' violations of

4    law, Plaintiff Lindows.com has been injured in an amount to be proved at trial.

5                            **SECOND CLAIM**

6    **(FRAUD AGAINST DEFENDANTS XANDROS, BEGO, LGP AND ROSEMAN)**

7         41.    Lindows.com hereby refers to and incorporates by reference

8    paragraphs 1 through 40, inclusive, of this Complaint.

9         42.    The above-referenced representations in paragraphs 15 through 19

10   regarding the financial commitments from LGP and/or its venture capital partners was

11   material, false, and misleading.

12        43.    At the time that each of Bego, Roseman, LGP and Xandros made,

13   acknowledged, or approved each of the above-referenced representations, each of them

14   knew that the representations were in fact false and misleading.

15        44.    At the time that each of Bego, Roseman, LGP and Xandros made,

16   acknowledged, or approved each of the representations concerning LGP, its venture capital

17   partners, or the financial health of Xandros, each of them intended, expected, and should

18   have foreseen that Plaintiff would in fact rely on such representations in executing the

19   Convertible Securities.

20        45.    In executing the Convertible Securities listed above, Plaintiff

21   reasonably relied on the above misrepresentations.

22        46.    As an actual and proximate result of Defendants' fraudulent

23   misrepresentations, Lindows.com has been injured in an amount to be proven at trial.

24                            **THIRD CLAIM**

25   **(NEGLIGENT MISREPRESENTATION AGAINST DEFENDANTS**

26   **XANDROS, BEGO, LGP AND ROSEMAN)**

27        47.    Lindows.com hereby refers to and incorporates by reference

28   paragraphs 1 through 46, inclusive, of this Complaint.

9

48.     Both prior and subsequent to execution of the Convertible Securities, Lindows.com requested of each of Xandros, LGP, Bego and Roseman full and truthful disclosure of information regarding relevant facts relating to the business prospects, direction, and financial health of Xandros, which information Xandros and LGP failed and refused to provide.

49.     Each of Bego, Roseman, LGP and Xandros owed a duty to Plaintiff Lindows.com to provide full and truthful disclosure of all relevant facts relating to the financial health of Xandros, including facts relating to the relationship between LGP and Xandros detailed in paragraphs 29 through 32 above, the financial LGP commitment to Xandros as well as facts relating to Xandros accountings, business prospects, outside financing, and other relevant matters.

50.     In fact, Bego, Roseman, LGP and Xandros intentionally, negligently and recklessly breached their duty of full and truthful disclosure of all relevant facts by:

      a.     failing to provide full and truthful disclosure of all relevant facts relating to the relationship between LGP and Xandros, the financial health of Xandros, LGP's financial commitment to Xandros as well as facts relating to Xandros accountings, business prospects, outside financing, and other relevant matters; and

      b.     making other and further misrepresentations or omissions.

51.     Each of the abovereferenced omissions and misrepresentations was in fact material, false, and misleading.

52.     At the time that each Defendant made each of the representations or omissions detailed above, Defendants intended, expected, and should have foreseen that Plaintiff would in fact rely on such representations, including in executing the Convertible Securities and in continuing to conduct business with Xandros.

53.     In executing the Convertible Securities and continuing to conduct

1  business with Xandros, Plaintiff reasonably relied on Defendants' above misrepresentations

2  and omissions.

3        54.    As an actual and proximate result of Defendants' negligent

4  misrepresentations, Lindows.com has been injured in an amount to be proven at trial.

5  **FOURTH CLAIM**

6  **(BREACH OF CONTRACT REGARDING THE CONVERTIBLE**

7  **SECURITIES AGAINST DEFENDANT XANDROS)**

8        55.    Lindows.com hereby refers to and incorporates by reference

9  paragraphs 1 through 54, inclusive, of this Complaint.

10        56.    Lindows.com and Xandros entered into the Convertible Securities as

11  described above on or about November 20, 2001, December 6, 2001, and December 21,

12  2001.

13        57.    The Convertible Securities required Defendant Xandros to make

14  payment in the amount of $250,000, in addition to interest in the amount of 8% per annum,

15  on the "Due Date" described in the each respective Convertible Security.

16        58.    Each of the Convertible Securities remains due and payable as no

17  conversion pursuant to paragraph 3.1, 3.2, or 3.3 of each of the Convertible Securities has

18  occurred.

19        59.    Xandros failed to deliver written notice to Lindows.com "at least 15

20  days prior to the expected closing" of any "Equity Financing" as that term is defined in

21  paragraph 3.1 of each of the Convertible Securities.

22        60.    As of this date, no "Equity Financing" as that term is defined in

23  paragraph 3.1 of the three Notes has occurred.

24        61.    Pursuant to paragraph 1.2 of the November 20 Note, on December 3,

25  2002, Lindows.com demanded payment of all sums due under the Note on December 9,

26  2002; an amount equal to $271,041.10. As of this date, Defendant Xandros has failed and

27  refused to pay any sums due, including but not limited to the principal described above, in

28  addition to any and all interest on said sums.

11

62.    Pursuant to paragraph 1.2 of the December 6 Note, on December 5, 2002 Lindows.com demanded payment of all sums due under the Note as of December 11, 2002; an amount equal to $270,273.95.  As of this date, Defendant Xandros has failed and refused to pay any sums due, including but not limited to the principal described above, in addition to any and all interest on said sums.

63.    Pursuant to paragraph 1.2 of the December 21 Note, on December 21, 2002 Lindows.com demanded payment of all sums due under the Note as of December 27, 2002; an amount equal to $270,273.95.  As of this date, Defendant Xandros has failed and refused to pay any sums due, including but not limited to the principal described above, in addition to any and all interest on said sums.

64.    Lindows.com has at all times fully complied with any and all of its obligations under the Convertible Securities.

65.    As an actual and proximate result of Defendant's breach of the Convertible Securities, Lindows.com has been injured in an amount equal to all principal and interest due under said Notes, the exact amount to be proven at trial.

## FIFTH CLAIM

### (RESCISSION AGAINST DEFENDANT XANDROS;
### CAL CIV. C. SECTION 1689)

66.    Lindows.com hereby refers to and incorporates by reference paragraphs 1 through 65, inclusive, of this Complaint.

67.    The misrepresentations and omissions made by Xandros and detailed above were each in fact false and fraudulent when they were made as described above, and Xandros made them with the intent to deceive Lindows.com to enter into the Convertible Securities.

68.    Xandros knew that the misrepresentations and omissions were false and fraudulent when made.

69.    Plaintiff Lindows.com justifiably relied on the misrepresentations in executing the Convertible Securities such that any consent to enter into the Convertible

12

1    Securities given by Lindows.com was in fact induced by the fraudulent misrepresentations

2    and the nondisclosure of material facts, entitling Lindows.com to rescind the Agreements

3    pursuant to California Civil Code §1689(b)(1).

4         70.    In addition, the misrepresentations and omissions made in violation of

5    the Securities Act of 1934 has rendered the Convertible Securities void and unlawful.

6         71.    In addition, the public interest would be injured if the Convertible

7    Securities were not rescinded.

8         72.    Pursuant to the provisions of Civil Code §1689(b)(1), Lindows.com is

9    entitled to rescind the Convertible Securities and elects to do so by the notice provided in

10   this Complaint pursuant to Cal. Civ. C. §1691.

11        73.    In addition, as an actual and proximate result of Defendants'

12   intentional and negligent misrepresentations, Lindows.com is entitled to restitution in an

13   amount to be proven at trial.

14                          **PRAYER FOR RELIEF**

15        WHEREFORE, Lindows.com prays that judgment be entered by this Court in

16   its favor and against the Defendants, providing the following relief:

17        A.    On such causes of action that entitle the Plaintiff to such relief, for damages,

18   rescission, restitution and disgorgement of all amounts wrongfully obtained by Defendants;

19        B.    For pre-judgment interest at the maximum rate allowable by law according to

20   proof at trial;

21        C.    For punitive and exemplary damages subject to proof at trial on such causes

22   of action in which punitive damages are capable of being awarded;

23        D.    For costs of suit and attorneys fees incurred herein; and

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

13

1      E.     For such other and further relief as this court may deem proper.

2

3   DATED:  January 9, 2003                 BROBECK, PHLEGER & HARRISON LLP

4

5                                           By

6                                              Michael S. Kagnoff

7                                              Attorneys for Plaintiff
                                               LINDOWS.COM, INC.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SDILIB1\CS05\
472809.01

02 CV 2460 BTM(RBB

FIRST AMENDED COMPLAINT FOR VIOLATION OF SECURITIES LAWS, FRAUD, BREACH OF CONTRACT, RESCISSION

1

## DEMAND FOR JURY TRIAL

2      Pursuant to the Federal Rules of Civil Procedure, Plaintiff Lindows.com respectfully

3  demands a trial by jury.

4

5  DATED:  January 9, 2003          BROBECK, PHLEGER & HARRISON LLP

6

7

8                                   By _____

9                                      Michael S. Kagnoff
                                       Attorneys for Plaintiff
10                                     LINDOWS.COM, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SDILIB1\CS05\
472809.01

02 CV 2460 BTM(RBB

FIRST AMENDED COMPLAINT FOR VIOLATION OF SECURITIES LAWS, FRAUD, BREACH OF CONTRACT, RESCISSION

**EXHIBIT A**





home   products   support   about xandros   store

- news
- media
- releases
- archive

## August 29, 2001

### Xandros Announces Strategic Licensing Agreement with Corel Corporation

*Licensing deal and $10 million commitment from Linux Global Partners t*
*backbone of Xandros' go to market strategy.*

August 29, 2001 - San Francisco, CA - Xandros Corporation today annou
that it has signed a strategic licensing agreement with Corel Corporatior
it access to Corel's Linux desktop OS and related technologies. The newl
formed company will focus on developing the desktop and server marke
assistance from its founding parent, Linux Global Partners.

Xandros has secured a $10 million capital commitment from NY-based L
Global Partners, a Linux-specific investment company with financial hold
several key desktop application companies. The new company will be
headquartered in Ottawa, Canada and has already retained a majority o
original software architects of the award-winning Corel Linux operating s

"Xandros combines the best of open source technologies with a corporat
attention to completeness, usability, and support to benefit the end usei
Michael A. Bego, president of Xandros. "We believe Xandros has all the
elements necessary to deliver an outstanding desktop experience to
customers," Bego added.

Bego explained that the resulting combination of technology and usabilit
provide an easy-to-install and easy-to-use solution. This positions Xandi
viable alternative to the Windows operating system and also marks the
end-to-end Linux desktop that will better meet the needs of its current ι
well as potential users.

The Xandros distribution is scheduled for release in the coming months ;
retail for a fraction of the cost of the comparable Windows OS and applic
Bego said that the software will ship with a full suite of productivity tool:
providers, and the variety of drivers, and applications that users need ai
expect. In addition, Xandros officials see great promise in that the applic
contained within the Linux Global Partners' portfolio companies currently
with 62 percent of the Linux computers sold today and have significant
recognition with users.

"For the past three years, before Linux was a common name, we were
identifying and financially supporting the leading Linux desktop applicati
companies in development," said Wm. J. Roseman, co-chairman of Linu:
Partners. "We are now working to incorporate our portfolio companies ir
Xandros OS which will provide a complete desktop application for Linux.

ExH *A* PG *16*
ExH *A* PG *15*

"Today's announcement represents the start of a new chapter for Corel's desktop and fulfills a promise Corel made earlier this year when we anno our intention to spin off the Linux distribution component of our busines Rene Schmidt, chief technology officer at Corel Corporation. " We are ple entrust this technology to a company which is fully dedicated to deliverin end-to-end solution to customers. '

We believe this decision is in the best interests of customers and shareh since it allows Xandros to carry the technology forward and, in turn, allo Corel to maintain its singular focus on an aggressive new growth strateg announced in January of this year."

Under the terms of the deal, Corel will receive an undisclosed amount of along with a 5 percent equity stake in Xandros and a 2 percent equity st Linux Global Partners. Xandros will have unlimited rights of use to the C Linux desktop OS and related technologies for a period of eighteen mon

**About Xandros**

Xandros is creating a desktop solution that will combine the best of oper technologies with a corporate attention to completeness, usability, and s It is based on v3.0 of the award-winning Corel Linux OS and represents next step in the evolution of the desktop. Furthermore, Xandros will be unveiling server and enterprise management solutions in 2002.

Based in Ottawa, the Xandros team includes the world-renowned develo and architects of the award-winning Corel Linux OS. The first release of Xandros' desktop will come in early 2002. Xandros is inheriting a sizeabl base from Corel Linux OS from which it plans on significantly expanding market presence. Xandros is currently developing its direct and indirect distribution channels for corporate, government, home, and educational worldwide.

contact us | legal | privacy

ExH *A* PG *17*

ExH *A* PG *16*

12/13/2002

THE SECURITIES REPRESENTED HEREBY HAVE BEEN ACQUIRED BY THE HOLDER
HEREOF FOR ITS OWN ACCOUNT FOR INVESTMENT WITH NO INTENTION OF
MAKING OR CAUSING TO BE MADE A PUBLIC DISTRIBUTION OF ALL OR ANY
PORTION THEREOF. SUCH SECURITIES HAVE NOT BEEN REGISTERED UNDER THE
SECURITIES ACT OF 1933 OR ANY STATE SECURITIES LAWS AND MAY NOT BE
SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED.

$250,000.00                                                    San Diego, California
                                                               November 29 2001

## XANDROS, INC.

## CONVERTIBLE PROMISSORY NOTE

Xandros, Inc., a Delaware corporation (the "Maker"), for value received, hereby promises
to pay to Lindows.com, Inc., a Delaware corporation (the "Holder"), the principal amount of
Two Hundred Fifty Thousand Dollars ($250,000) (the "Issue Price"), together with interest on
the unpaid amount thereof in accordance with the terms hereof, from the date hereof until paid or
converted in accordance with the terms hereof.

1.    Convertible Promissory Note ("Note").

       1.1    Interest Rate.  The rate of interest hereunder ("Interest Rate") shall equal
eight percent (8.0%) per annum and shall be computed on the basis of a 365 day year for the
actual number of days elapsed; provided that in no event shall the interest rate be less than the
minimum rate of interest required in order to avoid the imputation of interest for federal income
tax purposes.

       1.2    Payment.  Subject to the provisions of Section 2 regarding an Acquisition
and Section 3 regarding conversion of this Note, the Issue Price plus all accrued but previously
unpaid interest thereon shall become due and payable in one lump sum on the earlier of (a) five
(5) days notice of demand after November 20, 2002 (the "Due Date") or (b) immediately upon
the closing of an Acquisition (as defined below).  The Maker may at any time prepay in whole or
in part the principal and interest accrued under this Note.  Any payment will be applied first to
the payment of any and all accrued and unpaid interest through the payment date and second to
the payment of principal remaining due hereunder.  Payment shall be made at the offices or
residence of the Holder, or at such other place as the Holder shall have designated to the Maker
in writing, in lawful money of the United States of America.

       1.3    Letter Agreement.  Of even date herewith, the Holder and Xandros
Corporation, a wholly owned subsidiary of the Maker, are entering into a side letter agreement
regarding this Note and future investments in the Maker by the Holder.

2.    Acquisition.  In the event the Maker is to be acquired, whether by means of a
merger, sale of all or substantially all of the assets of the Maker, sale of more than fifty percent
(50%) of the Maker's outstanding securities or otherwise, prior to the Due Date, the date of any
Equity Financing and the Optional Conversion Date (an "Acquisition"), then the Issue Price plus

EXH B PG 18
EXH B PG 17                    MAB                    KBC

all accrued but previously unpaid interest thereon shall become due and payable in one lump sum immediately upon the closing of such Acquisition.

3.    <u>Conversion.</u>

3.1    <u>Automatic Conversion</u>. Upon the closing of a bona fide equity financing (an "Equity Financing") of the Maker of at least <u>Two Hundred Fifty Thousand Dollars</u> ($250,000), excluding conversion of this Note, in which shares of a series of the Maker's Preferred Stock are issued, the sum of the Issue Price of this Note plus all accrued but unpaid interest thereon (the "Conversion Amount") shall be converted into that number of fully paid and nonassessable shares of the equity security of the Maker sold in the Equity Financing (the "New Equity Shares") as is equal to the Conversion Amount divided by the lesser of the following (the "Automatic Conversion Price"):

(a)    If the Equity Financing is at a pre-money enterprise valuation of the Maker of no greater than Fifteen Million Dollars ($15,000,000), the per share purchase price of the New Equity Shares in the Equity Financing.

(b)    If the Equity Financing is at a pre-money enterprise valuation of the Maker of greater than Fifteen Million Dollars ($15,000,000), the per share price determined by assuming the Equity Financing was at a pre-money enterprise valuation of the Maker equal to Fifteen Million Dollars ($15,000,000).

3.2    <u>Optional Conversion</u>. In the event that the Maker does not consummate an Equity Financing prior to May 20, 2002 (the "Optional Conversion Date"), the Holder shall have the right to convert the Conversion Amount into shares of Series A Preferred Stock (the "Optional Conversion Shares") of the Maker, the rights, preferences and privileges of which shall be negotiated in good faith by the Maker and the Holder, at the Optional Conversion Date (an "Optional Conversion"), at a per share price (the "Optional Conversion Price") determined by assuming an enterprise valuation of the Maker equal to Fifteen Million Dollars ($15,000,000). On the Optional Conversion Date, the number of shares of Series A Preferred Stock into which this Note may be converted is determined by dividing the Conversion Amount by the by the Optional Conversion Price. Prior to the Optional Conversion Date the Maker shall take all necessary steps to validly authorize the shares of Series A Preferred Stock to be issued upon the Optional Conversion Date.

3.3    <u>Conversion Procedure.</u>

(a)    The Maker shall provide the Holder written notice at least fifteen (15) days prior to the expected closing of an Equity Financing.

(b)    In the event of an Equity Financing, the Note shall convert automatically on the closing of the Equity Financing (the "Automatic Conversion Date") without any further action by the Holder hereof.

(c)    In order to exercise the Optional Conversion privilege under Paragraph 3.2, the Holder shall provide the Maker at least five (5) days prior to the Optional Conversion Date written notice in form reasonably satisfactory to the Maker that the Holder elects to convert

2 EXH _B_ PG _19_

EXH _B_ PG _18_

the Note on the Optional Conversion Date. The Holder shall surrender the original Note for conversion on the Optional Conversion Date.

3.4 Termination of Rights Upon Conversion. Any conversion of this Note shall be deemed effective on the Automatic Conversion Date or Optional Conversion Date, as applicable, and, upon conversion of this Note, the Holder of this Note shall have no further rights under this Note, whether or not this Note is surrendered.

3.5 Fractional Shares. No fractional shares of any equity securities of the Maker will be issued in connection with any conversion hereunder but rather any such fractional shares shall be rounded up to the nearest whole share.

3.6 Delivery of Stock Certificates. As promptly as practicable after any conversion of this Note, the Maker, at its expense, shall issue and deliver to the Holder of this Note a certificate or certificates evidencing the number of full New Equity Shares or Optional Conversion Shares, as applicable, issuable to the Holder upon such conversion.

4. Miscellaneous.

4.1 Transfer of Note. This Note shall not be transferable or assignable in any manner and no interest shall be pledged or otherwise encumbered by the Holder without the consent of the Maker, which consent shall not be unreasonably withheld.

4.2 Titles and Subtitles. The titles and subtitles used in this Note are for convenience only and are not to be considered in construing or interpreting this Note.

4.3 Notices. All notices and other communications provided for hereunder shall be in writing and shall be delivered personally, by overnight delivery service or by facsimile, with confirmation of receipt, addressed as set forth on the signature page hereto. Either party hereto may by like notice specify or change an address to which notices and communications shall thereafter be sent. Notices sent by facsimile shall be effective upon confirmation of receipt, notices sent by overnight delivery service shall be effective upon receipt, and notices given personally shall be effective when delivered.

4.4 Attorneys' Fees. If any action at law or in equity is necessary to enforce or interpret the terms of this Note, the prevailing party shall be entitled to reasonable attorneys' fees, costs and disbursements in addition to any other relief to which such party may be entitled.

4.5 Amendments and Waivers. This Note may be amended and the observance of any other term of this Note may be waived (either generally or in a particular instance and either retroactively or prospectively), with the written consent of the Maker and the Holder. The Maker waives presentment, demand for performance, notice of nonperformance, protest, notice of protest, and notice of dishonor. No delay on the part of the Holder in exercising any right hereunder shall operate as a waiver of such right under this Note.

4.6 Severability. If one or more provisions of this Note are held to be unenforceable under applicable law, such provision shall be excluded from this Note and the

EXH B PG 20
EXH B PG 19

KbC

balance of the Note shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

        4.7    <u>Governing Law</u>.  This Note shall be governed by and construed and enforced in accordance with the laws of the State of California, without giving effect to its conflicts of laws principles.

        4.8    <u>Counterparts</u>.  This Note may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Executed as of the date first written above.

MAKER:
XANDROS, INC.,
a Delaware corporation

By: _____
Title: PRESIDENT
Name: MICHAEL A. BACO
Address:    1410 Blair Place, Suite 600
                Ottawa, Ontario K1J 9B9, Canada

ACKNOWLEDGED AND AGREED:

HOLDER:
LINDOWS.COM, INC.,
a Delaware corporation

By: _____
Title: PRESIDENT
Name: KEVIN CARMONY
Address:    4350 La Jolla Village Dr., Suite 450
                San Diego, CA 92122

**EXHIBIT C**

THE SECURITIES REPRESENTED HEREBY HAVE BEEN ACQUIRED BY THE HOLDER
HEREOF FOR ITS OWN ACCOUNT FOR INVESTMENT WITH NO INTENTION OF
MAKING OR CAUSING TO BE MADE A PUBLIC DISTRIBUTION OF ALL OR ANY
PORTION THEREOF. SUCH SECURITIES HAVE NOT BEEN REGISTERED UNDER THE
SECURITIES ACT OF 1933 OR ANY STATE SECURITIES LAWS AND MAY NOT BE
SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED.

$250,000.00

San Diego, California
December 6, 2001

## XANDROS, INC.

## CONVERTIBLE PROMISSORY NOTE

Xandros, Inc., a Delaware corporation (the "Maker"), for value received, hereby promises
to pay to Lindows.com, Inc., a Delaware corporation (the "Holder"), the principal amount of
Two Hundred Fifty Thousand Dollars ($250,000) (the "Issue Price"), together with interest on
the unpaid amount thereof in accordance with the terms hereof, from the date hereof until paid or
converted in accordance with the terms hereof.

1.    Convertible Promissory Note ("Note").

1.1    Interest Rate. The rate of interest hereunder ("Interest Rate") shall equal
eight percent (8.0%) per annum and shall be computed on the basis of a 365 day year for the
actual number of days elapsed; provided that in no event shall the interest rate be less than the
minimum rate of interest required in order to avoid the imputation of interest for federal income
tax purposes.

1.2    Payment. Subject to the provisions of Section 2 regarding an Acquisition
and Section 3 regarding conversion of this Note, the Issue Price plus all accrued but previously
unpaid interest thereon shall become due and payable in one lump sum on the earlier of (a) five
(5) days notice of demand (the "Due Date") after December 5, 2002 or (b) immediately upon the
closing of an Acquisition (as defined below). The Maker may not at any time prepay in whole or
in part the principal and interest accrued under this Note without the prior written consent of the
Holder. Any payment will be applied first to the payment of any and all accrued and unpaid
interest through the payment date and second to the payment of principal remaining due
hereunder. Payment shall be made at the offices or residence of the Holder, or at such other
place as the Holder shall have designated to the Maker in writing, in lawful money of the United
States of America.

1.3    Amendment of Letter Agreement. Of even date herewith, the Holder and
the Maker are amending that certain letter agreement dated November __, 2001, by and among
the Holder, the Maker and Xandros Corporation, a wholly owned subsidiary of the Maker.

2.    Acquisition. In the event the Maker is to be acquired, whether by means of a
merger, sale of all or substantially all of the assets of the Maker, sale of more than fifty percent
(50%) of the Maker's outstanding securities or otherwise, prior to the Due Date, the date of any

EXH C PG 22
EXH C PG 21    MAB   KbL

Equity Financing and the Optional Conversion Date (an "Acquisition"), then the Issue Price plus all accrued but previously unpaid interest thereon shall become due and payable in one lump sum immediately upon the closing of such Acquisition.

3. <u>Conversion</u>.

3.1 <u>Automatic Conversion</u>. Upon the closing of a bona fide equity financing (an "Equity Financing") of the Maker of at least Two Hundred Fifty Thousand Dollars ($250,000), excluding conversion of this Note, in which shares of a series of the Maker's Preferred Stock are issued, the sum of the Issue Price of this Note plus all accrued but unpaid interest thereon (the "Conversion Amount") shall be converted into that number of fully paid and nonassessable shares of the equity security of the Maker sold in the Equity Financing (the "New Equity Shares") as is equal to the Conversion Amount divided by the lesser of the following (the "Automatic Conversion Price"):

(a) If the Equity Financing is at a pre-money enterprise valuation of the Maker of no greater than Fifteen Million Dollars ($15,000,000), the per share purchase price of the New Equity Shares in the Equity Financing.

(b) If the Equity Financing is at a pre-money enterprise valuation of the Maker of greater than Fifteen Million Dollars ($15,000,000), the per share price determined by assuming the Equity Financing was at a pre-money enterprise valuation of the Maker equal to Fifteen Million Dollars ($15,000,000).

3.2 <u>Optional Conversion</u>. In the event that the Maker does not consummate an Equity Financing prior to May __, 2002 (the "Optional Conversion Date"), the Holder shall have the right to convert the Conversion Amount into shares of Series A Preferred Stock (the "Optional Conversion Shares") of the Maker, the rights, preferences and privileges of which shall be negotiated in good faith by the Maker and the Holder, at the Optional Conversion Date (an "Optional Conversion"), at a per share price (the "Optional Conversion Price") determined by assuming an enterprise valuation of the Maker equal to Fifteen Million Dollars ($15,000,000). On the Optional Conversion Date, the number of shares of Series A Preferred Stock into which this Note may be converted is determined by dividing the Conversion Amount by the by the Optional Conversion Price. Prior to the Optional Conversion Date the Maker shall take all necessary steps to validly authorize the shares of Series A Preferred Stock to be issued upon the Optional Conversion Date.

3.3 <u>Conversion Procedure</u>.

(a) The Maker shall provide the Holder written notice at least fifteen (15) days prior to the expected closing of an Equity Financing.

(b) In the event of an Equity Financing, the Note shall convert automatically on the closing of the Equity Financing (the "Automatic Conversion Date") without any further action by the Holder hereof.

(c) In order to exercise the Optional Conversion privilege under Paragraph 3.2, the Holder shall provide the Maker at least five (5) days prior to the Optional Conversion

Date written notice in form reasonably satisfactory to the Maker that the Holder elects to convert the Note on the Optional Conversion Date. The Holder shall surrender the original Note for conversion on the Optional Conversion Date.

3.4     <u>Termination of Rights Upon Conversion</u>. Any conversion of this Note shall be deemed effective on the Automatic Conversion Date or Optional Conversion Date, as applicable, and, upon conversion of this Note, the Holder of this Note shall have no further rights under this Note, whether or not this Note is surrendered.

3.5     <u>Fractional Shares</u>. No fractional shares of any equity securities of the Maker will be issued in connection with any conversion hereunder but rather any such fractional shares shall be rounded up to the nearest whole share.

3.6     <u>Delivery of Stock Certificates</u>. As promptly as practicable after any conversion of this Note, the Maker, at its expense, shall issue and deliver to the Holder of this Note a certificate or certificates evidencing the number of full New Equity Shares or Optional Conversion Shares, as applicable, issuable to the Holder upon such conversion.

4.     <u>Miscellaneous</u>.

4.1     <u>Transfer of Note</u>. This Note shall not be transferable or assignable in any manner and no interest shall be pledged or otherwise encumbered by the Holder without the consent of the Maker, which consent shall not be unreasonably withheld.

4.2     <u>Titles and Subtitles</u>. The titles and subtitles used in this Note are for convenience only and are not to be considered in construing or interpreting this Note.

4.3     <u>Notices</u>. All notices and other communications provided for hereunder shall be in writing and shall be delivered personally, by overnight delivery service or by facsimile, with confirmation of receipt, addressed as set forth on the signature page hereto. Either party hereto may by like notice specify or change an address to which notices and communications shall thereafter be sent. Notices sent by facsimile shall be effective upon confirmation of receipt, notices sent by overnight delivery service shall be effective upon receipt, and notices given personally shall be effective when delivered.

4.4     <u>Attorneys' Fees</u>. If any action at law or in equity is necessary to enforce or interpret the terms of this Note, the prevailing party shall be entitled to reasonable attorneys' fees, costs and disbursements in addition to any other relief to which such party may be entitled.

4.5     <u>Amendments and Waivers</u>. This Note may be amended and the observance of any other term of this Note may be waived (either generally or in a particular instance and either retroactively or prospectively), with the written consent of the Maker and the Holder. The Maker waives presentment, demand for performance, notice of nonperformance, protest, notice of protest, and notice of dishonor. No delay on the part of the Holder in exercising any right hereunder shall operate as a waiver of such right under this Note.

4.6     <u>Severability</u>. If one or more provisions of this Note are held to be unenforceable under applicable law, such provision shall be excluded from this Note and the

balance of the Note shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

      4.7   <u>Governing Law</u>. This Note shall be governed by and construed and enforced in accordance with the laws of the State of California, without giving effect to its conflicts of laws principles.

      4.8   <u>Counterparts</u>. This Note may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

      Executed as of the date first written above.

**MAKER:**
XANDROS, INC.,
a Delaware corporation

By: _____
Title: PRESIDENT
Name: MICHAEL A. BEGO
Address:    1410 Blair Place, Suite 600
             Ottawa, Ontario K1J 9B9, Canada

ACKNOWLEDGED AND AGREED:

**HOLDER:**
LINDOWS.COM, INC.,
a Delaware corporation

By: _____
Title: Pres.
Name: Kevin Carmony
Address:    4350 La Jolla Village Dr., Suite 450
             San Diego, CA 92122

4
EXH C PG 25
EXH C PG 24

**EXHIBIT D**

THE SECURITIES REPRESENTED HEREBY HAVE BEEN ACQUIRED BY THE HOLDER HEREOF FOR ITS OWN ACCOUNT FOR INVESTMENT WITH NO INTENTION OF MAKING OR CAUSING TO BE MADE A PUBLIC DISTRIBUTION OF ALL OR ANY PORTION THEREOF. SUCH SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR ANY STATE SECURITIES LAWS AND MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED.

$250,000.00
San Diego, California

December 21, 2001

## XANDROS, INC.

## CONVERTIBLE PROMISSORY NOTE

Xandros, Inc., a Delaware corporation (the "Maker"), for value received, hereby promises to pay to Lindows.com, Inc., a Delaware corporation (the "Holder"), the principal amount of Two Hundred Fifty Thousand Dollars ($250,000) (the "Issue Price"), together with interest on the unpaid amount thereof in accordance with the terms hereof, from the date hereof until paid or converted in accordance with the terms hereof.

1.    Convertible Promissory Note ("Note").

    1.1    Interest Rate. The rate of interest hereunder ("Interest Rate") shall equal eight percent (8.0%) per annum and shall be computed on the basis of a 365 day year for the actual number of days elapsed; provided that in no event shall the interest rate be less than the minimum rate of interest required in order to avoid the imputation of interest for federal income tax purposes.

    1.2    Payment. Subject to the provisions of Section 2 regarding an Acquisition and Section 3 regarding conversion of this Note, the Issue Price plus all accrued but previously unpaid interest thereon shall become due and payable in one lump sum on the earlier of (a) five (5) days notice of demand (the "Due Date") after December 21, 2002 or (b) immediately upon the closing of an Acquisition (as defined below). The Maker may not at any time prepay in whole or in part the principal and interest accrued under this Note without the prior written consent of the Holder. Any payment will be applied first to the payment of any and all accrued and unpaid interest through the payment date and second to the payment of principal remaining due hereunder. Payment shall be made at the offices or residence of the Holder, or at such other place as the Holder shall have designated to the Maker in writing, in lawful money of the United States of America.

    2.    Acquisition. In the event the Maker is to be acquired, whether by means of a merger, sale of all or substantially all of the assets of the Maker, sale of more than fifty percent (50%) of the Maker's outstanding securities or otherwise, prior to the Due Date, the date of any Equity Financing and the Optional Conversion Date (an "Acquisition"), then the Issue Price plus all accrued but previously unpaid interest thereon shall become due and payable in one lump sum immediately upon the closing of such Acquisition.



3.     Conversion.

    3.1     Automatic Conversion. Upon the closing of a bona fide equity financing (an "Equity Financing") of the Maker of at least Two Hundred Fifty Thousand Dollars ($250,000), excluding conversion of this Note, in which shares of a series of the Maker's Preferred Stock are issued, the sum of the Issue Price of this Note plus all accrued but unpaid interest thereon (the "Conversion Amount") shall be converted into that number of fully paid and nonassessable shares of the equity security of the Maker sold in the Equity Financing (the "New Equity Shares") as is equal to the Conversion Amount divided by the lesser of the following (the "Automatic Conversion Price"):

    (a)     If the Equity Financing is at a pre-money enterprise valuation of the Maker of no greater than Fifteen Million Dollars ($15,000,000), the per share purchase price of the New Equity Shares in the Equity Financing.

    (b)     If the Equity Financing is at a pre-money enterprise valuation of the Maker of greater than Fifteen Million Dollars ($15,000,000), the per share price determined by assuming the Equity Financing was at a pre-money enterprise valuation of the Maker equal to Fifteen Million Dollars ($15,000,000).

    3.2     Optional Conversion. In the event that the Maker does not consummate an Equity Financing prior to May 31, 2002 (the "Optional Conversion Date"), the Holder shall have the right to convert the Conversion Amount into shares of Series A Preferred Stock (the "Optional Conversion Shares") of the Maker, the rights, preferences and privileges of which shall be negotiated in good faith by the Maker and the Holder, at the Optional Conversion Date (an "Optional Conversion"), at a per share price (the "Optional Conversion Price") determined by assuming an enterprise valuation of the Maker equal to Fifteen Million Dollars ($15,000,000). On the Optional Conversion Date, the number of shares of Series A Preferred Stock into which this Note may be converted is determined by dividing the Conversion Amount by the by the Optional Conversion Price. Prior to the Optional Conversion Date the Maker shall take all necessary steps to validly authorize the shares of Series A Preferred Stock to be issued upon the Optional Conversion Date.

    3.3     Conversion Procedure.

    (a)     The Maker shall provide the Holder written notice at least fifteen (15) days prior to the expected closing of an Equity Financing.

    (b)     In the event of an Equity Financing, the Note shall convert automatically on the closing of the Equity Financing (the "Automatic Conversion Date") without any further action by the Holder hereof.

    (c)     In order to exercise the Optional Conversion privilege under Paragraph 3.2, the Holder shall provide the Maker at least five (5) days prior to the Optional Conversion Date written notice in form reasonably satisfactory to the Maker that the Holder elects to convert the Note on the Optional Conversion Date. The



Holder shall surrender the original Note for conversion on the Optional Conversion Date.

3.4    Termination of Rights Upon Conversion. Any conversion of this Note shall be deemed effective on the Automatic Conversion Date or Optional Conversion Date, as applicable, and, upon conversion of this Note, the Holder of this Note shall have no further rights under this Note, whether or not this Note is surrendered.

3.5    Fractional Shares. No fractional shares of any equity securities of the Maker will be issued in connection with any conversion hereunder but rather any such fractional shares shall be rounded up to the nearest whole share.

3.6    Delivery of Stock Certificates. As promptly as practicable after any conversion of this Note, the Maker, at its expense, shall issue and deliver to the Holder of this Note a certificate or certificates evidencing the number of full New Equity Shares or Optional Conversion Shares, as applicable, issuable to the Holder upon such conversion.

4.    Miscellaneous.

4.1    Transfer of Note. This Note shall not be transferable or assignable in any manner and no interest shall be pledged or otherwise encumbered by the Holder without the consent of the Maker, which consent shall not be unreasonably withheld.

4.2    Titles and Subtitles. The titles and subtitles used in this Note are for convenience only and are not to be considered in construing or interpreting this Note.

4.3    Notices. All notices and other communications provided for hereunder shall be in writing and shall be delivered personally, by overnight delivery service or by facsimile, with confirmation of receipt, addressed as set forth on the signature page hereto. Either party hereto may by like notice specify or change an address to which notices and communications shall thereafter be sent. Notices sent by facsimile shall be effective upon confirmation of receipt, notices sent by overnight delivery service shall be effective upon receipt, and notices given personally shall be effective when delivered.

4.4    Attorneys' Fees. If any action at law or in equity is necessary to enforce or interpret the terms of this Note, the prevailing party shall be entitled to reasonable attorneys' fees, costs and disbursements in addition to any other relief to which such party may be entitled.

4.5    Amendments and Waivers. This Note may be amended and the observance of any other term of this Note may be waived (either generally or in a particular instance and either retroactively or prospectively), with the written consent of the Maker and the Holder. The Maker waives presentment, demand for performance, notice of nonperformance, protest, notice of protest, and notice of dishonor. No delay on the part of the Holder in exercising any right hereunder shall operate as a waiver of such right under this Note.



4.6 Severability. If one or more provisions of this Note are held to be unenforceable under applicable law, such provision shall be excluded from this Note and the balance of the Note shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

4.7 Governing Law. This Note shall be governed by and construed and enforced in accordance with the laws of the State of California, without giving effect to its conflicts of laws principles.

4.8 Counterparts. This Note may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Executed as of the date first written above.

MAKER:
XANDROS, INC.,
a Delaware corporation

By: _____

Title: PRESIDENT
Name: MICHAEL A. BEGO
Address: 1410 Blair Place, Suite 600
Ottawa, Ontario K1J 9B9, Canada


ACKNOWLEDGED AND AGREED:

HOLDER:
LINDOWS.COM, INC.,
a Delaware corporation


By: _____
Title: _____
Name: _____
Address: 4350 La Jolla Village Dr., Suite 450
San Diego, CA 92122

December 6, 2001

Mr. Michael Bego
Xandros, Inc.
1410 Blair Place, Suite 600
Ottawa, Ontario K1J 9B9, Canada

    Re:    <u>Amendment of Letter Agreement</u>.

Dear Michael:

    This amendment (the "Amendment") amends that certain Letter Agreement (the "Letter Agreement") regarding Future Investment dated November __, 2001 by and among Lindows.com, Inc., a Delaware corporation ("Lindows"), Xandros, Inc., a Delaware corporation ("Xandros"), and Xandros Corporation, a wholly-owned subsidiary of Xandros ("Sub"). Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Letter Agreement.

    1.    <u>Amendment of Paragraph 2</u>. In accordance with the terms of Paragraph 5 of the Letter Agreement, Paragraph 2 of the Letter Agreement is hereby amended to read in its entirety as follows:

    "In the event that, during the term of the Strategic Agreement and in no event later than December 12, 2001, the Preview Release (as defined in the Strategic Agreement) is completed by Sub (as contemplated in the Strategic Agreement) and accepted by Lindows, then, upon the written request (the "Preview Release Investment Request") of Xandros delivered to Lindows within seven (7) days after the date of the completion of the Preview Release, Lindows shall invest in Xandros up to Two Hundred Fifty Thousand Dollars ($250,000) (the "Preview Release Investment"), with the exact amount specified in the Preview Release Investment Request (the "Preview Release Investment Amount"). In consideration for the Preview Release Investment, Xandros shall issue to Lindows, either (a) a convertible promissory note in the principal amount equal to the Preview Release Investment Amount and in the same form and substance as that certain Convertible Promissory Note dated December __, 2001 issued by Xandros to Lindows in the principal amount of $250,000 (the "December Note"), or (b) in the event that the December Note has converted in accordance with its terms, validly authorized shares of the capital stock of Xandros into which the December Note has converted at the per share price equal to the per share conversion price of the December Note (as equitably adjusted for any dividends, distributions, stock splits, combinations, recapitalization, reclassification, reorganization or other event effecting the class of capital stock into which the December Note converted). In no event shall Lindows be entitled to make the Preview Release Investment unless (i) the Preview Release is completed during the term of the Strategic Agreement and on or prior to

December 12, 2001 and (ii) Xandros delivers to Lindows the Preview Release Investment Request within seven (7) days after the date of the completion of the Preview Release."

2.　　Effect of Amendment. Except as amended and set forth above, the Letter Agreement shall continue in full force and effect.

3.　　Entire Agreement. This Amendment, together with the Letter Agreement, as amended herein, constitutes the full and entire understanding and agreement between the parties with regard to the subjects hereof and thereof.

4.　　Amendments and Waivers. Any term of this Amendment may be amended and the observance of any term of this Amendment may be waived only with the written consent of the Xandros and Lindows.

5.　　Counterparts. This Amendment may be executed in two counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

6.　　Governing Law. This Amendment shall be governed by and construed under the laws of the State of California as applied to agreements among California residents entered into and to be performed entirely within California.

Very truly yours,

LINDOWS.COM, INC.

By: _____
Title: PRES
Name: KEVIN CARMONY

AGREED AND ACCEPTED:

XANDROS, INC.

By: _____
Title: PRESIDENT
Name: XAN MICHIEL P. BELO