USDC SCAN INDEX SHEET

















TKL   1/20/04   13:00

3:02-CV-02460   LINDOWS.COM INC V. XANDROS INC

*60*

*DECL.*

1 | COLBERN C. STUART, III (SBN 177897)
JAMES P. CONLEY (SBN 216639)
2 | PAUL, HASTINGS, JANOFSKY & WALKER LLP
3579 Valley Centre Drive
3 | San Diego, CA 92130
Telephone: (858) 720-2500
4 | Facsimile:  (858) 720-2555

5 | Attorneys for Plaintiff
LINDOWS.COM, INC.

6

7

**FILED**

**JAN 2 0 2004**

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**ORIGINAL**

8 | UNITED STATES DISTRICT COURT

9 | SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  LINDOWS.COM, INC., a Delaware corporation, | CASE NO. 02 CV 2460 JAH (RBB) |
| 12              Plaintiff, | **DECLARATION OF COLBERN C. STUART IN SUPPORT OF PLAINTIFF** |
| 13       vs. | **LINDOWS.COM, INC.'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION** |
| 14  XANDROS, INC., a Delaware corporation; LINUX GLOBAL | |
| 15  PARTNERS, INC., a Delaware corporation; MICHAEL BEGO, an | Hearing Date:   January 30, 2004 |
| 16  individual; WILLIAM JAY ROSEMAN, an individual., | Time:           2:00 p.m. |
| 17 | Judge:          Hon. John A. Houston |
| 18              Defendants. | Courtroom:      11, Second Floor |
| | **ORAL ARGUMENT REQUESTED** |

19

20 | I, Colbern C. Stuart, declare and state as follows:

21 | 1.      I am an attorney licensed to practice in the State of California and before the

22 | United States District Court for the Southern District of California. I am the attorney of record

23 | for LINDOWS.COM, INC., plaintiff in this action, and am an attorney with the law firm of Paul,

24 | Hastings, Janofsky & Walker LLP of San Diego California. I have primary responsibility in my

25 | office for the handling and supervision of this matter. I have personal knowledge of all facts

26 | contained herein and, if called to testify, could and would competently testify thereto.

27 | 2.      After a discovery conference on August 14, 2003, Magistrate Judge Brooks

28 | ordered that Defendants produce five witnesses for deposition, including Mr. Bego.

3.      Attached hereto as Exhibit A is a true and correct copy of the August 14, 2003 discovery conference minutes where Magistrate Judge Brooks ordered that Defendants produce five witnesses for deposition, including Mr. Bego.

4.      Plaintiff promptly scheduled Mr. Bego's deposition to occur on September 18, 2003.

5.      Attached hereto as Exhibit B is a true and correct copy of the September 9, 2003 letter promptly scheduling Mr. Bego's deposition to occur on September 18, 2003.

6.      Defendants thereafter objected to Plaintiff's notice of intent to record the depositions stenographically and by videotape, taking the preposterous position that the depositions should take place off the record.

7.      Attached hereto as Exhibit C is a true and correct copy of the September 15, 2003 letter by Defendants objecting to Plaintiff's notice of intent to record the depositions.

8.      Plaintiff was again forced to seek a second discovery conference before Magistrate Judge Brooks, who on October 23, 2003 granted Plaintiff's request that the depositions be recorded stenographically and by videotape.

9.      Attached hereto as Exhibit D is a true and correct copy of the October 23, 2003 discovery conference minutes before Magistrate Brooks, who on granted Plaintiff's request that the depositions be recorded stenographically and by videotape.

10.      Only after these two discovery conferences did Defendants once again agree to make Mr. Bego available for deposition on October 29.

11.      Attached hereto as Exhibit E is a true and correct copy of the October 28, 2003 letter in which Defendants finally agreed to make Mr. Bego available for deposition on October 29.

12.      Despite this agreement, Mr. Bego refused to appear for deposition at the time agreed upon by counsel, causing Plaintiff's counsel to incur $169.80 in court reporter costs to make a record of Mr. Bego's nonappearance, and unnecessarily waste hours of attorney preparation time.

13.   Attached hereto as Exhibit F is a true and correct copy of the invoice for Legal Link San Diego court reporters for the Non-appearance of Michael Bego.

14.   Defendants' counsel's excuse for Mr. Bego's failure to appear (which was not communicated until after the time for his deposition had passed) was that Mr. Bego had an unexpected scheduling conflict which made it impossible for him to appear.  Defendants agreed to make Mr. Bego available "promptly" thereafter.

15.   Attached hereto as Exhibit G is a true and correct copy of the October 30, 2003 letter by Defendants' counsel's excusing Mr. Bego's failure to appear as a potential conflict of interest had arisen in defense counsel's joint representation of both Mr. Bego and other parties.

16.   Even though Defendants had not yet produced Mr. Bego for deposition, on November 10, 2003, Defendants jointly re-filed their Motion which was based solely on the declaration of Mr. Bego.

17.   Attached hereto as Exhibit H is a true and correct copy of the Notice of Renewed Motion to Compel Arbitration and Dismiss or Stay Action.

18.   After Plaintiff objected to Defendants' filing the motion to compel arbitration based upon a declaration from a witness they refused to produce, Defendants offered to make Mr. Bego available on November 20, 2003.

19.   Attached hereto as Exhibit I is a true and correct copy of the November 12, 2003 letter by Defendants arranging Mr. Bego to be available on November 20, 2003.

20.   Attached hereto as Exhibit J is a true and correct copy of the November 18, 2003 letter by Plaintiffs confirming defendants again offered to make Mr. Bego available on November 20, 2003.

21.   Plaintiff's counsel again began preparing for the deposition, but on the evening of November 19 (mere hours before Mr. Bego's re-scheduled deposition on the 20th), Defense counsel notified Plaintiff's counsel that Mr. Bego was again refusing to appear for deposition. This time counsel represented that Mr. Bego could not attend because of a potential conflict of interest that had arisen between Mr. Bego and the other co-defendants also represented by defense counsel, Mr. Robertson.

22.     Attached hereto as Exhibit K is a true and correct copy of the November 19, 2003 letter stating that Mr. Bego had again refused to appear for deposition.

23.     Plaintiff's counsel vehemently objected to this last-minute cancellation and further objected to Defendants continued prosecution of their Motion despite the fact that the sole witness supporting the Motion had repeatedly delayed the action by refusing to comply with court-ordered depositions.  Plaintiff's counsel demanded that Defendants withdraw the Motion and file an answer and compensate Lindows.com for costs and fees incurred because of the several delays.

24.     Attached hereto as Exhibit L is a true and correct copy of the November 20, 2003 letter by Plaintiffs' demanding that Defendants withdraw the Motion and file an answer and compensate Lindows.com for costs and fees incurred because of such delays.

25.     On November 24, 2003, Defense counsel notified Plaintiff's counsel that the conflict of interest between Bego and the remaining defendants was irresolvable and that Mr. Bego was seeking separate counsel.  Nevertheless, Mr. Bego agreed to make himself available for deposition on December 9.

26.     Attached hereto as Exhibit M is a true and correct copy of the November 24, 2003 letter by Defense counsel notifying Plaintiff's that the conflict of interest between Bego and the remaining defendants was irresolvable and that Mr. Bego was seeking separate counsel.

27.     Plaintiffs' counsel responded that because Mr. Bego had filed a motion while refusing to make himself available for deposition, the appropriate action would be for Defendants to withdraw the pending motion and promptly file an answer.

28.     Attached hereto as Exhibit N is a true and correct copy of the November 24, 2003 letter by Plaintiff's counsel stating that because Mr. Bego had filed a motion while refusing to make himself available for deposition, the appropriate response would be for Defendants to withdraw the pending motion and promptly file an answer.

29.     Attached hereto as Exhibit O is a true and correct copy of the December 2, 2003 letter by Defense counsel denying the request to withdraw the Motion to Compel Arbitration.

30.     Plaintiff's counsel nevertheless confirmed Plaintiff's intent to depose Mr. Bego on the date offered—December 9, 2003.

31.     Attached hereto as Exhibit P is a true and correct copy of the December 5, 2003 letter by Plaintiff's counsel confirming Plaintiff's intent to depose Mr. Bego on the date offered-- December 9, 2003.

32.     Late in the afternoon of December 8, 2003 (again, mere hours before Mr. Bego's twice-rescheduled December 9 deposition), Mr. Bego's new independent counsel, Mr. Edward Walton, telephoned Plaintiff's counsel to advise that Mr. Bego was once again refusing to be deposed citing difficulties in preparing.  Plaintiff's counsel again suggested that because defendants were consistently refusing to produce the single witness on whose declaration the pending motion to compel arbitration is based, Defendants should simply withdraw the motion, file an answer, and re-file the motion at a later date if appropriate.

33.     Attached hereto as Exhibit Q is a true and correct copy of the December 9, 2003 letter to Mr. Bego's new independent counsel, Mr. Edward Walton requesting that Defendants simply withdraw the motion, file an answer, and re-file the motion at a later date if appropriate.

34.     Defendants again refused.  Plaintiff's counsel advised of its intent to seek exclusionary sanctions relating to the refusal to produce Mr. Bego unless the Motion was withdrawn.

35.     Attached hereto as Exhibit R is a true and correct copy of the January 7, 2004 letter to Mr. Walton attempting to schedule the deposition of Mr. Bego.

36.     Attached hereto as Exhibit S is a true and correct copy of the January 14, 2004 letter to Mr. Walton advising him that Plaintiff will seek exclusion of Mr. Bego's declaration if Mr. Bego does not submit to deposition.

37.     Attached hereto as Exhibit T is a true and correct copy of the January 14, 2004 letter to Mr. Andrew Robertson advising that Mr. Bego continues to refuse to submit to deposition, asking Mr. Robertson to withdraw the Bego Declaration, and advising Mr. Robertson that if he does not withdraw the declaration, Plaintiff will seek to exclude it from evidence.

1       38.     Attached hereto as Exhibit U is a true and correct copy of the January 15, 2004

2 letter to Mr. Walton advising him Plaintiff will seek exclusionary sanctions for his failure to

3 produce Mr. Bego.

4       39.     Attached hereto as Exhibit V is a true and correct copy of Defendant Xandros,

5 Inc.'s response to Plaintiff's Request for Admission No. 27.

6       40.     Attached hereto as Exhibit W is a true and correct copy of Defendant LGP's

7 response to Plaintiff's Request for Admission No. 25.

8       41.     Attached hereto as Exhibit X is a true and correct copy of the deposition transcript

9 from the deposition of Mr. Berenstein on November 6, 2003.

10       42.     Attached hereto as Exhibit Y is a true and correct copy of the deposition

11 transcripts from the deposition of Mr. Roseman on October 29, 2003 and November 5, 2003.

12       43.     Attached hereto as Exhibit Z is a true and correct copy of the Promissory Note of

13 November 20, 2001.

14       44.     Attached hereto as Exhibit AA is a true and correct copy of the Promissory Note of

15 December 6, 2001.

16       45.     Attached hereto as Exhibit BB is a true and correct copy of the Promissory Note of

17 December 21, 2001.

18       I declare under penalty of perjury under the laws of the United States of America that the

19 forgoing is true and correct.

20       Executed this 16th day of January, 2004 at San Diego, California.

21

22                 Colbern C. Stuart III

23

24

25

26

27

28

MINUTES OF THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

LINDOW.COM v. XANDROS                    Case No. 02cv2460 BTM(RBB)

HON. RUBEN B. BROOKS        CT. DEPUTY VICKY LEE                    Rptr.

Attorneys

Plaintiffs                              Defendants

Colbern Stuart (present)                Andrew Robertson (present)
_____                 _____
_____                 _____

PROCEEDINGS:  __x__ In Chambers  _____  In Court  _____  Telephonic

A discovery conference was held.

The depositions of Defendant Michael Bego, Defendant William Roseman, and Mr.
Carmony shall be limited to two hours each.  The depositions of Mr.
Berenstein and the 30(b)(6) depositions for Defendants Xandros and LGP are
limited to one hour each.  The depositions should proceed telephonically
unless the parties agree to another procedure.  The subject matter of the
deposition is not limited to arbitrability of this dispute.

Plaintiff may obtain responses to ten requests for documents directed to a
particular party.  The requests are limited to the time period from August 1,
2001, through December 31, 2001.  The subject matter of the requests is
limited to the Strategic Alliance Agreement, promissory notes, side
agreements and similar items.

DATE:  August 14, 2003          IT IS SO ORDERED:  _____
                                                   Ruben B. Brooks,
                                                   U.S. Magistrate Judge
cc:  Judge Moskowitz                               INITIALS:  VL (mc/dl)  Deputy
     All Parties of Record

K:\COMMON\BROOKS\CASES\LINDOWS\MINUTES02.wpd

EXH A PG 1

Paul, Hastings, ⬛ & Walker LLP
3579 Valley Centre ⬛, San Diego, CA 92130
telephone 858-720-2500 / facsimile 858-720-2555 / internet www.paulhastings.com

**PaulHastings**

Atlanta
Beijing
Hong Kong
London
Los Angeles
New York
Orange County
San Diego
San Francisco
Stamford
Tokyo
Washington, D.C.

(858)720-2820
colestuart@paulhastings.com

September 9, 2003                                                                 45326.00004

VIA FACSIMILE AND U.S. MAIL

Andrew W. Robertson
LaBella & McNamara
401 West "A" Street
Suite 2300
San Diego CA 92101

Re:   *Lindows.com, Inc. v. Xandros, Inc., et al.*
       USDC Case No. 02 CV 2460 BTM(RBB)

Dear Mr. Robertson:

This will confirm your agreement to have all remaining documents delivered to this office
by end of this week, preferably by Wednesday, September 10, 2003, and that the
depositions of Messrs. Bego, Berenstein and Roseman will take place on September 18 or
19, 2003. The deposition will begin at 9:00 a.m. PST and continue until completion of
allotted time. If you disagree with any of the above, please contact me immediately.

Sincerely,

Colbern C. Stuart III
for PAUL, HASTINGS, JANOFSKY & WALKER LLP

EXH **B**  PG **8**

SAN/73418.1



# LA BELLA &
# MCNAMARA, LLP

September 15, 2003

Andrew W. Robertson
arobertson@labellamcnamara.com

*Via Facsimile and U.S. Mail*

Colbern C. Stuart, III
Paul Hastings Janofsky & Walker, LLP
12390 El Camino Real
San Diego, CA  92130

     Re:    *Lindows. com v. Xandros*
            Our File No. 1033.001

Dear Cole:

In light of the proceedings before Judge Moskovitz on Friday, we suggest to you that it is not appropriate to proceed with any further discovery until after the settlement meeting on October 30. The net of the hearing on Friday was that Defendants' motion is to be taken off calendar without prejudice to being renewed if the settlement meeting is not successful. As such, there is technically no motion pending. How do we justify Plaintiff continuing with discovery under the circumstances?

After the court hearing, you also suggested that you may wish to videotape the telephonic depositions which have have been scheduled for New York on September 18, 2003. In the event that such a suggestion was a serious one, I want to pass on our objection to any such procedure.

The basic premise of telephonic depositions is to reduce expense and simplify the procedure. That was certainly the concept put forth by Magistrate Brooks in suggesting that the requested depositions be brief and by telephone. We did not agree that such telephonic depositions could also be by videotape and we submit that videotaping was not contemplated by Magistrate Brooks.

We suggest that the appropriate and sensible approach at this point is to stay discovery pending the October 30 settlement meeting.

Sincerely,

Andrew W. Robertson

AWR:dgp

EXH **C** PG **9**

Los Angeles                                                  San Diego
TEL 619-696-9200  FAX 619-696-9299                             TEL 619-696-9200  FAX 619-696-9299
4705 LAUREL CANYON BLVD., SUITE 203 STUDIO CITY, CA 91607      www.labellamcnamara.com      401 WEST A STREET, SUITE 2300 SAN DIEGO, CA 92101

MINUTES OF THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

LINDOW.COM v. KANDROS                    Case No. 02cv2460 BEN(RBB)

HON. RUBEN B. BROOKS        CT. DEPUTY VICKY LEE                    Rptr.

Attorneys

                Plaintiffs                              Defendants

Colbern Stuart (present)                  Andrew Robertson (present)

_____          _____

_____          _____


PROCEEDINGS: _____ In Chambers   _____ In Court   __X__ Telephonic

A telephonic discovery conference was held.

The Court indicated that there was no prohibition to recording the
depositions previously ordered by stenographer or videographer.


DATE: October 23, 2003          IT IS SO ORDERED:  [signature]
                                                    Ruben B. Brooks,
                                                    U.S. Magistrate Judge
TO: Judge Moskowitz                          INITIALS: VL (mc/di) Deputy
    All Parties of Record

R:\COMMON\BROOKS\CASES\LINDOWS\MINUTES4.WPD          EXH D PG 10

10/30/2003 14:20 FAX 6196969269



# LA BELLA & MCNAMARA, LLP

October 28, 2003

Andrew W. Robertson
arobertson@labellamcnamara.com

*Via Facsimile*

Colbern C. Stuart, III
Paul Hastings Janofsky & Walker, LLP
12390 El Camino Real
San Diego, CA  92130

> Re:  *Lindows. com v. Xandros*
> Our File No. 1033.001
> <u>Scheduling – Depositions and Settlement Conference</u>

Dear Cole,

As discussed by phone, we are proceeding with the plan that Mr. Bego will be available at your New York offices for the telephonic deposition at noon EST in New York tomorrow followed by Messrs Roseman and Berenstein who will arrive at approximately 2:30 pm EST.

As also discussed, it has become unexpectedly unworkable for an appropriate representative of Defendants to be physically present in San Diego for the parties' proposed voluntary settlement conference on October 30, 2003 before Magistrate Brooks.  The Company had initially planned for Mr. Roseman to be present, but he is in the midst of his re-election campaign as the incumbent mayor of Carlstadt, New Jersey. As the campaign has unfolded, it is simply not feasible for him to make the trip to San Diego.

Mr. Berenstein would be Mr. Roseman's logical substitute, but he is scheduled for surgery on Friday October 31 and can not realistically be in San Diego the day before, particularly in light of the irregular travel situation in and out of San Diego due to the fires. Mr. Berenstein could, however, be available by telephone at the appointed hour on Thursday or in person on a date to be selected in the near future.

Given that this was to be a voluntary settlement conference, Defendants' motion to compel is now off calendar, and Lindows people are in San Diego, there is no prejudice to Lindows if the settlement discussions take place at a later date.

EXH **E** PG 11

Los Angeles                                                                                                 San Diego

TEL 419-496-9200  FAX 419-496-9289                                        TEL 419-496-9200  FAX 419-496-9269
4705 LAUREL CANYON BLVD., SUITE 305 STUDIO CITY, CA 91607    www.labellamcnamara.com    401 WEST A STREET, SUITE 1300 SAN DIEGO, CA 92101

10/30/2003 14:29 FAX 6199989103

## LA BELLA &
## MCNAMARA LLP

Mr. Colburn C. Stuart, III
October 28, 2003
Page 2


We have advised Magistrate Brook's office of the situation. We are prepared to proceed with Mr. Berenstein available by telephone if you would like and if Magistrate Brooks is agreeable.

Sincerely,

Andrew W. Robertson

LegaLink San Diego
550 West C Street
Suite 1440
San Diego, CA 92101   www.legalink.com

LEGALINK
A MERRILL COMPANY   GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

# INVOICE

| INVOICE NO. | DATE | JOB NUMBER |
|---|---|---|
| 19006738 | 11/14/2003 | 1905-1009880 |

| JOB DATE | REPORTER(S) | CASE NUMBER |
|---|---|---|
| 10/29/2003 | LNY | |

| CASE CAPTION |
|---|

Lindows vs. Xandros

| TERMS |
|---|

Due upon receipt

Cole Stuart
Paul, Hastings, Janofsky & Walker
3579 Valley Centre Drive
San Diego, CA 92130

NONAPPEARANCE OF WITNESS:
   Nonappearance of Michael Bego                                     169.80

ORIGINAL TRANSCRIPT OF:
   William Jay Roseman                                               837.70

                                        TOTAL  DUE  >>>>        1,007.50

LegaLink has a new logo and a new website! Visit www.legalink.com to see our new look
and all of the great services available to you.

TAX ID NO.: 33-0186987                              (858) 720-2500   Fax (858) 720-2555

*Please detach bottom portion and return with payment.*

Cole Stuart
Paul, Hastings, Janofsky & Walker
3579 Valley Centre Drive
San Diego, CA 92130

                                   Invoice No.:  19006738
                                   Date      :  11/14/2003
                                   TOTAL DUE  :    1,007.50


                                   Job No.   :  1905-1009880
                                   Case No.  :
                                   Lindows vs. Xandros

Remit To:   LegaLink San Diego
            550 West C Street, Suite 1440
            San Diego, CA 92101

                              EXH **F** PG 13

1

```
1

2                    UNITED STATES DISTRICT COURT

3                  SOUTHERN DISTRICT OF CALIFORNIA

4       ------------------------------------x

5       LINDOWS.COM, INC., a Delaware
        corporation,
6
                                    Plaintiff,
7                                            Case No. 02
                                             CV 2460 BTM(RBB)
8
                    -against-
9
        XANDROS, INC., a Delaware corporation;
10      LINUX GLOBAL PARTNERS, INC., a Delaware
        corporation; MICHAEL BEGO, an individual;
11      WILLIAM JAY ROSEMAN, an individual,

12                                  Defendants.

13      ------------------------------------x

14                                  October 29, 2003
                                    3:00 p.m.
15

16          Noticed deposition of MICHAEL BEGO, taken by

17      Plaintiff, pursuant to notice, at the offices of

18      Paul Hastings Janofsky & Walker LLP, 75 East 55th

19      Street, New York, New York, before Jack Finz, a

20      Certified Shorthand Reporter and Notary Public

21      within and for the State of New York.

22

23

24

25
```

EXH **F** PG 14

2

```
 1

 2    A P P E A R A N C E S:

 3        PAUL HASTINGS JANOFSKY & WALKER LLP
          Attorneys for Plaintiff
 4                12390 El Camino Real
                  San Diego, California 92130
 5
          BY:    COLBERN C. STUART III, ESQ.
 6

 7        LaBELLA & McNAMARA, LLP
          Attorneys for Defendants
 8                401 West "A" Street
                  San Diego, California 92101
 9
          BY:    ANDREW W. ROBERTSON, ESQ.
10

11    ALSO PRESENT:

12        FREDERICK BERENSTEIN

13        WILLIAM JAY ROSEMAN

14        JAMES T. BRADY, Videographer

15

16

17

18

19

20

21

22

23

24

25
```

3

1

2              MR. STUART:  This is Colbern C.

3   Stuart, counsel for plaintiff Lindows.com in this

4   action entitled Lindows.com against Xandros,

5   Inc., et al.  It is pending in the United States

6   District Court, Southern District of California,

7   Case No. 02 CV 2460 BTM(RBB).

8              Off the record and prior to this

9   deposition transcript being created, counsel for

10  defendants, Mr. Andy Robertson, and myself have

11  had a conversation.  Apparently one of the

12  witnesses who was noticed to appear today, Mr.

13  Michael Bego, is not able to attend this

14  deposition at the time and date noticed and

15  agreed upon by counsel.

16             We are going on the record to make a

17  record of his failure to appear and to preserve

18  all objections to Mr. Bego's failure to appear.

19             The history of Mr. Bego's appearance

20  and agreement to appear was based upon counsel's

21  representation at a hearing before Magistrate

22  Brooks at last week's telephonic hearing, at

23  which Mr. Robertson represented that defendants

24  would produce Mr. Bego actually before tomorrow's

25  settlement conference, and Mr. Bego has not yet

EXH **F** PG 16

4

1

2   been produced.

3               I want to make a note of Exhibit 3 --

4               MR. ROBERTSON:  So the record is

5   complete, that's 100 percent irrelevant.  Mr.

6   Bego is not here because he had schedule and

7   other difficulties.  He will be produced at a

8   suitable time and place in the very near future.

9   Today just didn't work for multiple reasons.

10              MR. STUART:  I would like to note for

11  the record Exhibit 3, which has been previously

12  marked, is the renotice of the deposition of

13  Michael Bego.

14              (Time noted:  3:05 p.m.)

15

16

17

18

19

20

21

22

23

24

25

5

1

2                  C E R T I F I C A T E

3    STATE OF NEW YORK   )

4                         : ss.

5    COUNTY OF NEW YORK   )

6

7            I, JACK FINZ, a Certified Shorthand

8    Reporter and Notary Public within and for the

9    State of New York, do hereby certify:

10           That I appeared to report the

11   deposition of MICHAEL BEGO and made a record of

12   the proceedings.

13           I further certify that I am not

14   related to any of the parties to this action by

15   blood or marriage, and that I am in no way

16   interested in the outcome of this matter.

17           IN WITNESS WHEREOF, I have hereunto

18   set my hand this ____ day of _____, 2003.

19

20                      _____

21                      JACK FINZ, C.S.R.

22

23

24

25

# LA BELLA &
# MCNAMARA, LLP

October 30, 2003

**Andrew W. Robertson**
arobertson@labellamcnamara.com

Honorable Judge Ruben B. Brooks
United States District Court
940 Front Street
San Diego, CA 92101-8926

    Re:   <u>Lindows.com vs. Xandros, Inc.</u>
         <u>Case No. CV 2460 BTM (RBB)</u>

Dear Magistrate Brooks:

    The undersigned abhors the exchange of tit-for-tat letters by counsel, but the letter delivered to you under date of October 29, 2003 by counsel for Plaintiff misstates the record as follows:

1. Defendants moved to compel arbitration in February, 2003 with the goal of expediting and reducing the expense of this dispute. Plaintiff has opposed the motion vigorously over the last nine months. Defendants have not yet been *required to even answer the Complaint.*

2. Defendants did, indeed, agree to participate in a voluntary settlement conference, and did, indeed, intend and desire to have a company spokesman travel from New York to be here. On October 28, 2003, Mr. Roseman, the person who had been designated, relayed to me that his re-election campaign for mayor of his town in New Jersey had heated up, and a family member was awaiting a liver transplant, and it was just unworkable to get to San Diego. His likely replacement, Rick Berenstein, was likewise unavailable because he had shoulder surgery set for Friday, October 31, 2003. We stand ready to participate – the only change is that the operative representatives can not get here in person.

EXH **6** PG 19

Los Angeles          San Diego

TEL 619-696-9200 FAX 619-696-9269          TEL 619-696-9200 FAX 619-696-9269

4705 LAUREL CANYON BLVD., SUITE 203 STUDIO CITY, CA 91607    www.labellamcnamara.com    401 WEST A STREET, SUITE 2300 SAN DIEGO, CA 92101

LA BELLA & 
MCNAMARA LLP

Hon. Judge Ruben B. Brooks
October 30, 2003
Page 2

3. I immediately advised Mr. Stuart and the Court of their unavailability.  By letter of October 28, 2003, copy attached, I explained the situation to Mr. Stuart.

4. At no time did Defendants tell Mr. Stuart that we "did not plan" to send a representative.  He was advised that both of our candidates had huge conflict situations, but could be available by phone.

5. Yesterday, October 29, 2003, Messrs. Roseman and Berenstein appeared in New York for depositions by videoconference.  Before Mr. Stuart completed the deposition of Roseman, he went off the record to propose that we now consider narrowing the disputes and have it <u>resolved by arbitration</u>.  We all agreed that the idea had potential, and the deposition was adjourned until next week so the parties could pursue such a solution.

6. The deposition of Mr. Bego, who is no longer employed by the Company, had also been scheduled for yesterday, but he advised me just prior that he had been unable to resolve some open issues with the Company and felt uncomfortable.  I advised him that if there were issues, I might also have a conflict which precluded my representing him and the Company.  I relayed all of this to Mr. Stuart.

7. At 11 a.m. today, October 29, 2003, I received by fax for the first time copies of a letter Mr. Stuart directed to the Court dated yesterday and a Settlement Letter Brief also dated yesterday.  The Settlement letter is inconsistent with and completely ignores the conversations held just last night in which Mr. Stuart proposed that we <u>stop</u> the depositions and consider an arbitration solution.  It also expressly ignores Mr. Stuart's own position of last night that until there is an audit of Lindows' sales using Defendants' software, it would be difficult to have a sensible settlement conversation.  The Letter Brief proposes no settlement – it just demands all relief under the Complaint.

Defendants appreciate the Court's willingness to assist in a voluntary settlement conference.  Unfortunately, the appropriate representatives for Defendants have encountered unexpected hurdles in being here personally.

Sincerely,

DICTATED BUT NOT READ

Andrew W. Robertson

cc: Colburn Stuart

EXH G PG 20

1 | LA BELLA & McNAMARA LLP
THOMAS W. McNAMARA (SBN 127280)
2 | ANDREW W. ROBERTSON (SBN 062541)
401 West "A" Street, Suite 2300
3 | San Diego, California 92101
(619) 696-9200
4 |
Attorneys for Defendants XANDROS, INC.; LINUX GLOBAL
5 | PARTNERS, INC.; MICHAEL BEGO; WILLIAM JAY
ROSEMAN
6 |

7 |

8 | UNITED STATES DISTRICT COURT

9 | SOUTHERN DISTRICT OF CALIFORNIA

10 |

11 | LINDOWS.COM, INC., a Delaware ) Case No.: 02 CV 2460 JAH (RBB)
corporation, )
12 | )
Plaintiff, ) NOTICE OF RENEWED MOTION TO
13 | ) COMPEL ARBITRATION AND DISMISS
v. ) OR STAY ACTION
14 | )
XANDROS, INC., a Delaware corporation; )
15 | LINUX GLOBAL PARTNERS, INC., a )
Delaware corporation; MICHAEL BEGO, )
16 | an individual; WILLIAM JAY ROSEMAN, ) Date:    January 9, 2004
an individual, ) Time:    2:00 p.m.
17 | ) Courtroom: F, 1st Floor
Defendants. ) Judge:   Hon. John A. Houston
18 | )
)
19 | _____ )

20 |

21 | TO PLAINTIFF LINDOWS.COM AND ITS ATTORNEYS OF RECORD:

22 |    PLEASE TAKE NOTICE that on January 9, 2004 at 2:00 p.m. in Courtroom F,

23 | 1st Floor, of the United States District Court, Southern District of California, located at

24 | 880 Front Street, San Diego, California 92101, Defendants XANDROS, INC.; LINUX

25 | GLOBAL PARTNERS, INC.; MICHAEL BEGO; and WILLIAM JAY ROSEMAN

26 | ("Defendants") will renew their previous motion, filed February 19, 2003, for an order

27 | compelling Plaintiff Lindows.com ("Plaintiff") to submit its claims to binding arbitration.

28 | Defendants further request that this action be dismissed, or in the alternative, stayed

02-CV-2460 (JAH)
Notice of Renewed Motion to Compel
Arbitration and Dismiss or Stay Action

EXH H  PG 21

1   pending such arbitration.

2       This motion is made upon the grounds that Plaintiff is a party to an agreement

3   which contains a dispute resolution provision which provides that the claims raised in

4   Plaintiff's Complaint be resolved through arbitration.

5       This motion is made pursuant to Federal Rule of Civil Procedure 12(b)(1) and

6   the Federal Arbitration act, 9 U.S.C. §§ 1, et seq., and will be based on this Notice of

7   Renewed Motion, the Memorandum of Points and Authorities and the Declaration of

8   Michael Bego filed February 19, 2003 and the papers, records and documents on file

9   in this matter and such oral and documentary evidence as may be presented at the

10  hearing on this motion.

11      Defendants previously moved for arbitration by a motion filed February 19,

12  2003. Following oral argument on May 7, 2003, the Court indicated that it would

13  require a brief evidentiary hearing and continued the motion for that purpose. At a

14  hearing on September 12, 2003, the Court advised counsel that since the motion had

15  not been ruled on within six months and requested that counsel stipulate to the

16  withdrawal of the motion without prejudice to its being re-filed.

17      By a Stipulation and Order filed and entered September 18, 2003, a copy of

18  which is attached to this Notice as Exhibit A, the parties stipulated and the Court

19  ordered that Defendants' motion to compel arbitration be withdrawn without prejudice

20  to its re-filing and set November 10, 2003 as the date by which Defendants were to

21  respond to the First Amended Complaint or re-file their motion to compel arbitration.

22

23

24

25

26

27

28

02-CV-2460 (JAH)
Notice of Renewed Motion to Compel
Arbitration and Dismiss or Stay Action

EXH __H__ PG __22__

1      By an Order dated October 21, 2003, this case was transferred from Hon.

2  Barry T. Moskowitz to Hon. John A; Houston.

3

4  DATED: November 10, 2003        La BELLA & McNAMARA, LLP

5                        THOMAS W. MCNAMARA

6                        ANDREW W. ROBERTSON

7                        By

8                        Andrew W. Robertson

                            Attorneys for Defendants XANDROS,
9                        INC.; LINUX GLOBAL  PARTNERS,
                            INC.; MICHAEL BEGO; WILLIAM JAY
                            ROSEMAN

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

EXH **H** PG 23

02-CV-2460 (JAH)
Notice of Renewed Motion to Compel
Arbitration and Dismiss or Stay Action

# Exhibit A

1  COLBERN C. STUART, III (SBN 177897)
   JAMES P. CONLEY (SBN 216639)
2  PAUL, HASTINGS, JANOFSKY & WALKER LLP
   12390 El Camino Real
3  San Diego, CA  92130
   Telephone: (858) 720-2500
4  Facsimile:  (858) 720-2555

5  Attorneys for Plaintiff
   LINDOWS.COM, INC.

6

7

8              UNITED STATES DISTRICT COURT

9             SOUTHERN DISTRICT OF CALIFORNIA

10

11  LINDOWS.COM, INC., a Delaware        CASE NO. 02 CV 2460 BTM (RBB)
    corporation,
12                                       STIPULATION AND [PROPOSED]
                  Plaintiff,             ORDER REGARDING MOTION TO
13                                       COMPEL ARBITRATION AND DISMISS
          vs.                            OR STAY ACTION
14
    XANDROS, INC., a Delaware
15  corporation; LINUX GLOBAL
    PARTNERS, INC., a Delaware
16  corporation; MICHAEL BEGO, an
    individual; WILLIAM JAY ROSEMAN,
17  an individual,

18                Defendants'.

19

20       Pursuant to the September 12, 2003 Status Hearing, the parties hereto

21  LINDOWS.COM, INC., XANDROS, INC., LINUX GLOBAL PARTNERS, INC., MICHAEL

22  BEGO, and WILLIAM JAY ROSEMAN by and through their respective counsel hereby

23  submit this Stipulation and [Proposed] Order Regarding Defendants' Motion to Compel

24  Arbitration and Dismiss or Stay Action:

25       1.      WHEREAS Plaintiff Lindows.com, Inc. ("Plaintiff"), filed its Complaint on

26  December 13, 2002;

27

28  C:\Documents and Settings\cstuart\Local Settings\Temporary          02 CV 2460 BTM(RBB)
    Internet Files\OLK263\79(16v1.DOC                i

2.    WHEREAS Defendants' Xandros, Inc., Linux Global Partners, Inc., Michael Bego, and William Jay Roseman ("Defendants'") responded to the Complaint on February 19, 2003 with a Notice of Motion and Motion to Compel Arbitration and Dismiss or Stay Action;

3    WHEREAS the Court heard oral argument regarding Defendants' Motion to Compel Arbitration and Dismiss or Stay Action on May 5, 2003;

5.    WHEREAS on May 16, 2003 the Court set a further evidentiary hearing on Defendants' Motion to Compel Arbitration and Dismiss or Stay Action for July 14, 2003;

6.    WHEREAS the parties thereafter stipulated, and the Court orded, that the July 14, 2003 evidentiary hearing be continued until September 12, 2003;

7.    WHEREAS on August 14, 2003, the parties attended a discovery conference before Hon. Ruben B. Brooks, Magistrate Judge, who, at the request of the parties, set a Settlement Conference for October 30, 2003;

8.    WHEREAS prior to and at the September 12, 2003 Status Conference/Evidentiary Hearing, the parties advised the Court of their mutual desire to devote resources toward settlement of this matter rather than the merits of Defendants' Motion in hopes that an informal resolution may be reached at the October 30, 2003 Settlement Conference;

9.    WHEREAS the Court has set a Status Conference for Tuesday, November 11, 2003 at 11:45 a.m., at, or prior to which the parties will advise the Court of the result of the October 30, 2003 Settlement Conference and whether there remains a need for further motion practice;

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and among all parties by and through their counsel of record as follows:

1.    Defendants' pending Motion to Compel Arbitration and Dismiss or Stay Action is hereby withdrawn without prejudice to Defendants' re-filing said motion;

C:\Documents and Settings\stuart\Local Settings\Temporary Internet Files\OLK3\17916v1.DOC                    2                    02 CV 2460 BTM(RBB)

EXH __H__ PG __26__

1

2

3

      2.     Defendants' shall have up to and including November 10, 2003 to respond

to Plaintiff's First Amended Complaint or to re-file the Notice of Motion and Motion to Compel

Arbitration and Dismiss or Stay Action as permitted under Federal Rules of Civil Procedure.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXH <u>H</u> PG 27

DATED: September 16, 2003          PAUL, HASTINGS, JANOFSKY & WALKER LLP

By: _____
                                      COLBERN C. STUART III

Attorneys for Plaintiff
LINDOWS.COM, INC.

DATED: September ___, 2003          La BELLA & McNAMARA, LLP

By: _____
                                      ANDREW W. ROBERTSON

Attorneys for Plaintiff
XANDROS, INC.; LINUX GLOBAL PARTNERS, INC.;
MICHAEL BEGO; and WILLIAM JAY ROSEMAN

## ORDER

IT IS SO ORDERED. that the Stipulation is approved. The pending
motion to compel arbitration shall be taken off calendar as
withdrawn, without prejudice as set forth herein

DATED: September 17, 2003          _____
                                   Honorable, Barry Ted Moskowitz
                                   United States District Court Judge

C:\Documents and Settings\cstuart\Local Settings\Temporary
Internet Files\OLK6\TD946v1.DOC

4

02 CV 2460 BTM(RBB)

EXH **H** PG 28

1    DATED: September 16, 2003          PAUL, HASTINGS, JANOFSKY & WALKER LLP

2

3                                       By: _____

4                                           COLBERN C. STUART III

5                                       Attorneys for Plaintiff
                                        LINDOWS.COM, INC.

6

7    DATED: September 16, 2003          La BELLA & McNAMARA, LLP

8

9                                       By: _____

10                                          ANDREW W. ROBERTSON

11                                      Attorneys for Plaintiff
                                        XANDROS, INC.; LINUX GLOBAL PARTNERS, INC.;

12                                      MICHAEL BEGO;  and WILLIAM JAY ROSEMAN

13

14                                      ORDER

15   IT IS SO ORDERED.

16

17   DATED: September ___, 2003

18                                      _____
                                        Honorable, Barry Ted Moskowitz
19                                      United States District Court Judge

20

21

22

23

24

25

26

27

28

C:\Documents and Settings\stuart\Local Settings\Temporary          4                    02 CV 2460 BTM(RBB)
Internet Files\OLK2\7391.6v1.DOC

EXH __H__ PG __39__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

LINDOWS.COM, INC., a Delaware corporation,    )   Case No.: 02 CV 2460 JAH (RBB)
                                              )
                    Plaintiff,                )
                                              )
        v.                                    )
                                              )   DECLARATION OF SERVICE
XANDROS, INC., a Delaware corporation; LINUX  )
GLOBAL PARTNERS, INC., a Delaware             )
corporation; MICHAEL BEGO, an individual;     )   Person served:  Counsel for Plaintiff
WILLIAM JAY ROSEMAN, an individual,           )
                                              )   Date served:    November 10, 2003
                    Defendants.               )
                                              )
_____)

I, the undersigned, declare under penalty of perjury that I am over eighteen years of age and not a party to this action; that I served the above-named person the following documents: NOTICE OF RENEWED MOTION TO COMPEL ARBITRATION AND DISMISS OR STAY ACTION in the following manner (check one):

1)    _____By personally delivering copies to the person served.

2)    _____By causing copies to be delivered, during usual office hours, to the office of the person served at the address listed below and left with the person who apparently was in charge.

3)    _____By leaving copies at the dwelling house, usual place of abode, or usual place of business of the person served in the presence of a competent member of the household or a person apparently in charge of his office or place of business, at least 18 years of age, who was informed of the general nature of the papers, and thereafter mailing (by first-class mail, postage prepaid) copies to the person served at the place where the copies were left.

4)    __/__By placing a copy in a separate envelope, with postage fully prepaid, for each address named below and depositing each in the U.S. Mail at San Diego, California on November 10, 2003.
          Colburn Stuart, Esq.
          Paul Hastings Janofsky & Walker
          3579 Valley Centre Drive
          San Diego, CA  92130

5)    __/__By causing such document to be transmitted by facsimile machine to the office(s) of the parties indicated below. The facsimile machine used complied with Rule 2003 and no error was reported by the machine.

          Colburn Stuart, Esq.
          Paul Hastings Janofsky & Walker
          3579 Valley Centre Drive
          San Diego, CA  92130
          Tel:  (858) 720-2500
          Fax:  (858) 720-2555

Executed on November 10, 2003, at San Diego, California.

                                        _____
                                        Annie S. Parrish

1

Exh H Pg 30

# LA BELLA & MCNAMARA, LLP

November 12, 2003

Andrew W. Robertson
arobertson@labellamcnamara.com

*Via Facsimile and US Mail*
Colbern C. Stuart, III, Esq.
Paul, Hastings, Janofsky & Walker, LLP
3579 Valley Centre Drive
San Diego, CA  92130

Re:   *Lindows. com v. Xandros*
Our File No. 1033.001

Dear Cole:

We write to bring you current on the following:

1. **Michael Bego Deposition.** Mr. Bego has now provided us a date of Thursday November 20, 2003 at 4pm EST at the Paul Hastings office in New York City.  Please advise if that is acceptable.

2. **Sales Audit.** The Company designates Matranga & Correia of San Diego to perform the sales audit of Lindows sales pursuant to the SAA. The Matranga firm is located at 4180 La Jolla Village Drive, Suite 470, La Jolla, CA.  Joe Matranga will be the partner in charge. Please advise when he may commence. It would be helpful if the Company first delivered to us its own internal summary of sales.

3. **Cap Charts.** During his deposition, Mr. Roseman, identified a document he referred to as a "Cap Chart" which would reflect stock ownership in Xandros and LGP. The Company advises that it will deliver such charts by week's end – upon receipt, I will provide copies to you.

Sincerely,

Andrew W. Robertson

AWR:jch

Paul, Hastings, Ja         Walker LLP
3579 Valley Centre         an Diego, CA 92130
telephone 858-720-2500 / facsimile 858-720-2555 / internet www.paulhastings.com

**ıulHastings**

Atlanta
Beijing
Hong Kong
London
Los Angeles
New York
Orange County
San Diego
San Francisco
Stamford
Tokyo
Washington, D.C.

(858)720-2820
colestuart@paulhastings.com

November 18, 2003                                              43326.00004

VIA FACSIMILE AND U.S. MAIL

Andrew W. Robertson
LaBella & McNamara
401 West "A" Street, Suite 1150
San Diego CA 92101

Re:    *Lindows.com v. Xandros, Inc., et al.*
       USDC Case No. 02 CV 2460 JH(RBB)

Dear Mr. Robertson:

This will confirm that we are available to take the videotaped deposition of your client
Michael Bego on Thursday, November 20, 2003 at 4:00 Eastern in our New York office.
Please direct Mr. Bego to inform the receptionist he is attending a deposition in the case
when he arrives.

This will also notify you that I have yet to receive the "cap sheets" or stock certificates
which you and your client agreed to produce by last Friday, November 14, 2003. Please
produce these items before Mr. Bego's deposition or we will have no choice but to raise
the issue with Magistrate Brooks.

Regarding Xandros' request to conduct an audit of Lindows.com's sales receipts, my client
has requested that Xandros follow the procedure for accomplishing the audit as provided
in paragraph 4.6 of the Strategic Alliance Agreement.

Please call with any questions.

Sincerely,

Colbern C. Stuart III
for PAUL, HASTINGS, JANOFSKY & WALKER LLP

# LA BELLA &
## MCNAMARA, LLP

November 19, 2003

Andrew W. Robertson
arobertson@labellamcnamara.com

*Via Facsimile and U.S. Mail*

Colbern C. Stuart, III
Paul Hastings Janofsky & Walker, LLP
12390 El Camino Real
San Diego, CA 92130

Re:   *Lindows. com v. Xandros*
      Michael Bego Deposition

Dear Cole:

I have received a message from Michael Bego that he can not be available for a deposition tomorrow. As we reported previously, he is no longer employed by the Company and there remain some open issues between them. Until those issues are resolved, he is not comfortable proceeding and there exists the possibility of a conflict between him and the Company which could make our representation of him inappropriate.

We will secure alternative dates and pass them on to you.

Sincerely,

Andrew W. Robertson

AWR:ap

EXH **K** PG 33

Paul, Hastings, ⬤ & Walker LLP
3579 Valley Cen⬤, San Diego, CA 92130
telephone 858-720-⬤00 / facsimile 858-720-2555 / internet www.paulhastings.com

# .aulHastings

Atlanta
Beijing
Hong Kong
London
Los Angeles
New York
Orange County
San Diego
San Francisco
Stamford
Tokyo
Washington, D.C.

(858)720-2820
colestuart@paulhastings.com

November 20, 2003                                                    45326.00004

VIA FACSIMILE AND U.S. MAIL

Andrew W. Robertson
LaBella & McNamara
401 West "A" Street, Suite 1150
San Diego CA 92101

Re:     *Lindows.com v. Xandros, Inc., et al.*
        USDC Case No. 02 CV 2460 JH(RBB)

Dear Mr. Robertson:

We received yesterday evening the facsimile notice that Mr. Bego is refusing to appear at
his deposition scheduled for today. This is the third occasion Mr. Bego has refused to
appear at the time and date you and he had agreed to appear and the most recent of over a
dozen similar discovery delays attempted by your clients. As a result of these repeated
failures to appear or last-minute cancellations, my client has incurred unnecessary costs
and attorney's fees in connection with Mr. Bego's actions and has been prevented from
conducting the discovery ordered by both Judge Moskowitz and Magistrate Brooks.

We fail to understand your explanation for your failure to produce Mr. Bego--while you
claim that "there exists the possibility of a conflict between him and the Company which
could make our representation of him inappropriate", just last week you filed a motion on
behalf of *all* defendants, including Mr. Bego, in which you asserted that you represented
Mr. Bego. Moreover, the "potential conflict" excuse given in your November 19 letter is
the same excuse you gave in your last refusal to produce Mr. Bego in your letter of
October 30 (see attached). It therefore appears that you never in fact resolved the conflict
you first identified in your letter of October 30, but nevertheless re-filed Defendants'
motion to dismiss which relies on the declaration of the very witness you are refusing to
produce.

Your attempt to secrete Mr. Bego while at the same time filing a motion based solely on
his testimony is inappropriate and a direct violation of both Judge Moskowitz's and
Magistrate Brooks' orders in this regard. As you are refusing to produce Mr. Bego, we
demand that you immediately withdraw your motion to dismiss and the declaration of Mr.
Bego on which it is based. Further, we demand that you compensate Lindows.com for
your client's repeated failure and refusal to appear at deposition. Lindows.com has
presently expended in excess of $15,000 in costs and fees because of Mr. Bego's repeated
refusal to appear, delays, and cancellations.

EXH **L** PG 34

Paul*Hastings*

Andrew W. Robertson
November 20, 2003
Page 2

If we have not received a satisfactory reply from you by Monday, November 24, we will file a motion for sanctions against all defendants with the Court.

In response to your second letter of November 19, please see my facsimile to you of yesterday requesting that your client comply with the requirements of the Strategic Alliance Agreement regarding the audit. I am not authorized to act as an agent on Lindows.com's behalf regarding the audit. I would therefore suggest that your client contact them directly pursuant to the relevant sections of the Agreement.

Sincerely,

Colbern C. Stuart III
for PAUL, HASTINGS, JANOFSKY & WALKER LLP

Enclosure

SAN/78109.1

EXH L PG 35

## LA BELLA & MCNAMARA, LLP

November 24, 2003

Andrew W. Robertson
arobertson@labellamcnamara.com

*Via Facsimile and US Mail*

Colbern C. Stuart, III, Esq.
Paul, Hastings, Janofsky & Walker, LLP
3579 Valley Centre Drive
San Diego, CA  92130

    Re:   *Lindows. com v. Xandros*
         Our File No. 1033.001

Dear Cole:

Michael Bego and the Company have both confirmed to us that there exists an unresolved dispute between the Company and Mr. Bego. Due to that unresolved conflict, this will firm will not represent Mr. Bego going forward.

Mr. Bego has authorized us to report to you that he can be available for the deposition by videoconference on either December  8 or 9, 2003 at 5:30 pm EST at the Paul, Hastings office in New York. In the meantime, he will secure new counsel. He has also told us that he will secure new counsel promptly and will do the deposition earlier, if at all possible.

Sincerely,

Andrew W. Robertson

Andrew W. Robertson

AWR:ap

EXH **M** PG **36**

**aulHastings**

Paul, Hastings, ___y & Walker ___
1579 Valley Cen___ ___e, San Diego, CA 92130
telephone 858-72___-___00 / facsimile 858-720-2555 / internet www.paulhastings.com

Atlanta
Beijing
Hong Kong
London
Los Angeles
New York
Orange County
San Diego
San Francisco
Stamford
Tokyo
Washington, D.C.

(858)720-2820
colestuart@paulhastings.com

November 24, 2003

45326.00004

VIA FACSIMILE AND U.S. MAIL

Andrew W. Robertson
LaBella & McNamara
401 West "A" Street, Suite 1150
San Diego CA 92101

Re:   *Lindows.com v. Xandros, Inc., et al.*
      USDC Case No. 02 CV 2460 JH(RBB)

Dear Mr. Robertson:

We understand from your letter of this morning that you no longer represent Mr. Bego.
Please advise us of Mr. Bego's contact information or his current counsel as soon as
possible so that we may communicate with him.

We note that your letter fails to respond to our demand that your clients withdraw their
pending motion to dismiss. We believe that Mr. Bego's last-minute decision to retain
separate counsel further supports this demand. As I indicated, Mr. Bego's numerous
cancellations and failure to appear at his scheduled deposition have made it impossible for
Plaintiff to obtain the discovery ordered by Judge Moskowitz and Magistrate Judge
Brooks. We therefore reiterate our demand that your remaining clients withdraw the
motion to dismiss, which is based solely upon Mr. Bego's declaration, whom your clients
and former client have repeatedly failed and refused to produce.

Please be advised that unless your clients withdraw the pending motion and promptly file
an answer, we will move the court to exclude Mr. Bego's declaration as sanctions for his
repeated failures to appear.

EXH **N** PG 37

Paul*Hastings*

Andrew W. Robertson
November 24, 2003
Page 2

If you decline this request we would request that you be available to meet and confer this week in order to permit us to file the motion in a timely manner.

Sincerely,

Colbern C. Stuart III
for PAUL, HASTINGS, JANOFSKY & WALKER LLP

Enclosure

EXH __N__ PG 38

SAN/73320.1



# LA BELLA & MCNAMARA, LLP

December 2, 2003

Andrew W. Robertson
arobertson@labellamcnamara.com

*Via Facsimile and US Mail*

Colbern C. Stuart, III, Esq.
Paul, Hastings, Janofsky & Walker, LLP
3579 Valley Centre Drive
San Diego, CA 92130

Re:   *Lindows. com v. Xandros*
      Our File No. 1033.001

Dear Cole:

Michael Bego has authorized us to relate to you that December 9, 2003 at 4:30 p.m. EST is an available date for his teleconference deposition, and that he expects to have new counsel in place in the next day or two, such that he can proceed with the deposition on December 9, 2003. We have advised him that it is important that he resolve the representation issue promptly and that he do everything possible to complete the deposition on December 9, 2003.

Your recent suggestion that Defendants withdraw their motion to compel arbitration is respectfully denied. The motion was well-taken when it was originally filed on February 19, 2003 and remains well-taken after being re-filed pursuant to the arrangement set forth in the Stipulation and Order filed September 18, 2003. The fact that Mr. Bego is now invoking his right to retain separate counsel has no impact on the merits of the motion. You will have a full opportunity to examine him on his Declaration at his deposition.

Sincerely,

Andrew W. Robertson

AWR:ap

401 West "A" Street, Suite 1150 ♦ San Diego, CA 92101
(619) 696-9200 ♦ (619) 696-9269 (FAX)

EXH **O** PG 39

Paul, Hastings, J████ & Walker LLP
3579 Valley Centr█████ San Diego, CA 92130
telephone 858-720-█████ / facsimile 858-720-2555 / internet www.paulhastings.com

ɔulHastings

Atlanta
Beijing
Hong Kong
London
Los Angeles
New York
Orange County
San Diego
San Francisco
Stamford
Tokyo
Washington, D.C.

(858)720-2920
colestuart@paulhastings.com

December 5, 2003                                                    45326.00004

VIA FACSIMILE AND U.S. MAIL

Andrew W. Robertson
LaBella & McNamara
401 West "A" Street, Suite 1150
San Diego CA 92101

Re:    *Lindows.com v. Xandros, Inc., et al.*
       USDC Case No. 02 CV 2460 JH(RBB)

Dear Mr. Robertson:

Per your most recent letter, this will confirm that Mr. Bego will be deposed on Tuesday,
December 9, 2003, at 4:30 EST at our New York offices. We will be conducting the
deposition via videoconference as with Mr. Roseman and Mr. Berenstein. Please ask Mr.
Bego's current counsel to contact me as soon as possible to confirm Mr. Bego will be
attending and to obtain his current counsel's contact information.

Sincerely,

Colbern C. Stuart III
for PAUL, HASTINGS, JANOFSKY & WALKER LLP

EXH **P** · PG 40

SAN/799061.1

Paul, Hastings, J...... & Walker LLP
3579 Valley Centr...... San Diego, CA 92130
telephone 858-720-..... / facsimile 858-720-2555 / internet www.paulhastings.com

# ℸaul Hastings

Atlanta
Beijing
Hong Kong
London
Los Angeles
New York
Orange County
San Diego
San Francisco
Stamford
Tokyo
Washington, D.C.

(858)720-2820
colestuart@paulhastings.com

December 9, 2003                                                          45326.00004

VIA FACSIMILE AND U.S. MAIL

Edward C. Walton
Walton & Associates
402 West Broadway, Suite 1210
San Diego CA 92101

Re:    *Lindows.com v. Xandros, Inc., et al.*
       USDC Case No. 02 CV 2460 JH(RBB)

Dear Mr. Walton:

Thank you for speaking with me yesterday regarding your client's scheduled deposition
today.  I understand that you are advising that Mr. Bego will not be appearing for his
deposition though Mr. Robertson advised last week that he would be available today.  As
we discussed, the deposition of your client was specifically ordered by Magistrate Brooks
as well as Judge Moskowitz *months* ago.  Nevertheless, Mr. Bego has failed or refused to
appear for deposition on four separate occasions while represented by former counsel, in
one case causing my client to incur court reporter fees and costs due to his refusal to
attend.  We discussed that this situation is particularly problematic as Mr. Bego and other
defendants have filed a motion to dismiss the action which is solely based on your client's
declaration, which your client's former counsel has refused to withdraw despite Mr.
Bego's refusal to be available for deposition.

Your client's repeated refusal to comply with two court orders is contemptuous and
sanctionable conduct which causes obvious prejudice to Lindows.com.  I advised you that
unless Defendants agree to withdraw the pending motion to dismiss as well as Mr. Bego's
declaration and promptly file an answer in this action, I have no choice but to move the
court for exclusionary and monetary sanctions.  I appreciate your agreement to respond to
my suggestion as soon as you can speak with your client.  I would appreciate your
response by no later than Thursday of this week.

SAN/79235.1                                     EXH **Q** PG 41

Edward C. Walton
December 9, 2003
Page 2

. look forward to your reply.

Sincerely,

Colbern C. Stuart III
for PAUL, HASTINGS, JANOFSKY & WALKER LLP

LN/79225.1

Paul, Hastings, Janofsky & Walker LLP
3579 Valley Centre Drive, San Diego, CA 92130
telephone 858-720-2500 / facsimile 858-720-2555 / internet www.paulhastings.com

**Paul Hastings**

Atlanta
Beijing
Hong Kong
London
Los Angeles
New York
Orange County
San Diego
San Francisco
Stamford
Tokyo
Washington, D.C.

(858)720-2820
colestuart@paulhastings.com

January 7, 2004                                                       45326.00004

VIA FACSIMILE AND U.S. MAIL

Edward C. Walton
Walton & Associates
402 West Broadway, Suite 1210
San Diego CA 92101

Re:   *Lindows.com v. Xandros, Inc., et al.*
      USDC Case No. 02 CV 2460 JH(RBB)

Dear Mr. Walton:

I have not heard from you regarding dates on which your client is available for deposition.
As my client's answer is due next week, I would appreciate your confirming that your
client is available for deposition on either Monday or Tuesday or next week. As you are
aware, we have a standing agreement that the deposition will be recorded and will occur
by videoconference link between our San Diego and New York office. I believe Mr. Bego
has the address of our New York office. Please feel free to contact me if you need further
instructions.

I look forward to hearing from you.

Sincerely,

Colbern C. Stuart III
for PAUL, HASTINGS, JANOFSKY & WALKER LLP

SAN/809101

EXH **R** PG 43

Paul*Hastings*

Paul, Hastings, Ja̲̅̅̅̅ky & Walker LLP
3579 Valley Centre Drive, San Diego, CA 92130 .
telephone 858-720-2500 / facsimile 858-720-2555 / internet www.paulhastings.com

Atlanta
Beijing
Hong Kong
London
Los Angeles
New York
Orange County
San Diego
San Francisco
Stamford
Tokyo
Washington, D.C.

(858)720-2820
colestuart@paulhastings.com

January 14, 2004

45326.00004

VIA FACSIMILE AND U.S. MAIL

Edward C. Walton
Walton & Associates
402 West Broadway, Suite 1210
San Diego CA 92101

Re:     *Lindows.com v. Xandros, Inc., et al.*
        USDC Case No. 02 CV 2460 JH(RBB)

Dear Mr. Walton:

I have not heard a response from you since my letter to you of last week requesting that
you advise me of dates on which your client is available for deposition. I informed you
that I was available Monday or Tuesday of this week. I have also left two messages with
your office requesting that you return my call. As of today, Wednesday, January 14, 2004,
you have not responded to my request.

You are aware that Judge Houston granted Defendants' joint request for a continuance of
the pending motion hearing date for the sole purpose of permitting Mr. Bego to complete
his arrangements with you and so that his deposition can be taken. Yet your client has
refused to make himself available for deposition.

As you are aware, Plaintiff must file an opposition to Defendants' motion this week. I can
only assume that your client's repeated failure to respond to my several requests indicates
that he is no longer willing to submit to deposition. If this is not the case, please advise
immediately of a date on which he will be available.

You understand that your client's refusal to submit for deposition will necessitate that I
move to exclude your client's testimony as exclusionary sanctions under F.R.C.P. Rule 37.
Therefore, unless your client agrees to withdraw his earlier-filed declaration, I will have no
choice but to request that the Court strike your client's declaration.

EXH **5** PG ⁴⁴

SAN/81432.1

Paul*Hastings*

Edward C. Walton
January 14, 2004
Page 2

I look forward to your prompt reply.

Sincerely,

Colbern C. Stuart III
for PAUL, HASTINGS, JANOFSKY & WALKER LLP

SAN/81432.1

**Paul**Hastings

Paul, Hastings, Janofsky & Walker LLP
3579 Valley Centre Drive, San Diego, CA 92130·
telephone 858-720-2500 / facsimile 858-720-2555 / internet www.paulhastings.com

Atlanta
Beijing
Hong Kong
London
Los Angeles
New York
Orange County
San Diego
San Francisco
Stamford
Tokyo
Washington, D.C.

(858)720-2820
colestuart@paulhastings.com

January 14, 2004                                                                    45326.00004

VIA FACSIMILE AND U.S. MAIL

Andrew W. Robertson
LaBella & McNamara
401 West "A" Street, Suite 1150
San Diego CA 92101

Re:     *Lindows.com v. Xandros, Inc., et al.*
        USDC Case No. 02 CV 2460 JH(RBB)

Dear Mr. Robertson:

As you are likely aware, Mr. Bego continues to fail and refuse to comply with the
deposition notices and orders to submit to deposition by Judge Moskowitz and Magistrate
Judge Brooks. Judge Houston granted Defendants' joint request for a continuance of the
pending motion hearing date based upon Defendants' representation that Mr. Bego
needed additional time to complete his arrangements with new counsel so that his
deposition can be taken. I can only assume that Mr. Bego's continued intransigence
indicates that he is no longer willing to submit to deposition.

As your motion is based solely upon the testimony of a witness whom refuses to submit
to cross examination, my client hereby demands that you withdraw Mr. Bego's declaration
promptly. If you refuse, you understand that I have no choice but to move to exclude Mr.
Bego's testimony as exclusionary sanctions under F.R.C.P. Rule 37. I have communicated
this demand directly to Mr. Walton as well.

I look forward to your prompt reply.

Sincerely,

Colbern C. Stuart III
for PAUL, HASTINGS, JANOFSKY & WALKER LLP

EXH __T__ PG __46__

SAN/81433.1

Paul, Hastings, Janofsky & Walker LLP
3579 Valley Centre Drive, San Diego, CA 92130
telephone 858-720-2500 / facsimile 858-720-2555 / internet www.paulhastings.com

# Paul Hastings

Atlanta
Beijing
Hong Kong
London
Los Angeles
New York
Orange County
San Diego
San Francisco
Stamford
Tokyo
Washington, D.C.

(858)720-2820
colestuart@paulhastings.com

January 15, 2004

45326.00004

VIA FACSIMILE AND U.S. MAIL

Edward C. Walton
Walton & Associates
402 West Broadway, Suite 1210
San Diego CA 92101

Re:   *Lindows.com v. Xandros, Inc., et al.*
       USDC Case No. 02 CV 2460 JH(RBB)

Dear Mr. Walton:

In response to my January 9 and 14 letters and several telephone calls requesting dates for your client Michael Bego's deposition, this morning I received a message from your secretary that you could not produce Mr. Bego before next Wednesday, January 21, 2003. I returned your secretary's call and asked her to convey to you that because Plaintiff's opposition to your client's and other defendants' motion is due tomorrow (Friday, January 16), I clearly cannot wait until next week to depose Mr. Bego. I therefore explained that unless you agreed to withdraw Mr. Bego's declaration, I would have no choice but to seek exclusionary sanctions in our opposition papers being filed tomorrow.

I trust your secretary has conveyed this information to you. I have not heard from you regarding whether you will be withdrawing your client's declaration. I therefore have no choice but to seek exclusion of your client's declaration.

I welcome the opportunity to discuss this matter further.

Sincerely,

Colbern C. Stuart III
for PAUL, HASTINGS, JANOFSKY & WALKER LLP

LA BELLA & McNAMARA LLP
1  THOMAS W. McNAMARA (SBN 127280)
   ANDREW W. ROBERTSON (SBN 062541)
2  401 West "A" Street, Suite 2300
   San Diego, California  92101
3  (619) 696-9200

4  Attorneys for Defendants XANDROS, INC.; LINUX GLOBAL
          PARTNERS, INC.; MICHAEL BEGO; WILLIAM JAY
5         ROSEMAN

6

7
                    UNITED STATES DISTRICT COURT
8
                 SOUTHERN DISTRICT OF CALIFORNIA
9

10
   LINDOWS.COM, INC., a Delaware          )  Case No.:  02 CV 2460 BTM (RBB)
11 corporation,                            )
                                           )
12         Plaintiff,                       )  **RESPONSES OF DEFENDANT**
                                           )  **XANDROS, INC. TO PLAINTIFF'S FIRST**
13         v.                               )  **SET OF REQUESTS FOR ADMISSION**
                                           )
14 XANDROS, INC., a Delaware corporation; )
   LINUX GLOBAL PARTNERS, INC., a          )
15 Delaware corporation; MICHAEL BEGO,     )
   an individual; WILLIAM JAY ROSEMAN,     )
16 an individual,                          )
                                           )
17         Defendants.                      )
                                           )
18

19 PROPOUNDING PARTY  :        Plaintiff LINDOWS.COM, INC.

20 RESPONDING PARTY   :        Defendant XANDROS, INC.

21 SET NO.            :        ONE

22

23         Defendant XANDROS, INC. (hereinafter "XANDROS") responds to the

24 Plaintiff's First Set of Requests for Admissions as follows:

25 //

26 //

27 //

                                    1

28 ──────────────────────────────────────────────────
                                    02 CV 2460 BTM (RBB)
              EXH __V__ PG __48__       Responses of Defendant Xandros, Inc. to
                                    Plaintiff's First Set of Requests for Admission

1 | REQUEST FOR ADMISSION NO. 25:

2 |     Admit that LGP and XANDROS represented to LINDOWS and the general

3 | public that LGP and XANDROS were two distinct entities.

4 | RESPONSE TO REQUEST FOR ADMISSION NO. 25:

5 |     Admit.

6 | REQUEST FOR ADMISSION NO. 26:

7 |     Admit that YOU are an agent of LGP.

8 | RESPONSE TO REQUEST FOR ADMISSION NO. 26:

9 |     Denied.

10 | REQUEST FOR ADMISSION NO. 27:

11 |     Admit that LGP is the alter ego of XANDROS.

12 | RESPONSE TO REQUEST FOR ADMISSION NO. 27:

13 |     Denied.

14 | REQUEST FOR ADMISSION NO. 28:

15 |     Admit that XANDROS is the alter ego LGP.

16 | RESPONSE TO REQUEST FOR ADMISSION NO. 28:

17 |     Denied.

18 | REQUEST FOR ADMISSION NO. 29:

19 |     Admit that ROSEMAN participated in a telephone conversation on or about

20 | October 4, 2001, in which ROSEMAN represented to LINDOWS that LGP had

21 | agreed to provide $10 million in equity financing to XANDROS.

22 | RESPONSE TO REQUEST FOR ADMISSION NO. 29:

23 |     Denied.

24 | REQUEST FOR ADMISSION NO. 30:

25 |     Admit that during the telephone conversation referenced in Request for

26 | Admission 29 above, YOU represented to LINDOWS that LGP was divesting itself of

27 |

28 |

7

EXH **V** PG **49**

02 CV 2460 BTM (RBB)
Responses of Defendant Xandros, Inc. to
Plaintiff's First Set of Requests for Admission

1 | RESPONSE TO REQUEST FOR ADMISSION NO. 79:

2 |      Denied.

3 |

4 | DATED:  July 3, 2003                          La BELLA & McNAMARA, LLP
                                                  THOMAS W. McNAMARA
5 |                                               ANDREW W. ROBERTSON

6 |

7 |                                    By    _____

8 |                                          ANDREW W. ROBERTSON
                                             Attorneys for Defendants XANDROS, INC.;
                                             LINUX GLOBAL PARTNERS, INC.;
9 |                                          MICHAEL BEGO; WILLIAM JAY
                                             ROSEMAN

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |
                                          18
28 |
02 CV 2460 BTM (RBB)
                                          Responses of Defendant Xandros, Inc. to
                                          Plaintiff's First Set of Requests for Admission

1   LA BELLA & McNAMARA LLP
    THOMAS W. McNAMARA (SBN 127280)
    ANDREW W. ROBERTSON (SBN 062541)
2   401 West "A" Street, Suite 2300
    San Diego, California  92101
3   (619) 696-9200

4   Attorneys for Defendants XANDROS, INC.; LINUX GLOBAL
            PARTNERS, INC.; MICHAEL BEGO; WILLIAM JAY
5           ROSEMAN

6

7

8                       UNITED STATES DISTRICT COURT

9                     SOUTHERN DISTRICT OF CALIFORNIA

10

11   LINDOWS.COM, INC., a Delaware          )   Case No.:  02 CV 2460 BTM (RBB)
     corporation,                           )
12                                          )
                 Plaintiff,                 )   RESPONSE OF DEFENDANT LINUX
13                                          )   GLOBAL PARTNERS, INC. TO
            v.                              )   PLAINTIFF'S FIRST SET OF
14                                          )   REQUESTS FOR ADMISSION
     XANDROS, INC., a Delaware corporation; )
15   LINUX GLOBAL PARTNERS, INC., a         )
     Delaware corporation; MICHAEL BEGO,    )
16   an individual; WILLIAM JAY ROSEMAN,    )
     an individual,                         )
17                                          )
                 Defendants.                )
18

19   PROPOUNDING PARTY    :      Plaintiff LINDOWS.COM, INC.

20   RESPONDING PARTY     :      Defendant LINUX GLOBAL PARTNERS,

21   INC.

22   SET NO.              :      ONE

23

24          Defendant LINUX GLOBAL PARTNERS, INC. (hereinafter "LGP") hereby

25   responds to Plaintiff's First Set of the Requests for Admissions as follows:

26   //

27   //

                                     1

28   ──────────────────────────────────────
                                          02 CV 2460 BTM (RBB)
                              Response of Defendant Linux Global Partners, Inc. to
                              Plaintiff's First Set of Requests For Admissions

1   RESPONSE TO REQUEST FOR ADMISSION NO. 20:

2       Deny.

3   REQUEST FOR ADMISSION NO. 21:

4       Admit that YOU and XANDROS caused or allowed the diversion of assets

5   from YOU to XANDROS, and XANDROS to YOU.

6   RESPONSE TO REQUEST FOR ADMISSION NO. 21:

7       Deny.

8   REQUEST FOR ADMISSION NO. 22:

9       Admit that YOU manipulated the assets of XANDROS for the benefit of YOU,

10  to the detriment of XANDROS.

11  RESPONSE TO REQUEST FOR ADMISSION NO. 22:

12      Deny.

13  REQUEST FOR ADMISSION NO. 23:

14      Admit that since XANDROS and YOU each failed to maintain unique corporate

15  minutes and corporate records.

16  RESPONSE TO REQUEST FOR ADMISSION NO. 23:

17      Deny.

18  REQUEST FOR ADMISSION NO. 24:

19      Admit that YOU represented to LINDOWS and the general public that YOU

20  and XANDROS were two distinct entities.

21  RESPONSE TO REQUEST FOR ADMISSION NO. 24:

22      Admit.

23  REQUEST FOR ADMISSION NO. 25:

24      Admit that YOU are alter ego if XANDROS.

25  RESPONSE TO REQUEST FOR ADMISSION NO. 25:

26      Deny.

27  //

28

6

EXH **W** PG 52

02 CV 2460 BTM (RBB)
Response of Defendant Linux Global Partners, Inc. to
Plaintiff's First Set of Requests For Admissions

1   RESPONSE TO REQUEST FOR ADMISSION NO. 61:

2          Deny.

3

4   DATED:  July 3, 2003                    La BELLA & McNAMARA, LLP
                                            THOMAS W. McNAMARA
5                                           ANDREW W. ROBERTSON

6

7                            By

8                                           ANDREW W. ROBERTSON
                                            Attorneys for Defendants XANDROS, INC.;
9                                           LINUX GLOBAL PARTNERS, INC.;
                                            MICHAEL BEGO; WILLIAM JAY

10                                          ROSEMAN

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18

19

20

21

22

23

24

25

26

27

28

                                    15

02 CV 2460 BTM (RBB)
Response of Defendant Linux Global Partners, Inc. to
Plaintiff's First Set of Requests For Admissions

CERTIFIED COPY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

------------------------------------x

LINDOWS.COM, INC., a Delaware

corporation,

                          Plaintiff,

                                Case No.

      -against-        02 CV 2460 BTM(RBB)

XANDROS, INC., a Delaware corporation;

LINUX GLOBAL PARTNERS, INC., a Delaware

corporation; MICHAEL BEGO, an individual;

WILLIAM JAY ROSEMAN, an individual,

                          Defendants.

------------------------------------x

                   November 6, 2003

                   4:55 p.m.

   Deposition of FREDERICK BERENSTEIN, taken by

Plaintiff, pursuant to Notice, at the offices of

Paul Hastings Janofsky & Walker LLP, 75 East

55th Street, New York, New York, before ERIC J.

FINZ, a Shorthand Reporter and Notary Public

within and for the State of New York.

EXH **X** PG 54



LEGALINK
A WORDWAVE COMPANY

LegaLink San Diego
550 West C Street, Suite 1440
San Diego, CA 92101

tel (619) 544-8344
tel (800) 544-3656
fax (619) 544-8345

www.legalink.com

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

```
 1

 2   A P P E A R A N C E S:

 3      PAUL HASTINGS JANOFSY & WALKER LLP
        Attorneys for Plaintiff
 4            3579 Valley Centre Drive
              San Diego, California  92130

 5

        BY:   COLBERN C. STUART, III, ESQ.
 6                  (Via Teleconference)

 7

 8      LaBELLA & McNAMARA, LLP
        Attorneys for Defendants
 9            401 West "A" Street, Suite 1150
              San Diego, California  92101

10

        BY:   ANDREW W. ROBERTSON, ESQ.
11                  (Telephonically)

12

13   ALSO PRESENT:

14      DAVID CASSEL, Videographer

15

16

17

18

19

20

21

22

23

24

25
```

EXH **X** PG 55

2

1           FREDERICK BERENSTEIN

2           THE VIDEO OPERATOR:  Here begins          16:58:45

3    the videotape No. 1 in the deposition of        16:58:46

4    Frederick Berenstein, in the matter of          16:58:49

5    Lindows.com, Inc., a Delaware corporation,      16:58:52

6    versus Xandros, Inc., a Delaware corporation, et 16:58:56

7    al., in United States District Court, Southern  16:59:00

8    District of California, case No. 02 CV 2460 BTM. 16:59:02

9           Today's date is November 6, 2003.        16:59:10

10   The time on the video monitor is 4:59.  The     16:59:13

11   video operator is David Cassel, contracted by   16:59:19

12   LegaLink San Diego, California.  This deposition 16:59:22

13   is taking place at the offices of Paul Hastings, 16:59:26

14   75 East 55th Street, New York, New York, and was 16:59:30

15   noticed by Lindows.com for plaintiff.           16:59:33

16           Counsel please voice identify           16:59:37

17   yourselves and state whom you represent.        16:59:39

18           MR. STUART:  This is Colbern Stuart      16:59:42

19   on behalf of the plaintiff Lindows.com.         16:59:44

20           MR. ROBERTSON:  This is Andy             16:59:47

21   Robertson for the defendant.                    16:59:48

22           I apologize to all for delaying         16:59:51

23   you; I was in a courtroom and I couldn't get    16:59:53

24   out.                                            16:59:55

25           THE VIDEO OPERATOR:  The court           16:59:59

EXH X PG 56

3

```
 1              FREDERICK BERENSTEIN

 2   reporter today is Eric Finz of LegaLink San        16:59:59

 3   Diego.  Would the court reporter please swear in   17:00:03

 4   the witness.                                       17:00:06

 5   F R E D E R I C K   B E R E N S T E I N,

 6   having been first duly sworn by the Notary

 7   Public (Eric J. Finz), was examined and

 8   testified as follows:

 9              EXAMINATION BY MR. STUART:              17:00:16

10       Q.    Good afternoon, Mr. Berenstein.  As     17:00:21

11   I introduced myself earlier, my name is Cole      17:00:24

12   Stuart, and I've introduced myself to you         17:00:29

13   previously in the deposition of Mr. William       17:00:30

14   Roseman, I represent the plaintiff in this case,  17:00:33

15   Lindows.com.  You've been called here to testify  17:00:35

16   today and to give your testimony under oath.      17:00:38

17              And before we begin asking you         17:00:39

18   questions under oath, I have a few basic          17:00:42

19   instructions for you regarding the ground rules   17:00:45

20   for a deposition.  If that's okay with you, sir?  17:00:47

21       A.    That's fine.                            17:00:50

22       Q.    You were present at the deposition      17:00:51

23   of Mr. Roseman; were you not?                     17:00:52

24       A.    Part of it, yes.                        17:00:54

25       Q.    It was the first part in which I        17:00:57
```

EXH X PG 57

4

```
 1                    FREDERICK BERENSTEIN

 2   gave Mr. Roseman the basic instructions           17:00:59

 3   regarding how a deposition is conducted; were     17:01:01

 4   you not?                                          17:01:04

 5        A.     Yes.                                  17:01:05

 6        Q.     Did you hear and understand those     17:01:07

 7   instructions that I gave to Mr. Roseman?          17:01:08

 8        A.     Well, they were clear when you said   17:01:11

 9   them, I don't know if I remember them all.        17:01:13

10        Q.     Well, I'll go over them again         17:01:16

11   briefly for your convenience.                     17:01:18

12               Have you had your deposition taken    17:01:19

13   before?                                           17:01:20

14        A.     Yes.                                  17:01:21

15        Q.     How many times?                       17:01:23

16        A.     Once.                                 17:01:23

17        Q.     What type of matter was that?         17:01:26

18        A.     Real estate proceeding.              17:01:29

19        Q.     When was your deposition taken in     17:01:32

20   that matter?                                      17:01:33

21        A.     1996.                                 17:01:36

22        Q.     Were you a party to the action?       17:01:40

23        A.     Yes.                                  17:01:43

24        Q.     Plaintiff or defendant?               17:01:45

25        A.     A plaintiff.                          17:01:46
```

EXH **X** PG 58

5

```
 1              .        FREDERICK BERENSTEIN

 2         Q.     And what was the case entitled?          17:01:48

 3        · A.     Oh, I have no idea.  You are              17:01:51

 4  talking about a long time ago.                          17:01:53

 5         Q.     Do you recall the name of any·           17:01:57

 6  defendant?                                              17:01:58

 7         A.  ·   I don't really remember the names        17:02:05

 8  of the defense, because it was companies, you          17:02:06

 9  know, that were involved, not really                    17:02:09

10  individuals.                                ‹           17:02:12

11         Q.     Was that a case filed in New York?       17:02:12

12         A.     No.  Florida.                           · 17:02:14

13         Q.     Do you recall what county?               17:02:16

14         A.     Dade County.                              17:02:18

15         Q.     Dade County, Florida.                     17:02:22

16                Do you recall when that case was         17:02:24

17  resolved?                                               17:02:25

18         A.     I think 1998.                             17:02:25

19         Q.     Mr. Berenstein, the instructions         17:02:33

20  that I'm going to give you apply to the conduct        17:02:37

21  of this deposition, even though it's a                 17:02:40

22  relatively short one, therefore I'm going to be        17:02:42

23  relatively short in my directions.                     17:02:45

24                First and foremost, you have just        17:02:47

25  taken an oath, that oath is to be taken with the       17:02:49
```

EXH **X** PG 59

6

```
 1                    FREDERICK BERENSTEIN

 2   same solemnity and seriousness as if you had          17:02:52

 3   taken that oath in a court of law, that oath is       17:02:56

 4   to tell the truth, the whole truth and nothing        17:02:59

 5   but the truth.                                        17:03:01

 6            Do you understand that, sir?                 17:03:02

 7      A.    Yes.                                          17:03:03

 8      Q.    If you don't understand any of my            17:03:03

 9   questions, I would appreciate if you let me know      17:03:05

10   you don't understand the question, and I will         17:03:07

11   attempt to rephrase it.                               17:03:08

12            Do you understand that?                      17:03:10

13      A.    Yes.                                          17:03:11

14      Q.    If for any reason you feel that you          17:03:11

15   are not able to give your best and most accurate      17:03:12

16   testimony here today, would you please let us         17:03:15

17   know that?                                            17:03:18

18      A.    Okay.                                         17:03:19

19      Q.    If for some reason I ask you a               17:03:20

20   question that the answer to is not in the front       17:03:21

21   of your mind, such as the name of the defendants      17:03:25

22   in the Dade County, Florida action, I don't want      17:03:28

23   you to give me a guess or I don't want you to         17:03:31

24   speculate, but if you do recall any of the            17:03:34

25   details, though they may not be all of the            17:03:41
```

EXH **X** PG 60

7

| | | |
|---|---|---|
| 1 | FREDERICK BERENSTEIN | |
| 2 | details in response to my question, I would ask | 17:03:43 |
| 3 | that you give me your best recollection. | 17:03:45 |
| 4 | Do you understand that? | 17:03:47 |
| 5 | A.    Okay. | 17:03:47 |
| 6 | Q.    And to the extent that you can give | 17:03:50 |
| 7 | me an estimate of figures or responses that may | 17:03:52 |
| 8 | not be exactly precise, I would appreciate your | 17:04:00 |
| 9 | best estimate.  For instance, if I ask you how | 17:04:02 |
| 10 | much money did you make last year, you probably | 17:04:04 |
| 11 | wouldn't, as you sit here today, be able to tell | 17:04:07 |
| 12 | me to the penny exact amount, but most people at | 17:04:09 |
| 13 | least would be able to give an estimate, a | 17:04:13 |
| 14 | general range.  If for whatever reason you | 17:04:15 |
| 15 | cannot give me an exact answer, I would ask you | 17:04:18 |
| 16 | to give me your best estimate and to simply let | 17:04:20 |
| 17 | me know you are giving me an estimate. | 17:04:23 |
| 18 | Do you understand that? | 17:04:31 |
| 19 | A.    Yes. | 17:04:31 |
| 20 | Q.    It's important that we communicate | 17:04:31 |
| 21 | clearly with each other, especially given that | 17:04:31 |
| 22 | this deposition is being taken by video | 17:04:31 |
| 23 | conference.  You have been very good about | 17:04:34 |
| 24 | letting me finish my question before you begin | 17:04:38 |
| 25 | your answer, and I will attempt to give you the | 17:04:40 |

EXH **X** PG 61

8

```
 1                    FREDERICK BERENSTEIN

 2   same courtesy, but that's very important here so      17:04:43

 3   the court reporter can take down all of the           17:04:45

 4   words that are being said by all of the parties.      17:04:47

 5            Do you understand that?                      17:04:49

 6       A.    Yes.                                        17:04:50

 7       Q.    Mr. Berenstein, what is your full           17:04:54

 8   name?                                                 17:04:55

 9       A.    Frederick Herman Berenstein.                17:04:56

10       Q.    What is your current residence             17:05:00

11   address?                                              17:05:02

12       A.    250 East 87th Street.   That's New          17:05:03

13   York, New York.                                       17:05:09

14       Q.    How long have you resided at 250            17:05:11

15   East 87th Street?                                     17:05:13

16       A.    About a year and a half.                    17:05:15

17       Q.    Prior to that address, where did            17:05:17

18   you reside?                                           17:05:19

19       A.    200 East 62nd Street.                       17:05:20

20       Q.    How long did you reside at 200 East         17:05:27

21   62nd Street?                                          17:05:29

22       A.    About a year and a half.                    17:05:32

23       Q.    By the way, are either of those            17:05:34

24   residences homes in which you own in fee simple       17:05:36

25   or condominiums?                                       17:05:44
```

EXH **X** PG 62

9

| 1 | | FREDERICK BERENSTEIN | |
|---|---|---|---|
| 2 | A. | No. | 17:05:46 |
| 3 | Q. | Or are they rentals? | 17:05:46 |
| 4 | A. | They are rentals. | 17:05:48 |
| 5 | Q. | Prior to 200 East 62nd Street, | 17:05:50 |
| 6 | where did you reside? | | 17:05:53 |
| 7 | A. | Chappaqua, New York. | 17:05:54 |
| 8 | Q. | What was the address? | 17:05:57 |
| 9 | A. | 1 Kittle, K-i-t-t-l-e, Road. | 17:05:59 |
| 10 | Q. | Was that a home or an apartment or | 17:06:12 |
| 11 | a condominium? | | 17:06:14 |
| 12 | A. | That was a home. | 17:06:15 |
| 13 | Q. | Did you own that home? | 17:06:16 |
| 14 | A. | Yes. | 17:06:17 |
| 15 | Q. | How long did you live there? | 17:06:18 |
| 16 | A. | 25 years. | 17:06:19 |
| 17 | Q. | What is your current -- are you | 17:06:28 |
| 18 | currently employed? | | 17:06:29 |
| 19 | A. | Yes. | 17:06:30 |
| 20 | Q. | By whom? | 17:06:32 |
| 21 | A. | By Linux Global Partners. | 17:06:35 |
| 22 | Q. | Anyone else? | 17:06:40 |
| 23 | A. | By Xandros, Incorporated. | 17:06:42 |
| 24 | Q. | Xandros, Inc.? | 17:06:45 |
| 25 | A. | Um-hum. | 17:06:47 |

EXH **X** PG 63

10

| | | | |
|---|---|---|---|
| 1 | | FREDERICK BERENSTEIN | |
| 2 | Q. | Anyone else? | 17:06:47 |
| 3 | A. | Nope. | 17:06:48 |
| 4 | Q. | What's your title with Linux Global | 17:06:49 |
| 5 | Partners?  And that's also been referred to in | | 17:06:53 |
| 6 | this litigation at least as LGP? | | 17:06:56 |
| 7 | A. | Yes. | 17:06:59 |
| 8 | Q. | If I refer to it as LGP you'll | 17:07:00 |
| 9 | understand that to be Linux Global Partners; | | 17:07:03 |
| 10 | correct? | | 17:07:06 |
| 11 | A. | Yes. | 17:07:06 |
| 12 | Q. | How long have you been employed by | 17:07:07 |
| 13 | LGP? | | 17:07:08 |
| 14 | A. | Since 1998. | 17:07:09 |
| 15 | Q. | And in what capacities or what | 17:07:10 |
| 16 | roles or what titles? | | 17:07:12 |
| 17 | A. | Basically as co-founder and | 17:07:15 |
| 18 | co-chairman of the company. | | 17:07:18 |
| 19 | Q. | Have you maintained a position as | 17:07:20 |
| 20 | an officer? | | 17:07:22 |
| 21 | A. | Yes. | 17:07:23 |
| 22 | Q. | What position? | 17:07:25 |
| 23 | A. | Well, since Will and I are the only | 17:07:28 |
| 24 | two people, we've always been very informal | | 17:07:32 |
| 25 | about it.  I'm not sure if I'm the president or | | 17:07:34 |

EXH **X** PG **64**

11

```
1                  FREDERICK BERENSTEIN
2  the CEO.  It doesn't make much difference when      17:07:36
3  two people are running a company.                   17:07:39
4       Q.     Have you and Mr. Roseman been the       17:07:41
5  only officers and directors of Linux Global         17:07:43
6  Partners since its inception?                        17:07:46
7       A.     I think there was a short period of     17:07:51
8  time when Tom Langbein was CEO of the company.       17:07:51
9       Q.     Do you recall what that period of        17:07:54
10 time -- I'm sorry, do you recall what that           17:07:56
11 period of time was?                                  17:07:57
12      A.     I think sometime in the summer of        17:08:01
13 2002 to sometime in the winter of 2002, or           17:08:13
14 possibly January 2003.                               17:08:16
15      Q.     Is Mr. Langbein still employed with      17:08:22
16 Linux Global Partners in any capacity?               17:08:24
17      A.     No.                                       17:08:28
18      Q.     How many employees does Linux            17:08:29
19 Global Partners have today?                           17:08:32
20      A.     Just myself and Will Roseman.            17:08:35
21      Q.     Apart from you, Mr. Roseman and          17:08:40
22 Mr. Langbein, has Linux Global Partners ever had     17:08:43
23 any other employees?                                 17:08:46
24      A.     Yes, we had Mike Bego who acted as       17:08:47
25 vice president of marketing for a while.  And        17:08:50
```

EXH **X** PG 65                                    12

```
 1              .      FREDERICK BERENSTEIN
 2   who we also loaned out to Xandros Corporation, I      17:08:56
 3   believe, in Canada, as acting president for a         17:09:00
 4   while.                                                17:09:03
 5        Q.      Has Mr. Bego, to your knowledge,         17:09:06
 6   ever been an officer or a director of Xandros,        17:09:07
 7   Inc.?                                                 17:09:11
 8        A.      No.                                      17:09:11
 9        Q.      Let's move on to Xandros, Inc.,          17:09:21
10   your role in Xandros, Inc.  What is your current      17:09:24
11   title or position?                                   17:09:26
12        A.      Chairman of the board.  And CTO.         17:09:28
13        Q.      How long have you been chairman of       17:09:33
14   the board?                                            17:09:34
15        A.      Since July of this year.                 17:09:38
16        Q.      Did you hold any other positions on      17:09:46
17   the board of directors prior to July of this          17:09:48
18   year?                                                 17:09:51
19        A.      Yeah, I was co-chairman.                 17:09:51
20        Q.      When did you begin as co-chairman?       17:09:53
21        A.      At the inception of the company.         17:09:56
22   August 2001, I think.                                 17:09:58
23        Q.      Did you hold any other positions on      17:10:02
24   the board of directors other than co-chairman         17:10:03
25   and chairman of the board?                            17:10:06
```

EXH **X** PG **bb**

13

```
1                    FREDERICK BERENSTEIN

2        A.     I don't think so.  Again, I don't        17:10:09

3   know if officially Willie was the secretary and     17:10:12

4   I was the treasurer.  We never really did that      17:10:17

5   kind of formality.                                   17:10:19

6        Q.     By Willie you are referring to          17:10:22

7   Mr. Roseman?                                          17:10:24

8        A.     Yes.                                      17:10:24

9        Q.     How long have you been CTO with          17:10:25

10  Xandros, Inc.?                                        17:10:27

11       A.     For the last -- as a title, for the      17:10:33

12  last couple of months.                               17:10:35

13       Q.     I'm not sure what you mean by as a       17:10:37

14  title.  Did you actually hold the role and carry     17:10:39

15  the responsibilities prior to that?                  17:10:42

16       A.     Prior to that, again, we are            17:10:43

17  talking about a very small company.  Mr. Roseman     17:10:45

18  and I wore quite a number of hats.  So it's sort     17:10:47

19  of like CTO is the hat that remained when I got      17:10:51

20  rid of all the other ones.                           17:10:55

21       Q.     What other hats have you worn on         17:10:56

22  behalf of Xandros, Inc.?                             17:10:58

23       A.     Just unofficially jobs, not hats.        17:11:02

24  Did a little marketing, a little business            17:11:09

25  development, a little money raising.  You know..     17:11:09
```

EXH __X__ PG _67_

14

| 1  | FREDERICK BERENSTEIN | |
|---|---|---|
| 2  | But the company is now coming to a place where | 17:11:13 |
| 3  | other people have been hired to, you know, who | 17:11:15 |
| 4  | have a lot of experience in these things to do | 17:11:17 |
| 5  | those roles, allowing me to do the thing that I | 17:11:19 |
| 6  | do best, which is technology. | 17:11:21 |
| 7  | Q.   So as far as your roles then, prior | 17:11:26 |
| 8  | to September or more or less of this year, when | 17:11:30 |
| 9  | you became CTO, you've pretty much conducted | 17:11:33 |
| 10 | many business roles with Xandros, Inc., but | 17:11:38 |
| 11 | never held any other official titles; is that | 17:11:40 |
| 12 | correct? | 17:11:46 |
| 13 | A.   That's correct. | 17:11:46 |
| 14 | Q.   Apart from CTO; correct? | 17:11:46 |
| 15 | A.   Right. | 17:11:48 |
| 16 | Q.   How about Xandros Corporation, have | 17:11:51 |
| 17 | you ever been an employee or held a position on | 17:11:53 |
| 18 | the board of directors or been an officer of | 17:11:55 |
| 19 | Xandros Corporation? | 17:11:57 |
| 20 | A.   I'm on the board.  I certainly | 17:12:00 |
| 21 | never had a position there.  And I don't know if | 17:12:04 |
| 22 | we had executive titles there or not. | 17:12:11 |
| 23 | Q.   Mr. Berenstein, during the | 17:12:24 |
| 24 | deposition of Mr. Roseman, he, the first day | 17:12:28 |
| 25 | where you were present, he identified you as a | 17:12:32 |

EXH __X__ PG __68__

15

Frederick Berenstein         11/6/03         Lindows.com v. Xandros

```
 1              FREDERICK BERENSTEIN

 2  person with knowledge regarding certain       17:12:35

 3  categories and certain areas.  Do you recall  17:12:38

 4  that?                                          17:12:41

 5       A.     No.  But you can refresh my memory.  17:12:41

 6       Q.     In general, you heard Mr. Roseman's  17:12:46

 7  testimony while you were present; correct?    17:12:51

 8       A.     I mean, I heard the words, but I   17:12:54

 9  wasn't sitting there memorizing what he said.  17:12:57

10  After all, he was talking for two or three     17:13:00

11  hours.  If there is something specific that he  17:13:03

12  said that you would like to ask me to ask about,  17:13:06

13  please tell me what it is.                      17:13:09

14       Q.     What I'm going to ask you, sir, is  17:13:10

15  having sat there beside him for the two hours or  17:13:12

16  so, is there anything that he said during his   17:13:15

17  deposition testimony that you believe is        17:13:17

18  inaccurate or you would like to add comments to?  17:13:19

19            MR. ROBERTSON:  I'll object to the    17:13:26

20  form of that question.  It's completely         17:13:27

21  speculation, just an improper question.  He     17:13:31

22  can't be called upon to remember everything that  17:13:36

23  was said in a deposition.  You are going to have  17:13:38

24  to ask him specific questions.                  17:13:40

25       Q.     You can answer the question,        17:13:42
```

EXH **X** PG 69

16

```
 1                  FREDERICK BERENSTEIN

 2   Mr. Berenstein.                              17:13:42

 3        A.    Was the question do I remember    17:13:45

 4   anything that I think was inaccurate, or that I   17:13:47

 5   would like to add to?                        17:13:52

 6        Q.    Yes.                              17:13:54

 7        A.    Since I don't really remember the 17:13:55

 8   specifics of everything he said, I would have to 17:13:57

 9   answer no.  If you ask me something          17:13:59

10   specifically, maybe I could be more helpful. 17:14:01

11        Q.    No, I just want to make sure we are 17:14:04

12   capturing anything that is in your mind as you 17:14:06

13   sit here today that was inaccurate about what 17:14:09

14   Mr. Roseman said.                            17:14:10

15             MR. ROBERTSON:  I object to the   17:14:13

16   question as calling for speculation, there is no 17:14:14

17   foundation, it's completely improper.        17:14:17

18        Q.    Mr. Berenstein, would you please  17:14:24

19   turn to Exhibit 5 in the stack of exhibits   17:14:27

20   that's before you.                           17:14:31

21        A.    Yes.                              17:14:42

22        Q.    Do you see that as the renotice of 17:14:44

23   deposition of Frederick Berenstein?          17:14:46

24        A.    Yes.                              17:14:49

25        Q.    And if you'll turn to page 3 of   17:14:51
```

EXH __X__ PG _70_

17

| | | |
|---|---|---|
| 1 | FREDERICK BERENSTEIN | |
| 2 | Exhibit 5. | 17:14:53 |
| 3 | A.    Yes. | 17:14:57 |
| 4 | Q.    At the bottom of that page, there | 17:14:57 |
| 5 | is a title "documents requested," with | 17:14:59 |
| 6 | underneath that request for production number 1, | 17:15:03 |
| 7 | and then moving on to page 4, requests for | 17:15:05 |
| 8 | production numbers 2 through 6. | 17:15:11 |
| 9 | Do you see that? | 17:15:12 |
| 10 | A.    Yes. | 17:15:13 |
| 11 | Q.    Have you brought any documents with | 17:15:14 |
| 12 | you here today, sir, in response to those | 17:15:15 |
| 13 | requests for production of documents? | 17:15:17 |
| 14 | MR. ROBERTSON:  Object to the | 17:15:19 |
| 15 | question.  The entire issue of production of | 17:15:19 |
| 16 | documents was discussed at great length with the | 17:15:22 |
| 17 | magistrate and the defendant, there was a | 17:15:28 |
| 18 | compromise it will be produced, and that those | 17:15:30 |
| 19 | documents have been produced. | 17:15:34 |
| 20 | Q.    You can answer the question. | 17:15:35 |
| 21 | A.    I didn't bring any documents other | 17:15:36 |
| 22 | than the ones you've already gotten, because | 17:15:37 |
| 23 | those are all the ones that we have. | 17:15:41 |
| 24 | Q.    Did you happen to bring with you | 17:15:43 |
| 25 | today any documents that were identified in | 17:15:44 |

Exh **X** Pg 7

18

|    | FREDERICK BERENSTEIN |  |
|----|---------------------|------------|
| 1  |  |  |
| 2  | Mr. Roseman's deposition, which counsel has | 17:15:47 |
| 3  | agreed to bring and to produce, including the | 17:15:51 |
| 4  | cap sheets for Xandros, Inc. and LGP? | 17:15:53 |
| 5  | A.     No, nobody gave me any cap sheets | 17:15:56 |
| 6  | to bring, or told me that I should. | 17:15:59 |
| 7  | MR. STUART:  Mr. Robertson, will | 17:16:03 |
| 8  | you be producing those cap sheets that you | 17:16:05 |
| 9  | agreed to produce previously?  Mr. Robertson? | 17:16:07 |
| 10 | MR. ROBERTSON:  We stated for the | 17:16:15 |
| 11 | record we would produce the cap sheets. | 17:16:16 |
| 12 | Q.     Mr. Berenstein, if you will, | 17:16:38 |
| 13 | please, turn to Exhibit 15. | 17:16:39 |
| 14 | A.     Yes. | 17:17:00 |
| 15 | Q.     Do you recognize Exhibit 15? | 17:17:00 |
| 16 | A.     Yes.  It's a press announcement, I | 17:17:03 |
| 17 | think.  And is that a press release on behalf of | 17:17:05 |
| 18 | Xandros, Inc.? | 17:17:08 |
| 19 | A.     I think so, yes. | 17:17:10 |
| 20 | Q.     This would be the type of press | 17:17:12 |
| 21 | release that would be found on Xandros, Inc.'s | 17:17:14 |
| 22 | web site, as well as would be released to | 17:17:19 |
| 23 | various business wires to announce certain | 17:17:21 |
| 24 | company events to the general public; correct? | 17:17:23 |
| 25 | A.     Yes. | 17:17:25 |

ExH **X** PG 12

19

| | | |
|---|---|---|
| 1 | FREDERICK BERENSTEIN | |
| 2 | Q.    Do you have any role as a -- in | 17:17:27 |
| 3 | having worn many hats at Xandros, Inc., in | 17:17:31 |
| 4 | preparation, review or authorization of press | 17:17:35 |
| 5 | releases? | 17:17:37 |
| 6 | A.    I probably reviewed this.  I don't | 17:17:39 |
| 7 | know whether I was the person who said okay, | 17:17:51 |
| 8 | this is what we should go with. | 17:17:51 |
| 9 | Could I just take a few seconds of | 17:17:51 |
| 10 | your time to maybe put this in perspective for | 17:17:51 |
| 11 | you. | 17:17:54 |
| 12 | Q.    Yes, sir. | 17:17:55 |
| 13 | A.    In September of 2000 I was | 17:17:58 |
| 14 | diagnosed with a very rare form of cancer of the | 17:18:01 |
| 15 | eye.  And my eye was removed.  The cancer, I was | 17:18:03 |
| 16 | subsequently treated for a year, and, actually | 17:18:07 |
| 17 | fifteen months, until December of 2001.  In | 17:18:11 |
| 18 | chemotherapy, at which point the cancer had | 17:18:16 |
| 19 | spread to my liver and I spent the next six or | 17:18:20 |
| 20 | seven months having a variety of operations, | 17:18:22 |
| 21 | which is why I'm still here and not dead. | 17:18:25 |
| 22 | So the actual reality is that most | 17:18:31 |
| 23 | of the events in this period of time that you | 17:18:32 |
| 24 | are covering, I was either not around for, | 17:18:34 |
| 25 | because I was in the hospital, or I was during. | 17:18:36 |

EXH **X** PG **73**

20

```
 1                FREDERICK BERENSTEIN

 2   the year I was in chemotherapy in a very, very        17:18:41

 3   reduced state in terms of physically as well as       17:18:44

 4   mentally.                                             17:18:47

 5             With that as a caveat as to how far         17:18:48

 6   I was involved with these things, you can go on.      17:18:50

 7        Q.    I'm very sorry to hear about your          17:18:53

 8   illness, Mr. Berenstein.  And I understand that       17:18:55

 9   your role as an officer, director and                 17:18:58

10   involvement with the various defendants may have      17:19:01

11   been limited.  And I appreciate your                  17:19:03

12   explanation.                                          17:19:05

13             I would refer you back to the               17:19:08

14   earlier explanation that I made at the beginning      17:19:11

15   of the deposition, and ask for your best              17:19:13

16   recollection for those events that you may not        17:19:15

17   have been personally involved in.  I would ask        17:19:16

18   that you not speculate about events that you may      17:19:19

19   not have been personally involved in.  However,       17:19:21

20   to the extent that you have an awareness that is      17:19:24

21   based on hearing about press releases or having       17:19:26

22   reviewed a press release, I would ask only for        17:19:28

23   your own recollection as to whatever extent you       17:19:31

24   were involved.                                        17:19:36

25        A.    Okay.  Go ahead.                           17:19:36
```

EXH _X_ PG 74

21

1              FREDERICK BERENSTEIN

2        Q.     Again, do you recall having been          17:19:42

3    involved in -- let's just focus on this              17:19:43

4    particular press release.  Did you have any          17:19:45

5    involvement with regards to the drafting,            17:19:47

6    review, approval or issuance of the press            17:19:50

7    release that's referenced in Exhibit 15?             17:19:52

8        A.     I remember seeing it when it was          17:19:58

9    released, or maybe the day before.  I only           17:19:59

10   arrived in San Francisco when this was signed,       17:20:02

11   the day before I had been in Europe.                 17:20:05

12       Q.     And can you please take a look at         17:20:08

13   the second full paragraph of Exhibit 15.             17:20:11

14       A.     Yes.                                      17:20:16

15       Q.     Beginning with the words "Xandros         17:20:16

16   has secured."                                        17:20:18

17       A.     Yes, I see it.                            17:20:20

18       Q.     As of August 29, 2001, had Linux          17:20:23

19   Global Partners delivered $10 million in cash to     17:20:31

20   Xandros, Inc.?                                       17:20:38

21       A.     I don't think they had delivered         17:20:43

22   $10 million.  If I recall, Allen Capital -- do       17:20:44

23   you know the name of the company?  Allen Capital     17:20:52

24   Partners arranged to raise $10 million for Linux     17:20:56

25   Global Partners for the purposes of supplying        17:21:01

EXH **X** PG **75**

22

```
 1              FREDERICK BERENSTEIN
 2   Xandros with funds to operate.  If -- I think        17:21:04
 3   that's correct.                                      17:21:11
 4        Q.     But in fact LGP had not delivered        17:21:12
 5   $10 million in cash to Xandros, Inc.; correct?       17:21:14
 6        A.     Not as of August 29, 2001, no.           17:21:17
 7        Q.     Had Linux Global Partners promised       17:21:21
 8   or agreed to deliver $10 million in cash to          17:21:25
 9   Xandros, Inc.?                                       17:21:27
10        A.     Well, I wouldn't know that.  I have      17:21:29
11   no idea.  I'm sure we didn't promise to give         17:21:33
12   them $10 million.  I'm sure that we probably         17:21:36
13   said we have been told that $10 million is going     17:21:39
14   to be raised, and if it's raised, you know, we       17:21:41
15   will be giving it to you.  We certainly gave         17:21:44
16   Xandros all the money we raised from that point      17:21:47
17   on, even if it wasn't $10 million.                   17:21:49
18        Q.     And your understanding is that that      17:21:53
19   $10 million figure came from a -- some type of       17:21:54
20   arrangement with Allen Capital Markets, I            17:22:00
21   believe is the name of the company?                  17:22:02
22        A.     It was Allen Capital something.          17:22:04
23        Q.     I believe Mr. Roseman testified it       17:22:07
24   was Allen Capital Markets, I could be wrong.         17:22:08
25        A.     Okay.
```

EXH **X** PG **76**

23

| | | |
|---|---|---|
| 1 | FREDERICK BERENSTEIN | |
| 2 | Q.   But that $10 million figure came | 17:22:14 |
| 3 | from some type of arrangement between LGP and | 17:22:15 |
| 4 | Allen Capital Markets, whereby Allen Capital | 17:22:18 |
| 5 | Markets was intending to go out into the private | 17:22:22 |
| 6 | equity markets, the venture capital markets, and | 17:22:26 |
| 7 | attempt to raise $10 million; correct? | 17:22:28 |
| 8 | A.   I think that's correct, yes. | 17:22:32 |
| 9 | Q.   Were you actually involved in the | 17:22:40 |
| 10 | negotiation between LGP and Allen Capital | 17:22:41 |
| 11 | Markets? | 17:22:44 |
| 12 | A.   No. | 17:22:44 |
| 13 | Q.   Do you know who was the point man | 17:22:45 |
| 14 | for LGP? | 17:22:46 |
| 15 | A.   What do you mean by point man? | 17:22:48 |
| 16 | Q.   Who was representing LGP in | 17:22:51 |
| 17 | negotiating with Allen Capital Markets for Allen | 17:22:54 |
| 18 | Capital Markets' agreement to attempt to raise | 17:22:59 |
| 19 | $10 million? | 17:23:02 |
| 20 | A.   I would assume Will Roseman. | 17:23:02 |
| 21 | Q.   I don't want you to assume, | 17:23:05 |
| 22 | Mr. Berenstein.  If you don't have any personal | 17:23:06 |
| 23 | knowledge. | 17:23:08 |
| 24 | A.   I was, as I said to you before, I | 17:23:10 |
| 25 | was in Europe from July 5th of 2001 until August | 17:23:11 |

EXH **X** PG 77

24

Frederick Berenstein                    11/6/03                    Lindows.com v. Xandros

```
 1              FREDERICK BERENSTEIN
 2  28th, when I flew from France to San Francisco.      17:23:15
 3  So I wasn't present when those arrangements were     17:23:20
 4  made.  You know, whatever they did over the          17:23:24
 5  summer of 2001.  So anything I would say would       17:23:33
 6  be speculation.                                      17:23:33
 7       Q.    Let's move on then.                       17:23:38
 8       A.    Okay.                                     17:23:39
 9       Q.    Take a look at Exhibit 16.  Do you        17:23:39
10  recognize Exhibit 16?                                17:23:41
11       A.    Yes.                                      17:23:43
12       Q.    What is it?                               17:23:44
13       A.    It's the strategic alliance              17:23:45
14  agreement between Xandros and Lindows.com.           17:23:46
15       Q.    And, Mr. Berenstein, do you have          17:23:55
16  any knowledge as to how Linux Global Partners or     17:23:56
17  Xandros, Inc. maintains its records, in              17:24:00
18  particular maintains agreements with companies       17:24:05
19  such as Lindows.com?                                 17:24:10
20       A.    I don't understand your question.         17:24:14
21       Q.    For instance, the strategic               17:24:17
22  alliance agreement is an agreement that exists       17:24:19
23  between Xandros, Inc. and Xandros Corporation, I     17:24:21
24  believe, and Lindows.com.  It would be               17:24:25
25  considered a business record or a company            17:24:31
```

EXH **X** PG 78                                           25

| | | |
|---|---|---|
| 1 | FREDERICK BERENSTEIN | |
| 2 | record; would you agree with that? | 17:24:32 |
| 3 | A.    Yes. | 17:24:36 |
| 4 | Q.    And in general how is -- how are | 17:24:38 |
| 5 | business records or company records kept at | 17:24:41 |
| 6 | Xandros, Inc.?  For instance, are they kept in a | 17:24:43 |
| 7 | file, are they laid on a desk, are they kept on | 17:24:46 |
| 8 | computer disk? | 17:24:51 |
| 9 | A.    I would say most things exist in a | 17:24:54 |
| 10 | computer form.  Printed agreements that have | 17:24:58 |
| 11 | been signed, the originals are kept in a file | 17:25:03 |
| 12 | and usually also at one of our various | 17:25:06 |
| 13 | attorneys' offices. | 17:25:11 |
| 14 | Q.    Is that how the strategic alliance | 17:25:17 |
| 15 | agreement would have been maintained at Xandros, | 17:25:19 |
| 16 | Inc.? | 17:25:21 |
| 17 | A.    Yes. | 17:25:22 |
| 18 | Q.    Do you know if it was maintained at | 17:25:22 |
| 19 | the attorney's office or if it was maintained at | 17:25:24 |
| 20 | Xandros, Inc.'s offices? | 17:25:26 |
| 21 | A.    Well, I can tell you that it was at | 17:25:28 |
| 22 | Xandros, Inc.'s offices in New York, let's say | 17:25:33 |
| 23 | the last, you know, nine months or a year.  But | 17:25:35 |
| 24 | since this agreement was basically negotiated | 17:25:38 |
| 25 | between Lindows.com and Mr. Bego, I don't know. | 17:25:41 |

ExH **X** PG 79

26

```
1              FREDERICK BERENSTEIN

2   whether he originally kept this in the first        17:25:47

3   year or so up in Canada or not.                     17:25:51

4       Q.    And prior to your deposition here         17:25:55

5   today, had you seen a copy of Exhibit 16?           17:25:58

6       A.    Oh, yes.                                   17:26:01

7       Q.    And when did you first see the            17:26:02

8   signed version of Exhibit 16?  In other words,      17:26:04

9   when did you first see the original with all of     17:26:10

10  the signatures, including the signatures of         17:26:12

11  Lindows.com and the Xandros entities?               17:26:15

12      A.    I really don't know.                      17:26:18

13      Q.    Let's move on to Exhibit 17.              17:26:21

14      A.    Okay.                                     17:26:23

15      Q.    Do you recognize Exhibit 17?             17:26:31

16      A.    I've seen it before, yes.                17:26:32

17      Q.    And when did you first see Exhibit       17:26:33

18  17?                                                 17:26:40

19      A.    Actually I think I first went            17:26:48

20  looking for it this past January, when Mr. Bego     17:26:49

21  mentioned it to me as being one of a number of      17:26:54

22  documents that related to the Lindows agreement.    17:26:57

23      Q.    And the copy of Exhibit 17 that we        17:27:02

24  have here before us, is that a copy that existed    17:27:06

25  in Xandros records, files?                          17:27:11
```

EXH **X** PG **80**

27

```
1                FREDERICK BERENSTEIN
2        A.    I think it was actually -- I could        17:27:17
3   be wrong, I think this was actually sent down        17:27:20
4   from Canada after Mike mentioned it.  But I'm        17:27:23
5   not really sure.                                     17:27:28
6        Q.    And by Canada, are you referring          17:27:30
7   to --                                                17:27:35
8        A.    Xandros Corporation, or the               17:27:38
9   attorneys there, at Fraser Milner Casgrain.          17:27:39
10       Q.    Who is the attorney at Fraser             17:27:43
11  Milner Casgrain?                                     17:27:48
12       A.    Tom Reaume, R-e-a-u-m-e.                  17:27:48
13       Q.    And in what city is Mr. Reaume            17:27:54
14  located?                                             17:27:59
15       A.    Ottawa.                                   17:28:00
16       Q.    Does Xandros, Inc. or Xandros             17:28:01
17  Corporation still utilize Mr. Reaume or Fraser       17:28:04
18  Milner Casgrain as attorneys?                        17:28:09
19       A.    Yes.                                      17:28:11
20       Q.    Do you know if the records relating       17:28:11
21  to Lindows.com and Xandros, Inc.'s relationship      17:28:14
22  with Lindows.com are still maintained at Fraser      17:28:19
23  Milner & Casgrain?                                   
24       A.    It's Fraser, F-r-a-s-e-r, Milner,         17:28:33
25  M-i-l-n-e-r, Casgrain, C-a-s-g-r-a-i-n, and I        17:28:26
```

EXH **X** PG **8|**

28

| | FREDERICK BERENSTEIN | |
|---|---|---|
| 1 | | |
| 2 | don't know if they still have the originals or | 17:28:35 |
| 3 | if they sent down everything they had. | 17:28:36 |
| 4 | Q.    At some point -- Mr. Roseman had | 17:28:40 |
| 5 | mentioned at some point that the attorneys may | 17:28:41 |
| 6 | have been instructed to send down their files. | 17:28:48 |
| 7 | Do you recall whether or not that's in fact | 17:28:50 |
| 8 | true? | 17:28:51 |
| 9 | A.    I'm not really sure.  That's why I | 17:28:52 |
| 10 | said I'm not sure whether they still have them | 17:28:53 |
| 11 | or whether they did sent them down at some | 17:28:55 |
| 12 | period of time. | 17:28:57 |
| 13 | Q.    When were those records -- there | 17:28:58 |
| 14 | were some records apparently that were sent | 17:29:00 |
| 15 | down? | 17:29:03 |
| 16 | A.    Yes.  But I don't know when. | 17:29:04 |
| 17 | That's why I'm not sure whether they still have | 17:29:06 |
| 18 | some or whether they actually sent them all | 17:29:08 |
| 19 | down.  But I remember there was a request to | 17:29:10 |
| 20 | send down documents at some point, but I just | 17:29:12 |
| 21 | don't remember when. | 17:29:15 |
| 22 | Q.    What was the cause of that request | 17:29:16 |
| 23 | that your attorneys send down documents? | 17:29:17 |
| 24 | A.    I don't remember if there was | 17:29:25 |
| 25 | anything specific that prompted that or whether | 17:29:29 |

EXH **X** PG 82

29

| | | |
|---|---|---|
| 1 | FREDERICK BERENSTEIN | |
| 2 | there was just a desire to have the contracts | 17:29:32 |
| 3 | and things in New York. | 17:29:35 |
| 4 | Q.    And by in New York, you are | 17:29:37 |
| 5 | referring to Xandros, Inc.'s offices in New | 17:29:37 |
| 6 | York? | 17:29:40 |
| 7 | A.    Yes. | 17:29:40 |
| 8 | Q.    And the records that were in fact | 17:29:40 |
| 9 | sent down, are those still in Xandros, Inc.'s | 17:29:42 |
| 10 | offices in New York? | 17:29:46 |
| 11 | A.    They should be. | 17:29:47 |
| 12 | Q.    You are not aware if they have been | 17:29:49 |
| 13 | transmitted to new counsel or have been | 17:29:51 |
| 14 | transmitted to another office somewhere? | 17:29:53 |
| 15 | A.    No, they shouldn't have been.  They | 17:30:03 |
| 16 | should be there. | 17:30:03 |
| 17 | Q.    Let's then take a look at Exhibit | 17:30:03 |
| 18 | 18, if you will, please. | 17:30:03 |
| 19 | A.    Okay. | 17:30:03 |
| 20 | Q.    Have you seen Exhibit 18 before? | 17:30:06 |
| 21 | A.    Yes. | 17:30:07 |
| 22 | Q.    When did you first see Exhibit 18? | 17:30:08 |
| 23 | A.    Probably about the same time I saw | 17:30:12 |
| 24 | this Exhibit 17. | 17:30:14 |
| 25 | Q.    That would have been sometime in | 17:30:18 |

EXH X PG 83

30

| | | |
|---|---|---|
| 1 | FREDERICK BERENSTEIN | |
| 2 | January of this year? | 17:30:19 |
| 3 | A.      Yeah, probably. | 17:30:21 |
| 4 | Q.      And just take a moment to review | 17:30:26 |
| 5 | Exhibit 18.  And I'm going to ask you if you | 17:30:28 |
| 6 | notice that Exhibit 18 has a number of blanks | 17:30:32 |
| 7 | which are not filled in. | 17:30:34 |
| 8 | A.      Correct. | 17:30:36 |
| 9 | Q.      Have you ever seen a version of | 17:30:37 |
| 10 | Exhibit 18 in which the blanks that are blank on | 17:30:38 |
| 11 | the exhibit have been filled in? | 17:30:44 |
| 12 | A.      No. | 17:30:46 |
| 13 | Q.      Do you have any information as to | 17:30:48 |
| 14 | why the version of Exhibit 18 was not filled in? | 17:30:49 |
| 15 | A.      No.  I mean, I asked Mr. Bego why | 17:30:58 |
| 16 | it wasn't filled in, and he said he couldn't | 17:31:01 |
| 17 | recall if it had ever been signed or not.  But | 17:31:04 |
| 18 | if it had been signed, the signed copy would be | 17:31:07 |
| 19 | in Canada.  Maybe that's why we asked for the | 17:31:11 |
| 20 | documents from Canada, I don't really remember. | 17:31:13 |
| 21 | Q.      Was it Mr. Bego that actually asked | 17:31:19 |
| 22 | for the documents to be sent from Canada, do you | 17:31:20 |
| 23 | recall? | 17:31:23 |
| 24 | A.      I actually don't recall. | 17:31:23 |
| 25 | Q.      So you've never seen an executed | 17:31:28 |

ExH **X** PG **84**

31

| | | |
|---|---|---|
| 1 | FREDERICK BERENSTEIN | |
| 2 | version of Exhibit 18? | 17:31:30 |
| 3 | A.    Not that I can recall. | 17:31:32 |
| 4 | Q.    And you've never seen a version of | 17:31:34 |
| 5 | 18 in which any of the blanks that are left -- | 17:31:36 |
| 6 | A.    You got broken up there.  What did | 17:31:40 |
| 7 | you say? | 17:31:42 |
| 8 | MR. STUART:  Mr. Robertson, there | 17:31:47 |
| 9 | is something you are doing next to the phone | 17:31:49 |
| 10 | that's causing some static. | 17:31:51 |
| 11 | Q.    My question, Mr. Berenstein, I'm | 17:31:57 |
| 12 | sorry it wasn't transmitted clearly, is, you | 17:31:59 |
| 13 | have never seen a version of Exhibit 18 in which | 17:32:03 |
| 14 | any of the blanks in the document have been | 17:32:06 |
| 15 | filled in; correct? | 17:32:08 |
| 16 | A.    Not that I can recall, no. | 17:32:09 |
| 17 | Q.    Do you have any information as to | 17:32:12 |
| 18 | whether or not such a version of Exhibit 18 ever | 17:32:13 |
| 19 | existed? | 17:32:16 |
| 20 | A.    No.  Other than what I just told | 17:32:18 |
| 21 | you, which was that Mr. Bego couldn't remember | 17:32:19 |
| 22 | if the document had ever been signed. | 17:32:22 |
| 23 | Q.    What I'm going to ask you about | 17:32:27 |
| 24 | now, Mr. Berenstein, are some additional data | 17:32:28 |
| 25 | points that Mr. Roseman stated that you would | 17:32:31 |

EXH **X** PG **85**

32

```
 1               FREDERICK BERENSTEIN

 2   have more information than he regarding.  And if      17:32:33

 3   you will just be patient, I'm going to review my      17:32:37

 4   notes.                                                17:32:41

 5        A.    Okay.                                      17:32:42

 6        Q.    First, there were a number of --           17:32:43

 7   Mr. Roseman discussed a number of financings          17:32:49

 8   that had occurred, or a number of investments in      17:32:55

 9   Xandros, Inc. that have occurred, and stated          17:32:58

10   that you would be the person more knowledgeable       17:33:01

11   regarding those financings and those                  17:33:04

12   investments.  That's the general category of the      17:33:06

13   next line of questioning, so you understand           17:33:11

14   that, sir.                                            17:33:11

15        A.    Okay.                                      17:33:11

16        Q.    Have there been any investments in         17:33:13

17   Xandros, Inc. in 2003?                                17:33:15

18        A.    In 2003?  Yes.                             17:33:20

19        Q.    How many?                                  17:33:24

20        A.    Do you mean how many individual            17:33:30

21   private people have put money into Xandros, Inc.      17:33:32

22   in 2003?                                              17:33:35

23        Q.    No, sir.  And I apologize if my            17:33:36

24   language in this regard is clumsy, I'm not a          17:33:39

25   corporate securities transactional lawyer.            17:33:41
```

EXH X PG 86

33

```
1                    FREDERICK BERENSTEIN

2        A.     Me neither.                          17:33:44

3        Q.     My question was probably more        17:33:46

4   directed to the number of closings, actual      17:33:51

5   closings of equity financings within 2003.      17:33:52

6        A.     Well, if you mean by equity          17:34:01

7   closings a formal closing involving, you know, a 17:34:03

8   securities document and that sort of thing, I    17:34:07

9   think just one.                                  17:34:10

10       Q.     Can you please identify that         17:34:12

11  closing.                                         17:34:15

12       A.     That was a closing -- what do you    17:34:18

13  mean by identify it, who were the parties to it? 17:34:20

14       Q.     Let's just start with when did it    17:34:23

15  occur.                                           17:34:25

16       A.     June 26th.                           17:34:26

17       Q.     And who was the investor?            17:34:31

18       A.     Well, it was a group of investors.   17:34:36

19  Private clients of some brokers in New York      17:34:40

20  City.                                            17:34:45

21       Q.     The broker being Allen Capital       17:34:45

22  Markets, I believe?                              17:34:48

23       A.     No.  Being Strasbourger Pearson      17:34:49

24  Tulcin & Wolff.                                  17:34:54

25       Q.     Do you recall how much that -- how   17:34:58
```

EXH __X__ PG __87__

34

| | | |
|---|---|---|
| 1 | FREDERICK BERENSTEIN | |
| 2 | much money was raised as a result of that | 17:35:01 |
| 3 | financing? | 17:35:03 |
| 4 | A.    I think the overall amount was | 17:35:05 |
| 5 | somewhere in the neighborhood of $1.6 million. | 17:35:11 |
| 6 | Q.    Is that the only private equity | 17:35:15 |
| 7 | financing of Xandros, Inc. that has occurred in | 17:35:18 |
| 8 | 2003? | 17:35:21 |
| 9 | A.    If you mean something like I | 17:35:22 |
| 10 | described, yes.  If you mean private individuals | 17:35:24 |
| 11 | separately, you know, buying securities or debt | 17:35:28 |
| 12 | notes into the company in 2003, no. | 17:35:32 |
| 13 | Q.    Let's talk about the other private | 17:35:37 |
| 14 | individuals buying debt notes.  Have there been | 17:35:39 |
| 15 | any such transactions in 2003? | 17:35:43 |
| 16 | A.    Yes. | 17:35:46 |
| 17 | Q.    How many? | 17:35:47 |
| 18 | A.    I would say approximately 40. | 17:35:51 |
| 19 | Q.    Can you describe general categories | 17:36:00 |
| 20 | of type of investments?  You mentioned a direct | 17:36:02 |
| 21 | investment -- | 17:36:07 |
| 22 | A.    Convertible note. | 17:36:08 |
| 23 | Q.    You mentioned one type was a direct | 17:36:09 |
| 24 | investment in securities, you mentioned another | 17:36:11 |
| 25 | type was a debt financing.  Can you give me | 17:36:14 |

EXH X PG 86

35

```
 1              FREDERICK BERENSTEIN
 2  categories?
 3       A.     The individual ones were all          17:36:18
 4  convertible debt.                                 17:36:19
 5       Q.     Convertible promissory notes?'        17:36:21
 6       A.     Yes.                                  17:36:24
 7       Q.     Are you aware that Lindows.com had    17:36:35
 8  in fact entered into a number of convertible      17:36:38
 9  promissory notes with Xandros, Inc.?              17:36:41
10       A.     Yes, I think so.  Is that what        17:36:44
11  those are?                                        17:36:53
12       Q.     Well, let me ask you that.  Take a    17:36:53
13  look at Exhibits 6, 7 and 8, if you will.         17:36:53
14       A.     Okay.                                 17:37:02
15       Q.     Do you recognize those documents?     17:37:03
16       A.     Yes.                                  17:37:04
17       Q.     What are they?                        17:37:04
18       A.     Convertible promissory notes.         17:37:06
19       Q.     Those are entered into between        17:37:09
20  Xandros, Inc. and Lindows.com; correct?           17:37:10
21       A.     Right.                                17:37:16
22       Q.     The convertible promissory notes      17:37:17
23  that you referred to that the separate            17:37:19
24  individuals entered into, are the same types of   17:37:22
25  instruments as the convertible promissory note.   17:37:24
```

EXH **X** PG 89

36

| | | |
|---|---|---|
| 1 | FREDERICK BERENSTEIN | |
| 2 | between Xandros, Inc. and Lindows.com; correct? | 17:37:29 |
| 3 | A.    Well, they are the same in the | 17:37:33 |
| 4 | sense that they are both called convertible | 17:37:34 |
| 5 | promissory notes, but the structure of the notes | 17:37:36 |
| 6 | is not the same. | 17:37:38 |
| 7 | Q.    Can you, as you sit here then, just | 17:37:39 |
| 8 | flesh that distinction out for me.  What's the | 17:37:44 |
| 9 | difference in the structure of the notes with | 17:37:46 |
| 10 | Lindows.com and the structure of the notes with | 17:37:48 |
| 11 | these other separate individuals who entered | 17:37:51 |
| 12 | into convertible promissory notes with Xandros, | 17:37:53 |
| 13 | Inc. this year? | 17:37:56 |
| 14 | A.    Just the amount of interest and the | 17:37:59 |
| 15 | terms of the conversion; the option of the | 17:38:00 |
| 16 | conversion. | 17:38:03 |
| 17 | Q.    In what way is the interest amount | 17:38:09 |
| 18 | different between the -- | 17:38:12 |
| 19 | A.    I didn't look.  I'll just take a | 17:38:16 |
| 20 | look now. | 17:38:18 |
| 21 | Q.    You mentioned that it was a | 17:38:20 |
| 22 | distinction, so I just want to flesh that out. | 17:38:21 |
| 23 | A.    Yes, for instance you have 8 | 17:38:35 |
| 24 | percent interest, ours is 7 percent interest. | 17:38:36 |
| 25 | Your conversion is based on an equity financing, | 17:38:40 |

EXH **X** PG 9D

37

| | | |
|---|---|---|
| 1 | FREDERICK BERENSTEIN | |
| 2 | and ours is not.  That kind of distinction. | 17:38:43 |
| 3 | Q.    Any other distinctions you | 17:38:49 |
| 4 | recognize? | 17:38:51 |
| 5 | A.    Not offhand. | 17:38:55 |
| 6 | Q.    And were each of those | 17:38:56 |
| 7 | approximately 40 separate investments all | 17:38:57 |
| 8 | convertible promissory notes, or were there | 17:39:02 |
| 9 | other types of investments? | 17:39:05 |
| 10 | A.    No, they are all convertible | 17:39:06 |
| 11 | promissory notes. | 17:39:08 |
| 12 | Q.    And with regards to each of those | 17:39:09 |
| 13 | approximate 40 convertible promissory notes, was | 17:39:10 |
| 14 | there also a separate strategic alliance | 17:39:13 |
| 15 | agreement signed with any of those individuals? | 17:39:16 |
| 16 | A.    No. | 17:39:19 |
| 17 | Q.    The convertible promissory notes | 17:39:21 |
| 18 | were freestanding in that regard? | 17:39:22 |
| 19 | A.    Yes. | 17:39:24 |
| 20 | Q.    I'm going to ask you the same | 17:39:34 |
| 21 | question with regards to 2002.  Were there any | 17:39:36 |
| 22 | equity closings in 2002, the same type that you | 17:39:40 |
| 23 | identified on June 26th of 1.6 million? | 17:39:45 |
| 24 | A.    There were equity financings in | 17:39:54 |
| 25 | 2002, but not of this same type. | 17:39:57 |

EXH X PG 91

38

| | | |
|---|---|---|
| 1 | FREDERICK BERENSTEIN | |
| 2 | Q.    How many equity financings occurred | 17:40:02 |
| 3 | in 2002? | 17:40:03 |
| 4 | A.    I could be wrong.  If I had to | 17:40:12 |
| 5 | estimate, I would estimate between six and nine. | 17:40:15 |
| 6 | Q.    Do you recall the approximate | 17:40:20 |
| 7 | dates? | 17:40:21 |
| 8 | A.    There were two or three in February | 17:40:24 |
| 9 | of 2002.  Two or three in March of 2002. | 17:40:26 |
| 10 | Possibly another one in May.  And another one in | 17:40:37 |
| 11 | August, I believe.  Or two in August. | 17:40:43 |
| 12 | Q.    And do you recall the approximate | 17:40:51 |
| 13 | amounts of each of those equity financings? | 17:40:52 |
| 14 | A.    Well, not of each of them.  There | 17:40:57 |
| 15 | was one for 300,000, I think one for 150,000, | 17:41:02 |
| 16 | another for 100,000, another for 50,000, another | 17:41:06 |
| 17 | for 250,000.  Another for 50,000.  Those are the | 17:41:10 |
| 18 | ones that I can remember offhand. | 17:41:17 |
| 19 | Q.    You said there was only one for | 17:41:20 |
| 20 | 250,000 that you can recall? | 17:41:22 |
| 21 | A.    I think there was only one for 250. | 17:41:25 |
| 22 | There was another one for 300.  Actually -- no, | 17:41:27 |
| 23 | that's right, I think there was only one for | 17:41:33 |
| 24 | 250. | 17:41:34 |
| 25 | Q.    Would these equity financings be | 17:41:35 |

EXH X PG 92

39

```
  1              FREDERICK BERENSTEIN
  2   identified on the cap sheet for Xandros, Inc.?        17:41:37
  3        A.    I would imagine so.  I don't keep          17:41:44
  4   the cap sheets.  The way the partnership works        17:41:47
  5   basically is that Will comes from the financial       17:41:50
  6   world and I come from the technology world.  So       17:41:54
  7   keeping financial things and spreadsheets,            17:41:57
  8   things like that, is not something that I do.         17:42:00
  9        Q.    So it would be Mr. Roseman that            17:42:02
 10   keeps the cap sheets?                                 17:42:04
 11        A.    Yeah.                                       17:42:05
 12        Q.    Is Mr. Bego currently an employee          17:42:37
 13   of Xandros Corporation?                               17:42:40
 14        A.    No.                                         17:42:42
 15        Q.    Is he currently an employee of            17:42:44
 16   Xandros, Inc.?                                         17:42:46
 17        A.    No.                                         17:42:47
 18        Q.    Is he an employee of LGP?                  17:42:47
 19        A.    No.                                         17:42:50
 20        Q.    When did his employment with              17:42:53
 21   Xandros, Inc. end?                                     17:42:55
 22        A.    He was never an employee of               17:43:00
 23   Xandros, Inc.                                          17:43:03
 24        Q.    I'm sorry.  When did his employment       17:43:03
 25   with Xandros Corporation end?                          17:43:04
```

ExH __X__ PG 93

40

```
 1              FREDERICK BERENSTEIN
 2        A.     He was never an employee of Xandros      17:43:07
 3   Corporation.  He was always an employee of Linux    17:43:09
 4   Global Partners.  We loaned him to Xandros          17:43:12
 5   Corporation to act as interim president.  I told    17:43:14
 6   you that at the beginning.                          17:43:17
 7        Q.     And that's the only relationship         17:43:19
 8   that Mr. Bego had, as far as you're aware, with     17:43:20
 9   either Xandros, Inc. or Xandros Corporation;        17:43:23
10   correct?                                            17:43:25
11        A.     That's the only relationship that        17:43:27
12   he had.                                             17:43:28
13              Again, at the time that we started       17:43:35
14   working on this, as I said, we are a very small     17:43:38
15   company, Mr. Roseman has a young child that he's    17:43:42
16   responsible for every day, and was not a            17:43:46
17   candidate to spend three or four days a week in     17:43:50
18   Ottawa.  And as I told you, I was fairly            17:43:51
19   mortally ill at the time, so I was also not a       17:43:53
20   candidate.  So we loaned Mr. Bego to Canada.        17:43:56
21        Q.     Thank you, sir.                          17:44:15
22              The current CEO of Xandros, Inc.,        17:44:49
23   who is that?                                        17:44:56
24        A.     Andreas Typaldos.  T-y-p-a-l-d-o-s.      17:44:57
25        Q.     And as far as you're aware, what         17:45:03
```

EXH X PG 94

41

1                    FREDERICK BERENSTEIN

2   are the other officers of Xandros, Inc.?              17:45:05

3        A.     I think Will is the secretary.  And       17:45:13

4   I think I'm the treasurer.  Or it may be the          17:45:16

5   other way around.  If you are talking about           17:45:19

6   officers of the board.                                17:45:23

7        Q.     With whom does Xandros, Inc.              17:45:32

8   currently do its banking?                             17:45:34

9        A.     In Canada or -- Xandros, Inc.,            17:45:37

10  North Fork Bank.                                      17:45:43

11       Q.     Same question with regards to            17:45:47

12  Xandros Corporation.                                  17:45:50

13       A.     Royal Bank of Canada.                     17:45:51

14       Q.     With whom does LGP do its banking?        17:45:54

15       A.     North Fork Bank.                          17:45:57

16       Q.     Do LGP and Xandros maintain              17:45:59

17  separate bank accounts?                               17:46:02

18       A.     Yes.                                      17:46:03

19       Q.     How many bank accounts does             17:46:05

20  Xandros, Inc. maintain at North Fork Bank?            17:46:06

21       A.     One.                                      17:46:10

22       Q.     How many bank accounts does North        17:46:13

23  Fork Bank maintain at -- does LGP maintain at         17:46:17

24  North Fork Bank?                                      17:46:21

25       A.     One.                                      17:46:22

EXH **X** PG 95

42

```
 1              .        FREDERICK BERENSTEIN
 2         Q.      Those are general corporate entity      17:46:24
 3    checking accounts, I would assume?                   17:46:27
 4         A.      Yes.                                     17:46:30
 5         Q.      Is that correct?                         17:46:30
 6                 Is that correct, sir?                    17:46:35
 7         A.      Yes.                                     17:46:36
 8         Q.   .  Apart from the relationship with         17:46:39
 9    North Fork Bank, does either LGP or Xandros,         17:46:41
10    Inc., have other banking relationships currently     17:46:44
11    with any other financial institutions?               17:46:46
12         A.      Not that I know of.                      17:46:50
13         Q.      Are you aware of whether or not          17:46:51
14    Xandros, Inc. has had in the past any                17:46:52
15    relationships with any banking institution other    17:46:54
16    than North Fork Bank?                                17:46:56
17    .    A.      No, they haven't.                        17:46:58
18         Q.      Same question with regards to LGP,       17:47:01
19    has LGP had a relationship with any other            17:47:03
20    entity,. any other banking entity, other than        17:47:05
21    North Fork Bank?                                      17:47:10
22         A.      Well, North Fork Bank originally         17:47:10
23    was a different bank, which was a different bank     17:47:12
24    before that, just different names.  It was           17:47:14
25    originally I think Commercial Bank of New York,      17:47:16
```

ExH **X** PG 96

43

```
 1                  FREDERICK BERENSTEIN

 2   and then maybe -- I forgot whether it became        17:47:19

 3   something else after that and then became North     17:47:22

 4   Fork Bank, or whether it just went from being       17:47:25

 5   Commercial Bank to North Fork Bank.                 17:47:27

 6       Q.    And my next line of questioning           17:47:32

 7   would be with regards to the current owners of      17:47:35

 8   Xandros, Inc., the number of shares that each       17:47:38

 9   shareholder would have.                             17:47:41

10       A.    Um-hum.                                   17:47:43

11       Q.    You earlier deferred to Mr. Roseman       17:47:44

12   in that regard.  And I'm wondering if your          17:47:46

13   response would be the same with regards to          17:47:50

14   questions as to who are the major investors in      17:47:51

15   Xandros, Inc.  Would you also defer to              17:47:55

16   Mr. Roseman in that regard?                         17:47:58

17       A.    Well, no.  I know who the major           17:48:00

18   owners of Xandros, Inc. are.                        17:48:01

19       Q.    Well, let's talk about that then.         17:48:04

20       A.    Linux Global Partners and Corel           17:48:06

21   Corporation.                                        17:48:10

22       Q.    Do you know how many shares or what       17:48:11

23   percentage of Xandros, Inc. either of those         17:48:12

24   entities own?                                       17:48:15

25       A.    I would say Linux Global Partners,        17:48:20
```

EXH **X** PG 97

44

```
 1              FREDERICK SERENSTEIN
 2   probably somewhere north of 80 percent.  Corel     17:48:24
 3   Corporation, around 5 percent.  Then there is an   17:48:27
 4   option pool.  And there may be some small          17:48:31
 5   shareholders.  I'm not quite sure under            17:48:37
 6   financial rules whether people who have invested  17:48:41
 7   in the convertible note are considered             17:48:43
 8   shareholders until they actually convert their     17:48:45
 9   note into shares.  I think up until that point     17:48:48
10   they are not on the cap charts, they are just      17:48:50
11   debt holders.  But I could be wrong, that's not    17:48:53
12   my strong point.                                   17:48:56
13        Q.    Are you as an individual an owner       17:48:57
14   of Xandros, Inc.?                                  17:48:59
15        A.    No.                                     17:49:01
16        Q.    Are you as an individual an owner       17:49:03
17   of LGP?                                            17:49:05
18        A.    Yes.                                    17:49:06
19        Q.    What percentage or how many shares?     17:49:07
20        A.    I don't know, I would estimate          17:49:14
21   maybe 20 percent of LGP.                           17:49:16
22             MR. STUART:  Let's go off the            17:49:35
23   record briefly, I believe I'm finished with the   17:49:35
24   questioning.                                       17:49:40
25             THE VIDEO OPERATOR:  We are going        17:49:41
```

ExH **X** PG 98

45

| | | |
|---|---|---|
| 1 | FREDERICK BERENSTEIN | |
| 2 | off the record, the time is 5:49. | 17:49:42 |
| 3 | (Discussion off the record.) | 17:56:35 |
| 4 | THE VIDEO OPERATOR:  We are back on | 17:56:36 |
| 5 | the record, the time is 5:56. | 17:56:36 |
| 6 | BY MR. STUART: | 17:56:40 |
| 7 | Q.    Mr. Berenstein, thank you.  I have | 17:56:43 |
| 8 | just a few follow-up questions, and we should be | 17:56:47 |
| 9 | finished. | 17:56:49 |
| 10 | A.    Okay. | 17:56:50 |
| 11 | Q.    If you could please take a look at | 17:56:51 |
| 12 | Exhibits 6, 7 and 8 again, which are the three | 17:56:54 |
| 13 | convertible promissory notes. | 17:57:01 |
| 14 | A.    Right. | 17:57:04 |
| 15 | Q.    Did you have any personal role in | 17:57:05 |
| 16 | the negotiation of these three notes? | 17:57:08 |
| 17 | A.    No. | 17:57:14 |
| 18 | Q.    Do you have any personal knowledge | 17:57:18 |
| 19 | as to the terms that were negotiated at the time | 17:57:18 |
| 20 | of the negotiation? | 17:57:23 |
| 21 | A.    Just what Mr. Bego told me. | 17:57:27 |
| 22 | Q.    What did he tell you? | 17:57:29 |
| 23 | A.    He told me that he was negotiating | 17:57:33 |
| 24 | an arrangement whereby Lindows.com would build a | 17:57:35 |
| 25 | product based on Xandros's LinuxOS, and that we | 17:57:41 |

EXH **X** PG 99

46

1              FREDERICK BERENSTEIN

2   would be getting 50 percent of your revenues.        17:57:49

3   And that because financing had been so difficult     17:57:53

4   after 9/11, that the company had agreed to           17:58:00

5   advance us $750,000 in advance royalties that        17:58:06

6   would be broken up into three notes, although if     17:58:12

7   memory serves me, two of those notes, or at          17:58:18

8   least there was like one deposit of $250,000 and     17:58:23

9   then a subsequent one of $500,000.  So maybe the     17:58:26

10  last two notes came in at the same time, I           17:58:37

11  really don't know.                                   17:58:37

12       Q.    Is there anything else that              17:58:37

13  Mr. Bego told you, as you sit here today that        17:58:37

14  you recall?                                          17:58:40

15       A.    Well, you asked me about the notes.      17:58:42

16  That's how he described the negotiations with        17:58:43

17  me.  He negotiated these things directly with I      17:58:45

18  think Kevin Carmony is his name.                     17:58:51

19       Q.    And at the time that Mr. Bego was        17:58:54

20  negotiating these notes, what was his role with      17:58:57

21  Linux Global Partners?                               17:59:00

22     · A.    He was still a vice president of         17:59:03

23  Linux Global Partners, and he was the acting         17:59:06

24  president of Xandros Corp., I guess.                 17:59:09

25       Q.    But he had no role with Xandros,  ·       17:59:18

                                                              47

EXH **X** PG 100

```
1                    FREDERICK BERENSTEIN
2    Inc., as you testified earlier; correct?        17:59:19
3         A.    That's correct.                       17:59:22
4                MR. STUART:  I have nothing           17:59:24
5    further.                                          17:59:25
6                MR. ROBERTSON:  I don't think he      17:59:26
7    said he had no role.  He said he was not an       17:59:27
8    employee.                                         17:59:29
9                THE WITNESS:  Right.  Correct.        17:59:30
10               MR. STUART:  Is that an objection,    17:59:35
11   Mr. Robertson?                                    17:59:38
12   BY MR. STUART:                                    17:59:39
13        Q.    Did Mr. Bego have any role with        17:59:40
14   Xandros, Inc. in this period of time?            17:59:42
15        A.    In the sense that everybody had a     17:59:45
16   role, these are three very small companies.  He  17:59:48
17   didn't have, as Mr. Robertson pointed out, he    17:59:50
18   wasn't employed by Xandros, Inc.                  17:59:53
19        Q.    And he wasn't an officer of           17:59:55
20   Xandros, Inc.?                                    17:59:57
21        A.    That's correct.                        17:59:57
22        Q.    And he wasn't a director of           17:59:57
23   Xandros, Inc.?                                    17:59:58
24        A.    That's correct.                        17:59:59
25        Q.    His relationship was with -- in       18:00:00
```

EXH X PG |C|

48

```
 1                  FREDERICK BERENSTEIN
 2  that regard his relationship was with Xandros      18:00:03
 3  Corporation, LGP?                                  18:00:08
 4      A.    That's correct.                          18:00:10
 5            MR. STUART:  I have nothing              18:00:10
 6  further.                                           18:00:12
 7            MR. ROBERTSON:  Same stipulation as      18:00:15
 8  yesterday?                                         18:00:16
 9            MR. STUART:  As yesterday, yes.          18:00:16
10            THE VIDEO OPERATOR:  Here marks the      18:00:22
11  end of videotape No. 1 in the deposition of        18:00:23
12  Frederick Berenstein.  The original videotape      18:00:26
13  will be retained by LegaLink San Diego at 550      18:00:29
14  West C street, San Diego, California.  Going off   18:00:33
15  the record, the time is 6 o'clock.                 18:00:36
16            (Time noted:  6:00 p.m.)                 18:00:41
17
18                  _____
19                  FREDERICK BERENSTEIN
20
21  Subscribed and sworn to before me
22  this _____ day of _____, 2003.
23
24  _____
25
                    EXH  X  PG 10.2
                                                             49
```

```
 1                    FREDERICK BERENSTEIN
      STATE OF NEW YORK     )
 2                          ss:
      COUNTY OF NEW YORK    )
 3
         I wish to make the following changes, for the
 4    following reasons:
 5    PAGE LINE
      ____ ____  CHANGE _____
 6              REASON:_____
 7    ____ ____  CHANGE _____
               REASON:_____
 8
               CHANGE _____
 9              REASON:_____
10    ____ ____  CHANGE _____
               REASON:_____
11
               CHANGE _____
12              REASON:_____
13    ____ ____  CHANGE _____
               REASON:_____
14
               CHANGE _____
15              REASON:_____
16    ____ ____  CHANGE _____
               REASON:_____
17
               CHANGE _____
18              REASON:_____
19
20              _____
21                    FREDERICK BERENSTEIN
22    Subscribed and sworn to before me
23    this _____ day of _____, 2003.
24
25    _____
```

EXH X PG 103

50

**CERTIFIED COPY**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

-----------------------------------x

LINDOWS.COM, INC., a Delaware

corporation,

Plaintiff,

Case No. 02

CV 2460 BTM(RBB)

-against-

XANDROS, INC., a Delaware corporation;

LINUX GLOBAL PARTNERS, INC., a Delaware

corporation; MICHAEL BEGO, an individual;

WILLIAM JAY ROSEMAN, an individual,

Defendants.

-----------------------------------x

October 29, 2003

3:15 p.m.


Deposition of WILLIAM JAY ROSEMAN, taken by

Plaintiff, pursuant to notice, at the offices of

Paul Hastings Janofsky & Walker LLP, 75 East 55th

Street, New York, New York, before Jack Finz, a

Certified Shorthand Reporter and Notary Public

within and for the State of New York.


EXH **Y** PG **104**



**LEGALINK®**

A **WORDWAVE** COMPANY

LegaLink San·Diego
550 West C Street, Suite 1440
San Diego, CA 92101

tel (619)·544-8344
tel (800) 544-3656
fax (619) 544-8345

www.legalink.com

```
 1

 2   A P P E A R A N C E S:

 3        PAUL HASTINGS JANOFSKY & WALKER LLP
          Attorneys for Plaintiff
 4             3579 Valley Centre Drive
               San Diego, California 92130

 5

          BY:   COLBERN C. STUART III, ESQ.
 6

 7        LaBELLA & McNAMARA, LLP
          Attorneys for Defendants
 8             401 West "A" Street, Suite 1150
               San Diego, California 92101

 9

          BY:   ANDREW W. ROBERTSON, ESQ.
10

11   ALSO PRESENT:

12        FREDERICK BERENSTEIN

13        JAMES T. BRADY, Videographer

14

15

16

17

18

19

20

21

22

23

24

25
```

EXH __Y__ PG 105

2

1

2          THE VIDEOGRAPHER:  Today's date is

3   October 29, 2003.  The time is 4:21 p.m.  My name

4   is Jim Brady.  I'm the videographer.  And we are

5   going on the record.

6          W I L L I A M    J A Y    R O S E M A N,

7   having been first duly sworn by the Notary Public

8   (Jack Finz), was examined and testified as

9   follows:

10         THE VIDEOGRAPHER:  Could we go off

11  the record for one second?

12         MR. STUART:  Yes.

13         THE VIDEOGRAPHER:  Back on the

14  record.  The time is 3:22.

15         EXAMINATION BY MR. STUART:

16     Q.   Mr. Roseman, as I was saying, my name

17  is Cole Stuart.  I'm the counsel for the

18  plaintiff Lindows.com in this matter, and you

19  have been called here to testify, give your

20  deposition testimony, as both a personal witness,

21  as a defendant in this action, as well as as a

22  30(b)(6) witness for two other defendants in this

23  action.  Those two defendants are Xandros, Inc.,

24  as well as Linux Global Partners.  And I believe

25  that is also an Inc.  Yes.

EXH Y PG 10

3

William Jay Roseman                    10/29/03                    Lindows.com v. Xandros

```
 1                    WILLIAM JAY ROSEMAN

 2              Do you understand that?

 3         A.   Yes, I do.

 4         Q.   Now, let me go over some of the rules

 5    of the road of the deposition so that we will

 6    have a common understanding of what's going to be

 7    ongoing today and how we should conduct this

 8    deposition.  But, first of all, please, could you

 9    state your full name for the record?

10         A.   William Jay Roseman, R-o-s-e-m-a-n.

11         Q.   And what's your middle name?

12         A.   Jay.

13         Q.   J-a-y?

14         A.   Yes.

15         Q.   Mr. Roseman, you have just taken an

16    oath to tell the truth, the whole truth and

17    nothing but the truth, and do you understand that

18    that oath is to be taken with the same

19    seriousness as if we were in a court of law here

20    today?

21         A.   I do.

22         Q.   And you have been called here today

23    and we are conducting this deposition in a law

24    office and via a telephonic and video conference,

25    and we are obviously not in a court of law, but
```

EXH Y PG 107

4

```
 1              WILLIAM JAY ROSEMAN

 2   do you understand that your testimony can be used

 3   in a court of law and, therefore, you consider

 4   your testimony given here today with the same

 5   seriousness and solemnity as if it were being

 6   given in a court of law?

 7        A.    I do.

 8        Q.    Have you ever had your deposition

 9   taken before?

10        A.    Yes.

11        Q.    On how many occasions?

12        A.    30 times or more.

13        Q.    And can you just describe for me in

14   general why you had your deposition taken 30

15   times?  That seems like an awful lot.

16        A.    I'm the mayor of my community, and

17   each time our community goes through a suit, I'm

18   typically deposed as mayor, and I've been an

19   elected official for 24 years, so during that

20   period of time I've done many depositions,

21   perhaps more than 30.

22        Q.    You are quite experienced.  And,

23   therefore, I probably won't go over all the

24   details.  But do you understand the general rules

25   of a deposition?
```

EXH __Y__ PG 108

5

1          WILLIAM JAY ROSEMAN

2     A.   I do.

3     Q.   So that we can dispense with some of

4 these ground discussions?

5     A.   Yes.  I believe I do.

6     Q.   The one I do want to mention, though,

7 is because we are not face-to-face here today,

8 there may be difficulties in transmission of

9 words, and you may not completely understand my

10 question, and sometimes my questions may not be

11 good ones.  And if you don't understand my

12 question, please let me know and I will attempt

13 to rephrase the question in a way that's clearer

14 to you.

15     A.   Yes, I understand that.

16     Q.   Do you have before you the exhibits

17 that have been provided?

18     A.   I do.  I'm assuming they're complete,

19 but I've not had the opportunity to go through

20 them.

21     Q.   Okay.  Why don't you take a look at

22 Exhibit 1.  This is plaintiff Lindows.com's

23 re-notice of 30(b)(6) deposition, defendant

24 Xandros, Inc., and you have been designated, have

25 you not, as the 30(b)(6) deponent for defendant

EXH Y PG 109

6

```
1                    WILLIAM JAY ROSEMAN

2   Xandros, Inc.; correct?

3        A.    Yes.  Am I the only one that's a

4   30(b)(6) deponent?

5             MR. ROBERTSON:  Yes.

6        A.    I don't know what the significance

7   is.  I've never heard the terminology of

8   30(b)(6).

9             MR. ROBERTSON:  It's just a term

10  under the federal rules for the person who is

11  most familiar with the books and records.

12            THE WITNESS:  Okay.  I see.

13            MR. ROBERTSON:  The company has

14  designated a person on behalf of the company.

15            THE WITNESS:  Okay.  I see.

16        Q.    Specifically, Mr. Roseman, if you

17  look at page 4 of the 30(b)(6) deposition notice,

18  under the title "30(b)(6) Deposition Topics,"

19  those are the topics that you have been

20  designated as the witness for Xandros, Inc., as

21  the most knowledgeable person on behalf of

22  Xandros, Inc., for each of these topics.

23            Are you, in fact -- there are ten

24  topics listed there, the last two going on to

25  page 5.  Are you, in fact, the person most
```

ExH **Y** PG 110

7

```
1              WILLIAM JAY ROSEMAN

2  knowledgeable for Xandros, Inc., for each and

3  every of these topics?

4       A.    I believe I am.

5       Q.    Would you also please look on page 7,

6  it is an unnumbered page -- I'm sorry, page 6, it

7  is the last page, that includes a document

8  request.

9       A.    Yes.

10      Q.    Do you see that page?

11      A.    I do.

12      Q.    Have you brought any documents with

13 you here in response to this document production

14 request?

15      A.    You know, I don't have page 6.  I

16 have document request.  It's not numbered 6, but

17 I'm assuming it is 6.  But I believe all the

18 documents that we had copies of we have

19 previously given to our attorney, Andy

20 Robertson.

21            MR. ROBERTSON:  That's correct.

22 Under the arrangement with the magistrate, the

23 documents that are responsive to the various

24 amended requests based on negotiations with the

25 magistrate have been produced.
```

EXH **Y** PG _III_

8

William Jay Roseman                 10/29/03                 Lindows.com v. Xandros

1              WILLIAM JAY ROSEMAN

2        Q.    But you have not brought any of those

3   documents with you here today; is that correct?

4        A.    No, I have not.

5        Q.    Let's go on to Exhibit 2.  I am going

6   to ask you the same questions with regards to

7   Exhibit 2.  Specifically, there are three topics

8   listed on page 2 and 3 regarding the 30(b)(6)

9   deposition of defendant Linux Global Partners,

10  Inc.  Are you, in fact, the witness most

11  knowledgeable with respect to each of those three

12  topics?

13       A.    I'm just reading them.  Bear with me

14  one second.

15             I believe I am.

16       Q.    Let's go to Exhibit 4.

17       A.    Skipping Exhibit 3.  Okay.

18       Q.    Yes.  Exhibit 3 is a deposition

19  notice of Mr. Bego.  We have already dealt with

20  Mr. Bego's notice of deposition.

21             Go to Exhibit 4, which is the

22  re-notice of the deposition of yourself.  And if

23  you could please refer to pages 4 and 5 of that

24  notice.  That identifies six categories of

25  documents.  I trust that your response to my

EXH Y  PG 112

9

```
 1              WILLIAM JAY ROSEMAN

 2   question regarding whether or not you brought the

 3   categories of documents referenced in these two

 4   pages would be similar to your response to my

 5   questions regarding Linux Global Partners.

 6        A.    Yes.

 7        Q.    In other words, you have not --

 8        A.    I've not brought documents in the

 9   context that any copies of documents that we've

10   had we previously submitted.

11        Q.    Okay, thank you very much.

12              Outside of your depositions given

13   pursuant to your role as an officer or elected

14   official of the community, or of any public

15   entity, have you given your deposition in any

16   other type of action?

17        A.    No.

18        Q.    Have you given trial testimony in any

19   action whatsoever?

20        A.    Other than in my position as an

21   elected official?

22        Q.    Including in your position as an

23   elected official, given trial testimony, not

24   merely deposition testimony.

25        A.    Yes, I have.
```

EXH **Y** PG 113

10

```
1                   WILLIAM JAY ROSEMAN

2         Q.    On how many occasions?

3         A.    Many.  I would wager to say in excess

4    of 15, 20, I'm assuming.  I don't quite

5    remember.  But it was --

6         Q.    Okay.

7         A.    I mean, I'm assuming it was over -- I

8    guess more than 10, 15 times.

9         Q.    Okay.  Your best recollection is

10   fine.  Thank you.

11                And in each of those 10 or 15 times,

12   however many there are, was your trial testimony

13   given pursuant to your role as an elected

14   official?

15        A.    Yes.

16        Q.    And you have never given trial

17   testimony outside of the scope and outside of the

18   context of your role as an elected official?

19        A.    You know what, one time a builder had

20   stolen $40,000 from us, when we were building our

21   home, and I did on that one occasion.  But that

22   would be it.

23        Q.    And when did you give that trial

24   testimony?

25        A.    12 years ago.
```

ExH **Y** PG 114

11

1          WILLIAM JAY ROSEMAN

2      Q.    And what was the name of that case,

3   if you recall?

4      A.    I guess it was Roseman versus -- I

5   don't remember the name of the company that we

6   were suing.  It was a company that -- it was an

7   individual that absconded with our money.  We had

8   given him a down payment to build our house, and

9   he disappeared, and then they found him a year

10  later.

11     Q.    You don't recall --

12     A.    You know what, the prosecutor's

13  office had filed -- it was the prosecutor filed a

14  complaint against him, not my wife and myself, so

15  we were just -- because he had done it to many

16  other people as well, and I just testified at

17  that hearing.

18     Q.    So it was only a criminal proceeding,

19  not a civil proceeding?

20     A.    Yes.  Yes.

21     Q.    And it was brought by the State of

22  New Jersey?

23     A.    Yes, the County of Bergen.

24     Q.    Can you spell that, please?

25     A.    County of Bergen, B-e-r-g-e-n.

EXH **Y** PG 115

12

1                    WILLIAM JAY ROSEMAN

2          Q.    Thank you.

3                Mr. Roseman, I'm going to go over

4    some of your more or less recent history as an

5    owner of businesses and/or officer or director,

6    as well as your work history, and that may

7    include your role as an officer or any other

8    private positions you may have held.

9                Can you please tell me, what is your

10   current job?

11         A.    I am director and secretary of

12   Xandros, X-a-n-d-r-o-s.

13         Q.    How long have you been director and

14   secretary of Xandros?  And that's Xandros, Inc.;

15   is that correct?

16         A.    Well, I've been a director since its

17   inception, and I've been secretary -- yes,

18   Xandros, Inc.  And I've been a director -- a

19   secretary, I guess, in the past two months, I

20   think, maybe three months.

21         Q.    Who preceded you as secretary of

22   Xandros, Inc.?

23         A.    I don't recall.  I had done the

24   position prior to that, but I was not appointed

25   formally as secretary.

EXH Y PG 116

13

1           WILLIAM JAY ROSEMAN

2       Q.    So you performed the roles and

3   responsibilities of secretary but you only became

4   formally appointed within the last two or three

5   months?

6       A.    Yes.

7       Q.    And for how long had you been

8   performing those roles and responsibilities of

9   secretary prior to that two or three months?

10      A.    I guess since Xandros' inception.  I

11  should tell you I have a horrific memory for

12  dates and lengths of time.  So I guess I've been

13  doing that position -- was your question how long

14  have I been doing that position prior to my

15  formal appointment?

16      Q.    Yes.

17      A.    I guess maybe a year and a half, two

18  years prior, approximately.

19      Q.    And that would be since Xandros'

20  inception?

21      A.    Yes.

22      Q.    Do you recall roughly the time period

23  of Xandros' inception?

24      A.    I think it was August of 2001.  I

25  could be wrong, though.  I don't recall the exact

EXH __Y__ PG _11_                    14

1                    WILLIAM JAY ROSEMAN

2   date.

3       Q.    And to the extent that you do recall

4   general dates or general time frames, we are not

5   going to require that you as you sit here give us

6   exact dates if you don't recall them, but to the

7   extent that you do recall them, your best

8   recollection or estimate or time frame, as close

9   as you can estimate that, would suffice.

10      A.    Okay.   Thank you.

11      Q.    Do you hold any other positions as an

12  officer or director with Xandros?

13      A.    No, I do not.

14      Q.    How long have you been a member of

15  the board of directors?

16      A.    Since Xandros' inception.

17      Q.    Do you hold any other positions as an

18  officer and/or director of any other corporation?

19      A.    Linux Global Partners.

20      Q.    And what is your role with Linux

21  Global Partners?

22      A.    I am a director there.

23      Q.    How long have you been a director

24  with Linux Global Partners?

25      A.    Since its inception.

EXH __Y__ PG _118_                          15

```
 1                    WILLIAM JAY ROSEMAN
 2         Q.    And when was that inception?
 3         A.    I believe it was 1998 or 1999.
 4         Q.    Have you ever held a position as an
 5  officer of Linux Global Partners?
 6         A.    I have.
 7         Q.    What was that position?
 8         A.    I was vice president.
 9         Q.    Are you still vice president?
10         A.    You know, I don't -- no.  Linux
11  Global Partners is a passive investment company,
12  so we really don't have active officers, so to
13  speak.
14         Q.    Do you have officers?
15         A.    We do.
16         Q.    Are you now an officer?
17         A.    I believe -- Rick is saying I am.
18               THE WITNESS:  What am I, Rick?
19               DR. BERENSTEIN:  I think the same
20  thing, vice president, maybe treasurer.
21         A.    Rick says I'm vice president and
22  treasurer.
23         Q.    Is that your testimony?  Is that your
24  best recollection of what your position is today?
25         A.    It could be, yes.
```

EXH Y PG 119                                        16

1              WILLIAM JAY ROSEMAN

2        Q.    Is it your testimony that you don't

3   know what your position is?

4        A.    Well, I mean, we don't really --

5   because it's passive investments, we don't

6   actively work at Linux Global Partners.  We have

7   made -- the structure of Linux Global Partners is

8   such that we have made investments in various

9   companies.  But I can't say that we are actively

10  involved on a day-to-day basis there.  Once the

11  investments are made, we don't -- it's an

12  investment company, so to speak.

13       Q.    Does Linux Global Partners -- and, by

14  the way, Linux Global Partners is also

15  occasionally referred to as LGP, is it not?

16       A.    Yes.

17       Q.    And we agree that if you or I refer

18  to the word LGP, that that refers to Linux Global

19  Partners, Inc., which is also a defendant in this

20  action?

21       A.    Yes.

22       Q.    Okay, thank you.

23             Are there other officers of LGP

24  currently?

25       A.    No -- yes, Dr. Berenstein.

EXH **Y** PG 126

17

```
 1                    WILLIAM JAY ROSEMAN

 2         Q.    And what is his role?

 3         A.    I think he's president.

 4               Oh, Rick is CEO.  I'm sorry.

 5         Q.    And are there other officers, apart

 6   from you and Mr. Berenstein, currently?

 7         A.    No, there are not.

 8         Q.    Have there ever been any other

 9   officers, other than you and Mr. Berenstein?

10         A.    Yes, there have been.

11         Q.    Who are they?

12         A.    Thomas Langbein.

13         Q.    Can you spell Mr. Langbein's last

14   name?

15         A.    L-a-n-g-b-e-i-n.

16         Q.    And what was his role and what dates

17   did he hold those roles?

18         A.    I don't quite remember the date, but

19   he served as president for a period of time.  But

20   I don't recall the dates.

21         Q.    Do you recall the years?

22         A.    Probably he -- up until maybe the

23   earlier part of this year, to maybe -- he was on

24   the board of directors since LGP's inception, and

25   he was president up until, I guess -- yes, the
```

EXH Y PG 121

18

1              WILLIAM JAY ROSEMAN

2    beginning of 2003.  I don't quite remember the

3    date that he no longer became president.

4         Q.   Would there be a document in LGP's

5    records that would reflect the dates of Mr.

6    Langbein's role as an officer?

7         A.   There could be.  Although not that I

8    know of, but there could be.  I could check.

9         Q.   What would that document be

10   entitled?  How would you identify that document?

11        A.   Well, I mean, I guess there might be

12   a letter of resignation from him.  I'm not quite

13   sure.  When he left the board.

14             MR. ROBERTSON:  Let me just note,

15   these precise questions were answered in both the

16   Xandros and LGP supplementary interrogatory

17   answers, giving the history of the directors and

18   officers.

19        Q.   Did Mr. Langbein hold any other

20   positions as an officer or director of LGP?

21        A.   I don't think so.  Unless -- was he

22   chairman at all, Rick?  No.  Then no.

23        Q.   And have there been other officers or

24   directors of LGP, apart from you, Mr. Berenstein

25   and Mr. Langbein?

                    EXH **Y** PG 132

                                                  19

William Jay Roseman        10/29/03        Lindows.com v. Xandros

```
1                   WILLIAM JAY ROSEMAN

2         A.    No.

3         Q.    I'm going to ask you the same

4   questions with regards to Xandros.  Have there

5   been other officers, apart from yourself, of

6   Xandros, Inc., since its inception?

7         A.    Mike Bego.  I believe he was a

8   director.

9         Q.    What position did Mr. Bego hold?

10        A.    He was a director.  You know, that

11  could be Xandros --

12              DR. BERENSTEIN:  No, he was a

13  director of Xandros Corp.

14        A.    He was a director of Xandros

15  Corporation.  I'm sorry.

16        Q.    We will get to that distinction in a

17  minute.  But let's just focus on Xandros, Inc.,

18  for now.  Anyone else who has held a position --

19  I'm sorry, we are focusing on Mr. Bego.  Has he

20  held any other positions with Xandros, Inc., as

21  an officer or director?

22        A.    No.

23        Q.    So his only position as a director

24  was with Xandros Corp., not Xandros, Inc.?

25        A.    Yes.
```

EXH Y PG 123

20

```
 1                    WILLIAM JAY ROSEMAN

 2          Q.    And he has not held a position as an

 3     officer of Xandros, Inc.?

 4          A.    No.

 5          Q.    Is that correct?

 6          A.    No.  Yes, you're correct.

 7          Q.    How about as an officer --

 8          A.    You're correct.

 9          Q.    How about as an officer of Xandros

10     Corp.?

11          A.    Yes, he was.  He served as --

12          Q.    What was his role?

13          A.    He served as president of Xandros

14     Corporation, and he was also a member of the

15     board of directors.

16          Q.    Do you recall the approximate dates

17     that he served as an officer -- as president and

18     as a director?

19          A.    It's difficult.  I mean, Rick is much

20     better at dates than I am.  But I really don't

21     recall.  I guess he -- I believe he may have

22     resigned from that position a year ago.

23                Rick is saying a year and a half ago,

24     so he's probably correct.

25          Q.    We will save that detail and question
```

EXH Y PG 124

21

```
 1                   WILLIAM JAY ROSEMAN

 2   then for Mr. Berenstein.  Thank you.

 3             I assume your response would be the

 4   same with regards to director, you would defer to

 5   Mr. Berenstein's knowledge in that regard?

 6        A.    Yes, please.

 7        Q.    Thank you.

 8             Has Mr. Bego ever been an employee of

 9   Xandros, Inc.?

10        A.    No.  I suppose not.

11        Q.    What's the difference between Xandros

12   Corp. and Xandros, Inc.?  Can you describe that

13   for me in a nutshell?

14        A.    One is a Canadian corporation.  The

15   other is the U.S. parent.

16        Q.    Xandros Corp. is the Canadian

17   corporation?

18        A.    Yes.

19        Q.    Is that right?

20        A.    Yes, that's correct.

21        Q.    And it is incorporated in -- is it

22   New Brunswick?

23        A.    No -- oh, New Brunswick, Canada?

24        Q.    Yes.

25        A.    You know, I don't know.
```

EXH **Y** PG 125

22

```
1                  WILLIAM JAY ROSEMAN

2              THE WITNESS:  Is it, Rick?

3              DR. BERENSTEIN:  Ontario.

4         A.    It's Ontario, I would assume.  I

5    don't know why you say New Brunswick.

6         Q.    In Canada there are provincial

7    corporations and there are Canadian

8    corporations.  I understand that's Canadian law.

9    I'm not an expert by any means.  Your

10   understanding is then that Xandros Corp. is a

11   corporation incorporated under the laws of the

12   province?

13        A.   ·I thought it was Ontario, but --

14        Q.    Ontario.

15        A.    Rick is not sure, either, so I don't

16   know.

17        Q.    And Xandros Corp. is the subsidiary

18   corporation of Xandros, Inc.; correct?

19        A.    Yes.

20        Q.    Are either Xandros, Inc., and/or

21   Xandros Corp. holding companies?

22        A.    Not that I know of.  I don't think

23   one -- I don't think they are holding companies,

24   no.

25        Q.    Apart from Xandros, Inc., are there
```

EXH Y PG 126

23

```
 1                WILLIAM JAY ROSEMAN

 2   any other owners of Xandros Corp.?

 3        A.    No.

 4        Q.    So Xandros Corp. is the wholly-owned

 5   subsidiary of Xandros, Inc.; correct?

 6        A.    Yes.

 7        Q.    I'm going to ask, what are the

 8   respective roles of Xandros Corp. versus Xandros,

 9   Inc.?  Is there a delegation of duties between

10   those two corporations?

11        A.    Well, I don't know how profound the

12   separation is, but the Canadian government

13   required that there be a Canadian incorporation,

14   and partly due to tax purposes.  I don't know

15   specifically what those tax benefits were, but

16   that was one of the major reasonings in having

17   Xandros Corp. and Xandros, Incorporated.

18        Q.    Do the two entities work together in

19   manufacturing, designing software, any of the

20   products that are marketed in the United States

21   and Canada?

22        A.    Typically, the vast majority of the

23   work is done at Xandros, Incorporated.

24        Q.    And what's the current business

25   location for Xandros Corp. in Canada?
```

EXH Y PG 127

24

```
 1                    WILLIAM JAY ROSEMAN

 2          A.    I'll have to look at my Palm Pilot.

 3   All right?  I don't know -- I mean, it used to be

 4   Blair -- it's Moody Street in Kanata.

 5                THE WITNESS:  Isn't it, Rick?

 6          A.    Rick is going to give you the correct

 7   address.

 8          Q.    We will defer to Mr. Berenstein in

 9   that regard.

10          A.    Okay.

11                MR. STUART:  And we can get that

12   information from you, Mr. Berenstein, at the time

13   of your deposition.

14          Q.    How many employees are employed by

15   Xandros Corp.?

16          A.    I guess 24.  Approximately 24.

17          Q.    And those employees are all located

18   in Canada?

19          A.    Yes.

20          Q.    Do they all work at the Moody Street

21   address?

22          A.    Yes.

23          Q.    Are you now an employee of Xandros

24   Corp.?

25          A.    No, I'm not.
```

ExH Y PG 128

. 25

```
 1                    WILLIAM JAY ROSEMAN

 2        Q.    Are you an officer or director of

 3   Xandros Corp.?

 4        A.    No.  I'm a director.

 5        Q.    I'm sorry, we have referred to that.

 6   You are not an officer of Xandros Corp., however;

 7   right?

 8        A.    No, I'm not.

 9        Q.    Who are the current officers of

10   Xandros Corp.?

11        A.    Believe it or not, I don't know that

12   we have officers of Xandros Corporation.

13        Q.    Who are the other directors of

14   Xandros Corp.?

15        A.    Dr. Berenstein and myself.  And at

16   this point, that's all.

17        Q.    Do you currently hold any other

18   positions as an officer or director of any other

19   corporation, public or private corporation?

20        A.    No.  Just my position as an elected

21   official with the municipality, but that's it.

22        Q.    And you are currently mayor of the

23   municipality of --

24        A.    Carlstadt.

25        Q.    Bergen?
```

EXH __Y__ PG 129

26

William Jay Roseman                     10/29/03                     Lindows.com v. Xandros

```
 1                    WILLIAM JAY ROSEMAN

 2        A.    Carlstadt, C-a-r-l-s-t-a-d-t.

 3        Q.    I understand that you are currently

 4   pursuing reelection?

 5        A.    I am.

 6        Q.    To that position?

 7        A.    Yes.

 8        Q.    And that has caused you to be

 9   unavailable to attend the settlement conference

10   that's scheduled for tomorrow; is that correct?

11        A.    Yes.  Well, two things.  My

12   mother-in-law is also getting a liver transplant.

13        Q.    And that's occurring tomorrow?

14        A.    Well, we're hoping so.

15        Q.    When were you first notified that the

16   settlement conference was going to take place

17   tomorrow, which is October 30, 2003?

18        A.    I guess maybe a month and a half ago,

19   approximately.

20        Q.    And did you at that time check your

21   calendar to see if you would be available

22   tomorrow to fly to San Diego to attend the

23   settlement conference?

24        A.    Yes.

25        Q.    Were you available at that time?
```

EXH Y PG 130                                        27

1           WILLIAM JAY ROSEMAN

2       A.    Yes.

3       Q.    When did you learn the two reasons

4    that you cannot attend tomorrow's settlement

5    conference, or you say you cannot attend

6    tomorrow's settlement conference, when did you

7    learn of those two reasons?

8       A.    Well, the situation with my

9    mother-in-law occurred maybe two or three days

10   ago.  She has been on a list to get a liver

11   transplant, and then what happened is her other

12   organs are starting to deteriorate, her kidneys,

13   and that's caused my wife to have to be there.  I

14   mean, that is what has created the major problem

15   for me, not so much the election.

16      Q.    And where is your mother-in-law being

17   treated, in what hospital?

18      A.    NYU, New York University Hospital.

19      Q.    Do you happen to know the name of her

20   physician?

21      A.    Off the top of my head, I don't.

22      Q.    But otherwise your campaign, were it

23   not for your mother-in-law's illness, you would

24   be able to travel to San Diego, notwithstanding

25   the fact that you have certain demands on your

EXH Y PG 13

28

```
 1              WILLIAM JAY ROSEMAN

 2   schedule due to your election campaign?

 3        A.   Well, I mean, it would be difficult

 4   nonetheless, but not impossible.

 5        Q.   And after you first learned of the

 6   settlement conference that's scheduled for

 7   tomorrow, you planned on attending; correct?

 8        A.   I did.

 9        Q.   And you knew at that time that you

10   would be in the throes of an election campaign, I

11   take it?

12        A.   Yes.

13        Q.   I want to go and discuss the history

14   of the officers and directors of Xandros, Inc.,

15   if we could.  Can you tell me, since inception,

16   who else has served as an officer or director of

17   Xandros, Inc., apart from those people we have

18   already identified?

19        A.   I think that's it.

20        Q.   Did a Mr. Sheldon Stevens ever serve

21   as on officer or director of Xandros, Inc.?

22        A.   No.

23        Q.   Are you aware of a person named

24   Sheldon Stevens?

25        A.   I am.
```

ExH **Y** PG 132                                                29

```
 1                    WILLIAM JAY ROSEMAN

 2         Q.    Who is he?

 3         A.    He is the -- he handles the finances

 4    up at Xandros Corporation.

 5         Q.    Is he currently employed by Xandros

 6    Corporation?

 7         A.    Yes, he is.

 8         Q.    But he has never been an officer or

 9    director of Xandros Corporation?

10         A.    I'm sorry?

11         Q.    He has never been an officer or

12    director of Xandros -- I'm sorry, he has never

13    been an officer or director of Xandros, Inc.;

14    correct?

15         A.    No.  No, he has not.

16         Q.    I'm sorry, go ahead.

17         A.    To the best of my recollection, no,

18    he has not been.

19         Q.    Has he ever been an officer or

20    director of Xandros Corporation?

21         A.    I don't think so, no.  Besides, he's

22    a contractor, as opposed to an employee.

23         Q.    And by contractor, I take it you mean

24    that he's employed on a term limited contract --

25         A.    Yes.
```

EXH **Y** PG 133

30

```
 1                 WILLIAM JAY ROSEMAN

 2        Q.    -- and not considered an employee?

 3        A.    Well, we don't take salaries out of

 4   his pay.  He's a 1099 employee -- not employee.

 5   Contractor.  I'm sorry.

 6        Q.    I understand.  He also works out of

 7   the Moody Street address; is that correct?

 8        A.    Yes, he does.

 9        Q.    Has he ever worked or been an

10   employee of Xandros Corporation -- I'm sorry,

11   Xandros, Inc.?

12        A.    No.

13        Q.    How many employees currently are

14   employed by Xandros, Inc.?

15        A.    I guess three, four.

16        Q.    Who are they?

17        A.    David Finkelstein.

18        Q.    And what is Mr. Finkelstein's role?

19        A.    Sales and marketing.

20        Q.    And Xandros, Inc., has a New York

21   address; is that correct?

22        A.    Yes, it is.

23        Q.    And what is that address?

24        A.    41 East 11th Street, New York, New

25   York 10004.
```

EXH **Y** PG 134

31

1                    WILLIAM JAY ROSEMAN

2          Q.    And Mr. Finkelstein works at that

3     11th Street address?

4          A.    He does.

5          Q.    Any other roles or responsibilities

6     of Mr. Finkelstein?

7          A.    No.

8          Q.    And what type of sales does he

9     preside over or does he manage?

10         A.    I don't understand the question.

11         Q.    Does he -- he manages sales of some

12    product, I take it?

13         A.    Yes.

14         Q.    What is that product?

15         A.    The Xandros desktop.

16         Q.    The Xandros desktop.  Thank you.

17               And what about the other two

18    employees?

19         A.    The other employee, Steve Harris.

20         Q.    Okay.

21         A.    He does sales mostly, and writes copy

22    for us.

23         Q.    By copy, do you mean advertising

24    copy?

25         A.    Yes, marketing and the like.

EXH Y PG 135                    32

```
 1                    WILLIAM JAY ROSEMAN
 2          Q.    Also related to the Xandros desktop
 3  product?
 4          A.    Yes.
 5          Q.    And the other employees?
 6          A.    Would be Rick and myself.  I'm sorry,
 7  you know, probably not even Rick and I.  Well,
 8  Andy Typaldos, I'm sorry.  That's right, Rick is
 9  right, Andy Typaldos.  I completely forgot.
10          Q.    Could you spell Mr. Typaldos' last
11  name?
12          A.    Sure.  T-y-p-a-l-d-o-s.
13          Q.    And what is Mr. Typaldos'
14  responsibility?
15          A.    CEO.
16          Q.    How long has he been CEO?
17          A.    The past maybe a month.  We just
18  hired him.
19          Q.    I take it Mr. Typaldos, Mr. Harris
20  and Mr. Finkelstein all work at the 11th Street
21  address; correct?
22          A.    Mr. Harris lives in Boston, but once
23  a week he comes into the office in New York.
24          Q.    And what's his address in Boston?
25          A.    You know, I don't know off the top of
```

ExH Y PG 136

33

1                    WILLIAM JAY ROSEMAN

2    my head.  I mean, I can get you that information.

3         Q.    What was Mr. Typaldos' last position

4    before joining Xandros, Inc.?

5         A.    Mr. Typaldos owns several companies,

6    and still does, so I don't know in regards to

7    what his last position was.  I believe he's

8    president of Enekia.

9         Q.    Can you spell that, please?

10        A.    I'm not quite sure how to spell it.

11              THE WITNESS:  Rick, do you know how?

12        A.    Rick will tell you how to spell it.

13        Q.    Can you give me your best guess as to

14   how to spell it?

15              DR. BERENSTEIN:  E-n-e-k-i-a.

16        A.    E-n-e-k-i-a.

17        Q.    And what is Enekia?

18        A.    It is a technology company.

19        Q.    What type of technology are they

20   involved in?

21        A.    Transmission of information over

22   power lines, broadband.

23        Q.    And he is currently president of

24   Enekia?

25        A.    I believe he is.  I'm not quite

EXH **Y** PG 137                          34

1           WILLIAM JAY ROSEMAN

2  sure.  I don't know if he's still president or

3  not.

4      Q.    And you mentioned that he was the

5  owner or an officer with several other

6  companies.  Do you know of any other companies,

7  apart from Enekia, that he owns or is an officer

8  of?

9      A.    Access One.

10     Q.    And what is Access One?

11     A.    You know, I really don't know what

12 they do.

13           THE WITNESS:  Do you know, Rick?

14     A.    I don't know.

15     Q.    Where is Access One located?

16     A.    New Jersey.

17     Q.    Do you know what city in New Jersey?

18     A.    I think it's Rutherford.

19     Q.    And what is his position with Access

20 One?

21     A.    I don't know that.

22     Q.    Any other companies that he owns or

23 is an officer or director of?

24     A.    There are several others.  I don't

25 know their names.

EXH Y PG 136

35

```
 1              WILLIAM JAY ROSEMAN

 2       Q.   I understand that Mr. Bego is no

 3  longer employed by Xandros Corporation.  Is that

 4  correct?

 5       A.   That is.

 6       Q.   At some point -- at what time was his

 7  term with Xandros Corporation terminated?

 8       A.   I guess two months ago.

 9       Q.   You referred to that.  I'm sorry.

10       A.   Oh, Xandros -- Rick is saying -- are

11  you asking me Xandros, Incorporated, or Xandros

12  Corporation?

13       Q.   I was asking for Xandros Corporation,

14  but I'm going to ask about both, so why don't we

15  just start with Xandros Corporation.

16       A.   He wasn't an employee of Xandros,

17  Incorporated.  He was an employee of Xandros

18  Corp.

19       Q.   Okay, Xandros Corp.  And he was

20  secretary until about two to three months ago;

21  correct?

22       A.   No.  Secretary of what?

23       Q.   Xandros Corp.

24       A.   No, he was president of Xandros

25  Corporation.
```

EXH **Y** PG 139

36

1              WILLIAM JAY ROSEMAN

2       Q.    I'm sorry, Mr. Roseman.  I'm looking

3   at the wrong spot on my notes.  He was president

4   until about two or three months ago; correct?

5       A.    No, no, that was June of 2002.

6       Q.    Did he hold another position after

7   June of 2002 with Xandros Corp.?

8       A.    No, he did not.

9       Q.    And so it was in June of 2002 that he

10  ceased to become affiliated with either Xandros

11  Corp. or Xandros, Inc.?

12      A.    That's correct, yes.

13      Q.    And what were the conditions of his

14  leaving Xandros Corp.?

15           DR. BERENSTEIN:  He remained as

16  marketing sales manager.

17      A.    He was always an employee of Linux

18  Global Partners, so he, you know, remained at

19  Linux Global Partners and was doing work and

20  continued to do work for us at Linux Global

21  Partners.

22           At that point we had another

23  individual take his position at Xandros Corp.

24      Q.    Who was that individual?

25      A.    John Pescatore and Brian McAuley.

ExH **Y** PG 140

37

1             WILLIAM JAY ROSEMAN

2        Q.    Mr. Bego is no longer employed at LGP

3   either; is that correct?

4        A.    That is correct.

5        Q.    When did he cease becoming an

6   employee of LGP?

7        A.    Two, three months ago.

8        Q.    And was he terminated or did he quit?

9        A.    No, no, he visits us every other

10  day.  He went on -- he left to do consulting.

11       Q.    So it was a mutual agreement that he

12  would leave to do other jobs?

13       A.    Yes.

14       Q.    Does he still continue to consult for

15  LGP?

16       A.    No, he does not.

17       Q.    Who does he consult for, do you know?

18       A.    I don't know.

19       Q.    Prior to being affiliated with

20  Xandros and LGP, Mr. Roseman, did you have a role

21  as an officer, director or owner of any other

22  companies?

23       A.    I was a partner at a firm called

24  Gramercy Partners, which was a brokerage firm.

25       Q.    And where were you located?

EXH **Y** PG 141

```
 1                WILLIAM JAY ROSEMAN

 2        A.    100 Wall Street, in New York.

 3        Q.    Were you a broker, a stockbroker?

 4        A.    I was a licensed -- I was the

 5   managing partner.

 6        Q.    Did you have a license to be a

 7   stockbroker with the State of New York?

 8        A.    I am Series 7 licensed and also

 9   Series 24 licensed.

10        Q.    And you currently have --

11        A.    64.  I'm sorry, Series 64 licensed.

12        Q.    You had a Series 7 and a Series 64

13   license?

14        A.    Yes.  I still do.

15        Q.    And have you maintained those

16   licenses since you were first given them, or

17   since you first obtained them?

18        A.    Yes.

19        Q.    Have those licenses ever been

20   suspended or revoked for any reason?

21        A.    No.

22        Q.    Do you hold any other licenses with

23   the State of New York, apart from a driver's

24   license, or New Jersey?

25        A.    Insurance license.
```

EXH Y PG 142

39

```
 1              WILLIAM JAY ROSEMAN

 2        Q.    A license to sell insurance?

 3        A.    Yes.

 4        Q.    And with what entity do you hold that

 5   license?

 6        A.    Sagemark Consulting.  But I just

 7   moved it out of Sagemark Consulting.  I was --

 8   when I left Gramercy Partners, I became a

 9   financial planner.  I opened up a financial

10   planning firm called Roseman Financial Planning.

11        Q.    I'm going to get to that in a

12   second.

13        A.    Okay.

14        Q.    But my question was, you hold a

15   license from some entity, some governmental

16   entity; is that correct?

17        A.    Yes.

18        Q.    And which entity granted you that

19   insurance license?

20        A.    Sagemark Consulting.  I mean, I was

21   my own broker -- I was my own entity, so, I mean,

22   I went on my own.  After I left my own business,

23   I housed my license at a company called

24   Sagemark.  But I was able to get my own license.

25        Q.    So this is not a license that's
```

EXH Y PG 143

40

```
 1                  WILLIAM JAY ROSEMAN

 2   granted by the State of New Jersey, for instance?

 3        A.    Yes, it is granted by the State of

 4   New Jersey, but you're asking who held my

 5   license.

 6        Q.    I'm sorry, maybe I'm using language

 7   that's confusing and we are using inconsistent

 8   terms.

 9        A.    Okay.

10        Q.    It was the State of New Jersey that

11   granted the license; is that correct?

12        A.    Yes.

13        Q.    And when did they grant that license?

14        A.    When?

15        Q.    Yes.

16        A.    Which license?  The --

17        Q.    The insurance license that you

18   referred to.

19        A.    Ten, twelve years ago, maybe, ten

20   years ago.

21        Q.    Has that license ever been revoked or

22   suspended for any reason?

23        A.    No.

24        Q.    So during what period of time were

25   you a partner or were you in the employ of
```

ExH **Y** PG 144

41

```
 1                    WILLIAM JAY ROSEMAN

 2   Gramercy Partners?

 3        A.    From 19 -- maybe approximately 1986

 4   to 1992 or 1993.

 5        Q.    And after you left the employ of

 6   Gramercy Partners, you began working for Sagemark

 7   Consulting; is that correct?

 8        A.    No, I had opened up my own firm,

 9   Roseman Financial Services.  I'm an estate

10   planner and a licensed investment advisor.

11        Q.    You opened up Roseman Financial

12   Services in 1993; is that correct?

13        A.    Yes.  I mean, approximately 1993.

14        Q.    And how long were you -- you were

15   president or CEO of that corporation?

16        A.    I was.

17        Q.    Was it a New Jersey or New York

18   corporation?

19        A.    New Jersey.  It was a sole

20   proprietorship.

21        Q.    New Jersey sole proprietorship.  And

22   how long were you the sole proprietor?

23        A.    Two, three years.

24        Q.    Until approximately '95-'96?

25        A.    Probably '95, or thereabout.
```

EXH Y PG 145

42

```
 1              WILLIAM JAY ROSEMAN
 2        Q.    And after you ceased being a sole
 3   proprietor of Roseman Financial Services, did you
 4   work anywhere else?
 5        A.    No.
 6        Q.    So the next position you held after
 7   Roseman Financial Services was with the Xandros
 8   entities; correct?
 9        A.    Yes.   That was three, four years
10   later.
11        Q.    You mentioned that you are a
12   certified financial planner or have a license in
13   that regard.  Could you describe what that
14   license is and the licensing entity or
15   governmental body that issued that license?
16        A.    It's a financial services license.
17   It allows me to make investment suggestions, and
18   the like, do estate planning.
19        Q.    That was issued by the State of New
20   Jersey also?
21        A.    My investment licenses?  Yes.
22        Q.    And has that license ever been
23   suspended or revoked for any reason?
24        A.    I've never had a license suspended or
25   revoked.
```

EXH **Y** PG 146

43

```
 1                    WILLIAM JAY ROSEMAN

 2         Q.    Can you identify any other licenses,

 3    apart from licenses you have already discussed

 4    and any driver's licenses you have had?

 5         A.    Well, I do have a driver's license.

 6         Q.    Any other licenses that we haven't

 7    already mentioned?

 8         A.    No, I think that's it.

 9         Q.    Mr. Roseman, I'm going to refer you

10    now to Exhibits 6, 7 and 8, which should be

11    before you.

12               Do you have those exhibits before

13    you?

14         A.    I found 8.

15               Oh, okay.  6.  Yes, I do have it.  6,

16    7 and 8, yes, I do have them.

17         Q.    Have you ever seen those documents

18    before?

19         A.    I have.

20         Q.    Can you please describe for me, then,

21    Exhibit 6?  What do you understand that to be?

22         A.    A convertible promissory note.

23         Q.    And in particular, is that a

24    convertible promissory note made by Xandros in

25    favor of Lindows.com?
```

EXH __Y__ PG __47__

44

1                    WILLIAM JAY ROSEMAN

2          A.    I believe so, yes.

3          Q.    And by Xandros, I should be specific,

4    we are talking about Xandros, Inc.; correct?

5          A.    Yes.

6          Q.    If you look on page 4 of that

7    exhibit, do you recognize the signature

8    underneath the words "Xandros, Inc., a Delaware

9    corporation"?

10         A.    It's Michael Bego.

11         Q.    You recognize that to be Mr. Bego's

12   signature?

13         A.    I do.

14         Q.    Beneath Mr. Bego's signature it

15   indicates that the title of Mr. Bego is president

16   of Xandros, Inc.; is that correct?

17         A.    Yes.

18         Q.    Is it your understanding Mr. Bego

19   ever held the title of president of Xandros,

20   Inc.?

21         A.    He may have.  I'm not quite sure.

22               DR. EERENSTEIN:  It should have been

23   Xandros Corp.

24         Q.    Are you familiar with the

25   circumstances surrounding the making of this note

EXH **Y** PG 148

45

```
 1                WILLIAM JAY ROSEMAN
 2  by Xandros, Inc.?
 3       A.    In what context?
 4       Q.    Did you have any role in negotiating
 5  the terms of the note, or approving the note, or
 6  reviewing the note, or have you considered the
 7  terms of the note since the note was made?
 8       A.    Yes, I have.
 9       Q.    And are you generally familiar with
10  the terms of the note and Xandros, Inc.'s intent
11  in entering into that?
12       A.    Yes.
13       Q.    I'm going to also refer you to
14  Exhibit 7 and 8.  Those are also notes made by
15  Xandros, Inc., in favor of Lindows.com; correct?
16       A.    Yes.
17       Q.    And if you will just look on the last
18  page, page 4 of each of those exhibits, they are
19  also signed by Michael Bego as president of
20  Xandros, Inc.; correct?
21       A.    Yes.
22       Q.    And you recognize his signature on
23  both of those notes; correct?
24       A.    Yes.
25       Q.    And the same question with regards to
```

EXH **Y** PG 149                                          46

```
1              WILLIAM JAY ROSEMAN

2   Exhibit 7 and 8 as to your familiarity with those

3   notes.  Would your answer be the same as with

4   regards to Exhibit 6?

5        A.    Yes.

6        Q.    And are you generally aware that the

7   terms, the stated terms, the typewritten

8   terminology within each of these notes, is

9   identical?

10       A.    I don't know if it's identical,

11  because 6 and 7 have a 1.3 and 8 does not.  I

12  mean, just looking at it very quickly.

13       Q.    Okay.  You're correct.  Exhibit 8

14  does not have a 1.3.  Exhibit 6 and 7 does.

15            Do you recognize any other

16  distinctions?

17            MR. ROBERTSON:  I have to object.

18  The documents speak for themselves.

19       Q.    You can answer the question, Mr.

20  Roseman.

21       A.    Well, it looks like 6 and 7 appear to

22  be -- I mean, at quick glance, appear to be the

23  same.  But I do notice changes in 8.  They could

24  simply be formatting changes, other than the lack

25  of 1.3.  But I've not done a comparative review
```

EXH Y PG 150

47

William Jay Roseman                    10/29/03                    Lindows.com v. Xandros

1                     WILLIAM JAY ROSEMAN

2   of them, no.

3        Q.    And you mentioned that you did have

4   some understanding or participation in the

5   preparation or in reading and reviewing these

6   notes.  Can you describe how you came about to

7   have knowledge of the content of each of these

8   notes?

9        A.    Mike Bego had informed us that he had

10  been contacted by Lindows, and that they were

11  willing -- they had wanted to utilize the Xandros

12  operating system in their product, Lindows

13  desktop, and they were willing to do a prepaid

14  royalty agreement with us, and these are the

15  subsequent notes.

16       Q.    More specifically, did you

17  participate in the negotiation of these notes?

18       A.    I did not participate so much in the

19  negotiations.  I did speak with Kevin Carmony on

20  one occasion.  I don't remember in reference to

21  which note that pertained to.  But I did speak to

22  him maybe once or twice.

23       Q.    And what was the content of your

24  conversation with Mr. Carmony in that regard?

25       A.    Well, the gist of what the notes were

48

EXH Y PG 151

```
 1                    WILLIAM JAY ROSEMAN

 2   being written for.

 3        Q.    By the gist, what do you mean?

 4        A.    Well, the objective.

 5        Q.    And what was your conversation in

 6   that regard?

 7        A.    Well, that they had wanted to utilize

 8   the Xandros operating system for a product that

 9   they were going to bring forth.  I think at that

10   time it wasn't Lindows.  I don't know what the

11   name of it was.  Or maybe it was Lindows.  Does

12   it say Lindows here?  Could be.

13             Yes, it was Lindows.com, yes.

14             And that they had wanted to -- that

15   they were willing to pay us in prepaid royalties

16   ahead of time.

17        Q..   Who did actually negotiate these

18   notes directly with Lindows, do you know?

19        A.    I guess for the most part Michael

20   Bego, and to a lesser part myself.

21        Q.    So you did participate along with Mr.

22   Bego in the negotiation and the decision --

23        A.    Not so much in the negotiation

24   aspect, but in some clarification aspect, I think

25   Kevin Carmony had wanted to speak to -- I don't
```

EXH Y PG 152

49

1                    WILLIAM JAY ROSEMAN

2 know if he said me in particular, but I spoke to

3 him about these notes specifically. I guess it

4 was one or two separate occasions. I don't

5 remember when.

6         Q.    So you were familiar then with the

7 terms and conditions of the notes prior to the

8 entry of the notes, the signature on the notes?

9         A.    Yes.

10         Q.    Each of these notes is for the amount

11 of $250,000; correct?

12         A.    Yes.

13         Q.    And each of these notes has a payment

14 or a term of roughly one year; correct?

15         A.    I mean, if that's what you're

16 saying. I don't see the --

17         Q.    Take a look at paragraph 1.2 on

18 Exhibit 6.

19               Exhibit 6 is a note that was made on

20 November 20, 2001; correct?

21         A.    Yes.

22         Q.    I'm sorry, was that a yes?

23         A.    Yes.

24         Q.    Thank you.

25               And according to paragraph 1.2, the

EXH **Y** PG 153

50

```
 1                WILLIAM JAY ROSEMAN

 2   note would be due and payable, I'm quoting, "in

 3   one lump sum on the earlier of (a) five days

 4   notice of demand after November 20, 2002 (the

 5   'Due Date') or (b) immediately upon the closing

 6   of an acquisition (as defined below)."

 7           Correct?

 8       A.    Yes.

 9       Q.    ·I am going to ask you the same

10   question with regards to Exhibit 7, which is the

11   note made on December 6, 2001, that is due and

12   payable on or after the earlier of five days

13   notice of demand after December 5, 2002, or

14   immediately upon the closing of an acquisition;

15   correct?

16       A.    Yes.

17       Q.    And the same question with regards to

18   Exhibit 8, which is the December 21, 2001 note,

19   made payable at the earlier of five days notice

20   of demand after the due date after December, I

21   believe that's 21, 2002, or immediately upon the

22   closing of an acquisition; correct?

23       A.    Yes.  That's what it says.

24       Q.    At least in that respect the three

25   notes are due and payable on similar terms,
```

EXH Y PG 154

51

```
 1              WILLIAM JAY ROSEMAN

 2  albeit on different dates; correct?

 3      A.   Yes.

 4      Q.   Do you have a position or opinion,

 5  sir, with regards to whether or not these notes

 6  became due and payable pursuant to paragraph

 7  1.2?

 8           MR. ROBERTSON:  I object to the form

 9  of the question, calls for an improper opinion,

10  legal conclusion.

11      Q.   You can answer the question.

12      A.   Okay.  Can you ask it -- can you ask

13  me that question again?

14      Q.   Sure.  Do you have an opinion or

15  understanding as to whether or not each of the

16  three notes represented by Exhibits 6, 7 and 8

17  are currently due and payable pursuant to

18  paragraph 1.2 of each of those promissory notes?

19           MR. ROBERTSON:  I object to the form

20  of the question, calls for a legal conclusion,

21  improper opinion.

22      A.   My understanding of the agreement was

23  that they were prepaid royalties, and we were

24  told that they were prepaid royalties.

25      Q.   What do you mean by that, they were
```

ExH **Y** PG 155

52

```
 1                WILLIAM JAY ROSEMAN

 2  prepaid royalties?

 3        A.    Well, there was discussion

 4  regarding -- I don't have the exact amounts in

 5  front of me, but there was some discussions

 6  regarding we were supposed to -- they were

 7  supposed to be a 50/50 revenue split, and that we

 8  were supposed to receive 50 percent of the

 9  revenues that Lindows received that would be

10  offset against these notes.

11        Q.    And where do you have that

12  understanding from?

13        A.    From my discussions with Kevin

14  Carmony.

15        Q.    Are you referring to -- do you

16  understand that there is a document that --

17        A.    I believe, yes.  But I don't have

18  that here.

19        Q.    -- that has that understanding?

20        A.    Yes.  As I understand it, yes.

21        Q.    Is that document known as the

22  strategic alliance agreement?

23        A.    Yes.  I believe that's what it's

24  called, yes.

25        Q.    Now, looking at Exhibit 6, do you see
```

ExH Y PG 156                                                    53

```
 1              WILLIAM JAY ROSEMAN
 2   any term or condition in this exhibit that
 3   references this 50/50 split on prepaid royalties?
 4        A.   Well, I would have to go through the
 5   entire document.  Would you like me to do that?
 6        Q.   Well, you are generally familiar with
 7   this document, are you not?
 8        A.   Yes, I'm generally familiar, but
 9   you're asking me specific questions.
10        Q.   Okay, why don't you take a moment
11   then, and I'm going to ask you the same questions
12   with regards to Exhibits 6, 7 and 8, if there is
13   any reference in any of these exhibits that
14   identifies the sums due and payable or the sums
15   that would be due and payable under paragraph 1.2
16   of the note as prepaid royalties.
17             MR. ROBERTSON:  I object to the form
18   of the question as compound, calling for a legal
19   conclusion.  If you are asking him if as he reads
20   that piece of paper does he see a reference to a
21   50/50 split, I think that's a proper question.
22   If you are asking his opinion as to an open issue
23   in the case, that's not a proper question.
24        A.   I don't see -- I mean, a quick glance
25   through the document, I don't see the reference,
```

ExH Y PG 157                                    54

```
 1              WILLIAM JAY ROSEMAN

 2    no.

 3         Q.    So the document itself doesn't

 4    reflect that there is any agreement between the

 5    parties that the amounts loaned by Lindows.com to

 6    Xandros, Inc., would be offset by any other

 7    amounts due to Xandros, Inc., from Lindows.com as

 8    prepayment on shared royalties; correct?

 9              MR. ROBERTSON:  Objection.  Hold on.

10    I object to that question.  It is compound in the

11    extreme, it assumes facts not in evidence, calls

12    for a legal conclusion.

13         A.    Okay, I mean, this, as I understand,

14    was merely the debt note, or the note that was

15    tied to the agreement.  And we had, you know,

16    many discussions about this, not just prior to

17    the signing of the agreement, but long

18    thereafter.  I had discussions with Kevin Carmony

19    about it, Mike Robertson about it, that these

20    were tied specifically to a revenue.  As a matter

21    of fact, when -- well, I won't go on.  I mean, as

22    you ask questions, I'll --

23         Q.    My question, though, sir, was whether

24    there was any reference in the notes themselves

25    to this prepayment.
```

EXH Y PG 158

55

1          WILLIAM JAY ROSEMAN

2       A.    I don't see the reference in these

3    documents, no.

4       Q.    And if you would, please, sir, look

5    at Exhibits 9, 10 and 11.  Exhibit 9 is a letter

6    dated December 3, 2002, to Mr. Bego from Mr.

7    Kagnoff.  Exhibit 10 is a letter dated December

8    5, 2002, again to Mr. Bego from Mr. Kagnoff.  And

9    Exhibit 11 is a letter dated December 21, 2002,

10   from Mr. Bego to Mr. Kagnoff.

11           Have you seen these letters before,

12   sir?

13      A.    9, 10 and 11?

14      Q.    Yes, sir.

15      A.    I did see these letters.

16      Q.    And do you have an understanding that

17   Exhibit 9 is, in fact, a letter which references

18   paragraph 1.2 of the November 20 note, and

19   demands payment pursuant to paragraph 1.2(a)?

20           MR. ROBERTSON:  I object to the form

21   of the question.  It's compound, calls for a

22   legal conclusion.  The document speaks for

23   itself.

24      A.    You know, I'm sorry.  Could you

25   just -- the question again is?

EXH **Y** PG 15⁹

56

```
1                WILLIAM JAY ROSEMAN

2          Q.    The question is, Exhibit 9, which is

3    a December 3, 2002 letter, is demanding payment

4    on the November 20, 2001 note, isn't it?

5          A.    Yes.

6          Q.    And it is demanding payment,

7    specifically references, in fact, paragraphs 1.1

8    and 1.2 of the note; correct?

9          A.    Yes.

10         Q.    And I'm going to ask the same

11   question with regards to Exhibit 10, which is, in

12   fact, a demand for payment of the December 6,

13   2001 note; correct?

14         A.    Yes.

15               MR. ROBERTSON:  Same objection.  All

16   these subjects are requests for admission which

17   the company acknowledges demands have been made.

18   Asking this witness his personal opinion as to

19   what it means is compound and an improper

20   opinion.

21         Q.    And Exhibit 11 is, in fact, a demand

22   for payment referencing the December 21, 2001

23   note?

24               MR. ROBERTSON:  Same objection.

25         Q.    Which is Exhibit 8.  Correct?
```

EXH Y PG 160

57

1           WILLIAM JAY ROSEMAN

2      A.    That's what the letters seem to be

3  referring to, yes.

4      Q.    And as of December 3, 2002, the

5  condition (b) under paragraph 1.2 of the November

6  20, 2001 note, which is Exhibit 6, which is the

7  closing of an acquisition, and the term

8  "acquisition" is defined within the note,

9  apparently, an acquisition had not yet occurred;

10 correct?

11           MR. ROBERTSON:  Objection.  It's

12 compound.

13     A.    An acquisition of Xandros at that

14 point had not occurred.

15     Q.    And I'm going to ask you the same

16 question with regards to the date of December 5,

17 2002, and an acquisition of Xandros had not yet

18 occurred; correct?  Let me restate that.

19           As of December 5, 2002, an

20 acquisition, as defined in paragraph 1.2,

21 subsection (b) of Plaintiff's Exhibit 7, which is

22 the December 6, 2001 note, had not yet occurred;

23 correct?

24           MR. ROBERTSON:  Objection to form,

25 compound, assumes facts not in evidence, and the

EXH **Y** PG 161

```
 1              WILLIAM JAY ROSEMAN
 2   document speaks for itself, improper opinion.
 3        A.    There was no acquisition at that
 4   time.
 5        Q.    And I'm going to ask you the same
 6   question with regards to Exhibit 8.  As of
 7   December 21, 2002, which is the date of Exhibit
 8   11, the demand letter on the December 21, 2001
 9   note, an acquisition, as defined or referenced in
10   paragraph 1.2 of Exhibit 8, had not yet occurred;
11   correct?
12              MR. ROBERTSON:  I object to the form
13   of the question.  It's compound, assumes facts
14   not in evidence, calls for an improper legal
15   opinion.  The document speaks for itself.
16        A.    There was no acquisition at that
17   point.
18        Q.    Now, is it your understanding, sir,
19   that -- let me back up here.
20              Refer, if you will, to paragraph 3
21   and the subparagraphs thereunder of Exhibit 6.
22        A.    Yes.
23        Q.    Do you understand that each of these
24   notes had conversion options under which the
25   notes could convert to equity in Xandros, Inc.,
```

EXH Y PG 162

59

```
 1              WILLIAM JAY ROSEMAN
 2  upon the occurrence of certain events, and/or at
 3  the option of the maker of the note?
 4  Specifically, I'm referring -- I'm sorry, go
 5  ahead.
 6       A.    I do understand that.
 7       Q.    I am referring to paragraph 3.1 and
 8  the subparagraphs in 3.2, and the subparagraphs
 9  in each of the notes.
10            Is that your understanding?
11       A.    Yes.
12       Q.    And are you aware of any conversion
13  under either paragraph 3.1 or 3.2 of either of
14  the three notes?
15       A.    We did -- I'll go back and check, but
16  I believe we did have an equity investment made
17  at that time of 250,000.  I did tell Kevin
18  Carmony that.  But -- is that your question
19  regarding the conversion?  Am I addressing that?
20       Q.    Yes, that is my question.  And your
21  recollection is that there was an equity
22  financing in excess of $250,000?
23       A.    I believe there was, yes.
24       Q.    Can you tell me, who was the -- let's
25  back up.  What is your understanding of the term
```

EXH __Y__ PG 163

60

```
 1                  WILLIAM JAY ROSEMAN
 2   "equity financing," as that term is used in the
 3   note?
 4        A.    An investment made into the company.
 5        Q.    And you understand that there was --
 6   do you understand that there was only one equity
 7   financing?
 8        A.    I think, no, there was maybe two or
 9   three.  I'll check.  I could name two off the top
10   of my head.  But I could check to see the rest.
11        Q.    All right.  Let's talk about those
12   two that you can name off the top of your head.
13   What's the first equity financing that occurred?
14        A.    It was either David -- I don't know
15   which came first, but David Kean, K-e-a-n.
16        Q.    K-e-a-n, okay.
17        A.    Yes.
18        Q.    This is an individual, I take it?
19        A.    Yes.
20        Q.    And what does Mr. Kean do?
21        A.    He's independently wealthy.  I don't
22   know what he does.
23        Q.    Can you describe the -- what were the
24   terms and conditions of the equity financing with
25   Mr. Kean?
```

EXH **Y** PG 164

61

1                    WILLIAM JAY ROSEMAN

2        A.    It was a simple investment.

3        Q.    And how much did he invest?

4        A.    It was well over 200,000, if I

5   remember correctly.  I don't remember the exact

6   amount.  But it was certainly over 200,000.  I

7   believe -- I'm almost sure it was over 250,000.

8        Q.    And when did that investment occur?

9        A.    Prior to this date, but I don't

10  recall the exact date.  I will check that for

11  you.

12       Q.    Prior to this date meaning prior to

13  what date?

14       A.    I believe it was prior to -- I

15  believe it was prior to May.  I mean, I'm going

16  to have to check.

17       Q.    May of what year?

18       A.    2002.  But there were several, so --

19  and there was another from Brian McAuley.

20       Q.    I'm sorry, did you say they were

21  settled?  What do you mean?

22       A.    Several.

23       Q.    Several, I'm sorry.

24       A.    Yes.

25       Q.    And was there a contract with Mr.

EXH **Y** PG **165**                          62

```
 1                    WILLIAM JAY ROSEMAN

 2   Kean referencing this equity financing?

 3        A.    No, just a distribution of shares.  I

 4   don't know if it would be a contract when people

 5   make an investment.  I don't know that there's a

 6   contract.

 7        Q.    So Mr. Kean actually made a direct

 8   investment in exchange for shares of Xandros,

 9   Inc.; correct?

10        A.    Yes.

11        Q.    Do you know how many shares Xandros,

12   Inc., disbursed?

13        A.    I don't remember off the top of my

14   head.

15        Q.    What documents would you refer to or

16   how would you learn the details of that

17   transaction?

18        A.    I would go to the stockholders'

19   certificates.

20        Q.    Where are those stockholders'

21   certificates kept?

22        A.    At our office.

23        Q.    Is there, in fact, a log of issuance

24   of stock also kept?

25        A.    Yes, there is.  Well, a cap chart.
```

EXH Y PG 166

63

```
 1                  WILLIAM JAY ROSEMAN

 2          Q.    And this cap chart is kept in your

 3    offices, Xandros, Inc.'s offices, also?

 4          A.    Yes.

 5          Q.    Would there be any other references

 6    apart from stock certificates and/or the cap

 7    chart to this transaction with Mr. Kean?

 8          A.    I mean, not that I could think of off

 9    the top of my head.

10          Q.    And you didn't take a look at the cap

11    chart or the stock certificates prior to coming

12    here today; correct?

13          A.    I didn't.  I didn't know where that

14    would be necessary.

15          Q.    Do you have a best estimate as to the

16    amount of the investment by Mr. Kean into

17    Xandros, Inc.?

18          A.    I believe it was over 250,000.  I

19    don't know the exact amount.  But cumulatively

20    over that period of time it could have been in

21    excess of 300.  I'm not sure.  Rick may have a

22    better recollection.

23          Q.    I'm sorry.  Was it a single lump sum

24    investment or was it a series of payments over a

25    period of time?
```

EXH Y PG 167

64

1                     WILLIAM JAY ROSEMAN

2         A.    It was -- I understand it was a

3    single lump sum investment.

4         Q.    And you mentioned that it was before

5    May of 2002.  Do you remember the earliest date

6    on which that occurred?

7         A.    Rick is saying February, but I'm not

8    sure.

9         Q.    All right.  You mentioned also that

10   there were a number of such financings.  Let's

11   talk about the second one that you recall off the

12   top of your head.  Who was the second equity

13   financing with?

14        A.    Brian McAuley.

15        Q.    And before we get too far, do you

16   happen to know, where is Mr. Kean, where does he

17   reside?

18        A.    New York.  I don't have his address

19   off the top of my head.

20        Q.    New York City?

21        A.    Yes.

22        Q.    What does Mr. Kean do?

23        A.    He's independently wealthy.  I

24   believe he owns the rights to "Oh, Calcutta", the

25   Broadway play.  But I don't know exactly --

                          EXH Y PG 168                        65

```
 1                    WILLIAM JAY ROSEMAN

 2          Q.    Do you know his business address?

 3          A.    I don't.

 4          Q.    Do you have his telephone number in

 5   your Palm Pilot?

 6          A.    I'll check.

 7                I don't.

 8          Q.    Let's talk about the equity financing

 9   with Mr. McAuley.  Was that also a direct

10   investment in exchange for shares?

11          A.    Yes.  Brian -- yes.

12          Q.    And can you just describe for me what

13   you recall regarding the terms and conditions of

14   that equity financing?

15          A.    There were some that were notes and

16   some that were direct investment.

17          Q.    So there were a number of financings

18   with Mr. McAuley?

19          A.    Yes.  There were --

20                DR. BERENSTEIN:  Four or five.

21          A.    I think it's more than that.  Rick is

22   saying four or five.  I think it's maybe six or

23   more.

24          Q.    And would these also be referenced in

25   the cap chart and on stock certificates that are
```

ExH **Y** PG 169                                    66

```
 1                   WILLIAM JAY ROSEMAN

 2  currently in Xandros, Inc.'s offices?

 3       A.    Yes.

 4       Q.    And do you recall the exact dates or

 5  approximate dates of each of these investments?

 6       A.    I mean, off the top of my head, no.

 7  But the reason I know that they were within this

 8  time period is because I spoke to Kevin about

 9  them, as did Mr. McAuley, as I recall.

10       Q.    You spoke to Kevin Carmony; is that

11  your testimony?

12       A.    Yes.

13       Q.    And how much, total, was invested by

14  Mr. McAuley?

15       A.    I thought it was closer to a

16  million.  Rick is saying it's 675.  I thought it

17  was closer to a million.  But I'd yield to Rick.

18       Q.    And that would be reflected in the

19  cap chart as well; correct?

20       A.    Yes.

21       Q.    And do you recall the amount of each

22  individual investment?

23       A.    I don't know.  Rick might.

24             THE WITNESS:  Do you remember?

25             DR. BERENSTEIN:  The first one was
```

EXH __Y__ PG __170__                                   67

```
 1                    WILLIAM JAY ROSEMAN
 2   300.
 3        A.    The first one, Rick is saying, was
 4   300.   I don't remember the others.
 5        Q.    Were they more than or less than 300?
 6        A.    The others?
 7        Q.    Yes.
 8        A.    They were in various amounts.   I
 9   think one was 150.
10             THE WITNESS:  Right, Rick?
11             DR. BERENSTEIN:  They were all less.
12        A.    The others were less than 300.   One
13   was 150, one was maybe another hundred.   I really
14   don't recall.
15        Q.    When, approximately, did the $300,000
16   investment occur?
17        A.    Rick is saying February.   I mean, I
18   don't remember.   But it was around that date.
19             THE WITNESS:  Was it in February?
20        A.    Rick is saying February.
21        Q.    February 2002?
22        A.    Yes.
23        Q.    You mentioned that there were several
24   equity financings that you could recall off the
25   top of your head.   Are there others than those
```

ExH **Y** PG 171

68

```
1              WILLIAM JAY ROSEMAN

2   two, Mr. Kean and Mr. McAuley?

3        A.    I believe there were others.  I don't

4   know how much they added up to, but there were

5   others.  Mr. McAuley is the founder of Nextel,

6   the cellular communications company, and I know

7   he had many conversations with Kevin at that

8   point, and I know that there was-- I know I

9   certainly had discussions with Kevin about it.

10  So I don't know -- I mean, we will have to ask

11  Mr. Pescatore or Mr. McAuley specifically what

12  his discussions were about it with Kevin.  I

13  don't know that answer.

14        Q.    Other than the investments by Mr.

15  McAuley and Mr. Kean, were there any other bona

16  fide equity financings that you are aware of?

17        A.    I'm sure there are other investments

18  at that time.  Off the top of my head, I don't

19  remember specifically what they were.

20        Q.    Do you remember any nonspecific

21  details as to the name of the investor or the

22  entity that made the investment, the amount of

23  the investment, the time frame of the

24  investment?

25              THE WITNESS:  Was Peter Norton in
```

EXH __Y__ PG 172

```
 1                    WILLIAM JAY ROSEMAN

 2   that investment at the time?

 3             DR. BERENSTEIN:  I don't really

 4   remember.

 5        A.    Neither of us really remember.

 6        Q.    But each of those investments would

 7   be reflected on the cap chart; correct?

 8        A.    Yes.  Well, either the cap chart or

 9   the --

10             DR. BERENSTEIN:  Stock certificates.

11        Q.    Is the cap chart updated each time an

12   investor makes an investment?

13        A.    You see, I don't know if their

14   investment -- yes, I believe it was in Xandros,

15   Inc.

16             I'm sorry?  Was it updated?

17        Q.    In general, is the cap chart updated

18   each time an investor makes an investment?

19        A.    In general, yes.

20        Q.    So the cap chart would have been in

21   existence prior to the investment from Mr. Kean,

22   and after the investment from Mr. Kean it would

23   have been updated to reflect his investment;

24   correct?

25        A.    It may have.  I wasn't doing the cap
```

Exh__Y__PG 173

70

```
 1                    WILLIAM JAY ROSEMAN

 2   chart then, but I'll check.

 3        Q.   ·You have been produced here as the

 4   person most knowledgeable regarding the records

 5   and documents of Xandros, Inc.  Is there a person

 6   that is more knowledgeable than you in this

 7   regard?

 8        A.   No.  But at that time we also had our

 9   attorneys up in Ottawa do the cap chart

10   initially, and right about the time we then

11   subsequently transferred everything to us.

12        Q.   Who were the Ottawa attorneys?

13        A.   Fraser, Milner, Casgrain.

14        Q.   Can you spell Fraser?  F-r-a-s-i-e-r;

15   is that right?

16        A.   No, s-e-r.

17        Q.   Miller, M-i-l-l-e-r?

18        A.   No, Milner, M-i-l-n-e-r.  And

19   Casgrain.  I guess it's C-a-s-g-r-a-n-e.·

20             DR. BERENSTEIN:  a-i-n.

21        A.   -- g-r-a-i-n.  Thanks, Rick.

22        Q.   And you mentioned that they were in

23   Ottawa, Canada; correct?

24        A.   Yes.

25        Q.   At some point the cap chart was
```

EXH **Y** PG 174

1                        WILLIAM JAY ROSEMAN

2    transferred to Xandros, Inc.; correct?

3         A.    Yes.

4         Q.    And what time frame was it

5    transferred to Xandros, Inc.?

6         A.    I don't remember.  I really don't

7    remember.

8         Q.    You don't recall the general time

9    frame?

10        A.    I don't.  I just looked to Rick.  He

11   doesn't remember, either.

12        Q.    You believe Mr. Berenstein would be

13   the person most knowledgeable in that regard?

14        A.    Well, he just said he doesn't

15   remember, either.  I mean, you could ask him when

16   you speak to him.

17        Q.    But you have seen the cap chart that

18   you are referring to in Xandros' offices; is that

19   correct?

20        A.    I've seen the cap chart -- could you

21   ask that question again?

22        Q.    You have seen the cap chart that you

23   referred to in your testimony in the last five or

24   ten minutes, you have seen that cap chart in

25   Xandros' offices; is that correct?

                    EXH Y PG 175                          72

1                    WILLIAM JAY ROSEMAN

2          A.    Yes.

3          Q.    And I have the same general questions

4   with regards to the stock certificates.  Are

5   those kept in Xandros' offices?

6          A.    Well, I mean, I keep a photocopy of

7   them, but the actual certificates are sent out to

8   the individual.  Unless they ask us to hold them.

9          Q.    And with regards to the investment by

10  Mr. Kean, was he actually issued stock

11  certificates?

12         A.    Oh, I'm sure he was.  Rick is saying

13  yes.

14         Q.    And would that have been issued at or

15  about the time that he actually made the

16  investment?

17         A.    Yes.

18         Q.    The general time frame?

19         A.    Yes.

20         Q.    Same question with regards to Mr.

21  McAuley.  Would stock certificates have been

22  issued directly to Mr. McAuley?

23         A.    No, because I think they were issued

24  at a later date, but, I mean, the investment date

25  was -- I mean, you could see by the checks when

ExH __Y__ PG 176

73

```
 1              WILLIAM JAY ROSEMAN
 2   the investment was made.  They may have been
 3   issued at a later date.
 4        Q.    I'm sorry, I don't understand your
 5   answer there.  For what reason would the stock
 6   certificates not have been issued at or about the
 7   time Mr. McAuley made his investment?
 8        A.    Because he made the investment, and
 9   then there was some discussion about joining
10   Xandros, Inc., and Xandros Corporation into one
11   company.  And he -- Rick is saying Xandros, Inc.,
12   and LGP into one company.  And he had wanted
13   to -- he wanted his shares to reflect the actual
14   investment, or the actual new entity.
15        Q.    The new entity?
16        A.    Yes.
17        Q.    And, in fact, Xandros, Inc., and LGP
18   have never been, in fact, merged into one
19   company; is that correct?
20        A.    They haven't, which means his
21   investment is specifically and directly into
22   Xandros.  He did not want to invest directly into
23   LGP. . I mean, he'll tell you that.
24        Q.    At some point, though, Mr. McAuley
25   was, in fact, issued stock certificates; correct?
```

EXH Y PG 177

74

```
 1                 WILLIAM JAY ROSEMAN

 2        A.    Yes.

 3        Q.    And do you recall the time frame in

 4   which he was issued stock certificates?

 5        A.    I don't.  I don't recall.

 6        Q.    You mentioned that there was some

 7   discussion as to joining Xandros, Inc., and LGP

 8   into one company.  Can you describe for me --

 9   well, first of all, when was that discussion

10   taking place?

11        A.    Well, it was something that Mr.

12   McAuley had thought would have been viable.  I

13   mean, I don't think it's something that we had

14   wanted to do initially, but it was something that

15   he had wanted to do.

16        Q.    And what did he tell you with regards

17   to why he thought it would be viable or a good

18   idea?

19        A.    He felt that it maximized value.  I

20   had discussed this with Kevin Carmony, and Kevin

21   had asked us at that time that we not do that.

22   And you'll have to ask Kevin -- I mean, Kevin

23   told me his reasoning for that.  But that was

24   discussed with Kevin Carmony.

25        Q.    And, again, you don't recall the
```

Exh __Y__ Pg 178

75

```
 1                    WILLIAM JAY ROSEMAN

 2   general time frame that this discussion occurred

 3   with Mr. McAuley?

 4        A.    I don't.

 5        Q.    And do you have -- where is Mr.

 6   McAuley working today?  Is he also in New York

 7   City?

 8        A.    No, he's in New Jersey.  I think it's

 9   Clifton.

10        Q.    Do you know if he has a position

11   today?

12        A.    If he has a position today?

13        Q.    Yes.  Is he employed by anyone today

14   or is he a director or an officer in any

15   corporation?

16        A.    He started his own company.  I don't

17   know what the name of it is.  In cellular

18   communications.

19        Q.    Is that company also located in

20   Clifton, New Jersey?

21        A.    Yes.

22        Q.    Do you have any other recollection of

23   any other entities, other than Mr. McAuley and

24   Mr. Kean, who made investments into Xandros,

25   Inc.?
```

EXH __Y__ PG 179

76

```
 1                    WILLIAM JAY ROSEMAN

 2        A.    No, not that I remember.  There could

 3   be.  I'm going to check.

 4        Q.    And you would check by looking at the

 5   stock cap sheet; correct?

 6        A.    Yes.

 7        Q.    And the stock certificates.  Any

 8   other documents that would reflect ownership

 9   and/or investments in Xandros, Inc.?

10        A.    Not that I could think of.

11              THE WITNESS:  Can you, Rick?

12              DR. BERENSTEIN:  I didn't hear the

13   question.

14        A.    No.

15        Q.    All right, this might be a good time

16   to take a break.

17              THE VIDEOGRAPHER:  Off the record.

18   The time is 4:45.

19              (A recess was taken.)

20              THE VIDEOGRAPHER:  We will go back on

21   the record.  The time is 5:01.  Just so you know,

22   in about 35 minutes or so I'm going to ask you to

23   go off the record so I can change my tape.

24              MR. STUART:  Okay.  Just give us a

25   couple of minutes' warning to wrap up.
```

EXH Y PG 10                                            77

1                    WILLIAM JAY ROSEMAN

2                    BY MR. STUART:

3         Q.    Mr. Roseman, before we went off the

4    record we were discussing the other equity

5    financings that you allege to have occurred.  And

6    I believe you stated before we went off the

7    record that you have now exhausted your current

8    understanding and current recollection of all

9    such equity financings as you sit here today;

10   correct?

11        A.    Yes.  I mean, my understanding of

12   them -- I mean, my memory is somewhat vague, but

13   I do specifically remember discussing those

14   equity financings with Kevin, though,

15   specifically.

16        Q.    That brings us to the point that I

17   wanted to embark on, and that is pertaining to

18   paragraph 3.3, subsection (a) of the three

19   promissory notes which are Exhibits, again, 6, 7

20   and 8 to this deposition transcript.  Do you have

21   those before you again?

22        A.    The conversion title, 3?

23        Q.    That's correct.

24        A.    Yes.

25        Q.    3.3, subsection (a) requires that the

EXH Y PG 181

78

1                    WILLIAM JAY ROSEMAN

2     maker shall provide written notice of at least 15

3     days prior to the expected closing of equity

4     financing.

5               Do you have any understanding as to

6     whether or not Xandros ever provided Lindows.com

7     written notice pursuant to this subsection with

8     regards to either of the two equity financings

9     that we have discussed here today or any other

10    equity financing that you may be aware of?

11          A.   I'm just reading this.  Can you bear

12    with me one second?

13          Q.   Of course.

14          A.   Okay, I'm sorry.  I'm sorry.  Could

15    you ask me the question again?

16          Q.   Yes.  Are you aware of whether

17    Xandros, Inc., provided written notice to

18    Lindows.com, pursuant to paragraph 3.3, of any of

19    the financings that you have discussed here with

20    us today, or any other financing, for that

21    matter?

22          A.   Well, I remember having corresponded

23    with Kevin Carmony via e-mail in that respect.

24          Q.   And is your -- I'm sorry, go ahead.

25          A.   No, that's it.

EXH __Y__ PG _182_

79

1               WILLIAM JAY ROSEMAN

2        Q.    Is your testimony then that the only

3   communications and only notice provided pursuant

4   to 3.3(a) was the e-mail communications between

5   you and Mr. Carmony?

6        A.    No, I spoke --

7              MR. ROBERTSON:  I object to the form

8   of the question.  You're asking him to interpret

9   the requirements of 3.3(a).  You asked him if he

10  ever did give notice.  If you ask him if it was

11  pursuant to the paragraph, it gets into an

12  improper legal opinion.

13       Q.    You are permitted to answer, Mr.

14  Roseman.

15       A.    I mean, I know -- I mean, I spoke to

16  him about it on the phone on one or two occasions

17  at least.

18       Q.    And apart from the e-mail

19  communications and the telephone communications

20  that you have referred to, have you provided

21  notice pursuant to paragraph 3.3 of Exhibit 6 of

22  the equity financings that we have discussed here

23  today?

24             MR. ROBERTSON:  I object to the form

25  of the question; legal conclusion.

EXH Y PG 183

80

1               WILLIAM JAY ROSEMAN

2        A.    Well, I mean, it was, as far as I

3   know -- I mean, we had discussed this by phone.

4   I mean, I guess my answer would be the same for 7

5   and 8 as well.

6        Q.    Okay.  I'm going to ask that in a

7   moment.

8        A.    Okay.

9        Q.    But let's just lay the foundation

10  here with regards to Exhibit 6, to take it one

11  step at a time.

12             So there were telephone conversations

13  between you and Mr. Carmony regarding these other

14  financings; correct?

15       A.    Yes.

16       Q.    And do you specifically recall which

17  financings you discussed with Mr. Carmony by

18  telephone?

19       A.    I mean, I don't recall which ones.  I

20  mean, I assume that all three were the same.  But

21  I don't recall which ones.

22       Q.    Apart from the telephone

23  conversations with regards to just Exhibit 6 now,

24  was there any written communication from Xandros,

25  Inc., to Lindows.com pursuant to Exhibit 3.3,

ExH Y PG 184                              81

1                    WILLIAM JAY ROSEMAN

2   paragraph (a)?

3           MR. ROBERTSON:  I object to the form

4   of the question.  It calls for an opinion.  You

5   just asked him does he recall giving them notice

6   of equity financings.

7       Q.    You can answer the question, Mr.

8   Roseman.

9       A.    Well, I mean, I spoke to him via

10  phone and e-mail, and as far as I can recollect,

11  that was the extent of my conversations with him

12  about this.

13      Q.    You never sent Mr. Carmony or anyone

14  else at Lindows.com a letter, for instance,

15  notifying them of any of the financings that you

16  have discussed here with us today?

17      A.    I mean, all our correspondence

18  regarding any of these matters were typically

19  done via e-mail and/or discussion.

20      Q.    And so the answer to my question then

21  would be no?

22      A.    Not that I recollect, no.

23          MR. ROBERTSON:  I guess you should

24  clarify it.  The letter separate and apart from

25  an e-mail?

EXH **Y** PG 185

82

```
 1                    WILLIAM JAY ROSEMAN

 2            MR. STUART:  Yes, definitely.

 3        Q.   Let me put it to you this way, Mr.

 4   Roseman.  Take a look at paragraph 4.3 of Exhibit

 5   6.

 6        A.   4.3.

 7             Okay.

 8        Q.   Paragraph 4.3, in general, refers to

 9   the method for communicating notice under the

10   promissory notes; correct?

11             MR. ROBERTSON:  I object to the form

12   of the question.  The document speaks for

13   itself.

14        Q.   You can answer the question.

15        A.   I was reading it.  Ask the question

16   again.  I'm sorry.

17        Q.   That's quite all right.  Why don't

18   you just -- why don't you give me your

19   understanding of what paragraph 4.3 requires.

20             MR. ROBERTSON:  Objection.  This

21   witness' understanding of what a legal paragraph

22   means or doesn't mean is not a pertinent

23   question.  Why don't you just ask him if he

24   recalls giving notice?

25        Q.   You can answer the question, Mr.
```

ExH Y PG 186                                          83

1                    WILLIAM JAY ROSEMAN

2    Roseman.

3         A.    I don't know that this is -- I don't

4    know that this isn't saying that we can't deliver

5    it by e-mail.

6         Q.    You believe that paragraph 4.3

7    permits delivery of notices, pursuant to the

8    requirement in the note, via e-mail?

9         A.    I've always been under the

10   understanding that e-mail is a legal form of

11   communications.

12        Q.    Okay.  I'm sorry, go ahead.

13        A.    No, go ahead.  I'm sorry.

14        Q.    Are you contending that e-mail is

15   either a writing delivered personally by

16   overnight service or by facsimile, with

17   confirmation of receipt, addressed as set forth

18   on the signature page hereto?

19             MR. ROBERTSON:  I object to the form

20   as compound.  We are asking this witness for his

21   interpretation of a legal document.  That's

22   improper opinion.

23        A.    Well, I understand that e-mail is a

24   legal form of notification.  That's always been

25   my understanding.  I know that it is in the

                        EXH Y PG 187                      84

```
 1                      WILLIAM JAY ROSEMAN

 2   securities industry.

 3        Q.    That's not my question, though, Mr.

 4   Roseman.  My question was, does e-mail fall

 5   within the category of accepted notice as

 6   provided under paragraph 4.3, which again, I will

 7   repeat, is a writing delivered personally by

 8   overnight delivery service or by facsimile, with

 9   confirmation of receipt, addressed as set forth

10   in the signature page hereto?

11             MR. ROBERTSON:  I object to the

12   question.  It's compound.  It calls for a legal

13   conclusion.  You are asking the witness to read a

14   legal document and give you his understanding of

15   what it means, which is pretty much irrelevant.

16   It's improper opinion.

17        Q.    You can answer the question, Mr.

18   Roseman.

19        A.    I mean, I guess the only thing I can

20   say is my understanding was that e-mail was a

21   legal form of communications.

22        Q.    Mr. Roseman, you're not answering my

23   question.

24        A.    I think that I am.

25        Q.    Do you believe that paragraph 4.3
```

ExH __Y__ PG __188__

85

```
 1                 WILLIAM JAY ROSEMAN

 2   permits notification by e-mail?

 3             MR. ROBERTSON:  Same objection.  It's

 4   improper opinion.

 5             Also, at this point he has already

 6   answered the question.  It's his view that e-mail

 7   is fine.

 8             MR. STUART:  Mr. Robertson, please

 9   don't instruct your witness on the record during

10   the deposition.  You are perfectly able to make

11   your objections known without instructing your

12   witness how to answer.

13        Q.    Mr. Roseman, can you answer the

14   question, please?

15        A.    I thought I had.

16        Q.    Is it your testimony, sir, that

17   e-mail is permitted under paragraph 4.3 as a

18   method of providing notice pursuant to the

19   promissory note?

20        A.    Well, it's certainly permitted by

21   Mike Robertson.  I mean, his correspondence to us

22   was done by e-mail, and from our discussions with

23   him, that was an accepted form of exchange, both

24   by him and by us.

25        Q.    I wasn't asking you as to whether or
```

EXH Y PG 189

86

```
1                    WILLIAM JAY ROSEMAN
2    not you had an e-mail correspondence with Mr.
3    Robertson, or many other people, probably, which
4    occurs of course regularly.  However, as you are
5    well aware, I'm certain, with regards to certain
6    legal documents, something more formal is
7    generally required, and typically the parties lay
8    out what the formality of those notices must be.
9              And my question again is, is e-mail
10   permitted under paragraph 4.3 of Exhibit 6?
11             MR. ROBERTSON:  Object, compound,
12   improper opinion, legal conclusion.
13        A.   I mean, I believe that it is.
14        Q.   And why do you believe that it is?
15             MR. ROBERTSON:  Same objection.
16        A.   Well, because -- I mean, from
17   numerous conversations that I had had with Kevin
18   Carmony -- I mean, I object to the fact that -- I
19   mean, Kevin sent everything by e-mail, every
20   correspondence, both legal and just general
21   correspondence he sent us via e-mail.  We
22   received this document, I believe, by e-mail
23   initially.  And then we printed it.  So, I mean,
24   this document itself came over, as I understand
25   it, by e-mail.  So this document itself --
```

EXH Y PG 190

87

William Jay Roseman                    10/29/03                    Lindows.com v. Xandros

1                       WILLIAM JAY ROSEMAN

2   pardon?

3       Q.    I'm sorry.  I just want to clarify

4   what your testimony is.  And it is my

5   understanding that your testimony is that e-mail

6   from an employee of Xandros to Mr. Carmony in

7   this case constitutes notice as provided and as

8   required under paragraph 4.3; is that correct?

9       A.    I do, yes.

10           MR. ROBERTSON:  I object to the form

11  of the question, improper opinion, legal

12  conclusion.

13      Q.    And your answer, Mr. Roseman, was "I

14  do"?

15      A.    Yes, I do.

16      Q.    Are you aware of whether or not

17  Xandros ever sent a letter delivered personally

18  to anyone at Lindows.com, notifying Lindows.com

19  of a conversion pursuant to paragraph 3.3(a)?

20  And I am referring just to a letter now.  Not an

21  e-mail, not a telephone conversation, but just a

22  letter delivered personally.

23      A.    Not that I know of, no.

24      Q.    How about a letter delivered by

25  overnight delivery service?

EXH 4 PG 191

88

```
 1                    WILLIAM JAY ROSEMAN

 2        A.    Not that I know of, no.

 3        Q.    How about a letter delivered by

 4   facsimile, with confirmation of receipt?  I'm

 5   sorry, go ahead.

 6        A.    Not that I know of.  You mean by

 7   fax?

 8        Q.    Yes, a letter by facsimile.

 9        A.    Not that I know of.

10        Q.    And --

11        A.    You know, it might be germane to know

12   about my conversations with Kevin Carmony

13   pertaining to this.  Because when I discussed

14   with him the investment, he specifically asked me

15   what the valuation was, and he had said at that

16   point that they had intentions of converting.  He

17   had told me that over the phone.  I believe he

18   also told -- he may have told Brian McAuley that

19   as well.

20              So there was a point in time when

21   there was no question that they were converting.

22        Q.    Actually, that's a different

23   question.  I'm going to get to that in a second.

24        A.    Okay.

25        Q.    Let me finish up with this line of
```

EXH **Y** PG 192                                    89

William Jay Roseman                    10/29/03                    Lindows.com v. Xandros

```
 1              WILLIAM JAY ROSEMAN
 2  questioning.
 3          I'm going to ask you the same
 4  question with regards to Exhibit 7, which also
 5  contains a paragraph 3.3(a), requiring written
 6  notice at least is a days prior to the expected
 7  closing of an equity financing, and it requires
 8  that notice, in paragraph 4.3, be in the same
 9  form as required under Exhibit 6.
10          Do you believe that -- I'm going to
11  ask you the same questions with regards to
12  Exhibit 7 as I asked you with regards to Exhibit
13  6.  Do you believe that e-mail notice suffices
14  for notice under paragraph 4.3 of Exhibit 7?
15      A.    I do.
16          MR. ROBERTSON:  Same objection,
17  compound, improper opinion, legal conclusion.
18      Q.    And I will represent to you, Mr.
19  Roseman, that the same paragraphs exist in
20  Exhibit 8, in particular there is a paragraph 3.3
21  that discusses the requirement that the maker
22  provide the holder with written notice at least
23  15 days prior to the expected closing of an
24  equity financing, and the notice provisions
25  requires, paragraph 4.3 of that note -- I will
```

EXH **Y** PG 193

90

```
 1                    WILLIAM JAY ROSEMAN
 2   slow down for the court reporter, I apologize,
 3   Mr. Finz -- paragraph 4.3 of that note requires
 4   the notice be in writing and shall be delivered
 5   personally by overnight delivery service or by
 6   facsimile, with confirmation of receipt,
 7   addressed as set forth on the signature page
 8   hereto.
 9             Do you believe that e-mail
10   constitutes service under that provision?
11             MR. ROBERTSON:  Same objection,
12   compound, improper opinion, legal conclusion.
13             MR. STUART:  Let me finish my
14   question.
15        Q.   Under that provision as well, subject
16   to your objections.
17        A.   I do, in the context that everything
18   was sent via e-mail.  That was the preferred form
19   of communication.
20        Q.   I understand.  And I'm also going to
21   ask the same questions with regards to Exhibits 7
22   and 8, with regards to whether or not Xandros
23   ever sent to Lindows.com a letter or a facsimile,
24   the letter to be delivered by personal delivery
25   or U.S. mail, addressed to the address on page 4
```

EXH Y PG 194

91

```
 1                    WILLIAM JAY ROSEMAN

 2   of Exhibits 7 and 8.

 3        A.    Not by me, no.

 4        Q.    Are you aware of anyone else at

 5   Xandros, Inc., who sent such a letter?

 6        A.    I'm not aware of anyone else.

 7        Q.    Do you believe that an e-mail was

 8   sent, specifically referring to Exhibit 7, an

 9   e-mail was sent notifying Lindows of equity

10   financings pursuant to Exhibit 3.3(a)?

11              MR. ROBERTSON:  I object to the form

12   of the question, compound.

13        A.    You are saying number 7, Exhibit 7?

14        Q.    Yes.

15        A.    Okay, I'm sorry.  Could you just ask

16   me that question again?

17        Q.    Certainly.  That was confusing.  I

18   apologize.

19              It's the same question that I had

20   initially with regards to Exhibit 6.  You sent

21   e-mail notice to Mr. Carmony that you believe

22   satisfies paragraph 4.3 of all three notes;

23   correct?

24        A.    Yes.

25        Q.    And you believe that that was the
```

EXH $\underline{7}$ PG $\underline{195}$

92

```
 1                WILLIAM JAY ROSEMAN

 2   notice, that e-mail notice was in satisfaction of

 3   the requirements of paragraph 3.3 of each of the

 4   notes; correct?

 5        A.   I do believe that.  But Kevin also

 6   said, even long before this happened, that they

 7   were going to convert no matter what.  We had

 8   flown out and met with them and they told us that

 9   they were going to convert.  They --

10        Q.   Okay.  Let's get to that particular

11   point.  There is an option for the holder of the

12   note to convert optionally; is that correct?

13        A.   I believe that there is.

14        Q.   And that's paragraph 3.2 of each of

15   the notes; is that correct?

16        A.   Yes.

17        Q.   Do you believe that an optional

18   conversion occurred pursuant to paragraph 3.2 of

19   either of the notes?

20        A.   I'm sorry.  I was just reading that.

21   Could you just say that again, please?  I

22   apologize.

23        Q.   Sure.  Why don't you just refer to

24   Exhibit 6, paragraph 3.2.

25        A.   Okay, 3.2.  Yes.
```

EXH Y PG 190                                          93

```
 1                    WILLIAM JAY ROSEMAN
 2        Q.    That's the paragraph that discusses
 3   the option for the maker of the note -- I'm
 4   sorry, for the holder of the note to convert the
 5   note into equity; correct?
 6        A.    Yes.
 7        Q.    You discussed earlier that you allege
 8   that Mr. Carmony stated that he was going to
 9   convert to equity.  Do you believe that such a
10   conversion actually did occur pursuant to
11   paragraph 3.2?
12        A.    Well, he had --
13              MR. ROBERTSON:  I will object for the
14   record.  It's compound.  You're asking for this
15   witness' personal opinion about a legal event.
16   It's improper opinion, legal conclusion.
17        A.    Well, I mean, I'll answer it the best
18   I can.  I mean, he not only told myself, but he
19   told Dr. Berenstein, and he told Tom Langbein,
20   that they had every intention and that they were,
21   in fact, going to convert, and he discussed the
22   conversion features.  When we flew out to San
23   Diego to meet with these individuals, we had
24   discussed not only conversion but, as Rick said,
25   a valuation at dinner, and, in fact, a merger of
```

EXH Y PG 197

94

William Jay Roseman                    10/29/03                    Lindows.com v. Xandros

```
 1                    WILLIAM JAY ROSEMAN
 2   the two companies, which is what they were
 3   desirous of.  So there was never any question in
 4   our mind moving forward that there wasn't going
 5   to be conversion.
 6        Q.    But I take it that it is your
 7   testimony, sir, that that conversion never did
 8   occur, at least never occurred pursuant to
 9   paragraph 3.2?
10        A.    I believe you're correct.  It did
11   not.
12        Q.    And that's true with regards to
13   Exhibits 6, 7 and 8; correct?
14        A.    Yes.
15             MR. ROBERTSON:  Compound.
16        Q.    However, I take it that your
17   testimony would be that, in fact, the notes made
18   payable to Lindows did, in fact, convert?  Is
19   that your understanding?
20        A.    No.  I mean, the fact is that they
21   did not convert, but I believe that they did not
22   convert, and I believe that we were deceived
23   intentionally by Lindows.  I believe that their
24   intention was to impress upon us that they had
25   every intention of converting, until the point we
```

EXH Y PG 196                                                          95

```
 1                    WILLIAM JAY ROSEMAN

 2   had several problems.  One was the use of the

 3   Lindows name, which they had said they had chosen

 4   purposely for publicity purposes against

 5   Microsoft, and we objected to the way that was

 6   being handled.  And there were certain other

 7   things that they were doing that we felt were

 8   inappropriate.

 9            And at that point we had decided that

10   we did not want to merge.  And that's when the

11   relationship went bad, and subsequent to that

12   everything that Kevin Carmony had told us

13   previous to that was pulled off the table.

14       Q.    All right, let me back up.  Your

15   testimony is, sir, that the three promissory

16   notes have not converted pursuant to paragraph 3

17   of each of the three notes?

18            MR. ROBERTSON:  I object to the form

19   of the question, compound, legal conclusion,

20   improper opinion.

21       A.    By virtue of the fact that there's no

22   conversion, I think that's obvious.

23       Q.    So the answer is yes?

24       A.    Yes.  I'm sorry.  Yes.

25       Q.    Thank you.  That makes it simple.  We
```

EXH Y PG 199

96

```
 1              WILLIAM JAY ROSEMAN

 2  can move on.

 3             You mentioned that you believe that

 4  you were deceived by Lindows.com, and you went on

 5  to describe in general terms how you were

 6  deceived.  Can you please just specify for me the

 7  nature of what you are saying that Lindows.com

 8  represented to you that was, in fact, deception?

 9       A.    Yes.  There were many, many points.

10             I think the most -- Lindows had

11  invited us out to San Diego to meet with them.

12  But prior to that, our original discussion was

13  that they were supposed to be giving us, every 90

14  days, paying us a royalty payment and/or this was

15  supposed to be -- the initial 500,000, and

16  subsequent 250,000, was supposed to be a prepaid

17  royalty based on the total revenues of Lindows.

18  And when we had flown out to meet with him, it

19  was Rick, Dr. Berenstein, myself, and Tom

20  Langbein, we had discussed many things:  The

21  conversion, we had discussed -- pardon?

22             DR. BERENSTEIN:  How much money they

23  made.

24       A.    Oh, how much money they had made at

25  that point, Rick just mentioned.
```

EXH __Y__ PG 200.                                          97

1          WILLIAM JAY ROSEMAN

2              They had been doing some things that

3    we felt were completely inappropriate, and we had

4    walked away from our meeting with them with

5    somewhat of a different impression than when we

6    had initially gone there.

7              They had explained to us some of

8    their strategies, which we felt were wrong.  One

9    included the use of a Lindows name, with the

10   intent to purposely goad Microsoft into suing

11   them for infringement on a trademark

12   infringement.  And their intention was fully at

13   that point to utilize the Lindows name to get the

14   lawsuit going so they could, in fact, capitalize

15   on the notoriety.  And then Tom Langbein, a

16   member of our board, thought that that was a

17   completely inappropriate thing to do, and I think

18   he told them that at that point.

19        Q.   My question, Mr. Roseman, was, you

20   mentioned there were a number of items that were

21   deceitful and that were deceptive to Xandros.  I

22   didn't ask you about whether you agreed with

23   Lindows.com's business plan or marketing plan,

24   and your allegations in that regard aside, what

25   other deception are you alleging here today that

EXH Y PG 20|

98

                    WILLIAM JAY ROSEMAN

1

2   Lindows.com perpetrated on Xandros?

3        A.    They refused to allow us to look at

4   their books.  They refused to tell us exactly

5   what their revenues were.  I think at our initial

6   meeting --

7            THE WITNESS:  Rick, do you remember

8   what their revenues, were, off the top of your

9   head?  I don't recall.

10           DR. BERENSTEIN:  150,000.

11       A.    Rick is saying 150,000.  I knew it

12  was over a hundred thousand.  And they were

13  supposed to share those revenues with us.

14           They then later said things like, no,

15  no, every time we asked to see how much money

16  they were making they refused to tell us.  We had

17  no idea and we couldn't base, you know, what our

18  revenue was supposed to be in conjunction to the

19  50 percent pay scenario.

20           They had solicited some of our

21  employees to go work for them.  They had then

22  later said that they didn't actual sell the

23  Lindows product, that they were selling a service

24  thereafter.  I mean, it was one thing after

25  another.  It got to the point where it was

EXH Y PG 202

99

```
 1                    WILLIAM JAY ROSEMAN

 2   absolutely ridiculous.

 3              I mean, it was just -- there were

 4   numerous things.

 5         Q.    And I'm asking you to enumerate those

 6   things, if you could, please.  Other than what

 7   you have already mentioned, are there any other

 8   deceptions, as you have described them, by

 9   Lindows.com?

10         A.    We were supposed to have a quality

11   issue, regarding the quality of the product

12   itself.  We had felt that their usage of the

13   Lindows product was -- they were advertising

14   "Powered by Xandros," and they were using a very

15   unstable system.  Elements that they have added

16   to the product made the actual product unstable,

17   and it was subsequently hurting us to the point

18   where we even asked -- I spoke to Kevin and asked

19   him to please remove the "Powered by Xandros"

20   name from their system.

21              I know Rick had some other points

22   that he could probably elaborate on as well.

23         Q.    He will have an opportunity to do

24   that later today.

25              Can you elaborate on any other
```

EXH Y PG 203

100

1               WILLIAM JAY ROSEMAN

2   additional deceptions, as you described them, by

3   Lindows.com?

4        A.    I mean, not right at this moment, but

5   I'm sure I could think of others.

6        Q.    Well, do you have any others in your

7   mind right now?

8        A.    I think we were disappointed in

9   regards to -- well, when we were discussing the

10  potential merger with them, Kevin Carmony had

11  given us one valuation, which we were potentially

12  interested in at that point of time, and then he

13  later changed it.

14            I mean, just the whole idea -- I

15  mean, there's no doubt in anyone's mind that this

16  was a royalty.  I mean, he told Brian McAuley and

17  John Pescatore that this was a royalty basis, and

18  now all of a sudden they're saying it's not.  I

19  mean, it's just utterly ridiculous.  And yet --

20  we sent our accountant to their office I think

21  two or three times --.

22            THE WITNESS:  Maybe two times.

23  Right, Rick?

24        A.    At least twice, to their office, to

25  get a bookkeeping number.  And they refused to

EXH __Y__ PG __204__

101

```
 1                    WILLIAM JAY ROSEMAN

 2   allow the accountant into their office for us to

 3   get an audit.  I was calling Kevin Carmony.  He

 4   refused to return my phone calls.  It turned out

 5   to be a very, very bad relationship.

 6        Q.    Let me follow up on sending the

 7   accountant to the office.  Do you recall any

 8   details of each of those occasions you allege

 9   that an accountant actually went to Lindows.com's

10   office?

11        A.    Yes, our accountant went there, and

12   they would not let them in.  I don't remember his

13   name -- or her name.

14              THE WITNESS:  Rick, do you remember

15   her name?

16        A.    Rick doesn't remember it, either.

17        Q.    And do you recall the dates that you

18   allege that the accountant actually went to

19   Lindows.com's offices?

20        A.    Rick is saying it's January 2003.

21        Q.    And she went, your recollection is,

22   on two occasions to Lindows.com?

23        A.    At least, yes.

24              THE VIDEOGRAPHER:  You've got about

25   five minutes of tape left.
```

EXH Y PG 205

102

William Jay Roseman                    10/29/03                    Lindows.com v. Xandros

```
 1              WILLIAM JAY ROSEMAN
 2         MR. STUART:  Thank you.
 3    Q.    You state that the promissory notes,
 4  notwithstanding the fact that they do not in and
 5  of themselves reference that they are to be
 6  advances on royalties, are, in fact, advances on
 7  royalties, because of the strategic alliance
 8  agreement.
 9    A.    And because of what Kevin told us.
10    Q.    And what was that?  What did he tell
11  you?
12    A.    He told us that they were prepaid
13  royalties.
14    Q.    And did he mention that to you in
15  person or was that something that you received
16  through a written communication, e-mail or
17  otherwise?
18    A.    I'm sure he sent it to us by e-mail,
19  but I specifically recall conversations.  I mean,
20  not just myself.  I mean, Rick, Tom Langbein,
21  Brian McAuley, John Pescatore, Mike Bego.  This
22  was not a -- I mean, each one of these
23  individuals had conversations about this with
24  him.
25    Q.    And with regards to your personal
```

EXH Y PG 206                                                    103

William Jay Roseman                    10/29/03                    Lindows.com v. Xandros

1                    WILLIAM JAY ROSEMAN

2  conversations with Mr. Carmony, what exactly did

3  Mr. Carmony say to you that indicated to you that

4  the three promissory notes were, in fact,

5  prepayments on royalties?

6       A.    Well, I remember a conversation that

7  I had with him regarding these royalty notes, and

8  Kevin had at that point said that they

9  anticipated significant revenue, and the reason

10 why they wanted to merge the two companies was

11 because they felt that, you know, they already

12 had 750,000 that was due in royalties, and there

13 would have been a beneficial aspect, they felt,

14 to both Xandros and to Lindows, and -- I mean,

15 there was just many conversations that it was

16 royalties.  I mean many conversations.

17      Q.    So it was to the effect that Mr.

18 Carmony expected that future sales would, in

19 fact, result in royalties due and payable to

20 Xandros, Inc., under the strategic alliance

21 agreement that would exceed the value of the

22 notes?

23      A.    Yes, far exceed.

24            MR. ROBERTSON:  I object to the form

25 of that.  It's compound.

EXH Y PG 207                    104

1     WILLIAM JAY ROSEMAN

2  Q. Would far exceed, I believe was your

3 response; correct, Mr. Roseman?

4  A. Yes.

5  Q. And did you ever have a subsequent

6 conversation with Mr. Carmony as to whether or

7 not the royalties due and payable to Xandros out

8 of this strategic alliance agreement did, in

9 fact, far exceed the amount of the promissory

10 notes?

11  A. At one point, yes.

12  Q. And what was that conversation?

13  A. I had said to him how much money have

14 you guys made, and he was always illusive in

15 regard to that.  Except for the first time that

16 we went to go see him.  But when they did a

17 presentation for us.  But our discussions at that

18 point were what he had -- your question is what

19 had they done in revenues?

20  Q. No.  My question was, you say that

21 initially Mr. Carmony represented to you that he

22 expected that future sales of the Lindows product

23 that incorporated the Xandros code, or the code

24 that Xandros claimed as its own, would far exceed

25 the total value of the three promissory notes.

EXH Y PG 208      105

1       WILLIAM JAY ROSEMAN

2    My question was, after that discussion with Mr.

3    Carmony, did you then have later conversations

4    with him discussing whether or not the revenues

5    did, in fact, exceed the total value of the three

6    promissory notes?

7        A.   He would never tell me what the

8    revenues were.  I mean, I asked on many

9    occasions, but he would never tell me.

10       Q.   Did he ever tell you that the

11   revenues or the royalties that were due and

12   payable to Xandros under the strategic alliance

13   agreement did not, in fact, exceed the total

14   value of the promissory notes?

15       A.   No.

16       Q.   Never told you that?

17       A.   I don't remember him telling me that,

18   no.

19       Q.   And is it your testimony today, sir,

20   that the royalties due and payable, that you

21   allege are due and payable to Xandros under the

22   strategic alliance agreement are, in fact, in

23   excess of the total value of the promissory

24   notes, plus interest thereon?

25       A.   I have no idea what they are.  I

EXH Y PG 209

106

```
 1              WILLIAM JAY ROSEMAN
 2  mean, we still don't know what the revenues have
 3  been.  Nobody has ever told us.  I mean, so I
 4  couldn't even fathom to guess.  I mean, I would
 5  assume that their revenues have been -- I mean,
 6  they're a private company.  But I would assume
 7  that their revenues -- if they had, I think it
 8. was over 120, but Rick remembers 150,000, when we
 9  first met with them, I would assume that their
10  revenues are at least considerably over that
11  amount.
12       Q.    All right, but you have no facts --
13  that's an assumption on your part?  It's based on
14  your general perception of Lindows from the
15  outside; correct?
16       A.    Rick just said that they told him in
17  December that they had made over a million
18  dollars.  I don't recall that, but, you know, you
19  could ask Rick that.
20            MR. STUART:  Mr. Videographer, would
21  this be a good time to stop?
22            THE VIDEOGRAPHER:  Yes.  We will go
23  off the record.  The time is 5:35.
24            (A recess was taken.)
25            MR. STUART:  Because of the late hour
```

EXH Y PG 210                                     107

1                    WILLIAM JAY ROSEMAN

2    on the east coast, and because the parties are

3    anticipating that there is a settlement

4    conference tomorrow, the parties have agreed to

5    continue the remainder of Mr. Roseman's

6    deposition.   I believe that the court reporter

7    has indicated that two hours of the four hours

8    with Mr. Roseman have expired.   Therefore, there

9    should be an additional two hours, pursuant to

10   the court's order.

11             And the parties agree that that

12   deposition of Mr. Roseman will continue until

13   November 5, 2003, at 1 o'clock Eastern Standard

14   Time, under the same conditions and circumstances

15   as this deposition.   It could be in a different

16   room, Mr. Roseman.

17             The parties have also agreed that the

18   deposition of Mr. Berenstein will continue until

19   November 6, 2003, at 4 o'clock p.m. Eastern

20   Standard Time, also at the same law firm and at

21   the same location, under the same conditions as

22   this deposition.

23             Again, Mr. Berenstein, that could be

24   in a different conference room.   Please just

25   check with the receptionist when you arrive.

EXH Y PG 211

108

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

LINDOWS.COM, INC., a Delaware

corporation,

                    Plaintiff,

                    Case No.

     -against-      02 CV 2460 BTM(RBB)

XANDROS, INC., a Delaware corporation;

LINUX GLOBAL PARTNERS, INC., a Delaware

corporation; MICHAEL BEGO, an individual;

WILLIAM JAY ROSEMAN, an individual,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

                    November 5, 2003

                    1:40 p.m.

    Continued deposition of WILLIAM JAY ROSEMAN, VOL. 2,

taken by Plaintiff, pursuant to Notice, at the

offices of Paul Hastings Janofsky & Walker LLP,

75 East 55th Street, New York, New York, before

ERIC J. FINZ, a Shorthand Reporter and Notary

Public within and for the State of New York.

                    EXH **Y** PG **212**



**LEGALINK®**

A **WORDWAVE** COMPANY

LegaLink San Diego
550 West C Street, Suite 1440
San Diego, CA 92101

tel (619) 544-8344
tel (800) 544-9666
fax (619) 544-8345

www.legalink.com

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

|    |                                                              |          |
|----|--------------------------------------------------------------|----------|
| 1  | WILLIAM JAY ROSEMAN                                           |          |
| 2  | THE VIDEO OPERATOR:  Here continues                          | 13:40:51 |
| 3  | the deposition of William J. Roseman, in the                | 13:40:52 |
| 4  | matter of Lindows.com, Inc., versus Xandros,                | 13:40:55 |
| 5  | Inc., et al., in the United States District                 | 13:41:00 |
| 6  | Court, Southern District of California, Case                | 13:41:03 |
| 7  | No. 02 CV 2460 BTM.                                          | 13:41:06 |
| 8  | Today's date is November 5, 2003,                           | 13:41:12 |
| 9  | the time on the video monitor is 1:41.  The                 | 13:41:15 |
| 10 | video operator today is David Cassel, contracted            | 13:41:19 |
| 11 | by LegaLink San Diego, California.  This video              | 13:41:22 |
| 12 | deposition is taking place at Paul Hastings, 75             | 13:41:26 |
| 13 | East 55th Street, New York, New York.  The court            | 13:41:31 |
| 14 | reporter today is Eric Finz of LegaLink San                 | 13:41:39 |
| 15 | Diego.                                                       | 13:41:44 |
| 16 | Would the reporter please swear in                          | 13:41:44 |
| 17 | the witness.                                                 | 13:41:46 |
| 18 | W I L L I A M   J A Y   R O S E M A N,                       |          |
| 19 | having been first duly sworn by the Notary                  |          |
| 20 | Public (Eric J. Finz), was examined and                     |          |
| 21 | testified as follows:                                        |          |
| 22 | EXAMINATION BY MR. STUART:                                   | 13:41:57 |
| 23 | Q.    Mr. Roseman, again, my name is Cole                   | 13:41:58 |
| 24 | Stuart, and I represent the plaintiff                        | 13:42:02 |
| 25 | Lindows.com in this matter.  Your deposition                | 13:42:04 |

EXH **Y** PG **213**

114

| | | |
|---|---|---|
| 1 | WILLIAM JAY ROSEMAN | |
| 2 | today is a continuation from your deposition | 13:42:07 |
| 3 | last week.  And just so you're aware, the same | 13:42:09 |
| 4 | rules and general guidelines that we spoke about | 13:42:12 |
| 5 | last week regarding the conduct of the | 13:42:17 |
| 6 | deposition and the importance of the oath that | 13:42:20 |
| 7 | you've just taken also apply here today. | 13:42:21 |
| 8 | Do you understand that, sir? | 13:42:24 |
| 9 | A.    I do. | 13:42:25 |
| 10 | Q.    Mr. Roseman, when we went off the | 13:42:26 |
| 11 | record last week, we were in the midst of | 13:42:27 |
| 12 | discussing a number of exhibits.  And I want to | 13:42:30 |
| 13 | go back to where we left off.  Do you have the | 13:42:32 |
| 14 | exhibits that have been pre-marked before you? | 13:42:35 |
| 15 | A.    I do. | 13:42:37 |
| 16 | Q.    Can you please take a look at | 13:42:43 |
| 17 | Exhibit 13.  Do you have that before you? | 13:42:50 |
| 18 | A.    I do, yes. | 13:43:24 |
| 19 | Q.    Have you ever seen a copy of the | 13:43:25 |
| 20 | letter that is marked as Exhibit 13 before | 13:43:27 |
| 21 | today? | 13:43:29 |
| 22 | A.    I may have.  I see that it was cc'd | 13:43:34 |
| 23 | to me, but I don't remember. | 13:43:36 |
| 24 | Q.    Do you understand this to be a | 13:43:43 |
| 25 | letter that purports to be from Mr. Michael | 13:43:44 |

Exh __Y__ PG _214_

115

| | | |
|---|---|---|
| 1 | WILLIAM JAY ROSEMAN | |
| 2 | Bego, dated December 27, 2002? | 13:43:47 |
| 3 | A.    Yeah, it's not signed, so I don't | 13:43:52 |
| 4 | know if he did -- if this was sent out or not. | 13:43:56 |
| 5 | But... | 13:43:58 |
| 6 | Q.    Have you ever seen a signed copy of | 13:44:04 |
| 7 | this letter? | 13:44:06 |
| 8 | A.    I don't recall having seen this | 13:44:07 |
| 9 | letter before.  I mean, I may have, but off the | 13:44:09 |
| 10 | top of my head I don't recall having seen it. | 13:44:13 |
| 11 | Q.    If you'll note, the first paragraph | 13:44:18 |
| 12 | of that exhibit in which Mr. Bego writes "we are | 13:44:20 |
| 13 | presently compiling the information that you | 13:44:26 |
| 14 | requested on our equity financings and will | 13:44:28 |
| 15 | forward this information to you as soon as | 13:44:31 |
| 16 | possible." | 13:44:35 |
| 17 | Did you have a conversation with | 13:44:36 |
| 18 | Mr. Bego around the time that this letter is | 13:44:38 |
| 19 | dated, which is December 27, 2002, regarding | 13:44:42 |
| 20 | providing information on Xandros equity | 13:44:45 |
| 21 | financings that would be compiled and forwarded | 13:44:50 |
| 22 | to Lindows.com? | 13:44:52 |
| 23 | A.    I don't remember having a | 13:44:56 |
| 24 | conversation -- I remember having a conversation | 13:44:58 |
| 25 | in that regard with Kevin Carmony, but not with | 13:45:00 |

EXH Y PG 215

116

| | | |
|---|---|---|
| 1 | WILLIAM JAY ROSEMAN | |
| 2 | Mike Bego.  I may have, but I don't recall. | 13:45:04 |
| 3 | Q.     And what was your conversation with | 13:45:15 |
| 4 | Mr. Carmony in that regard? | 13:45:16 |
| 5 | A.     Kevin had just asked -- they had | 13:45:19 |
| 6 | said that they would assist us in -- they had | 13:45:21 |
| 7 | wanted to introduce us to various venture | 13:45:27 |
| 8 | capital firms.  And Kevin had an interest in | 13:45:32 |
| 9 | what specifically we were dealing or who we had | 13:45:34 |
| 10 | spoken to in the past and what our progress was | 13:45:39 |
| 11 | thereof. | 13:45:43 |
| 12 | Q.     Did you ever have a conversation | 13:45:46 |
| 13 | with Mr. Carmony about providing him | 13:45:47 |
| 14 | documentation and information relating to any | 13:45:50 |
| 15 | equity financings that may have been conducted | 13:45:55 |
| 16 | by Xandros? | 13:45:57 |
| 17 | A.     Well, just what I just said. | 13:45:58 |
| 18 | Q.     Did you ever in fact provide | 13:46:00 |
| 19 | Mr. Carmony with any of that information that | 13:46:02 |
| 20 | you discussed? | 13:46:04 |
| 21 | A.     Yes. | 13:46:06 |
| 22 | MR. STUART:  Let's go off the | 13:46:16 |
| 23 | record. | 13:46:17 |
| 24 | THE VIDEO OPERATOR:  We are going | 13:46:19 |
| 25 | off the record, the time is 1:46. | 13:46:20 |

EXH _Y_ PG 216

117

| | | |
|---|---|---|
| 1 | WILLIAM JAY ROSEMAN | |
| 2 | (Discussion off the record.) | 13:47:28 |
| 3 | THE VIDEO OPERATOR:  We are back on | 13:47:31 |
| 4 | the record, the time is 1:47. | 13:47:32 |
| 5 | BY MR. STUART: | 13:47:38 |
| 6 | Q.    Mr. Roseman, before we went off the | 13:47:40 |
| 7 | record we were discussing a conversation you may | 13:47:42 |
| 8 | have had with Mr. Carmony regarding providing | 13:47:44 |
| 9 | Mr. Carmony with information relating to private | 13:47:47 |
| 10 | equity financings that actually took place by | 13:47:50 |
| 11 | Xandros. | 13:47:55 |
| 12 | My question, sir, is, did you ever | 13:48:02 |
| 13 | provide Mr. Carmony with any information | 13:48:04 |
| 14 | relating to any equity financings by Xandros | 13:48:07 |
| 15 | that actually did take place? | 13:48:10 |
| 16 | A.    Well, I don't remember that.  I | 13:48:12 |
| 17 | mean, I remember our discussions being very | 13:48:14 |
| 18 | different.  I remember our discussions specific | 13:48:18 |
| 19 | to Lindows introducing us to venture capital | 13:48:20 |
| 20 | firms and us making presentations in conjunction | 13:48:24 |
| 21 | with Lindows.  But I don't recall Lindows -- are | 13:48:26 |
| 22 | you asking me -- could you just ask the question | 13:48:29 |
| 23 | again? | 13:48:32 |
| 24 | Q.    Yes, sir.  I'm asking you if you | 13:48:33 |
| 25 | recall specifically giving Lindows.com any | 13:48:35 |

EXH Y PG 217

118

```
 1              :        WILLIAM JAY ROSEMAN

 2   information on any private equity financings        13:48:38

 3   that Xandros did actually undertake.                13:48:43

 4         A.     No.  I mean, I don't recall that.      13:48:47

 5         Q.     In other words, we discussed last      13:48:53

 6   week at least two private equity financings that    13:48:58

 7   actually did take place.                            13:49:01

 8         A.     I did?                                 13:49:04

 9         Q.     Do you recall that testimony?          13:49:05

10         A.     I discussed that?           :          13:49:06

11         Q.     Yes, sir.                              13:49:07

12         A.     What were they?                        13:49:18

13         Q.     I believe you discussed two private    13:49:18

14   equity financings by two individuals.  And I       13:49:18

15   don't have their names.                             13:49:20

16         A.     Are you talking about Brian            13:49:21

17   McAuley and David Kean?                             13:49:22

18         Q.     Yes, sir.                              13:49:25

19         A.     But I thought that they were -- I      13:49:28

20   didn't look at the date here, as of January 13,    13:49:32

21   2003.  They were investments made, yes.  I         13:49:36

22   thought you were talking about venture capitals.   13:49:42

23   I didn't know you were talking about investments   13:49:45

24   made.                                               13:49:47

25         Q.     I'm sorry, any type of private         13:49:47
```

EXH __Y__ PG __218__

119

1              .          WILLIAM JAY ROSEMAN

2    equity financing, whether it be by an individual·        13:49:48

3    investor, venture capitalist, angel investors,           13:49:52

4    public investors.                                         13:49:56

5         A.     I did not talk to Kevin about that.           13:49:57

6    But I know Kevin specifically spoke to Brian              13:49:59

7    McAuley about that, because I know Kevin and              13:50:02

8    Brian McAuley and John Pescatore had numerous            13:50:04

9    discussions regarding Brian McAuley's                     13:50:10

10   investments into Xandros.  But I was not party           13:50:12

11   to those conversations.                                   13:50:15

12        Q.     Refer now to Exhibit 17.  And do             13:50:24

13   you understand Exhibit 17 to be a letter from            13:50:44

14   someone at Lindows.com to Michael Bego, dated            13:50:51

15   December 6, 2001?                                         13:50:55

16        A.     It appears that way, yes.  It looks          13:51:01

17   like it's from Kevin Carmony.                             13:51:03

18        Q.     Yes.  Have you ever seen a copy of           13:51:06

19   Exhibit 17 before today?                                  13:51:07

20        A.     I may have, but I don't recall.              13:51:12

21        Q.     Do you recognize the signature at            13:51:26

22   the bottom of page 2 on the left-hand side,              13:51:28

23   underneath the words "agreed and accepted,               13:51:31

24   Xandros, Inc."?                                           13:51:34

25        A.     Yes.                                          13:51:36

EXH Y PG 219

120

```
 1              WILLIAM JAY ROSEMAN
 2  equity financing, whether it be by an individual     13:49:48
 3  investor, venture capitalist, angel investors,       13:49:52
 4  public investors.                                    13:49:56
 5       A.    I did not talk to Kevin about that.       13:49:57
 6  But I know Kevin specifically spoke to Brian         13:49:59
 7  McAuley about that, because I know Kevin and         13:50:02
 8  Brian McAuley and John Pescatore had numerous        13:50:04
 9  discussions regarding Brian McAuley's               13:50:10
10  investments into Xandros.  But I was not party       13:50:12
11  to those conversations.                              13:50:15
12       Q.    Refer now to Exhibit 17.  And do          13:50:24
13  you understand Exhibit 17 to be a letter from        13:50:44
14  someone at Lindows.com to Michael Bego, dated        13:50:51
15  December 6, 2001?                                    13:50:55
16       A.    It appears that way, yes.  It looks       13:51:01
17  like it's from Kevin Carmony.                        13:51:03
18       Q.    Yes.  Have you ever seen a copy of        13:51:06
19  Exhibit 17 before today?                             13:51:07
20       A.    I may have, but I don't recall.           13:51:12
21       Q.    Do you recognize the signature at         13:51:26
22  the bottom of page 2 on the left-hand side,          13:51:28
23  underneath the words "agreed and accepted,           13:51:31
24  Xandros, Inc."?                                      13:51:34
25       A.    Yes.                                      13:51:36
```

EXH Y PG 220

120

1              WILLIAM JAY ROSEMAN

2    the Exhibit 18 before today, sir?                13:53:19

3        A.    I mean, I may have.  But, I mean, I    13:53:21

4    really don't recall.  I mean, I really don't.    13:53:25

5    It was a long time ago, and jeez, there is so    13:53:31

6    many documents.  I mean, I really don't recall.  13:53:32

7        Q.    And having looked at Exhibit 18, do    13:53:38

8    you recognize that there are a number of blanks  13:53:41

9    in this exhibit which are not filled in?         13:53:48

10       A.    Well, I mean the only blanks that I    13:53:53

11   see would be where it says dear is left blank,   13:53:55

12   as in the salutation.  And then the signature    13:53:58

13   things are blanked as well.                      13:54:02

14       Q.    Do you see the date at the top of      13:54:06

15   the page?                                        13:54:10

16       A.    It says November blank, 2001.          13:54:10

17       Q.    And that blank is not filled in;       13:54:12

18   correct?                                         13:54:13

19       A.    It's not filled in correct?            13:54:14

20       Q.    It's not filled in; is that            13:54:17

21   correct?                                         13:54:19

22       A.    Yes, it's not filled in.               13:54:19

23       Q.    And do you recognize the address       13:54:21

24   for Xandros, Inc., 1410 Blair Place, Suite 600?  13:54:27

25       A.    Yes.                                   13:54:35

                    ExH _Y_ PG _221_

                                                        122

1             WILLIAM JAY ROSEMAN

2        Q.    Above that Xandros, Inc., is that a        13:54:35

3   blank?                                               13:54:38

4        A.    Yes.                                       13:54:39

5        Q.    That blank's not filled in either;         13:54:39

6   right?                                                13:54:41

7        A.    Yeah, I don't know what would go           13:54:42

8   there.  Maybe the person's name that it's being      13:54:44

9   sent to.                                             13:54:46

10       Q.    And the same questions for the next        13:54:50

11  addressee block, Xandros Corporation, there is a     13:54:51

12  blank above that word; correct?                      13:54:57

13       A.    Yes.                                       13:55:00

14       Q.    That blank is not filled in?              13:55:00

15       A.    Correct.                                   13:55:04

16             That is the wrong address, just so         13:55:04

17  you know, for Xandros, Inc.                          13:55:06

18       Q.    I think we have the current               13:55:08

19  address.                                             13:55:10

20       A.    Yeah, but that was never Xandros,          13:55:11

21  Inc.'s address.                                      13:55:12

22       Q.    I see.  I understand.                      13:55:14

23             And on the last page, page 3 of the       13:55:17

24  three-page exhibit, there appears to be a            13:55:19

25  signature line for Lindows.com, Xandros, Inc.        13:55:21

EXH Y PG 222                      123

```
 1              WILLIAM JAY ROSEMAN

 2    and Xandros Corporation; correct?              13:55:26

 3        A.    Yes.                                  13:55:28

 4        Q.    And none of those blanks are filled   13:55:29

 5    in either?                                      13:55:31

 6        A.    No.                                   13:55:32

 7        Q.    Mr. Roseman, have you ever seen a     13:55:33

 8    copy of Exhibit 18 except that the blanks, any  13:55:35

 9    or all of the blanks that we just discussed are 13:55:40

10    actually filled in?                             13:55:46

11        A.    I don't recall.                       13:55:47

12        Q.    You don't recall having seen such a   13:55:48

13    document?                                       13:55:50

14        A.    Rick might.  But off the top of my    13:55:53

15    head I don't recall.  I mean, I would have to   13:55:56

16    read the entire document.  I'm not even quite   13:55:58

17    sure what the document is referring to.         13:56:00

18        Q.    Why don't you take a moment and       13:56:02

19    read through the entire document then.          13:56:03

20        A.    All right.                            13:56:05

21              Okay, I'm familiar with this          13:58:13

22    document.                                       13:58:14

23        Q.    Are you familiar with this document   13:58:14

24    by virtue of your having read it just now or are 13:58:23

25    you recognizing that you have seen that document 13:58:23
```

EXH __Y__ PG __223__

1                    WILLIAM JAY ROSEMAN

2   before?                                          13:58:23

3        A.    I believe I have.                     13:58:23

4        Q.    You have seen it before; correct?     13:58:23

5        A.    Well, I remembered -- I mean, it's    13:58:26

6   so hard.  Jeez, it's like over two years ago.    13:58:26

7   So I don't know if it's -- I don't know if my    13:58:31

8   recollection is from having read it or from us   13:58:35

9   having discussed it.                             13:58:39

10       Q.    My question to you --                 13:58:40

11       A.    This is something that I think Rick   13:58:42

12  is more familiar with and Rick may have dealt    13:58:43

13  with this.  I don't think I did.                 13:58:45

14       Q.    My question to you, Mr. Roseman,      13:58:47

15  is, have you ever seen a copy of Exhibit 18      13:58:49

16  where the blanks are actually filled in?         13:58:52

17       A.    I don't -- I really don't know.  I    13:58:55

18  mean, I may have.  I don't know.                 13:58:56

19       Q.    Do you have any understanding as to   13:58:59

20  whether or not the terms that are laid out in    13:59:00

21  Exhibit 18 actually constitute an agreement      13:59:05

22  between Lindows.com and Xandros, Inc. and        13:59:09

23  Xandros Corporation?                             13:59:11

24       A.    I mean, this is something that Rick   13:59:13

25  dealt with with Mike, I did not.  So, I mean, it 13:59:15

EXH __Y__ PG _224_                                   125

| | | |
|---|---|---|
| 1 | WILLIAM JAY ROSEMAN | |
| 2 | would be difficult for me to answer that | 13:59:18 |
| 3 | question. | 13:59:19 |
| 4 | Q.     So your testimony then I take it | 13:59:19 |
| 5 | would be that you don't have any understanding | 13:59:22 |
| 6 | as to whether or not they are or are not part of | 13:59:23 |
| 7 | any agreement between those entities? | 13:59:26 |
| 8 | A.     Well, I mean, I understood that -- | 13:59:29 |
| 9 | initially I thought that it was.  But, I mean, | 13:59:31 |
| 10 | I -- I mean, at that point in time I was not -- | 13:59:34 |
| 11 | I was concentrating in other areas, and I know | 13:59:37 |
| 12 | Rick was concentrating in this specific area. | 13:59:40 |
| 13 | So, you probably would be best -- | 13:59:42 |
| 14 | Rick would be able to best answer this for you. | 13:59:46 |
| 15 | I was not involved in every aspect of the | 13:59:48 |
| 16 | Lindows/Xandros agreement. | 13:59:50 |
| 17 | Q.     Just to make sure we have your | 13:59:58 |
| 18 | answer on the record, you have never seen a copy | 14:00:01 |
| 19 | of this exhibit with the blanks filled in? | 14:00:04 |
| 20 | A.     I didn't -- I don't remember having | 14:00:08 |
| 21 | said that.  I said I don't recall. | 14:00:09 |
| 22 | Q.     You don't recall whether you have | 14:00:15 |
| 23 | or have not? | 14:00:16 |
| 24 | A.     Right. | 14:00:17 |
| 25 | Q.     And prior to your appearance here | 14:00:18 |

EXH __Y__ PG 225

126

```
 1              WILLIAM JAY ROSEMAN

 2   today, did you take the time to look through the      14:00:22

 3   records of Xandros, Inc. or Xandros Corporation       14:00:26

 4   relating to Lindows.com in preparation --             14:00:30

 5        A.     I did some time ago.  I did not           14:00:35

 6   have an opportunity to go through all the             14:00:38

 7   documents, no.                                        14:00:40

 8        Q.     Let's take a look at Exhibit 16.          14:00:41

 9   I'm going to ask you, sir, if you've ever seen        14:01:05

10   Exhibit 16 before.                                    14:01:08

11        A.     I have.                                   14:01:09

12        Q.     Can you please tell us what is            14:01:11

13   Exhibit 16?                                           14:01:14

14        A.     It is the strategic alliance             14:01:16

15   agreement.                                            14:01:18

16        Q.     And that is an agreement between          14:01:19

17   Lindows.com, Xandros Corporation and Xandros,         14:01:20

18   Inc.; correct?                                        14:01:24

19        A.     Yes.                                      14:01:26

20        Q.     Prior to examining Exhibit 16 here        14:01:30

21   today, had you seen Exhibit 16 before?                14:01:36

22        A.     Yes, I have.                              14:01:39

23        Q.     When was the last time you saw            14:01:40

24   Exhibit 16?                                           14:01:42

25        A.     Quite some time ago.                      14:01:47
```

EXH __Y__ PG 226

127

William Jay Roseman, Vol. 2                11/5/03                Lindows.com v. Xandros

```
1              WILLIAM JAY ROSEMAN
2         Q.    Do you recall where it was that you      14:01:50
3    saw the strategic alliance agreement the last       14:01:51
4    time you saw it?                                     14:01:55
5         A.    Probably in our office.                  14:01:56
6         Q.    Do you know if the strategic             14:01:57
7    alliance agreement is kept in a particular file     14:01:59
8    or a filing cabinet or an area in your office?      14:02:02
9         A.    I mean, Rick would -- I wouldn't         14:02:05
10   know.  I mean, I don't keep the documents, Rick     14:02:07
11   does.  So Rick would know exactly where it would    14:02:10
12   be.                                                  14:02:14
13              I'm assuming it would probably be        14:02:19
14   in the Lindows file.                                 14:02:21
15        Q.    Have you ever seen a Lindows file?       14:02:23
16        A.    Yes.                                      14:02:26
17        Q.    Where is the Lindows file kept?          14:02:30
18        A.    At our office.                            14:02:36
19        Q.    That's the office in New York?           14:02:38
20        A.    Yes.                                      14:02:40
21        Q.    The address that you had previously      14:02:41
22   given us?                                            14:02:43
23        A.    Yes.  I mean, I know Tom Reaume has       14:02:44
24   some documents, but I don't know which documents    14:02:48
25   Tom has and which documents we have.                14:02:51
```

EXH Y PG 227                                              128

```
 1              WILLIAM JAY ROSEMAN

 2        Q.    And what other documents are          14:02:54

 3  contained in the Lindows file, to the best of     14:02:56

 4  your recollection?                                14:02:58

 5        A.    I really have no idea.  Because I      14:02:59

 6  know some are in Canada at our Canadian           14:03:01

 7  counsel's office, and some are here.  But I       14:03:04

 8  don't know which one is in which place.           14:03:07

 9        Q.    My recollection from your testimony   14:03:13

10  last week was that some of the documents, at      14:03:14

11  least, were removed from your Canadian counsel's  14:03:17

12  office and transferred to some other location.    14:03:21

13  Is it -- perhaps I misunderstood you.  Are you    14:03:23

14  stating that some documents in the possession of  14:03:27

15  Xandros are actually still with your Canadian     14:03:31

16  counsel?                                          14:03:34

17        A.    I mean, I don't know.  I mean, I      14:03:39

18  know some time ago Tom Reaume had some            14:03:40

19  documents.  But I don't know whether he still     14:03:43

20  has them or not or whether or not he sent them    14:03:46

21  down.  I don't do the filing, Rick does.  So I    14:03:48

22  don't know what was sent back to Rick and         14:03:51

23  whether Tom still has anything or not.  I know    14:03:53

24  there was a point in time when he did have        14:03:55

25  things, they may in fact have been all sent to    14:03:59
```

EXH Y PG 228

129

```
 1              WILLIAM JAY ROSEMAN

 2   Rick, I don't know.                            14:04:01

 3        Q.    Just in general, do you have an     14:04:06

 4   understanding as to what type of documents would  14:04:08

 5   go into the Lindows file and what type would     14:04:10

 6   not?  What does the document have to be to be    14:04:14

 7   placed into the Lindows file?                    14:04:24

 8        A.    I mean, it would have to be a        14:04:24

 9   document that pertains to Lindows.  I would      14:04:26

10   assume.                                          14:04:32

11        Q.    If you would, please, take a look    14:04:45

12   at the last page of Exhibit 16.  And I'm going   14:04:46

13   to ask you if you recognize the signatures       14:04:50

14   underneath Xandros Corporation and Xandros, Inc. 14:04:53

15        A.    Yes.                                  14:05:05

16        Q.    Are those the signatures of Michael  14:05:06

17   Bego?                                            14:05:07

18        A.    Yes.                                  14:05:08

19        Q.    Mr. Roseman, we are going to move    14:05:36

20   on to another exhibit.  Please take, if you      14:05:37

21   will, Exhibits 19 and 20.  In order to follow    14:05:43

22   these questions, it's going to be convenient for 14:05:54

23   you to lay those two exhibits side-by-side.  And 14:05:56

24   turn to page 7 of Exhibit 19, page 3 --          14:06:00

25        A.    Page 7, you say, or 3?               14:06:15
```

EXH Y PG 229

130

|    |    |                                              |          |
|----|----|----------------------------------------------|----------|
| 1  |    | WILLIAM JAY ROSEMAN                           |          |
| 2  | Q. | Page 7 of Exhibit 19.                        | 14:06:16 |
| 3  | A. | Okay.                                        | 14:06:18 |
| 4  | Q. | And page 3 of Exhibit 20.                    | 14:06:21 |
| 5  | A. | Okay.                                        | 14:06:31 |

6    Q.    Take a look, if you will, at          14:06:36
7  request for admission No. 29.  Let me back up.  14:06:37
8          Have you ever seen the request for     14:06:42
9  admissions that are Exhibit 19?                 14:06:45
10    A.    Well, I've discussed it with Andy.    14:06:52
11  But I've not seen it, no.                       14:06:55
12    Q.    And you had a discussion with your    14:06:59
13  counsel in response to requests for admissions  14:07:01
14  that were served on you by the plaintiff in this  14:07:04
15  case?                                           14:07:06
16    A.    Yes.                                    14:07:07
17    Q.    Take a look, if you will, at          14:07:11
18  request for admission No. 29 on page 7 of       14:07:12
19  Exhibit 19.                                     14:07:15
20    A.    What question number?                  14:07:20
21    Q.    Request for admission No. 29.          14:07:22
22    A.    Okay.  I go up to 28.                   14:07:25
23    Q.    Are you looking at Exhibit 19?         14:07:34
24    A.    Yes.                                    14:07:35
25    Q.    Is that document entitled             14:07:40

EXH __Y__ PG _230_

131

```
 1                    WILLIAM JAY ROSEMAN
 2   "responses of defendant Xandros, Inc. to        14:07:41
 3   plaintiff's first set of requests for           14:07:44
 4   admission"?                                      14:07:47
 5        A.    Yes.                                  14:07:51
 6        Q.    And on page 7 there does not appear   14:07:53
 7   to be a request for admission No. 29?            14:07:59
 8        A.    No.  Am I reading it wrong?  I'm      14:08:01
 9   sorry, I'm looking at line 29.  I'm seeing the   14:08:15
10   lines on the side.  I apologize.                 14:08:16
11        Q.    That's quite all right.  It would     14:08:19
12   be line 18, request for admission.              14:08:21
13        A.    I see, I'm sorry.                     14:08:23
14        Q.    Request for admission 29.             14:08:27
15        A.    Yes.                                  14:08:30
16        Q.    If you just would read that request  14:08:32
17   for admission to yourself.                       14:08:33
18        A.    "Admit that Roseman participated     14:08:36
19   in a telephone conversation on or about October 14:08:38
20   4, 2001, in which Roseman represented to Lindows 14:08:40
21   that LGP had agreed to provide $10 million in    14:08:43
22   equity financing to Xandros."                    14:08:46
23        Q.    Is that in fact true, Mr. Roseman?    14:08:50
24        A.    LGP was going to provide $10          14:08:55
25   million to Xandros, yes, it is true.             14:08:56
```

EXH __Y__ PG __231__

132

1              WILLIAM JAY ROSEMAN

2        Q.     And what do you mean by that, LGP        14:09:00

3   was going to provide $10 million to Xandros?         14:09:02

4        A.     Well, we were in the process of          14:09:05

5   raising or attempting to raise money.  Which is      14:09:06

6   why Kevin Carmony offered to assist us.              14:09:08

7        Q.     What was the nature of that              14:09:15

8   agreement to provide $10 million in equity           14:09:17

9   financing between -- from LGP to Xandros?  Was       14:09:19

10  that a term sheet, was that a contract, a            14:09:23

11  written contract?                                    14:09:26

12       A.     No.                                      14:09:28

13       Q.     Was it an oral agreement?                14:09:29

14       A.     It was Linux Global Partners when        14:09:30

15  they had purchased the product from Corel, had       14:09:34

16  negotiated with -- negotiated is the wrong word.     14:09:38

17  We discussed, we were going to put $10 million       14:09:45

18  into Xandros.  And I don't know that it was          14:09:49

19  going to be 10 million in equity, but our            14:09:56

20  objective was to raise money and put it into         14:10:00

21  Xandros.                                             14:10:03

22       Q.     So the type of arrangement that you      14:10:06

23  had in mind on or about October 4, 2001 was in       14:10:15

24  fact that LGP was going to attempt to raise          14:10:19

25  money, and then LGP was going to take the money      14:10:23

EXH Y PG 232

133

|    |                                                           |          |
|----|-----------------------------------------------------------|----------|
| 1  | WILLIAM JAY ROSEMAN                                        |          |
| 2  | that it raised thereafter and put that money              | 14:10:28 |
| 3  | into Xandros in some form or fashion?                      | 14:10:32 |
| 4  | A.     Yes.  And Ken Carmony had suggested                 | 14:10:35 |
| 5  | that we raise the money directly into Xandros             | 14:10:37 |
| 6  | and not into LGP.                                          | 14:10:40 |
| 7  | Q.     Did in fact LGP have, as of October                | 14:10:43 |
| 8  | 4, 2001, $10 million in cash or access to $10             | 14:10:46 |
| 9  | million through some other methods, that it               | 14:10:52 |
| 10 | could, as of October 4, 2001, have put into               | 14:10:54 |
| 11 | Xandros?                                                   | 14:10:57 |
| 12 | A.     No.  We did have a term sheet from                 | 14:10:59 |
| 13 | Allen Capital Markets for 10 million.  Rick will          | 14:11:03 |
| 14 | remember the dates better than myself.  But they          | 14:11:06 |
| 15 | were to put in $10 million into LGP, of course,           | 14:11:09 |
| 16 | that the objective of which was to go into                | 14:11:15 |
| 17 | Xandros.  And of course September 11th came and           | 14:11:19 |
| 18 | it became very difficult to raise that money.             | 14:11:27 |
| 19 | Q.     You said Al Capital Markets?                        | 14:11:35 |
| 20 | A.     Allen Capital Markets.                              | 14:11:38 |
| 21 | Q.     Can you spell that first word?                      | 14:11:41 |
| 22 | A.     Sure.  A-l-1, I don't know if it's                 | 14:11:43 |
| 23 | a-n or e-n, Capital Markets.                               | 14:11:46 |
| 24 | Q.     Who was representing Allen Capital                  | 14:11:49 |
| 25 | Markets?                                                   | 14:11:53 |

EXH __Y__ PG _233_

134

| | | |
|---|---|---|
| 1 | WILLIAM JAY ROSEMAN | |
| 2 | A.    Ronald Moschetta. | 14:11:54 |
| 3 | Q.    You had a term sheet with Allen | 14:11:57 |
| 4 | Capital Markets; correct? | 14:12:00 |
| 5 | A.    Yes. | 14:12:01 |
| 6 | Q.    Have you seen that term sheet? | 14:12:01 |
| 7 | A.    Yes, I have. | 14:12:04 |
| 8 | Q.    Is that term sheet still located in | 14:12:15 |
| 9 | Xandros' offices? | 14:12:15 |
| 10 | A.    Yes. | 14:12:15 |
| 11 | Q.    And that was a term sheet whereby | 14:12:15 |
| 12 | Allen Capital Markets was going to place -- was | 14:12:15 |
| 13 | to take an equity stake in LGP? | 14:12:17 |
| 14 | A.    Well, they were raising money for | 14:12:20 |
| 15 | LGP, the proceeds of which would go into Xandros | 14:12:22 |
| 16 | and the creation of the Xandros product. | 14:12:27 |
| 17 | Q.    And Allen Capital Markets | 14:12:29 |
| 18 | understood that the money was being raised by | 14:12:31 |
| 19 | LGP but was going to be placed into Xandros; | 14:12:34 |
| 20 | correct? | 14:12:38 |
| 21 | A.    Yes. | 14:12:39 |
| 22 | Q.    And this term sheet, do you recall | 14:12:42 |
| 23 | the date that it was created? | 14:12:43 |
| 24 | A.    I really don't. | 14:12:46 |
| 25 | Q.    Was there actually an equity | 14:12:48 |

EXH __Y__ PG _234_

135

```
 1                    WILLIAM JAY ROSEMAN
 2   placement by Allen Capital Markets into either      14:12:55
 3   LGP or Xandros?                                      14:13:00
 4        A.     There was.                               14:13:02
 5        Q.     And when was that?                       14:13:02
 6        A.     When?                                    14:13:04
 7        Q.     Yes.                                     14:13:05
 8        A.     Prior to September 11th.  And Rick       14:13:12
 9   can give you the closing dates.                      14:13:15
10        Q.     And do you recall how much Allen         14:13:19
11   Capital Markets placed into Xandros?                 14:13:22
12        A.     Well, Allen Capital Markets put the      14:13:25
13   money into Xandros, who subsequently put it --       14:13:28
14   I'm sorry, Allen Capital Markets put the money       14:13:30
15   into LGP, who subsequently put it into Xandros.      14:13:35
16        Q.     Can you recall how much?                 14:13:39
17        A.     I think it was maybe 2 or $3             14:13:40
18   million, approximately.                              14:13:42
19        Q.     Was there some agreement as to how       14:13:46
20   the remainder of that $10 million would be           14:13:53
21   placed into Xandros?                                 14:13:56
22        A.     Well, the money was going to LGP.        14:13:58
23   LGP was putting the money into Xandros.              14:14:00
24        Q.     And was there some agreement as to       14:14:04
25   how the remainder of that 2 to $3 million -- I'm     14:14:06
```

EXH __Y__ PG 235

136

1       WILLIAM JAY ROSEMAN

2 sorry, the remainder of the $10 million was    14:14:09

3 going to be placed into either LGP or Xandros?    14:14:12

4      A.    I don't -- when you say was it -- I    14:14:16

5 mean, there was a term sheet. When you say was    14:14:18

6 there an agreement, I don't quite understand.    14:14:21

7      Q.    I understand that you -- the term    14:14:24

8 sheet references the placement of $10 million    14:14:26

9 into LGP, which was then going to be placed    14:14:28

10 into --    14:14:31

11      A.    They never raised the rest of the    14:14:31

12 money. What happened was September 11th came.    14:14:33

13 As a matter of fact, we had a scheduled closing    14:14:37

14 on September 11th. And due to September 11th it    14:14:39

15 was cancelled. Then it became very difficult to    14:14:42

16 raise any additional monies.    14:14:45

17      Q.    How much was the scheduled closing    14:14:46

18 on September 11th to create?    14:14:48

19      A.    How much was it?    14:14:50

20      Q.    How much money, yes.    14:14:51

21      A.    I don't recall. I mean, Rick would    14:14:52

22 have the documentation of that. And how much it    14:14:55

23 would be. But the money was raised, there were    14:14:56

24 several closings, there was more than one    14:15:01

25 closing, naturally.    14:15:03

EXH Y PG 236

137

| | |
|---|---|
| 1 | WILLIAM JAY ROSEMAN |
| 2 | Q.   Do you recall the dates or amounts | 14:15:06 |
| 3 | of each closing? | 14:15:08 |
| 4 | A.   I don't.  I mean, we have that. | 14:15:09 |
| 5 | But I don't recall. | 14:15:12 |
| 6 | Q.   Is it your testimony that the total | 14:15:24 |
| 7 | amount of these several closings was in the | 14:15:26 |
| 8 | neighborhood of 2 to $3 million? | 14:15:29 |
| 9 | A.   Approximately, yes. | 14:15:31 |
| 10 | Q.   So it's not that the 2 to $3 | 14:15:35 |
| 11 | million was the equity investment prior to | 14:15:37 |
| 12 | September 11, there were subsequent equity | 14:15:41 |
| 13 | investments by Allen Capital Markets that were | 14:15:44 |
| 14 | in addition to that 2 to $3 million.  That's not | 14:15:51 |
| 15 | your testimony; correct? | 14:15:54 |
| 16 | A.   I don't understand the question, | 14:15:56 |
| 17 | I'm sorry. | 14:15:56 |
| 18 | Q.   That's okay, it was a difficult | 14:15:57 |
| 19 | question, it's my fault. | 14:15:59 |
| 20 | My question is, there were a number | 14:16:02 |
| 21 | of investments by Allen Capital Markets that | 14:16:05 |
| 22 | totalled the 2 to $3 million; correct? | 14:16:15 |
| 23 | A.   Yes.  It was at closing, several | 14:16:17 |
| 24 | closings. | 14:16:20 |
| 25 | Q.   And that's what you mean -- let me | 14:16:34 |

EXH **Y** PG **237**

138

```
 1                    WILLIAM JAY ROSEMAN
 2   refer you back then to Exhibit 20.                    14:16:39
 3         A.    Close these two documents?                14:16:46
 4         Q.    Exhibit 20 you have before you.           14:16:49
 5         A.    Okay, I'm sorry.  Go ahead.               14:16:52
 6         Q.    We are looking at page 3 of Exhibit       14:16:56
 7   20.                                                   14:16:58
 8         A.    I'm on that page.                         14:17:00
 9         Q.    If you look at line 12, which is          14:17:03
10   No. 29.  And I'll represent to you, sir, that         14:17:07
11   the way these documents interact is that request     14:17:16
12   for admission No. 29 requests that Xandros admit      14:17:18
13   what you had read earlier into the record, that       14:17:23
14   in effect Roseman represented to Lindows that         14:17:26
15   LGP had agreed to provide $10 million in equity       14:17:29
16   financing to Xandros.  And Exhibit 20, lines 12       14:17:35
17   and 13, explain why --                                14:17:38
18         A.    Wait, I'm sorry.  I'm trying to           14:17:41
19   follow.  You are referring to page 20 and you         14:17:42
20   are reading from where?  You are referring to         14:17:45
21   Exhibit 20 and you are referring to where?            14:17:47
22         Q.    Exhibit 20, page 3.                       14:17:51
23         A.    Yes.                                      14:17:53
24         Q.    Lines 12 and 13.                          14:17:53
25         A.    Okay.                                     14:17:55
```

EXH **Y** PG 238

139

| | | |
|---|---|---|
| 1 | WILLIAM JAY ROSEMAN | |
| 2 | Q.    That is your counsel's explanation | 14:17:56 |
| 3 | as to why you have denied that you represented | 14:17:58 |
| 4 | to Lindows that LGP agreed to provide a $10 | 14:18:07 |
| 5 | million equity financing to Xandros. | 14:18:10 |
| 6 | A.    Well, I mean, 12 and 13, I disagree | 14:18:15 |
| 7 | with the fact that it said LGP had made a | 14:18:17 |
| 8 | commitment of $10 million.  I don't know that | 14:18:21 |
| 9 | there was a commitment.  It was always our | 14:18:22 |
| 10 | objective was to raise this amount of money and | 14:18:25 |
| 11 | to invest it into Xandros.  Kevin certainly knew | 14:18:27 |
| 12 | that, I had discussed that with him.  But I | 14:18:41 |
| 13 | don't remember -- | 14:18:41 |
| 14 | THE WITNESS:  Andy, I'm not being | 14:18:41 |
| 15 | rude, but I don't remember using the word | 14:18:41 |
| 16 | commitment. | 14:18:42 |
| 17 | Q.    How would you -- why would you not | 14:18:43 |
| 18 | use the word commitment? | 14:18:45 |
| 19 | A.    Well, a commitment is -- I mean, | 14:18:47 |
| 20 | our objective at all times, I mean, with | 14:18:55 |
| 21 | anything, raising money is raising money.  Our | 14:18:56 |
| 22 | objective is to raise money.  Many things | 14:18:59 |
| 23 | happen, there is market risk, there is | 14:19:02 |
| 24 | investment risk and there is things that change. | 14:19:04 |
| 25 | We intended and fully intended to make this | 14:19:07 |

EXH __Y__ PG 239

140

```
 1              ·        WILLIAM JAY ROSEMAN

 2   investment into Xandros.  But, I mean, a            14:19:10

 3   commitment I think is, the word commitment is a     14:19:16

 4   bit strong in the context that, you know, that      14:19:20

 5   was our objective.  And our intent, yes.            14:19:23

 6        Q.     So what then -- if you could            14:19:29

 7   rewrite what exactly you did represent to Mr. --    14:19:31

 8   if you could rewrite that sentence 29, what in      14:19:37

 9   fact was the level of --                            14:19:42

10        A.     Sentence 29?                            14:19:45

11        Q.     Yes.  On Exhibit 20, page 3, lines      14:19:47

12   12 and 13, which are No. 29.                        14:19:50

13        A. ·   Okay.                                   14:19:53

14        Q.     If you could rewrite that, what         14:19:54

15   would you state?                                    14:19:57

16        A.     I would say Roseman accurately          14:20:00

17   represented that LGP was going to invest $10        14:20:01

18   million into Xandros.                               14:20:04

19        Q.     And that would not constitute a         14:20:11

20   commitment of LGP to Xandros? .                     14:20:15

21        A.     Well, I mean, it depends on what        14:20:17

22   your interpretation of commitment is.  I mean,      14:20:19

23   naturally our objective was unquestionably that     14:20:24

24   we were going to put this amount of money into      14:20:26

25   Xandros.  I don't think anybody is disputing        14:20:28
```

EXH __Y__ PG __240__

141

William Jay Roseman, Vol. 2                11/5/03                Lindows.com v. Xandros

| | | |
|---|---|---|
| 1 | WILLIAM JAY ROSEMAN | |
| 2 | that. | 14:20:31 |
| 3 | (Discussion off the record.) | 14:21:00 |
| 4 | Q.    You were responding to the | 14:21:01 |
| 5 | question.  So in fact the position of LGP was at | 14:21:02 |
| 6 | the time that it intended to raise money, which | 14:21:15 |
| 7 | would be put into LGP, but it had not yet | 14:21:24 |
| 8 | committed $10 million? | 14:21:28 |
| 9 | A.    Yes. | 14:21:29 |
| 10 | Q.    Also in Exhibit 20, please, if you | 14:21:35 |
| 11 | will, look at lines 16 through 18. | 14:21:36 |
| 12 | A.    Yes, I've read it. | 14:21:53 |
| 13 | Q.    And that is an explanation, your | 14:21:54 |
| 14 | counsel's explanation -- | 14:21:57 |
| 15 | A.    Which is kind of what I just said. | 14:21:58 |
| 16 | Q.    And that's what I wanted to dig in | 14:22:01 |
| 17 | on.  The private placement that is referred to | 14:22:04 |
| 18 | there on lines 16 and 17, that's the same thing | 14:22:06 |
| 19 | as the Allen Capital Markets investment; is that | 14:22:12 |
| 20 | right? | 14:22:16 |
| 21 | A.    Well, yes.  I mean, Allen Capital | 14:22:16 |
| 22 | Markets was not the only place that we were | 14:22:19 |
| 23 | raising money, we were also raising money | 14:22:21 |
| 24 | individually.  So Allen Capital Markets was just | 14:22:23 |
| 25 | one area.  That happened to be a term sheet for | 14:22:28 |

EXH __ PG 241

142

```
 1                    WILLIAM JAY ROSEMAN

 2   $10 million.  Maybe it was 15 million.  I think     14:22:31

 3   it was 10.  But we were also raising money          14:22:37

 4   elsewhere.                                          14:22:40

 5        Q.    On line 17, do you see the               14:22:41

 6   reference to an investment banking firm?            14:22:42

 7        A.    Yes.                                     14:22:44

 8        Q.    What is that investment banking          14:22:46

 9   firm that that refers to?                           14:22:49

10        A.    Allen Capital Markets.                   14:22:51

11        Q.    In addition to Allen Capital             14:22:58

12   Markets, as well as Mr. McAuley and Mr. Kean,       14:22:59

13   what other private placements were being            14:23:03

14   contemplated and are referred to in that            14:23:05

15   paragraph 35?                                       14:23:10

16        A.    I mean, I don't know.  I know we         14:23:16

17   were talking to investors.  I don't know who        14:23:18

18   else invested at that time.  I mean, you know       14:23:20

19   what, the reason I didn't look at the cap chart     14:23:23

20   the last time we spoke, I thought that you and      14:23:26

21   Andy were going -- when Andy called me up today     14:23:28

22   and said I'll see you at 1 o'clock, I was           14:23:32

23   surprised, I really didn't know I was going to      14:23:35

24   be here.  I thought that you guys were              14:23:36

25   discussing a settlement, that's why I didn't   .    14:23:39
```

EXH Y PG 242

143

| 1 | WILLIAM JAY ROSEMAN | |
|---|---|---|
| 2 | look at the other stuff.  So I apologize. | 14:23:41 |
| 3 | Q.    I understand.  And thank you for | 14:23:43 |
| 4 | that explanation. | 14:23:44 |
| 5 | My questions to you are obviously | 14:23:47 |
| 6 | to the best of your recollection as you sit here | 14:23:48 |
| 7 | today.  And I understand that you haven't had a | 14:23:50 |
| 8 | full opportunity to dig through some of these | 14:23:54 |
| 9 | records, recently at least. | 14:23:58 |
| 10 | My question to you is, as you sit | 14:24:02 |
| 11 | here today, are you aware of any other private | 14:24:04 |
| 12 | placements that Allen Capital Markets was | 14:24:06 |
| 13 | managing during the time frame referred to -- | 14:24:10 |
| 14 | well, the time frame of October 4, 2001 or soon | 14:24:17 |
| 15 | thereafter? | 14:24:21 |
| 16 | A.    That Allen Capital Markets was | 14:24:22 |
| 17 | managing? | 14:24:24 |
| 18 | Q.    Yes. | 14:24:25 |
| 19 | A.    I mean, I'm sure Allen Capital | 14:24:28 |
| 20 | Markets was doing many deals.  I don't know -- I | 14:24:30 |
| 21 | know they were doing at least four or five other | 14:24:33 |
| 22 | deals.  But that did not pertain to us. | 14:24:36 |
| 23 | Q.    My question is only as they pertain | 14:24:40 |
| 24 | to Xandros and/or LGP. | 14:24:42 |
| 25 | A.    But they were not our bankers, per | 14:24:44 |

EXH __Y__ PG _243_

144

```
 1              WILLIAM JAY ROSEMAN

 2   se.  They were raising money, you know, they      14:24:46

 3   were raising $10 million for us.  But that did    14:24:49

 4   not preclude us from bringing in additional       14:24:51

 5   investments as well.                              14:24:56

 6        Q.      So they were not actually out        14:24:57

 7   actively seeking third-party or other investors   14:25:01

 8   on your behalf in order to contribute that $10    14:25:05

 9   million term sheet?                               14:25:09

10        A.      They were, I don't know.  But they   14:25:10

11   were doing what they do in raising money for us,  14:25:19

12   and we were, you know, doing it ourselves.  I     14:25:19

13   mean, we were still making presentments to        14:25:19

14   smaller VC firms and the like.                    14:25:21

15        Q.      As of October 2001, did LGP have     14:25:41

16   $10,000 in cash on hand?                          14:25:43

17        A.      As of October 11, 2001?             14:25:46

18        Q.      I apologize, I said $10,000, I       14:25:48

19   meant to say $10 million.                         14:25:51

20        A.      No, I don't think so, no.            14:25:53

21        Q.      Did they have a credit line with     14:25:54

22   any entity to enable them to borrow $10 million?  14:25:56

23        A.      No.                                  14:26:01

24        Q.      Apart from the potential equity      14:26:10

25   investments that you discussed, and possibly      14:26:12
```

EXH Y PG 244

145

```
 1              WILLIAM JAY ROSEMAN

 2   obviously your testimony is your recollection      14:26:15

 3   may not be complete in this regard, but apart      14:26:16

 4   from those that we have discussed with             14:26:17

 5   Mr. McAuley, Mr. Kean, Allen Capital Markets,      14:26:18

 6   are you aware of any other potential sources for   14:26:24

 7   the $10 million that was referenced in the term    14:26:27

 8   sheet with Allen Capital Markets?                  14:26:32

 9        A.    I mean, we have spoken to other --      14:26:34

10   speaking to other VC firms at the time.  I don't   14:26:37

11   recall, you know, which firms they were, or what   14:26:40

12   presentations they were.  I mean, I can check my   14:26:43

13   Palm Pilot too.                                    14:26:47

14        Q.    Let's go back to No. 29 on Exhibit      14:26:55

15   20.  Lines 12 and 13.                              14:26:58

16        A.    Okay.                                   14:27:05

17        Q.    I'm referring back to page 3 of         14:27:39

18   Exhibit 20, lines 12 and 13.  My recollection of   14:27:41

19   your testimony, sir, was that that               14:27:45

20   representation that you made was based on the      14:27:48

21   term sheet that you had or that LGP had with       14:27:52

22   Allen Capital Markets; correct?                    14:27:56

23             MR. ROBERTSON:  Object to form.          14:28:01

24        A.    Well, not solely, but I'm sure in       14:28:02

25   part.                                              14:28:05
```

EXH __Y__ PG __245__

```
 1                    WILLIAM JAY ROSEMAN

 2        Q.    So you were stating that the          14:28:05

 3   commitment, or whatever the communication from   14:28:07

 4   LGP to Xandros was, whether it be a commitment   14:28:13

 5   or otherwise, was not just based on the term     14:28:17

 6   sheet with Allen Capital Markets, it was         14:28:20

 7   potentially based on other sources of revenue;   14:28:22

 8   correct?                                         14:28:25

 9             MR. ROBERTSON:  Object to the form;    14:28:25

10   it's compound.                                   14:28:26

11        Q.    You can answer the question,          14:28:28

12   Mr. Roseman.                                     14:28:29

13        A.    Well, I don't know if it was          14:28:30

14   revenue.  But we were looking to raise           14:28:31

15   additional monies.                               14:28:33

16        Q.    I'm sorry, I probably misspoke.       14:28:34

17   It's not revenue, it would be some type of       14:28:37

18   investment; correct?                             14:28:39

19        A.    Yes.                                  14:28:40

20        Q.    So when you stated that LGP made a    14:28:40

21   commitment of $10 million, you were relying not  14:28:43

22   only on the Allen Capital Markets potential      14:28:46

23   investment, but also other potential investments 14:28:50

24   from other VCs; correct?                         14:28:55

25        A.    Well, I think the Allen Capital       14:28:55
```

EXH _Y_ PG _246_                          147

1               WILLIAM JAY ROSEMAN

2   Markets, being that it was a $10 million raise,    14:28:57

3   was the one that we probably had in mind    14:29:00

4   specifically.  But that did not preclude the    14:29:02

5   fact that we were also raising money elsewhere    14:29:04

6   as well.    14:29:06

7       Q.    In fact, was there a contract    14:29:10

8   between LGP and Xandros Corporation or Xandros,    14:29:11

9   Inc., regarding Xandros's -- I'm sorry,    14:29:15

10   regarding LGP's agreement to attempt to raise    14:29:19

11   $10 million on behalf of Xandros?    14:29:23

12       A.    There was no contract, no.    14:29:26

13       Q.    Was there ever a term sheet between    14:29:28

14   those two entities?    14:29:29

15       A.    No.  I mean, the two entities, when    14:29:30

16   you say the two entities, I mean at that point    14:29:32

17   in time it was very much Rick and myself.  So,    14:29:34

18   you know, LGP was, you know, very close to    14:29:38

19   Xandros.    14:29:41

20       Q.    So there was never any written    14:29:44

21   record as far as you're aware of that --    14:29:46

22       A.    No.    14:29:51

23       Q.    -- agreement to attempt to raise    14:29:51

24   money on behalf of Xandros; correct?    14:29:53

25       A.    Not that I recall.    14:29:56

EXH Y PG 247

148

| 1 | WILLIAM JAY ROSEMAN | |
|---|---|---|
| 2 | Q.    And going back to Exhibit 20, page | 14:30:00 |
| 3 | 3, lines 17 and 18.  The sentence that says "due | 14:30:02 |
| 4 | to market conditions, they have not yet raised | 14:30:09 |
| 5 | the full $10 million." | 14:30:11 |
| 6 | Is that still true as of today, LGP | 14:30:15 |
| 7 | has not raised $10 million that it plans on | 14:30:16 |
| 8 | transmitting to Xandros? | 14:30:18 |
| 9 | A.    That's true. | 14:30:20 |
| 10 | Q.    What are the market conditions that | 14:30:28 |
| 11 | are referred to? | 14:30:30 |
| 12 | A.    Well, after September 11th it | 14:30:33 |
| 13 | became exceedingly difficult to raise money. | 14:30:35 |
| 14 | And naturally that precipitated a decline in the | 14:30:37 |
| 15 | market in the general investment industry.  And | 14:30:41 |
| 16 | the market conditions became such that it's very | 14:30:46 |
| 17 | difficult to raise money. | 14:30:49 |
| 18 | Q.    Are you aware of any other reasons | 14:30:52 |
| 19 | other than market conditions that LGP and | 14:30:55 |
| 20 | Xandros have not been able to raise the | 14:30:59 |
| 21 | remainder of the $10 million? | 14:31:01 |
| 22 | A.    No. | 14:31:03 |
| 23 | Q.    Are there currently -- is either | 14:31:39 |
| 24 | Xandros, LGP or Xandros Corporation currently | 14:31:44 |
| 25 | negotiating with any parties to conduct an | 14:31:49 |

EXH _Y_ PG _248_

149

```
 1              WILLIAM JAY ROSEMAN

 2   equity financing of Xandros Corporation or          14:31:53

 3   Xandros, Inc.?                                      14:31:55

 4        A.    We are.                                  14:31:57

 5        Q.    Who are those parties that you are       14:32:00

 6   negotiating with?                                   14:32:01

 7        A.    Who are they?                            14:32:02

 8        Q.    Yes.                                     14:32:04

 9        A.    I would rather not tell you who          14:32:04

10   they are.                                           14:32:05

11        Q.    Well, who is the entity of the           14:32:08

12   three that I mentioned, Xandros Corporation,        14:32:18

13   Xandros, Inc., and LGP, that is negotiating?        14:32:18

14        A.    Xandros, Incorporated.                   14:32:18

15   DIR     Q.        And can you describe for me       14:32:21

16   the nature of the investment, is it an equity       14:32:26

17   financing, is it a loan --                          14:32:30

18              MR. ROBERTSON:  I'll object to the       14:32:33

19   question on relevance grounds.                      14:32:34

20        A.    I would rather not -- that's             14:32:35

21   confidential business information that I would      14:32:37

22   rather not -- I'm not going to answer that.         14:32:39

23              MR. ROBERTSON:  Correct.  Because        14:32:44

24   the current financing efforts of Xandros is not     14:32:45

25   a pertinent subject to this case.                   14:32:48
```

EXH __Y__ PG _249_

150

```
 1              WILLIAM JAY ROSEMAN

 2              THE WITNESS:  I'm not trying to be        14:32:51

 3  rude.  I just feel like that's like -- that's --      14:32:51

 4              MR. STUART:  I understand.  And           14:32:57

 5  there are certain rules that we have to follow.       14:32:59

 6  And in order for you not to be required to            14:33:02

 7  answer, your attorney has to instruct you not to      14:33:04

 8  answer.                                               14:33:07

 9              Mr. Robertson, are you instructing        14:33:07

10  Mr. Roseman not to answer that question?             14:33:10

11              MR. ROBERTSON:  Yes.                      14:33:12

12              MR. STUART:  I have a series of           14:33:13

13  additional questions relating to this general        14:33:14

14  subject matter, in other words, current equity       14:33:15

15  financings and negotiations of Xandros              14:33:19

16  Corporation, Xandros, Inc., and LGP, are you         14:33:22

17  going to instruct him not to answer those types      14:33:25

18  of questions as well?                                14:33:27

19              MR. ROBERTSON:  Yes.                      14:33:29

20              MR. STUART:  Then I won't ask those       14:33:31

21  questions based upon your representation that         14:33:35

22  you will instruct the witness not to answer          14:33:35

23  those.  And we'll address this later.                14:33:36

24      Q.    As of October 29, 2001, in fact            14:34:15

25  Xandros did not yet have access to the capital       14:34:17
```

EXH __Y__ PG _250_

151

```
1                    WILLIAM JAY ROSEMAN

2   represented by the potential investment by Allen      14:34:21

3   Capital Markets; correct?                             14:34:26

4               MR. ROBERTSON:  Object to the form        14:34:28

5   of the question; compound, I don't know that          14:34:28

6   it -- let's try to do it in pieces.                   14:34:36

7        Q.    Mr. Roseman, your counsel is               14:34:48

8   suggesting that I break that question up, and         14:34:49

9   I'm going to do that at his request.                  14:34:52

10              As of October 29, 2001, again, this       14:34:57

11  is pre-September 11 period, Xandros in fact did        14:35:00

12  not have $10 million in capital?                       14:35:04

13       A.    October 29th is pre-September 11,           14:35:08

14  2001?                                                  14:35:11

15       Q.    Yes, sir.                                   14:35:12

16       A.    But it's really not.  I mean,              14:35:16

17  October 29th is after September 11, 2001.             14:35:18

18       Q.    I apologize, you are exactly right.        14:35:21

19  Let me rephrase that.                                 14:35:27

20       A.    Okay.                                       14:35:29

21       Q.    As of October 29, 2001, Xandros in         14:35:30

22  fact did not have $10 million in capital?             14:35:35

23       A.    That's correct.                            14:35:36

24       Q.    It didn't have $10 million in the          14:35:38

25  bank or a $10 million line of credit somewhere;       14:35:40
```

EXH Y PG 251

```
 1                WILLIAM JAY ROSEMAN

 2   correct?                                        14:35:42

 3        A.    We did not.                          14:35:43

 4              MR. ROBERTSON:  Was your question    14:35:46

 5   capital?                                        14:35:47

 6              THE WITNESS:  I was going to ask      14:35:49

 7   that question too, if it was capital.  Or are   14:35:49

 8   you talking about, when you say capital, do you 14:35:52

 9   mean liquidity?                                 14:35:54

10              MR. STUART:  Yes.                     14:35:57

11        A.    We did not.                          14:35:58

12        Q.    And did Xandros at that time have a  14:35:59

13   $10 million line of credit anywhere?           14:36:01

14        A.    No, we did not.                      14:36:03

15        Q.    In particular, Xandros did not have  14:36:23

16   access to any of the funds that Allen Capital   14:36:25

17   Markets was agreeing to attempt to raise for    14:36:28

18   LGP, which would ultimately be transmitted to   14:36:30

19   Xandros; correct?                               14:36:34

20        A.    Well --                              14:36:37

21              MR. ROBERTSON:  Object to the form;  14:36:38

22   it's compound.                                  14:36:39

23        A.    Well, we did raise money with Allen  14:36:40

24   Capital Markets, approximately $3 million.  Of  14:36:43

25   which had gone into Xandros, or at least the    14:36:45
```

EXH Y PG 252

153

```
 1                    WILLIAM JAY ROSEMAN

 2    better portion thereof had.  But I don't          14:36:48

 3    remember the specifics.  Like how much went in    14:36:50

 4    and when it went in.                              14:36:55

 5              We were also putting in the             14:37:02

 6    technology from some of our other companies,      14:37:04

 7    which is very valuable technology.  And of        14:37:07

 8    course it's subsequently been included in the     14:37:11

 9    product.  I mean, Rick can tell you the           14:37:13

10    specifics of that, since he's the technical       14:37:15

11    fellow.                                           14:37:18

12       Q.    By putting in, are you referring         14:37:24

13    to --                                             14:37:26

14       A.    Incorporating within the Xandros         14:37:29

15    product.                                          14:37:30

16       Q.    And what are those technologies          14:37:33

17    you're referring to?                              14:37:35

18       A.    That's what I said, Dr. Berenstein       14:37:36

19    is a technician, he can give you the technical    14:37:39

20    aspect.  I can generically describe some of       14:37:42

21    them.  But Rick can describe the particular, or   14:37:45

22    the specific products.                            14:37:50

23       Q.    Mr. Roseman, I want to follow on         14:40:17

24    one of the earlier responses that you made, and   14:40:19

25    that was relating to the amounts that had been    14:40:22
```

EXH Y PG 253

154

```
 1                    WILLIAM JAY ROSEMAN

 2   received from LGP by either Xandros Corporation        14:40:24

 3   or Xandros, Inc.  As you sit here today, do you         14:40:27

 4   know the exact amount of money that LGP has in          14:40:31

 5   fact given to, in terms of either equity                14:40:34

 6   financing or other type of equity placement, to         14:40:38

 7   Xandros, Inc.?                                          14:40:41

 8        A.    My guess would be it's north of 3           14:40:46

 9   to $5 million.  I don't know the exact amount.          14:40:53

10        Q.    As you probably know, a guess               14:41:01

11   doesn't do me a whole lot of good.  What I would        14:41:03

12   appreciate, though, to the extent that you can,         14:41:05

13   is give me your best estimate.  Obviously you           14:41:09

14   may not know the exact dollar and cent figure,          14:41:11

15   but your best estimate would be helpful.                14:41:14

16            Is in fact your best estimate that            14:41:17

17   the amount of money that has been given to              14:41:19

18   Xandros, Inc. by LGP is, as you said, north of 3        14:41:28

19   to $5 million?                                          14:41:28

20        A.    Yes.                                        14:41:28

21            MR. ROBERTSON:  Object to the                  14:41:28

22   question.  He already said that he didn't really        14:41:31

23   know for sure.                                          14:41:31

24        Q.    Is that your best estimate?                 14:41:34

25        A.    Yes.  Probably closer -- maybe              14:41:35
```

EXH __Y__ PG 254

155

```
 1              .        WILLIAM JAY ROSEMAN

 2   closer to 5 million, I'm thinking.  But I don't,       14:41:38

 3   I mean, I really don't know exactly.                   14:41:43

 4        Q.     Do you know the number of                  14:41:45

 5   financings or the number of closings that have         14:41:46

 6   occurred representing that $5 million?                 14:41:50

 7        A.     It may be more than 5 million.             14:41:56

 8        Q.     Okay.  Whatever that figure is, do         14:41:59

 9   you know how many closings occurred to reach           14:42:00

10   that figure?                                           14:42:02

11        A.     Five.  Five, six.                          14:42:08

12        Q.     And can you give me your best              14:42:11

13   recollection of the date of the last such              14:42:14

14   closing?                                               14:42:16

15        A.     June of this past -- June of this          14:42:23

16   past -- June of 2003.                                  14:42:27

17        Q.     And that was an equity financing?          14:42:29

18        A.     Yes.                                       14:42:32

19        Q.     An exchange of dollars from LGP to         14:42:33

20   Xandros, Inc., in exchange for a share of              14:42:39

21   Xandros, Inc.?                                         14:42:44

22        A.     Yes.                                       14:42:45

23        Q.     Was all of that money money that           14:42:45

24   was raised by LGP?                                     14:42:48

25        A.     That was money raised directly into       14:42:49
```

EXH __Y__ PG 255

156

```
 1              WILLIAM JAY ROSEMAN

 2   Xandros.                                    14:42:51

 3        Q.    Who was the investor in that      14:42:53

 4   closing?                                     14:42:56

 5        A.    It was done through an investment  14:42:56

 6   banking firm, and I don't know -- I mean, I  14:43:00

 7   don't know where they got their money from.  I  14:43:05

 8   guess their client base.                     14:43:07

 9        Q.    What was that investment banking  14:43:10

10   firm?                                        14:43:11

11        A.    Strasbourger Pearson Tulcin Wolff. 14:43:13

12        Q.    Can you spell that, please?       14:43:17

13        A.    Strasbourger -- I'm looking.  It's 14:43:19

14   S-t-r-a-s-b-o-u-r-g-e-r, P-e-a-r-s-o-n, Tulcin, 14:43:36

15   T-u-l-c-i-n, Wolff, W-o-l-f-f.               14:43:48

16        Q.    How much was that financing?      14:43:54

17        A.    The most recent one was 1.5       14:43:59

18   million.                                     14:44:02

19        Q.    That's the one that occurred in   14:44:04

20   June of this year?                           14:44:06

21        A.    Yes.                              14:44:07

22        Q.    Who at Strasbourger Pearson Tulcin 14:44:12

23   Wolff was the broker that was managing that  14:44:19

24   deal?                                        14:44:21

25        A.    The banker was Ronald Moschetta.  . 14:44:21
```

EXH _Y_ PG 256

157

```
1                    WILLIAM JAY ROSEMAN

2          Q.     Let's go back to the financing that      14:44:31

3    occurred immediately prior to the June 3             14:44:33

4    financing.  Do you recall the date of that           14:44:36

5    financing?                                            14:44:39

6          A.     I don't.                                 14:44:39

7          Q.     Do you recall the approximate date?      14:44:41

8          A.     I don't.                                 14:44:49

9          Q.     Was it in 2003?                          14:44:51

10         A.     Yes.                                      14:44:53

11         Q.     Do you recall the approximate            14:44:54

12   amount?                                               14:44:55

13         A.     You know, Rick would know the            14:44:59

14   approximate amount.  There was a small closing,       14:44:59

15   I'm assuming it was in excess of 500,000, maybe       14:45:05

16   to a million, I don't know.  I don't remember --      14:45:09

17   I mean, you are better off asking Rick those          14:45:12

18   questions because Rick handles that.                  14:45:14

19                By Rick, I mean Dr. Berenstein.          14:45:20

20         Q.     Who was the investor?                    14:45:24

21         A.     They were multiple investors, I          14:45:28

22   don't know specifically who they were.                14:45:32

23         Q.     Who was the banker?                      14:45:37

24         A.     Strasbourger.                            14:45:40

25         Q.     Also Mr. Moschetta?                      14:45:43
```

EXH __Y__ PG 357                                              158

```
1                    WILLIAM JAY ROSEMAN
2        A.     Yes.                                    14:45:49
3        Q.     Let's go to the financing              14:45:50
4  immediately before this 500,000 to $1 million       14:45:51
5  financing.  Can you describe that financing for     14:45:55
6  me, sir?                                             14:45:57
7        A.     It was an equity deal.  Again,          14:46:00
8  Dr. Berenstein would be able to best -- you are      14:46:05
9  better off asking him.                               14:46:09
10       Q.     I just want your best recollection      14:46:10
11 as you sit here today.                               14:46:13
12       A.     Okay, what's the question?              14:46:15
13       Q.     What was the date of that               14:46:16
14 financing?                                           14:46:18
15       A.     I have no idea.                         14:46:18
16       Q.     Was that in 2003?                       14:46:19
17       A.     Pardon?  It was in 2003, yes.           14:46:22
18       Q.     Do you recall the approximate           14:46:24
19 amount of the financing?                             14:46:25
20       A.     Well, 500 to a million.  I don't        14:46:28
21 quite recall the exact amount.                       14:46:32
22       Q.     Was Strasbourger also the               14:46:35
23 investment banker in that deal?                      14:46:37
24       A.     Yes.                                    14:46:39
25              You know, either you just asked me      14:46:40
```

EXH Y PG 258                                              159

1              WILLIAM JAY ROSEMAN

2   this question or I'm misunderstanding your          14:46:42

3   question.  I mean, are you asking -- I thought I    14:46:44

4   answered that.  But the fact that you are asking    14:46:48

5   me again, I want to make sure that I understand     14:46:51

6   that you are asking me that again.                  14:46:54

7         Q.    I'm sorry.  What I'm doing is going     14:46:56

8   back in time, stepping through each individual      14:46:59

9   equity financing, beginning with the most           14:47:01

10  recent, which you discussed with us occurred in     14:47:03

11  June of '03.  We discussed that one to my           14:47:06

12  satisfaction, and to your best recollection.        14:47:09

13  Then I asked for the one that occurred              14:47:11

14  immediately prior to the June of '03 one.           14:47:13

15        A.    And I answered that one, yes.           14:47:17

16        Q.    You answered that one, you said         14:47:19

17  that was $500,000 to a million.                     14:47:21

18        A.    Yes.                                    14:47:23

19        Q.    That occurred sometime in 2003,         14:47:24

20  also with Strasbourger as the investment banker.    14:47:25

21              I'm now asking you as to one more       14:47:28

22  step, let's go to the one immediately prior to      14:47:30

23  the one that we just discussed.  And I believe      14:47:33

24  that you identified a third.                        14:47:34

25        A.    We lost you again.                      14:47:39

EXH _Y_ PG _259_

160

```
 1              WILLIAM JAY ROSEMAN
 2        Q.    So we have discussed the '03           14:47:42
 3   500,000 to 1 million equity financing to my       14:47:46
 4   satisfaction and to your best recollection.  And  14:47:51
 5   I'm now asking you as to whether you have any      14:47:53
 6   recollection as to a third equity financing that  14:47:55
 7   occurred prior to the equity financing in 2003    14:47:57
 8   for approximately 500,000 to 1 million.           14:48:01
 9        A.    You know, Rick handled those           14:48:05
10   financings.  So there were certainly other        14:48:07
11   financings, I don't remember the specifics.  I    14:48:18
12   remember the larger ones from Allen Capital        14:48:18
13   Markets, which was approximately 3 to $4           14:48:18
14   million.  That's why I say that it's probably      14:48:21
15   well over 5 million that we raised and put into    14:48:22
16   Xandros.  But I don't have the particulars with    14:48:25
17   that.                                              14:48:28
18        Q.    And the larger one of Allen Capital     14:48:29
19   Markets, when did that one occur that you just     14:48:33
20   referred to?                                       14:48:36
21        A.    I guess on or about September 2001.     14:48:39
22   Maybe a bit before then.                           14:48:46
23        Q.    September of 2001?                      14:48:51
24        A.    Yes.                                    14:48:53
25        Q.    So we discussed that one; correct?      14:48:54
```

EXH Y PG 260

161

| | | |
|---|---|---|
| 1 | WILLIAM JAY ROSEMAN | |
| 2 | A.     Yes. | 14:48:58 |
| 3 | Q.     I'm not asking you necessarily for | 14:48:59 |
| 4 | specifics, I'm asking you for your best | 14:49:02 |
| 5 | recollection.  Prior to the second equity | 14:49:05 |
| 6 | financing that we discussed occurred in 2003, | 14:49:06 |
| 7 | that was for approximately 500,000 to $1 | 14:49:09 |
| 8 | million, do you recall a third equity financing, | 14:49:13 |
| 9 | other than the one -- | 14:49:15 |
| 10 | A.     I do.  But you'll have to ask Rick. | 14:49:18 |
| 11 | I don't know the amounts and the date.  Rick can | 14:49:20 |
| 12 | tell you that. | 14:49:22 |
| 13 | Q.     Can you give me your best | 14:49:23 |
| 14 | recollection as you sit here today? | 14:49:25 |
| 15 | A.     Half a million.  I mean, you know | 14:49:29 |
| 16 | what, I'm guessing. | 14:49:32 |
| 17 | Q.     Don't guess. | 14:49:34 |
| 18 | Do you know the investment banker | 14:49:36 |
| 19 | for that deal as well? | 14:49:39 |
| 20 | A.     Strasbourger -- I think it was | 14:49:39 |
| 21 | Strasbourger. | 14:49:43 |
| 22 | Q.     If it wasn't Strasbourger, do you | 14:49:47 |
| 23 | have another investment banking firm that you | 14:49:49 |
| 24 | work with occasionally? | 14:49:51 |
| 25 | A.     No.  But it could have been -- I | 14:49:52 |

EXH **V** PG 261

162

```
 1                    WILLIAM JAY ROSEMAN

 2   don't know if Allen Capital Markets was still        14:49:58

 3   involved at the time.  I don't remember.             14:50:00

 4        Q.     Other than Allen Capital Markets         14:50:02

 5   and Strasbourger, have you ever worked with any      14:50:05

 6   other investment banker firms as a                   14:50:08

 7   representative of Xandros and/or Xandros             14:50:10

 8   Corporation?                                         14:50:13

 9        A.     To date?                                 14:50:13

10        Q.     Yes, sir.                                14:50:14

11        A.     Yes.                                     14:50:15

12        Q.     Who?                                     14:50:16

13        A.     Well, I mean, we are dealing with        14:50:18

14   one now that's very strategic, and I don't think     14:50:19

15   it's germane to -- I would rather not say who,       14:50:22

16   because it is a strategic investor.                  14:50:26

17        Q.     You are no longer working with           14:50:29

18   Strasbourger as your investment banker firm?         14:50:30

19        A.     We are.  But this is a strategic         14:50:33

20   investment.                                          14:50:34

21   DIR     Q.         I will ask you to identify        14:50:37

22   that strategic vesting banking firm.                 14:50:38

23              MR. STUART:  Mr. Robertson, will          14:50:42

24   you instruct your witness not to answer that?        14:50:44

25              MR. ROBERTSON:  Yes.  The current.        14:50:47
```

ExH **Y** PG 262                    163

```
1              WILLIAM JAY ROSEMAN
2   financing efforts are not relevant.              14:50:48
3              MR. STUART:  You are instructing       14:50:50
4   your witness not to answer?                      14:50:50
5              MR. ROBERTSON:  Yes.                   14:50:53
6              MR. STUART:  Based on relevance?       14:50:54
7              MR. ROBERTSON:  Yes.                   14:50:57
8         Q.   Other than Strasbourger, Allen         14:51:00
9   Capital Markets and the strategic investment     14:51:03
10  firm that you are working with now, have you, as  14:51:05
11  a representative of Xandros Corporation and/or    14:51:07
12  Xandros, Inc., worked with any other investment  14:51:10
13  banking firms?                                    14:51:13
14        A.   No.                                    14:51:14
15        Q.   Do you know how many shares of         14:51:21
16  stock are currently outstanding in Xandros,      14:51:22
17  Inc.?                                            14:51:25
18        A.   Approximately 60 million shares.       14:51:27
19        Q.   Who is the largest percentage          14:51:36
20  shareholder?                                     14:51:39
21        A.   In Xandros, Inc.?                      14:51:46
22        Q.   Yes, sir.                              14:51:48
23        A.   Probably Linux Global Partners.        14:51:52
24        Q.   Do you know how many shares of         14:51:55
25  Xandros, Inc. Linux Global Partners owns?        14:51:56
```

EXH Y PG 263

164

| | | |
|---|---|---|
| 1 | WILLIAM JAY ROSEMAN | |
| 2 | A.    Not off the top of my head. | 14:52:01 |
| 3 | Q.    Do you have a best estimate? | 14:52:03 |
| 4 | A.    How many shares?  I guess we own | 14:52:19 |
| 5 | approximately 80 percent, but I don't know, off | 14:52:22 |
| 6 | the top of my head I don't know exactly how many | 14:52:27 |
| 7 | shares. | 14:52:29 |
| 8 | Q.    We can do the math later. | 14:52:30 |
| 9 | Who is the next largest investor in | 14:52:33 |
| 10 | Xandros, Inc.? | 14:52:36 |
| 11 | A.    Probably Strasbourger. | 14:52:44 |
| 12 | Q.    And do you recall how much in a | 14:52:46 |
| 13 | percentage basis or in terms of shares | 14:52:48 |
| 14 | Strasbourger owns? | 14:52:50 |
| 15 | A.    No. | 14:52:52 |
| 16 | The next largest percentage is | 14:52:52 |
| 17 | Corel. | 14:52:54 |
| 18 | Q.    And how much of Xandros, Inc. does | 14:52:56 |
| 19 | Corel own? | 14:53:00 |
| 20 | A.    5 percent. | 14:53:01 |
| 21 | Q.    After Corel, who is the next | 14:53:03 |
| 22 | largest shareholder? | 14:53:05 |
| 23 | A.    Strasbourger. | 14:53:07 |
| 24 | Q.    How much does Strasbourger own? | 14:53:08 |
| 25 | A.    I don't know.  I really don't know. | 14:53:10 |

EXH __Y__ PG _264_

165

```
 1              WILLIAM JAY ROSEMAN

 2        Q.    After Strasbourger, who is the next      14:53:14

 3   largest shareholder?                                14:53:16

 4        A.    I guess the ESOP plan.                   14:53:25

 5        Q.    Can you spell that, please?              14:53:27

 6        A.    The ESOP.  It's the retirement           14:53:29

 7   plan, the Xandros retirement plan.                  14:53:31

 8        Q.    That's A-E-S-O-P?                         14:53:34

 9        A.    Yes.                                      14:53:36

10        Q.    So that would be owned by --             14:53:39

11        A.    I think it's E-S-O-P.  It's ESOP.        14:53:40

12   It's a retirement plan.                             14:53:48

13        Q.    And do you recall what percentage        14:53:54

14   or how many shares the ESOP plan owns?              14:53:55

15        A.    I really don't, no.                      14:53:58

16        Q.    After the ESOP plan, who is the          14:54:00

17   next largest investor in --                         14:54:01

18        A.    I have no idea.                           14:54:05

19        Q.    I'm going to ask you the same            14:54:07

20   questions with regards to Xandros Corporation.      14:54:08

21   Who is the largest shareholder of Xandros           14:54:10

22   Corporation?                                         14:54:12

23        A.    Xandros, Inc.                             14:54:13

24        Q.    Is Xandros, Inc. the sole parent         14:54:17

25   corporation of Xandros Corporation?                 14:54:21
```

EXH **Y** PG **265**

166

```
 1                   WILLIAM JAY ROSEMAN

 2        A.      It is.                              14:54:23

 3                MR. STUART:  Let's take a break and  14:54:41

 4  let the videographer change tapes.               14:54:42

 5                MR. ROBERTSON:  There is a four      14:54:47

 6  hour limit to this, I want to know how much time  14:54:48

 7  is left.                                          14:54:51

 8                THE VIDEO OPERATOR:  We've run 67    14:54:53

 9  minutes.                                          14:54:54

10                MR. ROBERTSON:  How much was the     14:54:59

11  previous day?                                     14:54:59

12                MR. STUART:  Two hours.              14:55:03

13                THE WITNESS:  I thought we had an     14:55:05

14  hour and a half left.                            14:55:06

15                THE VIDEO OPERATOR:  Are we going     14:55:08

16  off the record?                                   14:55:17

17                MR. STUART:  Yes.                    14:55:17

18                MR. ROBERTSON:  Can you confirm how   14:55:17

19  much time we spent on the first session?         14:55:17

20                MR. STUART:  Two hours.              14:55:17

21                THE VIDEO OPERATOR:  This marks the   14:55:21

22  end of tape No. 3 in the deposition of William    14:55:21

23  J. Roseman.  Going off the record, the time is    14:55:25

24  2:55.                                             14:55:28

25                (A recess was taken.)                15:02:39
```

EXH __Y__ PG __266__

167

```
 1               WILLIAM JAY ROSEMAN

 2               THE VIDEO OPERATOR:  Back on the          15:03:06

 3  record.  Here marks the beginning of tape No. 4       15:03:06

 4  in the deposition of William J. Roseman.  The         15:03:18

 5  time is 3:03.                                         15:03:21

 6  BY MR. STUART:                                        15:03:26

 7       Q.    Mr. Roseman, I'm going to next ask         15:03:26

 8  you about Exhibit 14.  Do you have Exhibit 14         15:03:28

 9  before you?                                           15:03:30

10       A.    I do.                                      15:03:40

11       Q.    Can you please take a look at the          15:03:41

12  section of Exhibit 14 that is an E-mail message       15:03:52

13  from Michael Bego to Kevin Carmony, which begins      15:03:56

14  at approximately the middle of that page.             15:04:00

15       A.    I mean, I'm looking at it now.             15:04:20

16       Q.    Let me know when you've had a              15:04:22

17  chance to review that.                                15:04:24

18       A.    Okay.                                      15:04:25

19       Q.    Have you ever seen an E-mail from          15:04:28

20  Mr. Bego to Kevin Carmony that states what is         15:04:31

21  stated in the middle portion of Exhibit 14?           15:04:41

22       A.    Okay, I've read it.                        15:05:05

23       Q.    My question is, sir, Exhibit 14 is         15:05:07

24  in fact a printout from an E-mail from Kevin          15:05:11

25  Carmony to Mr. Bego.  Do you understand that?         15:05:14
```

EXH Y PG 267

168

| | | |
|---|---|---|
| 1 | WILLIAM JAY ROSEMAN | |
| 2 | MR. ROBERTSON:  From Bego to | 15:05:17 |
| 3 | Carmony.  I think you misspoke. | 15:05:18 |
| 4 | MR. STUART:  I think I didn't, | 15:05:24 |
| 5 | Mr. Robertson, and I'll explain why. | 15:05:25 |
| 6 | Q.    At the top of Exhibit 14, you see | 15:05:29 |
| 7 | the words Kevin Carmony; correct, Mr. Roseman? | 15:05:32 |
| 8 | A.    Yes. | 15:05:35 |
| 9 | Q.    In the from line, it appears that | 15:05:36 |
| 10 | this is an E-mail from Mr. Carmony, and below | 15:05:38 |
| 11 | the from line is the to line, and it appears to | 15:05:42 |
| 12 | be addressed to Mr. Bego; correct? | 15:05:46 |
| 13 | A.    It's really three E-mails.  It's | 15:05:48 |
| 14 | Kevin's initially, and then -- I'm sorry, an | 15:05:54 |
| 15 | original message.  So it's really three E-mails | 15:05:59 |
| 16 | on one page.  It's just a trail behind it. | 15:06:02 |
| 17 | Q.    You saved me five minutes to lay | 15:06:05 |
| 18 | the foundation. | 15:06:07 |
| 19 | Do you understand that this is in | 15:06:09 |
| 20 | fact a string of E-mails that constitutes | 15:06:09 |
| 21 | interaction between Mr. Bego and Mr. Carmony; | 15:06:13 |
| 22 | correct? | 15:06:16 |
| 23 | A.    Yes. | 15:06:17 |
| 24 | Q.    The middle E-mail, the second | 15:06:17 |
| 25 | E-mail, that begins in the middle of the page,. | 15:06:20 |

EXH _Y_ PG 268

169

| | | |
|---|---|---|
| 1 | WILLIAM JAY ROSEMAN | |
| 2 | from Mr. Bego to Mr. Carmony, that begins with | 15:06:22 |
| 3 | "Kevin, I've been holding out on sending this | 15:06:25 |
| 4 | E-mail." | 15:06:28 |
| 5 | That E-mail is what I want to ask | 15:06:32 |
| 6 | you about, Mr. Roseman.  Okay? | 15:06:34 |
| 7 | Have you ever seen a copy of this | 15:06:37 |
| 8 | E-mail, in other words, were you copied on this | 15:06:39 |
| 9 | E-mail or have you seen this E-mail through your | 15:06:41 |
| 10 | investigation in this case? | 15:06:46 |
| 11 | A.    I mean, I don't -- I'm not copied | 15:06:50 |
| 12 | on the E-mail.  At least it appears that I'm | 15:06:52 |
| 13 | not.  And I don't remember having seen this | 15:06:55 |
| 14 | E-mail.  And the text in itself refers, is an | 15:06:58 |
| 15 | indication that I probably didn't, because I | 15:07:03 |
| 16 | think it says that he would be happy to | 15:07:05 |
| 17 | introduce LGP to them, to Kevin. | 15:07:07 |
| 18 | Q.    The last page of the second | 15:07:36 |
| 19 | paragraph of the portion of this E-mail that's | 15:07:37 |
| 20 | from Mr. Bego to Mr. Carmony, the sentence that | 15:07:40 |
| 21 | says "additionally, through LGP and its partner | 15:07:43 |
| 22 | venture companies, we plan to raise an | 15:07:46 |
| 23 | additional 15 to $25 million to ensure longer | 15:07:48 |
| 24 | term stability." | 15:07:51 |
| 25 | Do you see that sentence? | 15:07:53 |

EXH __Y__ PG 269

170

| | | | |
|---|---|---|---|
| 1 | | WILLIAM JAY ROSEMAN | |
| 2 | A. | The last page, you say? | 15:07:54 |
| 3 | Q. | I'm sorry, it's the last sentence. | 15:07:56 |
| 4 | A. | Okay. | 15:07:59 |
| 5 | Q. | It's the second E-mail that we've | 15:05:02 |
| 6 | been referring to. | | 15:08:04 |
| 7 | A. | I do see this. | 15:08:05 |
| 8 | Q. | The second paragraph. The last | 15:08:06 |
| 9 | sentence of that paragraph, that begins with | | 15:08:08 |
| 10 | "additionally." | | 15:08:12 |
| 11 | A. | Okay, I do see that. | 15:08:14 |
| 12 | Q. | Mr. Bego represents to Mr. Carmony | 15:08:21 |
| 13 | that LGP has what he characterizes as partner | | 15:08:24 |
| 14 | venture companies.  Do you see that? | | 15:08:28 |
| 15 | A. | Yes. | 15:08:30 |
| 16 | Q. | In fact, as of October 29, 2001, | 15:08:32 |
| 17 | did LGP have partner venture companies? | | 15:08:35 |
| 18 | A. | Yes, Allen Capital Markets I guess | 15:08:42 |
| 19 | would be one. | | 15:08:43 |
| 20 | Q. | Are there others? | 15:08:45 |
| 21 | A. | There are -- I don't recall of any | 15:08:53 |
| 22 | other companies at that time, no. | | 15:08:55 |
| 23 | Q. | The sentence there refers to a plan | 15:09:02 |
| 24 | for the future.  Are you aware that as of | | 15:09:05 |
| 25 | October 29, Xandros, Inc. planned to raise an | | 15:09:09 |

EXH Y PG 270

171

| | | |
|---|---|---|
| 1 | WILLIAM JAY ROSEMAN | |
| 2 | additional 15 tc $25 million to ensure longer | 15:09:15 |
| 3 | term stability? | 15:09:19 |
| 4 | A.    Yes. | 15:09:22 |
| 5 | Q.    What was the nature of that plan, | 15:09:22 |
| 6 | can you just describe for me what the plan to | 15:09:24 |
| 7 | raise an additional 15 to $25 million was? | 15:09:28 |
| 8 | A.    I mean, to the best of my | 15:09:31 |
| 9 | recollection, I don't know -- I didn't write | 15:09:33 |
| 10 | this E-mail, and I don't recall having seen it. | 15:09:37 |
| 11 | But if I had to assume, I'm assuming Mike was | 15:09:40 |
| 12 | talking about a commitment from GE Capital for | 15:09:45 |
| 13 | $15 million. | 15:09:50 |
| 14 | Q.    Well, I don't want you to assume, | 15:09:57 |
| 15 | but let me ask you a question about that.  As of | 15:09:59 |
| 16 | October 29, 2001, had GE Capital committed $15 | 15:10:08 |
| 17 | million to Xandros and/or LGP? | 15:10:10 |
| 18 | A.    We received a term sheet for 15 | 15:10:13 |
| 19 | million.  I mean, 10 or 15.  I think it was 15. | 15:10:15 |
| 20 | .   Q.    What was the date of that term | 15:10:25 |
| 21 | sheet? | 15:10:26 |
| 22 | A.    I really don't remember. | 15:10:27 |
| 23 | Q.    And what was the nature of the | 15:10:31 |
| 24 | investment, was it in fact an equity placement, | 15:10:34 |
| 25 | a private equity placement? | 15:10:38 |

EXH _Y_ PG _271_

172

| | | |
|---|---|---|
| 1 | WILLIAM JAY ROSEMAN | |
| 2 | A.    It was an equity investment, yes. | 15:10:41 |
| 3 | Q.    That term sheet, I take it, never | 15:10:42 |
| 4 | resulted in a deal; correct? | 15:10:44 |
| 5 | A.    Well, if it -- it was a $15 million | 15:10:46 |
| 6 | investment, I think it was predicated on us | 15:10:50 |
| 7 | raising 7-1/2 million.  So if we raised the | 15:10:53 |
| 8 | 7-1/2 million -- I mean, I would have to read it | 15:10:57 |
| 9 | again, it's been a while.  But it was either | 15:11:01 |
| 10 | 7-1/2 or 10 million, then they would have made | 15:11:03 |
| 11 | the investment of 15 million.  I think it was 15 | 15:11:07 |
| 12 | million and 7-1/2. | 15:11:09 |
| 13 | Q.    GE Capital never actually made that | 15:11:12 |
| 14 | investment though; correct? | 15:11:14 |
| 15 | A.    We never raised the 7-1/2. | 15:11:15 |
| 16 | Q.    Was that the only reason that GE | 15:11:18 |
| 17 | Capital never raised -- I'm sorry, GE Capital | 15:11:22 |
| 18 | never made the $10 million investment? | 15:11:25 |
| 19 | A.    That's correct. | 15:11:27 |
| 20 | Q.    Were there any smaller financings | 15:11:28 |
| 21 | with GE Capital? | 15:11:29 |
| 22 | A.    No. | 15:11:31 |
| 23 | Q.    And was this an equity financing | 15:11:36 |
| 24 | that was through Allen Capital Markets, or was | 15:11:39 |
| 25 | this through a different investment bank? | 15:11:43 |

EXH __Y__ PG _272_

173

| | | |
|---|---|---|
| 1 | WILLIAM JAY ROSEMAN | |
| 2 | A.    Was this, you are talking about the | 15:11:46 |
| 3 | GE Capital? | 15:11:49 |
| 4 | Q.    Yes, sir. | 15:11:50 |
| 5 | A.    Was it -- I'm sorry, could you ask | 15:11:53 |
| 6 | me that question again? | 15:11:57 |
| 7 | Q.    Was this investment or this term | 15:11:59 |
| 8 | sheet contemplated to be made through Allen | 15:12:03 |
| 9 | Capital Markets, or was this through a separate | 15:12:06 |
| 10 | investment banker? | 15:12:09 |
| 11 | A.    I don't understand the question, | 15:12:14 |
| 12 | I'm sorry.  Are you talking about the GE Capital | 15:12:15 |
| 13 | term sheet? | 15:12:20 |
| 14 | Q.    Yes, sir.  Was there an investment | 15:12:21 |
| 15 | banker identified on the term sheet or | 15:12:23 |
| 16 | contemplated as part of the deal? | 15:12:25 |
| 17 | A.    Well, GE Capital is an investment | 15:12:28 |
| 18 | banker.  I mean, they are their own firm.  So, I | 15:12:30 |
| 19 | mean, GE Capital would make an investment, they | 15:12:33 |
| 20 | would not do it in conjunction with Strasbourger | 15:12:36 |
| 21 | or Goldman Sachs or anyone else like that, they | 15:12:39 |
| 22 | make their own investments. | 15:12:42 |
| 23 | Q.    Thank you, sir. | 15:12:45 |
| 24 | Again, referring back to that last | 15:12:54 |
| 25 | sentence in Exhibit 14 that we were referring to | 15:12:55 |

EXH Y PG 273

174

```
1                    WILLIAM JAY ROSEMAN

2    that begins with "additionally." Are you aware        15:13:02

3    of any other potential sources for the 15 to $25      15:13:07

4    million that Mr. Bego stated that Xandros, Inc.       15:13:11

5    planned to raise, other than GE Capital?              15:13:15

6         A.    No, I think probably just Allen            15:13:19

7    Capital and GE.                                       15:13:21

8         Q.    And as of October 29, 2001,                15:13:29

9    Xandros, Inc. actually had a term sheet with GE       15:13:33

10   Capital; correct?                                     15:13:36

11        A.    I believe so, yes. I mean, date            15:13:37

12   wise I'm not sure, but yes.                           15:13:39

13        Q.    Referring to the first sentence in         15:13:51

14   that paragraph, which reads "Xandros capital          15:13:53

15   comes from a $10 million commitment from Linux        15:13:58

16   Global Partners and its partner VC companies."        15:14:02

17              I'm going to ask you the same              15:14:07

18   questions I asked you about your responses to         15:14:08

19   interrogatories. Would your questions whether         15:14:10

20   or not the nature of the deal with Linux Global       15:14:16

21   Partners and Xandros, Inc. constitutes a              15:14:19

22   commitment be the same as your earlier                15:14:23

23   testimony?                                            15:14:26

24              MR. ROBERTSON: Object to the form;         15:14:27

25   it's compound and we don't know exactly what          15:14:28
```

EXH **Y** PG **274**

175

William Jay Roseman, Vol. 2       11/5/03       Lindows.com v. Xandros

| | | |
|---|---|---|
| 1 | WILLIAM JAY ROSEMAN | |
| 2 | former testimony you're talking about. | 15:14:31 |
| 3 | A.     I should answer this? | 15:14:39 |
| 4 | Q.     Yes, you may answer the question. | 15:14:40 |
| 5 | A.     The reason I said what I said | 15:14:42 |
| 6 | earlier today was for clarification purposes, in | 15:14:44 |
| 7 | the investment banking firm.  A commitment, the | 15:14:48 |
| 8 | terminology regarding a commitment is different | 15:14:51 |
| 9 | from a firm commitment.  A firm commitment is a | 15:14:53 |
| 10 | guarantee, a commitment of course is not.  But | 15:14:56 |
| 11 | to a layman not familiar with investment | 15:14:59 |
| 12 | language, a commitment -- they might interpret | 15:15:04 |
| 13 | commitment as my wife might. | 15:15:07 |
| 14 | Q.     And -- | 15:15:15 |
| 15 | A.     There is a difference between firm | 15:15:16 |
| 16 | commitment and commitment in the investment | 15:15:17 |
| 17 | banking world. | 15:15:21 |
| 18 | Q.     And those are terms of art that | 15:15:22 |
| 19 | investment bankers are familiar with? | 15:15:24 |
| 20 | A.     Well, I mean, I think anyone who's | 15:15:26 |
| 21 | involved in the business world are as well.  It | 15:15:29 |
| 22 | very much depends on -- it's terminology that's | 15:15:31 |
| 23 | used, there are really three -- there is best | 15:15:35 |
| 24 | efforts, commitment and firm commitment. | 15:15:42 |
| 25 | Q.     In the investment banking world, | 15:15:44 |

EXH _Y_ PG _275_

176

```
 1              WILLIAM JAY ROSEMAN

 2  can you just give me a definition of those three      15:15:46

 3  terms?                                                15:15:48

 4       A.     Well, best efforts is that you are        15:15:50

 5  going to -- that you would try or that -- I           15:15:51

 6  mean, with a best efforts, you really -- the GE       15:15:57

 7  Capital kind of was -- I don't know, GE Capital       15:16:03

 8  was probably a commitment.  A commitment is           15:16:05

 9  predicated on other things.  A firm commitment        15:16:07

10  of course is the firm commitment, the firm           15:16:10

11  actually guarantees that the money is there.          15:16:19

12       Q.     So with a firm commitment there is        15:16:19

13  a guarantee that the money is there without           15:16:21

14  condition; correct?                                   15:16:22

15       A.     Yes.  In other words, if you get a        15:16:23

16  firm commitment from an investment banking firm,      15:16:26

17  they don't have to raise the money themselves,        15:16:29

18  they should have the money there.  And then they      15:16:32

19  subsequently dispense the money.                      15:16:34

20       Q.     And what's the difference between         15:16:37

21  then a firm commitment and just a garden variety      15:16:41

22  commitment?                                           15:16:45

23       A.     A commitment is that they are going       15:16:45

24  to go out -- typically a commitment means that        15:16:47

25  they are committed to go out and raise the money      15:16:50
```

EXH Y PG 276

177

| | | |
|---|---|---|
| 1 | WILLIAM JAY ROSEMAN | |
| 2 | for you. | 15:16:52 |
| 3 | Q. It's a commitment to raise money, | 15:16:52 |
| 4 | not a commitment to deliver money? | 15:16:54 |
| 5 | A. Yeah. I mean, things happen, | 15:16:56 |
| 6 | obviously. Market conditions and such, which I | 15:16:58 |
| 7 | referred to earlier. But yes, generally, yes. | 15:17:00 |
| 8 | Q. And the difference between a | 15:17:04 |
| 9 | commitment and a best efforts, I believe you | 15:17:07 |
| 10 | said? | 15:17:10 |
| 11 | A. Yeah, best efforts is, you know, we | 15:17:10 |
| 12 | will see what we can do. There is a joke, you | 15:17:13 |
| 13 | know, on Wall Street that best efforts is not | 15:17:17 |
| 14 | worth -- is not really that great. Best efforts | 15:17:19 |
| 15 | are very easy to come by. | 15:17:22 |
| 16 | Q. You believe that Mr. Bego's | 15:17:29 |
| 17 | representation to Mr. Carmony was in fact | 15:17:33 |
| 18 | correct, that Xandros's capital had -- does come | 15:17:36 |
| 19 | from a $10 million commitment, in that sense | 15:17:41 |
| 20 | that investment bankers would recognize from | 15:17:46 |
| 21 | Linux Global Partners and its partner VC | 15:17:50 |
| 22 | companies? | 15:17:52 |
| 23 | MR. ROBERTSON: Objection; | 15:17:53 |
| 24 | compound. | 15:17:53 |
| 25 | A. You would have to ask Mike that. | 15:17:54 |

EXH Y PG 277

178

```
 1              WILLIAM JAY ROSEMAN

 2  I'm not going to try to guess what Mike was        15:17:56

 3  trying to convey.                                  15:17:58

 4       Q.    Well, my question, though, is as of     15:17:59

 5  October 29, 2001, you believe that that            15:18:01

 6  statement was true?                                15:18:05

 7       A.    I believe yes, we were committed to     15:18:08

 8  raise money to Xandros regarding the 15 to 25      15:18:12

 9  million.  I'm assuming that they are referring     15:18:18

10  to -- I'm assuming Mike, you know, I don't want    15:18:23

11  to assume, but I assume that Mike is referring     15:18:26

12  to GE Capital.  That's probably why he's come up   15:18:29

13  with those numbers.  But that's purely an          15:18:32

14  assumption.                                        15:18:34

15       Q.    Refer, if you will, to Exhibit 15.      15:19:07

16  Do you recognize Exhibit 15?                       15:19:13

17       A.    It looks like it's a news article.      15:19:36

18       Q.    Do you recognize the news article?      15:19:39

19       A.    Do I recognize it as what?  I mean,     15:19:47

20  do I recognize --                                  15:19:49

21       Q.    Have you seen this before being         15:19:51

22  presented with it today?                           15:19:59

23       A.    Have I seen it before today, you're     15:20:01

24  saying?  I mean, I may have.                       15:20:02

25       Q.    Yes, sir, that's my question.           15:20:05
```

ExH __Y__ PG __278__

179

1                     WILLIAM JAY ROSEMAN

2        A.     Yeah, I mean, I may have seen it.          15:20:06

3        Q.     Do you recall whether or not you           15:20:09

4    actually have seen it before today?                   15:20:10

5        A.     I really don't.  I'm not trying to         15:20:12

6    be evasive, it's just that we get so many             15:20:15

7    things.  I mean, I may have seen this, I really       15:20:18

8    don't know if I saw this specifically or not.         15:20:21

9        Q.     Why don't you take a moment and            15:20:23

10   read through it.                                       15:20:24

11       A.     All right, thank you.                      15:20:28

12              Okay.                                       15:22:05

13       Q.     Now that you've had a chance to            15:22:06

14   review Exhibit 15, can you recall if you've seen      15:22:07

15   this exhibit prior to today?                          15:22:11

16       A.     No.                                        15:22:15

17       Q.     Is it -- are you aware of whether          15:22:24

18   or not Xandros, Inc. regularly issues press           15:22:27

19   releases?                                             15:22:32

20       A.     You are saying this is a press             15:22:37

21   release?  You know what, it probably is, now          15:22:38

22   that I'm looking at the side.  I thought it was       15:22:41

23   a newspaper article.                                  15:22:43

24       Q.     Well, I'm not there yet.  But              15:22:47

25   that's the direction we are working towards.          15:22:49

EXH _Y_ PG 279

180

```
 1              .        WILLIAM JAY ROSEMAN

 2          A.      Okay.  Certainly -- I mean, I would      15:22:51

 3   not have issued this.  This would have been done        15:22:57

 4   by a public relations firm.  Is this from the           15:22:59

 5   Xandros web site?                                       15:23:06

 6          Q.      I can represent to you, sir, yes,        15:23:09

 7   that this is a printout from the Xandros web            15:23:11

 8   site that I or my paralegal obtained some time          15:23:15

 9   ago.                                                    15:23:20

10          A.      Okay.                                    15:23:21

11          Q.      Does that refresh your recollection      15:23:27

12   as to whether or not you've seen this before?           15:23:27

13          A.      I mean, I would assume that I have       15:23:31

14   seen it.  But I don't -- I can't guarantee that         15:23:33

15   it's the same document that I saw.                      15:23:36

16          Q.      Going back to my earlier question,       15:23:45

17   it is Xandros's business practice to on occasion        15:23:46

18   issue press releases; correct?                          15:23:51

19          A.      Yes.                                     15:23:53

20          Q.      Those press releases are issued to       15:23:54

21   the general public; correct?                            15:23:57

22          A.      Yes.                                     15:23:58

23          Q.      And you work through a public            15:24:00

24   relations firm in doing that?  I should say             15:24:03

25   Xandros works through a public relations firm in        15:24:05
```

EXH __Y__ PG __280__

181

| | | |
|---|---|---|
| 1 | WILLIAM JAY ROSEMAN | |
| 2 | doing that? | 15:24:07 |
| 3 | A.    We did.  We do now. | 15:24:09 |
| 4 | Q:    My question I believe is pending, | 15:24:33 |
| 5 | I'm not sure you answered it, if you did, I | 15:24:36 |
| 6 | apologize, I may have missed it. | 15:24:39 |
| 7 | As of August 29, 2001, did you work | 15:24:41 |
| 8 | with a public relations company? | 15:24:43 |
| 9 | A.    Yes, we did. | 15:24:46 |
| 10 | Q.    Who was that public relations | 15:24:47 |
| 11 | company? | 15:24:49 |
| 12 | A.    0ero to 5ive. | 15:24:49 |
| 13 | Q.    0ero to 5ive?  Where is 0ero to | 15:24:51 |
| 14 | 5ive located? | 15:24:57 |
| 15 | A.    New York.  They were in Manhattan. | 15:24:58 |
| 16 | Q.    Do you know the address? | 15:25:03 |
| 17 | A.    I think they are out of business | 15:25:06 |
| 18 | now. | 15:25:08 |
| 19 | Q.    Do you know the last known address? | 15:25:18 |
| 20 | A.    They are in Manhattan, and in | 15:25:18 |
| 21 | Philadelphia.  They were in our building, at 41 | 15:25:18 |
| 22 | East 11th Street, in New York. | 15:25:22 |
| 23 | Q.    Who did you work with, or who did | 15:25:31 |
| 24 | Xandros work with at 0ero to 5ive? | 15:25:33 |
| 25 | A.    Amy.  I don't remember her last | 15:25:37 |

EXH **Y** PG 281                                      182

```
1              WILLIAM JAY ROSEMAN

2   name.                                        15:25:39

3       Q.     And prior to 0ero to 5ive releasing    15:25:39

4   a press release in or about August of 2001,  15:25:43

5   would it have been Xandros's business practice 15:25:45

6   to review that press release prior to its    15:25:47

7   release?                                      15:25:51

8       A.     I did not review it.  Maybe Mike   15:25:52

9   did, or Amy did or Tom Langbein did.  I did not. 15:25:54

10      Q.     It would not have been Xandros's   15:26:07

11  practice to allow 0ero to 5ive to release    15:26:10

12  information about Xandros without Xandros     15:26:13

13  reviewing and approving that information; is  15:26:15

14  that correct?                                 15:26:19

15      A.     That's correct.                    15:26:20

16      Q.     Is it your understanding,          15:26:29

17  Mr. Roseman, that a press release is issued by a 15:26:30

18  company, is issued to any member of the public 15:26:34

19  that happens to run across the press release? 15:26:42

20      A.     Yes.                               15:26:46

21      Q.     This would not have been restricted 15:26:49

22  to, a press release is not restricted to     15:26:50

23  investment bankers or Wall Street brokers or  15:26:54

24  other investment professionals; correct?     15:27:03

25      A.     Correct.                           15:27:06
```

EXH Y PG 282

183

```
 1              WILLIAM JAY ROSEMAN

 2      Q.    The press release that's              15:27:08

 3  represented by Exhibit 15 would have been issued  15:27:10

 4  to people like your wife, for instance?         15:27:12

 5      A.    Yes.                                   15:27:14

 6      Q.    Just to go back and follow up on      15:27:24

 7  some basic information.  What is your home       15:27:27

 8  address?                                         15:27:29

 9      A.    411 Jefferson Street, Carlstadt,      15:27:29

10  C-a-r-l-s-t-a-d-t, New Jersey 07072.            15:27:33

11      Q.    How long have you been at that        15:27:50

12  address?                                         15:27:50

13      A.    Eight years.                           15:27:51

14      Q.    Immediately prior to residing on      15:27:56

15  Jefferson Street, where did you reside?         15:27:58

16      A.    440 4th Street, in Carlstadt, New     15:28:00

17  Jersey.                                          15:28:05

18      Q.    How long did you live there?          15:28:05

19      A.    I guess 34 years, 32 years.  Maybe    15:28:12

20  34 years.                                        15:28:19

21      Q.    Have you resided at any other         15:28:40

22  addresses in the last ten years?               15:28:42

23      A.    No.                                    15:28:44

24      Q.    Do you own any real estate?           15:28:44

25      A.    Yes.                                   15:28:47
```

EXH _Y_ PG 283

184

```
 1                 .        WILLIAM JAY ROSEMAN

 2        Q.     What real estate?                      15:28:47

 3        A.     ·I own apartments in Manhattan.  And   15:28:48

 4   I own land in Africa.  And land in Carlstadt.      15:28:58

 5   And apartments in Little Ferry.    .        ·       15:29:10

 6        Q.     Little Ferry, is that one word?         15:29:18

 7        A.     It's in New Jersey, yes.  Two           15:29:20

 8   words.                                        ·15:29:22

 9        Q.     Any other real estate that you are      15:29:27

10   an owner of?                            :           15:29:27

11        A.     No.                                     15:29:31

12     . Q.      What's the address of the               15:29:32

13   apartments in Manhattan that you're an owner of?    15:29:33

14        A.     436 East 58th Street, New York, New     15:29:37

15   York.                                               15:29:43

16        Q.     How many --                             15:29:50

17            .  MR. ROBERTSON:  I'm objecting to        15:29:53

18   further details on this.  It's totally beyond       15:29:54

19   the scope of any rational basis for this            15:29:58

20   litigation.                                         15:30:01

21        Q. .   Do you own the apartments as sole       15:30:03

22   proprietor, or through some corporation?            15:30:07

23     ·  A.     Sole proprietor.  All my properties     15:30:10

24   are owned as sole proprietor.                       15:30:13

25   DIR    Q.            Is there a loan or a            15:30:25
```

EXH ⅄ PG 264

185

```
 1              WILLIAM JAY ROSEMAN

 2   mortgage of any type on the apartments in           15:30:26

 3   Manhattan on East 58th Street?                      15:30:28

 4            MR. ROBERTSON:  I object to the            15:30:31

 5   questions, instruct him not to answer.  It's        15:30:31

 6   metaphysically irrelevant, improper, and has        15:30:33

 7   nothing to do with the case.  This is a             15:30:36

 8   defendant who hasn't even answered the complaint    15:30:36

 9   yet, and your questions regarding his assets are    15:30:38

10   just irrelevant.  I'm instructing him not to        15:30:41

11   answer.                                             15:30:44

12            MR. STUART:  You are going to give         15:30:47

13   the same instructions, I take it, regarding the     15:30:47

14   land in Africa, the Carlstadt properties and the    15:30:49

15   Little Ferry property?                              15:30:51

16            MR. ROBERTSON:  If you are going to        15:30:54

17   ask this defendant what he owns and where, yes.     15:30:55

18            MR. STUART:  Then I won't ask those        15:30:58

19   questions based upon your representation that       15:30:59

20   you will instruct this witness not to answer.       15:31:01

21       Q.    Mr. Roseman, what's your Social           15:31:08

22   Security number?                                    15:31:10

23       A.    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.                              15:31:12

24       Q.    Have you ever been convicted of a         15:31:18

25   felony?                                             15:31:19
```

EXH Y PG 275

186

```
 1              WILLIAM JAY ROSEMAN

 2      A.    No.                                    15:31:21

 3            MR. STUART:  I believe that's it.      15:31:29

 4  Let me have one moment to review my notes to     15:31:30

 5  make sure I've captured everything.  And I'll    15:31:32

 6  let you know.  Let's go off the record.          15:31:37

 7            THE VIDEO OPERATOR:  Going off the     15:31:43

 8  record, the time is 3:31.                        15:31:44

 9            (Discussion off the record.)           15:33:30

10            THE VIDEO OPERATOR:  We are back on    15:33:31

11  the record, the time is 3:33.                    15:33:32

12  BY MR. STUART:                                   15:33:40

13      Q.    Mr. Roseman, I want to ask you the     15:33:40

14  same questions about LGP as I had earlier asked  15:33:42

15  you about Xandros, Incorporated.  LGP is in fact 15:33:45

16  a corporation; correct?                          15:33:49

17      A.    Yes.                                   15:33:51

18      Q.    Has LGP issued shares?                 15:33:52

19      A.    Yes.                                   15:33:56

20      Q.    Who is the largest shareholder in     15:33:56

21  LGP?                                             15:33:58

22      A.    I think it might be Medicore.         15:34:05

23      Q.    Can you spell that, please?           15:34:08

24      A.    M-e-d-i-c-o-r-e.                       15:34:10

25      Q.    How many shares or what percentage    15:34:16
```

EXH __Y__ PG _286_

187

| | | |
|---|---|---|
| 1 | WILLIAM JAY ROSEMAN | |
| 2 | of LGP does Medicore own? | 15:34:18 |
| 3 | A.    I have no -- I really, I couldn't | 15:34:20 |
| 4 | fathom to guess. | 15:34:23 |
| 5 | Q.    Does there exist somewhere in LGP's | 15:34:26 |
| 6 | records a cap sheet? | 15:34:29 |
| 7 | A.    Yes. | 15:34:31 |
| 8 | Q.    Similar to the cap sheet we | 15:34:32 |
| 9 | discussed with respect to Xandros, Inc. that | 15:34:34 |
| 10 | identifies all the owners? | 15:34:43 |
| 11 | A.    Yes. | 15:34:43 |
| 12 | Q.    After Medicore, who is the next | 15:34:43 |
| 13 | largest shareholder? | 15:34:43 |
| 14 | A.    Netgain. | 15:34:43 |
| 15 | Q.    Spell that, please. | 15:34:43 |
| 16 | A.    N-e-t-g-a-i-n. | 15:34:46 |
| 17 | Q.    And I trust that you probably don't | 15:34:47 |
| 18 | know the percentage or number of shares? | 15:34:49 |
| 19 | A.    I really don't know. | 15:34:51 |
| 20 | Q.    And after Netgain, who is the next | 15:34:52 |
| 21 | largest shareholder? | 15:34:54 |
| 22 | A.    Maybe Upland Associates -- Dwight | 15:35:01 |
| 23 | Lee: | 15:35:05 |
| 24 | Q.    Are those the same entities? | 15:35:05 |
| 25 | A.    Yes.     EXH _Y_ PG _287_ | 15:35:07 |

188

```
 1              WILLIAM JAY ROSEMAN

 2      Q.      Upland Associates?                      15:35:07

 3      A.      That's where he works.  But Dwight      15:35:09

 4  Lee.                                                15:35:12

 5      Q.      Upland Associates?                      15:35:13

 6      A.      That's where he works.  But it's        15:35:15

 7  not in his company's name, it's in his personal    15:35:17

 8  shares.                                             15:35:21

 9              Rick and I are large shareholders       15:35:22

10  as well.                                            15:35:24

11      Q.      And after Mr. Lee, do you know who      15:35:28

12  the next largest shareholder is?                    15:35:29

13      A.      I really don't know.                    15:35:45

14      Q.      How many shares or what percentage      15:35:46

15  does Mr. Berenstein own of LGP?                     15:35:48

16      A.      I don't know, you will have to ask      15:35:50

17  him.  He will also know how many shares I have.     15:35:51

18      Q.      Do you know how many shares you         15:35:54

19  have?                                               15:35:56

20      A.      I guess it's over 4 million shares.     15:35:56

21  I don't know the exact amount.                      15:35:58

22      Q.      Do you know how many outstanding        15:36:01

23  shares of LGP there are?                            15:36:02

24      A.      Approximately 22 million.               15:36:05

25      Q.      Do you know the approximate value       15:36:09
```

EXH Y PG 288

189

```
1                  WILLIAM JAY ROSEMAN

2   of a share of LGP currently?                    15:36:13

3        A.     I don't.                            15:36:17

4        Q.     Other than yourself, Mr. Berenstein 15:36:22

5   and the other investors that you've already     15:36:24

6   identified, as you sit here, do you know of any 15:36:27

7   other owners of shares of LGP?                   15:36:29

8        A.     Do I know any other owners?         15:36:33

9        Q.     Yes.                                15:36:36

10        A.     Yes.                                15:36:37

11        Q.     Any other entities or people that   15:36:38

12   own shares of LGP.                              15:36:39

13        A.     Yes.                                15:36:41

14        Q.     Who?                                15:36:42

15        A.     Steven Emden.                       15:36:48

16        Q.     Can you spell that, please?         15:36:49

17        A.     I think it's E-m-d-e-n.             15:36:50

18        Q.     Where does Mr. Emden reside?        15:36:58

19        A.     London.  Not London, England.  I   15:37:02

20   think right outside of London.                  15:37:08

21        Q.     Who else?                           15:37:12

22        A.     Morris Bentatta.                    15:37:15

23        Q.     Can you spell that, please?         15:37:17

24        A.     B-e-n-t-a-t-t-a.                    15:37:19

25        Q.     I'm sorry, I misunderstood that.    15:37:27
```

EXH __Y__ PG __289__

190

```
 1              .         WILLIAM JAY ROSEMAN
 2    Spell the last name again.                      15:37:28
 3         A.     B-e-n-t-a-t-t-a, I think, or close  15:37:31
 4    to it.                                          15:37:34
 5         Q.     Where does Mr. Bentatta reside?     15:37:35
 6         A.     England.                            15:37:38
 7         Q.     Also in London?                     15:37:40
 8         A.     I don't know if it's London, but    15:37:42
 9    it's England.  I think it's a suburb outside of 15:37:43
10    London.                                         15:37:49
11         Q.     Who else is an owner of LGP?        15:37:50
12         A.     Henry Arnold.                       15:37:52
13         Q.     Can you spell that, please?         15:37:54
14         A.     A-r-n-o-l-d.                        15:37:55
15         Q.     Where does Mr. Arnold reside?       15:38:01
16         A.     England.                            15:38:04
17         Q.     Also in the London area?            15:38:05
18         A.     Yeah.                               15:38:06
19         Q.     Who else?                           15:38:08
20         A.     David Kean.                         15:38:13
21         Q.     Is this the same David Kean --      15:38:16
22         A.     Yes.                                15:38:18
23         Q.     -- who is an investor in Xandros?   15:38:20
24         A.     Yes.                                15:38:23
25         Q.     I don't recall if we identified     15:38:24
```

EXH __Y__ PG __290__                                      191

```
 1                    WILLIAM JAY ROSEMAN

 2   where Mr. Kean lives.  Do you know where he          15:38:24

 3   lives?                                               15:38:26

 4        A.      Long Island.                            15:38:27

 5        Q.      Who else is an owner of LGP?            15:38:35

 6        A.      Peter Norton.                           15:38:39

 7        Q.      Where does Mr. Norton reside?           15:38:43

 8        A.      New York City.                          15:38:45

 9        Q.      Anyone else?                            15:38:49

10        A.      There has got to be 50, 60 people.      15:38:55

11   You want me to go through them all as I can best     15:38:57

12   recall?                                              15:39:00

13        Q.      Yes, sir.                               15:39:01

14        A.      I'm going to have to write them         15:39:05

15   down.  I'll write them down on the back so I can     15:39:07

16   start to figure them out.                            15:39:10

17              Who did I mention so far?  I              15:39:47

18   mentioned Bentatta, Emden, Peter Norton.            15:39:49

19        Q.      You mentioned Steven Emden, Morris      15:39:57

20   Bentatta, Henry Arnold, David Kean, Peter            15:40:01

21   Norton.                                              15:40:06

22        A.      Give me a few minutes, it's easier      15:40:17

23   for me to do it this way.  Bentatta, Emden,          15:40:21

24   Norton, Arnold, Kean, Lee, Garalick.                 15:40:24

25        Q.      Can you spell Garalick, please?         15:40:36
```

EXH Y PG 291

192

```
 1                 .       WILLIAM JAY ROSEMAN

 2          A.       I'm doing it phonetically.              15:40:39

 3   G-a-r-a-l-i-c-k.                                        15:40:42

 4          Q.       And Mr. Garalick's first name?          15:40:49

 5          A.       I call him Mr. Garalick.  I don't       15:40:53

 6   know.                                                   15:40:55

 7          Q.       Where does Mr. Garalick reside?         15:40:57

 8          A.       New York.                               15:41:00

 9          Q.       New York City?                          15:41:00

10          A.       No.  In New York.  Northern New         15:41:01

11   York.                                                   15:41:06

12                   Dr. Chapman -- no, no, he didn't        15:41:29

13   invest.                                                 15:41:32

14                   Cole, C-o-l-e.                          15:41:52

15          Q.       Mr. Cole's first name?                  15:41:56

16          A.       Bob.                                    15:41:58

17          Q.       Robert Cole?                            15:42:01

18          A.       Yes.                                    15:42:02

19          Q.       Where does Mr. Cole reside?             15:42:02

20          A.       Texas.                                  15:42:04

21          Q.       Do you know what city?                  15:42:05

22          A.       No.                                     15:42:06

23                   Dr. Epstein.                            15:42:29

24          Q.       What's Dr. Epstein's first name?        15:42:30

25          A.       I don't know.                           15:42:33
```

EXH Y PG 292

193

| | | | |
|---|---|---|---|
| 1 | | WILLIAM JAY ROSEMAN | |
| 2 | Q. | Where does Dr. Epstein reside? | 15:42:33 |
| 3 | A. | Florida. | 15:42:35 |
| 4 | Q. | Do you know what city? | 15:42:36 |
| 5 | A. | No. | 15:42:36 |
| 6 | | Mr. Russo. | 15:43:12 |
| 7 | Q. | Do you know Mr. Russo's first name? | 15:43:14 |
| 8 | A. | I don't. | 15:43:16 |
| 9 | Q. | Can you spell Russo? | 15:43:16 |
| 10 | A. | R-u-s-s-o.  California. | 15:43:17 |
| 11 | Q. | Do you know what city in | 15:43:21 |
| 12 | California? | | 15:43:21 |
| 13 | A. | I think he's near Los Angeles. | 15:43:22 |
| 14 | | Mr. Golegly. | 15:44:02 |
| 15 | Q. | Can you spell that, please? | 15:44:05 |
| 16 | A. | I'll try.  It's probably | 15:44:06 |
| 17 | G-o-l-e-g-l-y. | | 15:44:20 |
| 18 | Q. | Where does Mr. Golegly reside? | 15:44:37 |
| 19 | A. | New York. | 15:44:39 |
| 20 | Q. | New York City? | 15:44:40 |
| 21 | A. | I really don't know.  I know he's | 15:44:40 |
| 22 | in New York.  He works in New York City, but I | | 15:44:42 |
| 23 | don't know where he resides. | | 15:44:49 |
| 24 | Q. | Anyone else? | 15:45:04 |
| 25 | A. | There is many more. | 15:45:05 |

EXH Y PG 293

194

| | | | |
|---|---|---|---|
| 1 | | WILLIAM JAY ROSEMAN | |
| 2 | | Thomas Langbein. | 15:45:10 |
| 3 | Q. | What's Mr. Langbein's current | 15:45:15 |
| 4 | address? | | 15:45:18 |
| 5 | A. | Hasbrouck Heights, New Jersey. | 15:45:18 |
| 6 | Q. | Can you spell that? | 15:45:23 |
| 7 | A. | Hasbrouck Heights or Langbein? | 15:45:26 |
| 8 | Q. | The Heights. | 15:45:28 |
| 9 | A. | Hasbrouck, H-a-s-b-r-o-u-c-k, | 15:45:33 |
| 10 | Heights, H-e-i-g-h-t-s. | | 15:45:35 |
| 11 | | Let me do a search of my Palm | 15:46:37 |
| 12 | Pilot.  I might have it under search for LGP | | 15:46:40 |
| 13 | shareholders. | | 15:46:43 |
| 14 | Q. | Certainly. | 15:46:44 |
| 15 | A. | Mr. Borkon, B-o-r-k-o-n, | 15:47:19 |
| 16 | Pennsylvania. | | 15:47:21 |
| 17 | Q. | Do you know Mr. Borkon's first | 15:47:25 |
| 18 | name? | | 15:47:28 |
| 19 | A. | You know, believe it or not, in my | 15:47:28 |
| 20 | Palm Pilot I have Mr. Borkon. | | 15:47:32 |
| 21 | Q. | What city in Pennsylvania? | 15:47:35 |
| 22 | A. | Balacynwyd. | 15:47:50 |
| 23 | Q. | Can you spell that, please? | 15:47:49 |
| 24 | A. | B-a-l-a-c-y-n-w-y-d. | 15:47:50 |
| 25 | Q. | Any other investors? | 15:48:03 |

EXH **Y** PG **294**

195

|    |    | WILLIAM JAY ROSEMAN |    |
|----|----|----|----|
| 1  |    |    |    |
| 2  | A. | I'm going through it. | 15:48:05 |
| 3  |    | Dr. Costanzo, C-o-s-t-a-n-z-o. | 15:48:13 |
| 4  | Q. | Where does Mr. Costanzo reside? | 15:48:24 |
| 5  | A. | Dr. Costanzo.  Manhattan. | 15:48:28 |
| 6  | Q. | Do you know Dr. Costanzo's first | 15:48:30 |
| 7  |    | name? | 15:48:33 |
| 8  | A. | I don't. | 15:48:33 |
| 9  |    | Steven Cunningham. | 15:48:36 |
| 10 | Q. | Where does Mr. Cunningham reside? | 15:48:43 |
| 11 | A. | Paris. | 15:48:45 |
| 12 | Q. | Paris, France? | 15:48:47 |
| 13 | A. | Yes. | 15:48:48 |
| 14 |    | David Dercher, D-e-r-c-h-e-r. | 15:48:56 |
| 15 | Q. | Where does Mr. Dercher reside? | 15:49:05 |
| 16 | A. | Philadelphia. | 15:49:08 |
| 17 |    | Dan Kaufmann, K-a-u-f-m-a-n-n, I'm | 15:49:28 |
| 18 |    | pretty sure he invested. | 15:49:32 |
| 19 | Q. | Where does Mr. Kaufmann reside? | 15:49:34 |
| 20 | A. | New York. | 15:49:37 |
| 21 | Q. | New York City? | 15:49:39 |
| 22 | A. | Yes. | 15:49:39 |
| 23 |    | Mr. Russo, did I say him already? | 15:50:11 |
| 24 | Q. | Yes, you did. | 15:50:13 |
| 25 |    | Do you know Mr. Russo's first name? | 15:50:15 |

EXH __Y__ PG 295

196

| | | | |
|---|---|---|---|
| 1 | | WILLIAM JAY ROSEMAN | |
| 2 | A. | Paul. | 15:50:17 |
| 3 | | That's all I have in my Palm Pilot. | 15:50:36 |
| 4 | Q. | The cap sheet that you referred to | 15:50:39 |
| 5 | earlier, is that kept and maintained as -- | | 15:50:40 |
| 6 | A. | New York. | 15:50:44 |
| 7 | Q. | Is it kept and maintained as | 15:50:45 |
| 8 | investors buy and sell shares? | | 15:50:47 |
| 9 | A. | Yes, it is. | 15:50:52 |
| 10 | Q. | And was that in existence after | 15:50:52 |
| 11 | August 29 of 2001? | | 15:50:57 |
| 12 | A. | Well, you are asking me the LGP | 15:51:03 |
| 13 | shareholders? | | 15:51:05 |
| 14 | Q. | Yes, sir. | 15:51:07 |
| 15 | A. | Yes. | 15:51:07 |
| 16 | Q. | Now, my next question, and this is | 15:51:12 |
| 17 | my last question, is what companies does LGP | | 15:51:14 |
| 18 | currently own? | | 15:51:19 |
| 19 | A. | Or have investments in? | 15:51:21 |
| 20 | Q. | Or have investments in, yes. | 15:51:23 |
| 21 | A. | Gobe, G-o-b-e. | 15:51:26 |
| 22 | Q. | What percentage of ownership does | 15:51:32 |
| 23 | Xandros own -- I'm sorry, does LGP own in Gobe? | | 15:51:36 |
| 24 | A. | I don't know, 5, 10 -- | 15:51:43 |
| 25 | approximately 5 to 7-1/2 percent. | | 15:51:45 |

EXH __Y__ PG _296_

197

| | | | |
|---|---|---|---|
| 1 | | WILLIAM JAY ROSEMAN | |
| 2 | Q. | Others? | 15:51:49 |
| 3 | A. | Metrolink.  Approximately 5 to 10 | 15:51:51 |
| 4 | percent. | | 15:51:58 |
| 5 | Q. | Any others? | 15:52:00 |
| 6 | A. | Obviously Xandros.  Ximian which we | 15:52:02 |
| 7 | just sold to Novell.  That was approximately 16, | | 15:52:07 |
| 8 | 17 percent. | | 15:52:15 |
| 9 | Q. | Any others? | 15:52:20 |
| 10 | A. | No, that's it. | 15:52:25 |
| 11 | | Other companies that we owned we | 15:52:31 |
| 12 | folded into Xandros, of course. | | 15:52:33 |
| 13 | Q. | And what were those companies?  You | 15:52:35 |
| 14 | folded these companies into Xandros prior to | | 15:52:40 |
| 15 | December of 2002; correct? | | 15:52:44 |
| 16 | A. | No, not necessarily, no. | 15:52:52 |
| 17 | Q. | After December of 2002, what | 15:52:52 |
| 18 | companies that LGP owned were folded into | | 15:52:54 |
| 19 | Xandros? | | 15:52:58 |
| 20 | A. | After 2002 what companies did LGP | 15:53:00 |
| 21 | own that were folded into Xandros?  Ask Rick the | | 15:53:03 |
| 22 | dates, I don't know the dates. | | 15:53:08 |
| 23 | Q. | Why don't you give me a list of all | 15:53:10 |
| 24 | the companies that LGP had owned that were | | 15:53:11 |
| 25 | folded into Xandros? | | 15:53:13 |

EXH Y PG 297

198

| | | | |
|---|---|---|---|
| 1 | | WILLIAM JAY ROSEMAN | |
| 2 | A. | Gnumatic. | 15:53:15 |
| 3 | Q. | Can you spell that, please? | 15:53:16 |
| 4 | A. | G-n-u-m-a-t-i-c. | 15:53:17 |
| 5 | Q. | And the approximate date that | 15:53:24 |
| 6 | Gnumatic was folded into Xandros? | | 15:53:26 |
| 7 | A. | I don't know, over a year ago.  Or | 15:53:30 |
| 8 | approximately a year ago. | | 15:53:37 |
| 9 | Q. | Anyone else? | 15:53:39 |
| 10 | A. | Haimdal, H-a-i-m-d-a-l. | 15:53:40 |
| 11 | Q. | And again, the approximate date? | 15:53:46 |
| 12 | A. | I guess approximate -- about the | 15:53:47 |
| 13 | same time. | | 15:53:49 |
| 14 | Q. | Others? | 15:53:55 |
| 15 | A. | That's about it. | 15:54:01 |
| 16 | | MR. STUART:  I have nothing | 15:54:08 |
| 17 | further. | | 15:54:08 |
| 18 | | THE WITNESS:  Thank you. | 15:54:10 |
| 19 | | MR. STUART:  Andy, would you like | 15:54:12 |
| 20 | to enter a stipulation? | | 15:54:13 |
| 21 | | MR. ROBERTSON:  Okay. | 15:54:16 |
| 22 | | MR. STUART:  Do you have a | 15:54:17 |
| 23 | proposal? | | 15:54:18 |
| 24 | | MR. ROBERTSON:  No. | 15:54:19 |
| 25 | | MR. STUART:  Then shall we | 15:54:20 |

EXH Y PG 298

199

| | | |
|---|---|---|
| 1 | WILLIAM JAY ROSEMAN | |
| 2 | stipulate that the witness shall be given 20 | 15:54:20 |
| 3 | days to review the transcript of his deposition, | 15:54:24 |
| 4 | and shall sign under penalty of perjury.  If he | 15:54:28 |
| 5 | does not sign under penalty of perjury within | 15:54:32 |
| 6 | that period of time, then the transcript shall | 15:54:35 |
| 7 | be deemed signed.  That Mr. -- otherwise I think | 15:54:39 |
| 8 | we can follow the federal rules with regard to | 15:54:45 |
| 9 | changes and maintenance of the transcript. | 15:54:48 |
| 10 | Is that acceptable to you, | 15:54:52 |
| 11 | Mr. Robertson? | 15:54:52 |
| 12 | MR. ROBERTSON:  I assume you are | 15:54:54 |
| 13 | saying 20 days after he receives it? | 15:54:55 |
| 14 | MR. STUART:  Yes, 20 days after he | 15:54:58 |
| 15 | receives it. | 15:54:59 |
| 16 | MR. ROBERTSON:  Yes, okay. | 15:55:00 |
| 17 | MR. STUART:  Would you like that | 15:55:01 |
| 18 | delivered to you? | 15:55:01 |
| 19 | MR. ROBERTSON:  Yes. | 15:55:02 |
| 20 | REQ              MR. STUART:  We also, | 15:55:05 |
| 21 | Mr. Robertson, I would ask that you produce the | 15:55:07 |
| 22 | cap sheets that were identified by Mr. Roseman | 15:55:09 |
| 23 | on behalf -- for both LGP, as well as for | 15:55:12 |
| 24 | Xandros, as those documents were in existence | 15:55:16 |
| 25 | during the relative time period.  Would you | 15:55:20 |

EXH _Y_ PG _299_

200

```
 1                   WILLIAM JAY ROSEMAN

 2   agree to produce those?                          15:55:29

 3              MR. ROBERTSON:  I will review it       15:55:29

 4   and we'll respond tomorrow.                       15:55:29

 5              MR. STUART:  Very well, thank you.     15:55:29

 6              Thank you, Mr. Roseman.                15:55:32

 7              THE WITNESS:  Thank you very much.     15:55:34

 8              THE VIDEO OPERATOR:  Here marks the    15:55:40

 9   end of videotape No. 4 in the deposition of       15:55:41

10   William J. Roseman.  The original videotapes      15:55:44

11   will be retained by LegaLink San Diego at 550     15:55:48

12   West C street, San Diego, California.             15:55:51

13              Going off the record, the time is      15:55:56

14   3:56.                                             15:55:57

15              (Time noted:  4:00 p.m.)               15:56:00

16              _____

17                   WILLIAM J. ROSEMAN

18

19   Subscribed and sworn to before me

20   this _____ day of _____, 2003.

21

22   _____

23

24

25
```

EXH **Y** PG <u>300</u>

```
 1
      STATE OF NEW YORK      )
 2                           ss:
      COUNTY OF NEW YORK     )
 3
         I wish to make the following changes, for the
 4    following reasons:
 5    PAGE LINE
      ____ ____    CHANGE _____
 6                 REASON:_____
 7    ____ ____    CHANGE _____
                   REASON:_____
 8
                   CHANGE _____
 9                 REASON:_____
10    ____ ____    CHANGE _____
                   REASON:_____
11
      ____ ____    CHANGE _____
12                 REASON:_____
13    ____ ____    CHANGE _____
                   REASON:_____
14
                   CHANGE _____
15                 REASON:_____
16    ____ ____    CHANGE _____
                   REASON:_____
17
      ____ ____    CHANGE _____
18                 REASON:_____
19
20                        _____
21                        WILLIAM J. ROSEMAN
22    Subscribed and sworn to before me
23    this _____ day of _____, 2003.
24
25    _____
```

EXH **Y** PG _301_

OCT-21-2002  10:25AM   FROM-LINDOWS                    +1953          T-639  P.002  F-497

THE SECURITIES REPRESENTED HEREBY HAVE BEEN ACQUIRED BY THE HOLDER
HEREOF FOR ITS OWN ACCOUNT FOR INVESTMENT WITH NO INTENTION OF
MAKING OR CAUSING TO BE MADE A PUBLIC DISTRIBUTION OF ALL OR ANY
PORTION THEREOF.  SUCH SECURITIES HAVE NOT BEEN REGISTERED UNDER THE
SECURITIES ACT OF 1933 OR ANY STATE SECURITIES LAWS AND MAY NOT BE
SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED.

$250,000.00

San Diego, California
November 29 2001

## XANDROS, INC.

## CONVERTIBLE PROMISSORY NOTE

Xandros, Inc., a Delaware corporation (the "Maker"), for value received, hereby promises
to pay to Lindows.com, Inc., a Delaware corporation (the "Holder"), the principal amount of
Two Hundred Fifty Thousand Dollars ($250,000) (the "Issue Price"), together with interest on
the unpaid amounts thereof in accordance with the terms hereof, from the date hereof until paid or
converted in accordance with the terms hereof.

I.    Convertible Promissory Note ("Note").

1.1    Interest Rate.  The rate of interest hereunder ("Interest Rate") shall equal
eight percent (8.0%) per annum. and shall be computed on the basis of a 365 day year for the
actual number of days elapsed; provided that in no event shall the interest rate be less than the
minimum rate of interest required in order to avoid the imputation of interest for federal income
tax purposes.

1.2    Payment.  Subject to the provisions of Section 2 regarding an Acquisition
and Section 3 regarding conversion of this Note, the Issue Price plus all accrued but previously
unpaid interest thereon shall become due and payable in one lump sum on the earlier of (a) five
(5) days notice of demand after November 20, 2002 (the "Due Date") or (b) immediately upon
the closing of an Acquisition (as defined below).  The Maker may at any time prepay in whole or
in part the principal and interest accrued under this Note.  Any payment will be applied first to
the payment of any and all accrued and unpaid interest through the payment date and second to
the payment of principal remaining due hereunder.  Payment shall be made at the offices or
residence of the Holder, or at such other place as the Holder shall have designated to the Maker
in writing, in lawful money of the United States of America.

1.3    Letter Agreement.  Of even date herewith, the Holder and Xandros
Corporation, a wholly owned subsidiary of the Maker, are entering into a side letter agreement
regarding this Note and future investments in the Maker by the Holder.

2.    Acquisition.  In the event the Maker is to be acquired, whether by means of a
merger, sale of all or substantially all of the assets of the Maker, sale of more than fifty percent
(50%) of the Maker's outstanding securities or otherwise, prior to the Due Date, the date of any
Equity Financing and the Optional Conversion Date (an "Acquisition"), then the Issue Price plus

all accrued but previously unpaid interest thereon shall become due and payable in one lump sum immediately upon the closing of such Acquisition.

3.   Conversion.

3.1   *Automatic Conversion.*  Upon the closing of a bona fide equity financing (an "Equity Financing") of the Maker of at least Two Hundred Fifty Thousand Dollars ($250,000), excluding conversion of this Note, in which shares of a series of the Maker's Preferred Stock are issued, the sum of the Issue Price of this Note plus all accrued but unpaid interest thereon (the "Conversion Amount") shall be converted into that number of fully paid and nonassessable shares of the equity security of the Maker sold in the Equity Financing (the "New Equity Shares") as is equal to the Conversion Amount divided by the lesser of the following (the "Automatic Conversion Price"):

(a)   If the Equity Financing is at a pre-money enterprise valuation of the Maker of no greater than Fifteen Million Dollars ($15,000,000), the per share purchase price of the New Equity Shares in the Equity Financing.

(b)   If the Equity Financing is at a pre-money enterprise valuation of the Maker of greater than Fifteen Million Dollars ($15,000,000), the per share price determined by assuming the Equity Financing was at a pre-money enterprise valuation of the Maker equal to Fifteen Million Dollars ($15,000,000).

3.2   *Optional Conversion.*  In the event that the Maker does not consummate an Equity Financing prior to May 20, 2002 (the "Optional Conversion Date"), the Holder shall have the right to convert the Conversion Amount into shares of Series A Preferred Stock (the "Optional Conversion Shares") of the Maker, the rights, preferences and privileges of which shall be negotiated in good faith by the Maker and the Holder, at the Optional Conversion Date (an "Optional Conversion"), at a per share price (the "Optional Conversion Price") determined by assuming an enterprise valuation of the Maker equal to Fifteen Million Dollars ($15,000,000). On the Optional Conversion Date, the number of shares of Series A Preferred Stock into which this Note may be converted is determined by dividing the Conversion Amount by the by the Optional Conversion Price.  Prior to the Optional Conversion Date the Maker shall take all necessary steps to validly authorize the shares of Series A Preferred Stock to be issued upon the Optional Conversion Date.

3.3   *Conversion Procedure.*

(a)   The Maker shall provide the Holder written notice at least fifteen (15) days prior to the expected closing of an Equity Financing.

(b)   In the event of an Equity Financing, the Note shall convert automatically on the closing of the Equity Financing (the "Automatic Conversion Date") without any further action by the Holder hereof.

(c)   In order to exercise the Optional Conversion privilege under Paragraph 3.2, the Holder shall provide the Maker at least five (5) days prior to the Optional Conversion Date written notice in form reasonably satisfactory to the Maker that the Holder elects to convert

2       EXH **2** PG 303

the Note on the Optional Conversion Date. The Holder shall surrender the original Note for conversion on the Optional Conversion Date.

       3.4    Termination of Rights Upon Conversion. Any conversion of this Note shall be deemed effective on the Automatic Conversion Date or Optional Conversion Date, as applicable, and, upon conversion of this Note, the Holder of this Note shall have no further rights under this Note, whether or not this Note is surrendered.

       3.5    Fractional Shares. No fractional shares of any equity securities of the Maker will be issued in connection with any conversion hereunder but rather any such fractional shares shall be rounded up to the nearest whole share.

       3.6    Delivery of Stock Certificates. As promptly as practicable after any conversion of this Note, the Maker, at its expense, shall issue and deliver to the Holder of this Note a certificate or certificates evidencing the number of full New Equity Shares or Optional Conversion Shares, as applicable, issuable to the Holder upon such conversion.

    4.    Miscellaneous.

       4.1    Transfer of Note. This Note shall not be transferable or assignable in any manner and no interest shall be pledged or otherwise encumbered by the Holder without the consent of the Maker, which consent shall not be unreasonably withheld.

       4.2    Titles and Subtitles. The titles and subtitles used in this Note are for convenience only and are not to be considered in construing or interpreting this Note.

       4.3    Notices. All notices and other communications provided for hereunder shall be in writing and shall be delivered personally, by overnight delivery service or by facsimile, with confirmation of receipt, addressed as set forth on the signature page hereto. Either party hereto may by like notice specify or change an address to which notices and communications shall thereafter be sent. Notices sent by facsimile shall be effective upon confirmation of receipt, notices sent by overnight delivery service shall be effective upon receipt, and notices given personally shall be effective when delivered.

       4.4    Attorneys' Fees. If any action at law or in equity is necessary to enforce or interpret the terms of this Note, the prevailing party shall be entitled to reasonable attorneys' fees, costs and disbursements in addition to any other relief to which such party may be entitled.

       4.5    Amendments and Waivers. This Note may be amended and the observance of any other term of this Note may be waived (either generally or in a particular instance and either retroactively or prospectively), with the written consent of the Maker and the Holder. The Maker waives presentment, demand for performance, notice of nonperformance, protest, notice of protest, and notice of dishonor. No delay on the part of the Holder in exercising any right hereunder shall operate as a waiver of such right under this Note.

       4.6    Severability. If one or more provisions of this Note are held to be unenforceable under applicable law, such provision shall be excluded from this Note and the

OCT-21-2003  10:25AM   FROM-LINDOWS                    +155555           T-539  P.005/013  F-497

balance of the Note shall be interpreted as if such provision were so excluded and shall be
enforceable in accordance with its terms.

    4.7   <u>Governing Law</u>.  This Note shall be governed by and construed and
enforced in accordance with the laws of the State of California, without giving effect to its
conflicts of laws principles.

    4.8   <u>Counterparts</u>.  This Note may be executed in one or more counterparts,
each of which shall be deemed an original, but all of which together shall constitute one and the
same instrument.

    Executed as of the date first written above.

MAKER:
XANDROS, INC.,
a Delaware corporation

By: _____
Title:  _PRESIDENT_
Name:  _MICHAEL A. BEGO_
Address:    1410 Blair Place, Suite 600
          Ottawa, Ontario K1J 9B9, Canada


ACKNOWLEDGED AND AGREED:

HOLDER:
LINDOWS.COM, INC.,
a Delaware corporation

By: _____
Title:  _PRESIDENT_
Name:  _KEVIN CARMONY_
Address:    4350 La Jolla Village Dr., Suite 450
          San Diego, CA 92122

THE SECURITIES REPRESENTED HEREBY HAVE BEEN ACQUIRED BY THE HOLDER HEREOF FOR ITS OWN ACCOUNT FOR INVESTMENT WITH NO INTENTION OF MAKING OR CAUSING TO BE MADE A PUBLIC DISTRIBUTION OF ALL OR ANY PORTION THEREOF. SUCH SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR ANY STATE SECURITIES LAWS AND MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED.

$250,000.00

San Diego, California
December 6, 2001

## XANDROS, INC.

## CONVERTIBLE PROMISSORY NOTE

Xandros, Inc., a Delaware corporation (the "Maker"), for value received, hereby promises to pay to Lindows.com, Inc., a Delaware corporation (the "Holder"), the principal amount of Two Hundred Fifty Thousand Dollars ($250,000) (the "Issue Price"), together with interest on the unpaid amount thereof in accordance with the terms hereof, from the date hereof until paid or converted in accordance with the terms hereof.

1.     Convertible Promissory Note ("Note").

1.1     Interest Rate. The rate of interest hereunder ("Interest Rate") shall equal eight percent (8.0%) per annum and shall be computed on the basis of a 365 day year for the actual number of days elapsed; provided that in no event shall the interest rate be less than the minimum rate of interest required in order to avoid the imputation of interest for federal income tax purposes.

1.2     Payment. Subject to the provisions of Section 2 regarding an Acquisition and Section 3 regarding conversion of this Note, the Issue Price plus all accrued but previously unpaid interest thereon shall become due and payable in one lump sum on the earlier of (a) five (5) days notice of demand (the "Due Date") after December 5, 2002 or (b) immediately upon the closing of an Acquisition (as defined below). The Maker may not at any time prepay in whole or in part the principal and interest accrued under this Note without the prior written consent of the Holder. Any payment will be applied first to the payment of any and all accrued and unpaid interest through the payment date and second to the payment of principal remaining due hereunder. Payment shall be made at the offices or residence of the Holder, or at such other place as the Holder shall have designated to the Maker in writing, in lawful money of the United States of America.

1.3     Amendment of Letter Agreement. Of even date herewith, the Holder and the Maker are amending that certain letter agreement dated November ___, 2001, by and among the Holder, the Maker and Xandros Corporation, a wholly owned subsidiary of the Maker.

2.     Acquisition. In the event the Maker is to be acquired, whether by means of a merger, sale of all or substantially all of the assets of the Maker, sale of more than fifty percent (50%) of the Maker's outstanding securities or otherwise, prior to the Due Date, the date of any

Equity Financing and the Optional Conversion Date (an "Acquisition"), then the Issue Price plus all accrued but previously unpaid interest thereon shall become due and payable in one lump sum immediately upon the closing of such Acquisition.

3.    Conversion.

3.1    Automatic Conversion.  Upon the closing of a bona fide equity financing (an "Equity Financing") of the Maker of at least Two Hundred Fifty Thousand Dollars ($250,000), excluding conversion of this Note, in which shares of a series of the Maker's Preferred Stock are issued, the sum of the Issue Price of this Note plus all accrued but unpaid interest thereon (the "Conversion Amount") shall be converted into that number of fully paid and nonassessable shares of the equity security of the Maker sold in the Equity Financing (the "New Equity Shares") as is equal to the Conversion Amount divided by the lesser of the following (the "Automatic Conversion Price"):

(a)    If the Equity Financing is at a pre-money enterprise valuation of the Maker of no greater than Fifteen Million Dollars ($15,000,000), the per share purchase price of the New Equity Shares in the Equity Financing.

(b)    If the Equity Financing is at a pre-money enterprise valuation of the Maker of greater than Fifteen Million Dollars ($15,000,000), the per share price determined by assuming the Equity Financing was at a pre-money enterprise valuation of the Maker equal to Fifteen Million Dollars ($15,000,000).

3.2    Optional Conversion.  In the event that the Maker does not consummate an Equity Financing prior to May __, 2002 (the "Optional Conversion Date"), the Holder shall have the right to convert the Conversion Amount into shares of Series A Preferred Stock (the "Optional Conversion Shares") of the Maker, the rights, preferences and privileges of which shall be negotiated in good faith by the Maker and the Holder, at the Optional Conversion Date (an "Optional Conversion"), at a per share price (the "Optional Conversion Price") determined by assuming an enterprise valuation of the Maker equal to Fifteen Million Dollars ($15,000,000). On the Optional Conversion Date, the number of shares of Series A Preferred Stock into which this Note may be converted is determined by dividing the Conversion Amount by the by the Optional Conversion Price.  Prior to the Optional Conversion Date the Maker shall take all necessary steps to validly authorize the shares of Series A Preferred Stock to be issued upon the Optional Conversion Date.

3.3    Conversion Procedure.

(a)    The Maker shall provide the Holder written notice at least fifteen (15) days prior to the expected closing of an Equity Financing.

(b)    In the event of an Equity Financing, the Note shall convert automatically on the closing of the Equity Financing (the "Automatic Conversion Date") without any further action by the Holder hereof.

(c)    In order to exercise the Optional Conversion privilege under Paragraph 3.2, the Holder shall provide the Maker at least five (5) days prior to the Optional Conversion

OCT-21-2002  10:26AM   FROM-LINGON                              +13                    T-639  P.008/013  F-497

Date written notice in form reasonably satisfactory to the Maker that the Holder elects to convert the Note on the Optional Conversion Date. The Holder shall surrender the original Note for conversion on the Optional Conversion Date.

3.4     Termination of Rights Upon Conversion. Any conversion of this Note shall be deemed effective on the Automatic Conversion Date or Optional Conversion Date, as applicable, and, upon conversion of this Note, the Holder of this Note shall have no further rights under this Note, whether or not this Note is surrendered.

3.5     Fractional Shares. No fractional shares of any equity securities of the Maker will be issued in connection with any conversion hereunder but rather any such fractional shares shall be rounded up to the nearest whole share.

3.6     Delivery of Stock Certificates. As promptly as practicable after any conversion of this Note, the Maker, at its expense, shall issue and deliver to the Holder of this Note a certificate or certificates evidencing the number of full New Equity Shares or Optional Conversion Shares, as applicable, issuable to the Holder upon such conversion.

4.      Miscellaneous.

4.1     Transfer of Note. This Note shall not be transferable or assignable in any manner and no interest shall be pledged or otherwise encumbered by the Holder without the consent of the Maker, which consent shall not be unreasonably withheld.

4.2     Titles and Subtitles. The titles and subtitles used in this Note are for convenience only and are not to be considered in construing or interpreting this Note.

4.3     Notices. All notices and other communications provided for hereunder shall be in writing and shall be delivered personally, by overnight delivery service or by facsimile, with confirmation of receipt, addressed as set forth on the signature page hereto. Either party hereto may by like notice specify or change an address to which notices and communications shall thereafter be sent. Notices sent by facsimile shall be effective upon confirmation of receipt, notices sent by overnight delivery service shall be effective upon receipt, and notices given personally shall be effective when delivered.

4.4     Attorneys' Fees. If any action at law or in equity is necessary to enforce or interpret the terms of this Note, the prevailing party shall be entitled to reasonable attorneys' fees, costs and disbursements in addition to any other relief to which such party may be entitled.

4.5     Amendments and Waivers. This Note may be amended and the observance of any other term of this Note may be waived (either generally or in a particular instance and either retroactively or prospectively), with the written consent of the Maker and the Holder. The Maker waives presentment, demand for performance, notice of nonperformance, protest, notice of protest, and notice of dishonor. No delay on the part of the Holder in exercising any right hereunder shall operate as a waiver of such right under this Note.

4.6     Severability. If one or more provisions of this Note are held to be unenforceable under applicable law, such provision shall be excluded from this Note and the


EXH  A  PG 308

OCT-21-2003  10:25AM   FROM-LINDOW                    +1 85          T-639  P.009/013  F-497

balance of the Note shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

4.7    Governing Law. This Note shall be governed by and construed and enforced in accordance with the laws of the State of California, without giving effect to its conflicts of laws principles.

4.8    Counterparts. This Note may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Executed as of the date first written above.

MAKER:
XANDROS, INC.,
a Delaware corporation

By: _____
Title:   President
Name:   Michael A. Bego
Address:    1410 Blair Place, Suite 600
            Ottawa, Ontario K1J 9B9, Canada


ACKNOWLEDGED AND AGREED:

HOLDER:
LINDOWS.COM, INC.,
a Delaware corporation

By: _____
Title:   Pres
Name:   Kevin Carmony
Address:    4350 La Jolla Village Dr., Suite 450
            San Diego, CA 92122

THE SECURITIES REPRESENTED HEREBY HAVE BEEN ACQUIRED BY THE HOLDER
HEREOF FOR ITS OWN ACCOUNT FOR INVESTMENT WITH NO INTENTION OF
MAKING OR CAUSING TO BE MADE A PUBLIC DISTRIBUTION OF ALL OR ANY
PORTION THEREOF.  SUCH SECURITIES HAVE NOT BEEN REGISTERED UNDER
THE SECURITIES ACT OF 1933 OR ANY STATE SECURITIES LAWS AND MAY NOT
BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED.

$250,000.00
San Diego, California

December 21, 2001

## XANDROS, INC.

## CONVERTIBLE PROMISSORY NOTE

Xandros, Inc., a Delaware corporation (the "Maker"), for value received, hereby
promises to pay to Lindows.com, Inc., a Delaware corporation (the "Holder"), the
principal amount of Two Hundred Fifty Thousand Dollars ($250,000) (the "Issue Price"),
together with interest on the unpaid amount thereof in accordance with the terms hereof,
from the date hereof until paid or converted in accordance with the terms hereof.

1.      Convertible Promissory Note ("Note").

        1.1     Interest Rate. The rate of interest hereunder ("Interest Rate") shall
equal eight percent (8.0%) per annum and shall be computed on the basis of a 365 day
year for the actual number of days elapsed; provided that in no event shall the interest rate
be less than the minimum rate of interest required in order to avoid the imputation of
interest for federal income tax purposes.

        1.2     Payment. Subject to the provisions of Section 2 regarding an
Acquisition and Section 3 regarding conversion of this Note, the Issue Price plus all
accrued but previously unpaid interest thereon shall become due and payable in one lump
sum on the earlier of (a) five (5) days notice of demand (the "Due Date") after December
21, 2002 or (b) immediately upon the closing of an Acquisition (as defined below).  The
Maker may not at any time prepay in whole or in part the principal and interest accrued
under this Note without the prior written consent of the Holder.  Any payment will be
applied first to the payment of any and all accrued and unpaid interest through the
payment date and second to the payment of principal remaining due hereunder.  Payment
shall be made at the offices or residence of the Holder, or at such other place as the
Holder shall have designated to the Maker in writing, in lawful money of the United States
of America.

        2.      Acquisition. In the event the Maker is to be acquired, whether by means of
a merger, sale of all or substantially all of the assets of the Maker, sale of more than fifty
percent (50%) of the Maker's outstanding securities or otherwise, prior to the Due Date,
the date of any Equity Financing and the Optional Conversion Date (an "Acquisition"),
then the Issue Price plus all accrued but previously unpaid interest thereon shall become
due and payable in one lump sum immediately upon the closing of such Acquisition.

EXH **BB** PG 310

3.     Conversion.

    3.1     Automatic Conversion.  Upon the closing of a bona fide equity financing (an "Equity Financing") of the Maker of at least Two Hundred Fifty Thousand Dollars ($250,000), excluding conversion of this Note, in which shares of a series of the Maker's Preferred Stock are issued, the sum of the Issue Price of this Note plus all accrued but unpaid interest thereon (the "Conversion Amount") shall be converted into that number of fully paid and nonassessable shares of the equity security of the Maker sold in the Equity Financing (the "New Equity Shares") as is equal to the Conversion Amount divided by the lesser of the following (the "Automatic Conversion Price"):

    (a)     If the Equity Financing is at a pre-money enterprise valuation of the Maker of no greater than Fifteen Million Dollars ($15,000,000), the per share purchase price of the New Equity Shares in the Equity Financing.

    (b)     If the Equity Financing is at a pre-money enterprise valuation of the Maker of greater than Fifteen Million Dollars ($15,000,000), the per share price determined by assuming the Equity Financing was at a pre-money enterprise valuation of the Maker equal to Fifteen Million Dollars ($15,000,000).

    3.2     Optional Conversion.  In the event that the Maker does not consummate an Equity Financing prior to May 31, 2002 (the "Optional Conversion Date"), the Holder shall have the right to convert the Conversion Amount into shares of Series A Preferred Stock (the "Optional Conversion Shares") of the Maker, the rights, preferences and privileges of which shall be negotiated in good faith by the Maker and the Holder, at the Optional Conversion Date (an "Optional Conversion"), at a per share price (the "Optional Conversion Price") determined by assuming an enterprise valuation of the Maker equal to Fifteen Million Dollars ($15,000,000).  On the Optional Conversion Date, the number of shares of Series A Preferred Stock into which this Note may be converted is determined by dividing the Conversion Amount by the by the Optional Conversion Price.  Prior to the Optional Conversion Date the Maker shall take all necessary steps to validly authorize the shares of Series A Preferred Stock to be issued upon the Optional Conversion Date.

    3.3     Conversion Procedure.

    (a)     The Maker shall provide the Holder written notice at least fifteen (15) days prior to the expected closing of an Equity Financing.

    (b)     In the event of an Equity Financing, the Note shall convert automatically on the closing of the Equity Financing (the "Automatic Conversion Date") without any further action by the Holder hereof.

    (c)     In order to exercise the Optional Conversion privilege under Paragraph 3.2, the Holder shall provide the Maker at least five (5) days prior to the Optional Conversion Date written notice in form reasonably satisfactory to the Maker that the Holder elects to convert the Note on the Optional Conversion Date.  The

EXH __BB__ PG _31_



Holder shall surrender the original Note for conversion on the Optional Conversion Date.

3.4     Termination of Rights Upon Conversion.  Any conversion of this Note shall be deemed effective on the Automatic Conversion Date or Optional Conversion Date, as applicable, and, upon conversion of this Note, the Holder of this Note shall have no further rights under this Note, whether or not this Note is surrendered.

3.5     Fractional Shares.  No fractional shares of any equity securities of the Maker will be issued in connection with any conversion hereunder but rather any such fractional shares shall be rounded up to the nearest whole share.

3.6     Delivery of Stock Certificates.  As promptly as practicable after any conversion of this Note, the Maker, at its expense, shall issue and deliver to the Holder of this Note a certificate or certificates evidencing the number of full New Equity Shares or Optional Conversion Shares, as applicable, issuable to the Holder upon such conversion.

4.     Miscellaneous.

4.1     Transfer of Note.  This Note shall not be transferable or assignable in any manner and no interest shall be pledged or otherwise encumbered by the Holder without the consent of the Maker, which consent shall not be unreasonably withheld.

4.2     Titles and Subtitles.  The titles and subtitles used in this Note are for convenience only and are not to be considered in construing or interpreting this Note.

4.3     Notices.  All notices and other communications provided for hereunder shall be in writing and shall be delivered personally, by overnight delivery service or by facsimile, with confirmation of receipt, addressed as set forth on the signature page hereto.  Either party hereto may by like notice specify or change an address to which notices and communications shall thereafter be sent.  Notices sent by facsimile shall be effective upon confirmation of receipt, notices sent by overnight delivery service shall be effective upon receipt, and notices given personally shall be effective when delivered.

4.4     Attorneys' Fees.  If any action at law or in equity is necessary to enforce or interpret the terms of this Note, the prevailing party shall be entitled to reasonable attorneys' fees, costs and disbursements in addition to any other relief to which such party may be entitled.

4.5     Amendments and Waivers.  This Note may be amended and the observance of any other term of this Note may be waived (either generally or in a particular instance and either retroactively or prospectively), with the written consent of the Maker and the Holder.  The Maker waives presentment, demand for performance, notice of nonperformance, protest, notice of protest, and notice of dishonor.  No delay on the part of the Holder in exercising any right hereunder shall operate as a waiver of such right under this Note.

4.6     Severability. If one or more provisions of this Note are held to be unenforceable under applicable law, such provision shall be excluded from this Note and the balance of the Note shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

4.7     Governing Law. This Note shall be governed by and construed and enforced in accordance with the laws of the State of California, without giving effect to its conflicts of laws principles.

4.8     Counterparts. This Note may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Executed as of the date first written above.

MAKER:
XANDROS, INC.,
a Delaware corporation

By: _____

Title: _PRESIDENT_
Name: _MICHAEL  A.  BEGG_
Address:     1410 Blair Place, Suite 600
             Ottawa, Ontario K1J 9B9, Canada


ACKNOWLEDGED AND AGREED:

HOLDER:
LINDOWS.COM, INC.,
a Delaware corporation


By: _____
Title: _____
Name: _____
Address:     4350 La Jolla Village Dr., Suite 450
             San Diego, CA 92122

EXH **B** PG 313