USDC SCAN INDEX SHEET

















RYC    3/23/04    11:38

3:02-CV-02460   LINDOWS.COM INC V. XANDROS INC

*72*

*DECL.*

1   COLBERN C. STUART, III (SBN 177897)
    JAMES P. CONLEY (SBN 216639)
2   PAUL, HASTINGS, JANOFSKY & WALKER LLP
    3579 Valley Centre Drive
3   San Diego, CA 92130
    Telephone: (858) 720-2500
4   Facsimile:  (858) 720-2555 **NUNC PRO TUNC**

**FILED**

**MAR 2 2 2004**

5   Attorneys for Plaintiff
    LINDOWS.COM, INC.    MAR 2 2 2004

6

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

7

**ORIGINAL**

8             UNITED STATES DISTRICT COURT

9          SOUTHERN DISTRICT OF CALIFORNIA

10   LINDOWS.COM, INC., a Delaware      CASE NO. 02 CV 2460 JAH (RBB)
    corporation,
11

             **DECLARATION OF COLBERN C.**
12             Plaintiff,     **STUART IN SUPPORT OF PLAINTIFF**
                      **LINDOWS.COM, INC.'S**
       vs.            **SUPPLEMENTAL OPPOSITION TO**
13                    **DEFENDANTS' MOTION TO COMPEL**
    XANDROS, INC., a Delaware     **ARBITRATION AND DISMISS OR STAY**
14   corporation; LINUX GLOBAL     **ACTION;**
    PARTNERS, INC., a Delaware
15   corporation; MICHAEL BEGO, an
    individual; WILLIAM JAY ROSEMAN,    Hearing Date:   April 9, 2004
16   an individual,            Time:         10:30 a.m.
                        Judge:        Hon. John A. Houston
17             Defendants.      Courtroom:    11, Second Floor

18                       **ORAL ARGUMENT REQUESTED**

19

20   I, Colbern C. Stuart, declare and state as follows:

21   1.   I am an attorney licensed to practice in the State of California and before the United

22   States District Court for the Southern District of California. I am the attorney of record for

23   LINDOWS.COM, INC., plaintiff in this action, and an with the the law firm of Paul, Hastings,

24   Janofsky & Walker LLP of San Diego California. I have primary responsibility in my office

25   for the handling and supervision of this matter. I have personal knowledge of all facts

26   contained herein and, if called to testify, could and would competently testify thereto.

27

28

SAN/85463.1                   -1-

2.    Attached hereto as Exhibit "A" is a true and correct copy of the Delaware Secretary of State 2001 Annual Franchise Tax Report for Xandros, Inc.

3.    Attached hereto as Exhibit "B" is a true and correct copy of the Delaware Secretary of State 2002 Annual Franchise Tax Report for Xandros, Inc.

4.    Attached hereto as Exhibit "C" is a true and correct copy of the deposition transcript from the deposition of Mr. Bego on February 19, 2004.

5.    Attached hereto as Exhibit "D" is a true and correct copy of Plaintiff Lindows.com, Inc.'s Re-Notice of 30(b)(6) Deposition Defendant Xandros, Inc.

6.    Attached hereto as Exhibit "E" is a true and correct copy of Plaintiff Lindows.com, Inc.'s Re-Notice of 30(b)(6) Deposition Defendant Linux Global Partners, Inc.

7.    Attached hereto as Exhibit "F" is a true and correct copy of the letter dated March 5, 2004 from Andrew Robertson to myself in which p. 2 states " We can confirm again that the Company has located no Minutes responsive to Plaintiff's document request.

8.    Attached hereto as Exhibit "G" is a true and correct copy of the letter dated July 25, 2003 regarding Defendant Xandros, Inc.'s discovery responses.

9.    Attached hereto as Exhibit "H" is a true and correct copy of the letter dated August 19, 2003 asking Defendants to respond to discovery requests.

10.   Attached hereto as Exhibit "I" is a true and correct copy of the letter dated August 19, 2003 responding to discovery requests.

11.   Attached hereto as Exhibit "J" is a true and correct copy of the letter dated August 20, 2003 amending discovery responses from previous day, August 19, 2003.

12.   Attached hereto as Exhibit "K" is a true and correct copy of the Xandros, Inc. Certificate of Incorporation dated August 23, 2001.

13.   Attached hereto as Exhibit "L" is a true and correct copy of the Bylaws of Xandros, Inc. dated August 23, 2001.

1       I declare under penalty of perjury under the laws of the United States of America that the

2  forgoing is true and correct.

3       Executed this ____19th____ day of March, 2004, at San Diego, California.

4

5                                      Colbern C. Stuart

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SAN/85463.1

## STATE OF DELAWARE
## ANNUAL FRANCHISE TAX REPORT

| FILE NUMBER | CORPORATION NAME | | TAX YR | PHONE NUMBER | | |
|---|---|---|---|---|---|---|
| 3420430 | XANDROS, INC. | | 2001 | 212-699-5622 BOOCDLN | | |

| FEDERAL EMPLOYER ID NO. | INCORPORATION DATE | RENEWAL/REVOCATION DATE | DATE OF INACTIVITY | | |
|---|---|---|---|---|---|
| | 08-23-2001 | 03-01-2003 | / / | FROM / / | TO / / |

| AUTHORIZED STOCK BEGIN DATE | ENDING DATE | DESCRIPTION OF STOCK CLASS | NO. OF SHARES | PAR VALUE/SHARE | TAX SHARES ISSUED | PAR VALUE GROSS ASSETS | ASSET DATE | MONTH FOR CALCULATED INVESTMENT CORPS |
|---|---|---|---|---|---|---|---|---|
| 08-23-2001 | | COMMON | 60,000,000 | .001000 | 47,474,842 | 4,125,000.00 | 12-31-2001 | JAN 1st DEC 31st |

| FRANCHISE TAX | LATER PENALTY | 1.5% MONTHLY INTEREST | ANN. FILING FEE | PRIOR CREDIT OR BALANCE | PREPAID QRTY. PAYMENTS | |
|---|---|---|---|---|---|---|
| $ 53,835.62 | $ 50.00 | $ 9,699.36 | $ 20.00 | $ .00 | | |
| | | | | | AMOUNT DUE $ 63,604.98 | |

9000014

CORPORATION SERVICE COMPANY
2711 CENTERVILLE ROAD
SUITE 400
WILMINGTON            DE  19808

MAKE CHECK PAYABLE TO:
DELAWARE SECRETARY OF STATE

| CHECK NO. | AMOUNT ENCLOSED |
|---|---|
| | |

$50.00 PENALTY if not Received on or before
March 1. Plus 1.5% interest per month.

2    030102    3420430    006360496 0    8

## STATE OF DELAWARE
## ANNUAL FRANCHISE TAX REPORT
## CONTINUATION REPORT

DO NOT ALTER FILE NUMBER

| FILE NUMBER | | CORPORATION NAME | | | | | |
|---|---|---|---|---|---|---|---|
| AUTHORIZED STOCK BEGIN DATE | ENDING DATE | DESCRIPTION OF STOCK CLASS | NO. OF SHARES | PAR VALUE/SHARE | TAX SHARES ISSUED | TOTAL GROSS ASSETS | ASSET DATE |
| | | | | | | | |

EXH A PG 4

SEND INVOICE AND PAYMENT ONLY - NO ATTACHMENTS - NO ADDITIONAL PAGES

| NATURE OF BUSINESS | PRINCIPAL PLACE OF BUSINESS OUTSIDE OF DELAWARE | |
|---|---|---|
| Software | 41 E. 11th St. NY NY 10003 | |
| DIRECTORS | NAME | STREET/CITY/STATE/ZIP | DATE TERM EXPIRES |
| 1. William Jay Rosenau | 41 E. 11th St. NY NY 10003 | 12-31-2003 |
| 2. Frederick Bermudez | 41 E. 11 St. NY NY 10003 | 12-31-2003 |
| 3. | | |
| 4. | | |
| 5. | | |
| 6. | | |

DO NOT WRITE IN THIS SPACE - FOR BANK USE ONLY

| OFFICERS | NAME | STREET/CITY/STATE/ZIP | DATE TERM EXPIRES |
|---|---|---|---|
| 1. William Jay Rosenau | 41 E. 11th St. NY NY 10003 | N/A |
| 2. Frederick Bermudez | 41 E. 11 St. NY NY 10003 | N/A |

| ORIGINAL SIGNATURE (OFFICER, DIRECTOR OR INCORPORATOR) | TITLE | DATE |
|---|---|---|
| X _(signature)_ | attorney in fact | 6/25/03 |

# STATE OF DELAWARE
## ANNUAL FRANCHISE TAX REPORT

DO NOT ALTER FILE NUMBER

| FILE NUMBER | CORPORATION NAME | | | TAX YR. | PHONE NUMBER |
|---|---|---|---|---|---|
| 3420430 | XANDROS, INC. | | | 2002 | 212-699-3622 SDOCDLN |

| FEDERAL EMPLOYER ID NO. | INCORPORATION DATE | RENEWAL/REVOCATION DATE | DATE OF INACTIVITY | | |
|---|---|---|---|---|---|
| | 08-23-2001 | 03-01-2003 | FROM / / | TO / / | |

| AUTHORIZED STOCK BEGIN DATE | ENDING DATE | DENOMINATION ON STOCK CLASS | NO. OF SHARES | PAR VALUE/SHARE | NO. SHARES ISSUED | TOTAL GROSS ASSETS | ASSET DATE | CHECK IF FOR REGULATED INVESTMENT COMPANY |
|---|---|---|---|---|---|---|---|---|
| 08-23-2001 | 12-31-2002 | COMMON | 60,000,000 | .001000 | 47,411,842 | 125,000.00 | 12-31-2002 | JAN 30 1803 3181 |

| FRANCHISE TAX | $50.00 PENALTY | 1.5% MONTHLY INTEREST | ANN. FILING FEE | PREV CREDIT OR BALANCE | PREPAID QRTLY. PAYMENTS |
|---|---|---|---|---|---|
| $ 150,000.00 | $ 50.00 | $ 4,360.68 | $ 20.00 | $ 63,384.98 | $ |

| | AMOUNT DUE |
|---|---|
| | 218,013.66 |

9000016

CORPORATION SERVICE COMPANY
2711 CENTERVILLE ROAD
SUITE 400
WILMINGTON          DE  19808

MAKE CHECK PAYABLE TO:
DELAWARE SECRETARY OF STATE

| CHECK NO. | AMOUNT ENCLOSED |
|---|---|
| | |

$50.00 PENALTY if not Received on or before
March 1.  Plus 1.5% interest per month.

E   030103   3420430   021801566 0   8

MATTHEW
212 888 4955
NYC                    NY  12345

# STATE OF DELAWARE
## ANNUAL FRANCHISE TAX REPORT
## CONTINUATION REPORT

DO NOT ALTER FILE NUMBER

| FILE NUMBER | CORPORATION NAME | | | 2002 | SDOCDLR |
|---|---|---|---|---|---|
| 3420430 | XANDROS, INC. | | | | |

| AUTHORIZED STOCK BEGIN DATE | ENDING DATE | DENOMINATION ON STOCK CLASS | NO. OF SHARES | PAR VALUE/SHARE | NO. SHARES ISSUED | TOTAL GROSS ASSETS | ASSET DATE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

**SEND INVOICE AND PAYMENT ONLY - NO ATTACHMENTS - NO ADDITIONAL PAGES**

| NATURE OF BUSINESS | | PRINCIPAL PLACE OF BUSINESS OUTSIDE OF DELAWARE | |
|---|---|---|---|
| Software | | 41 E. 11th St. NY NY 10003 | |
| **DIRECTORS** | **NAME** | **STREET/CITY/STATE/ZIP** | **DATE TERM EXPIRES** |
| 1. William J. Roseman | | 41 E. 11th St. NY NY 10003 | 12-31-2003 |
| 2. Frederick Berenstein | | 41 E. 11th St. NY NY 10003 | 12-31-2003 |
| 3. | | | |
| 4. | | | |
| 5. | | | |
| 6. | | | |

DO NOT WRITE IN THIS SPACE - FOR BANK USE ONLY

| OFFICERS | NAME | STREET/CITY/STATE/ZIP | | DATE TERM EXPIRES |
|---|---|---|---|---|
| 1. William J. Roseman | | 41 E. 11th St. NY NY 10003 | | N/A |
| 2. Frederick Berenstein | | 41 E. 11th St. NY NY 10003 | | N/A |
| **ORIGINAL SIGNATURE (OFFICER, DIRECTOR OR INCORPORATOR)** | | **TITLE** | | **DATE** |
| X *[signature]* | | attorney in fact | | 6/25/03 |

CERTIFIED COPY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

------------------------------------x

LINDOWS.COM, INC., a Delaware
corporation,

                  Plaintiff,

                       Case No. 02

                       CV 2460 BTM(RBB)

       -against-

XANDROS, INC., a Delaware corporation;
LINUX GLOBAL PARTNERS, INC., a Delaware
corporation; MICHAEL BEGO, an individual;
WILLIAM JAY ROSEMAN, an individual,

                  Defendants.

------------------------------------x

                 February 19, 2004

                 6:15 p.m.

     Deposition of MICHAEL A. BEGO, taken by
Plaintiff, pursuant to notice, at the offices of
Paul Hastings Janofsky & Walker LLP, 75 East 55th
Street, New York, New York, before Jack Finz, a
Certified Shorthand Reporter and Notary Public
within and for the State of New York.

                        Exh C Pg 6



LEGALINK

A WORDWAVE COMPANY

LegaLink San Diego
550 West C Street, Suite 1440
San Diego, CA 92101

tel (619) 544-8344
tel (800) 544-3656
fax (619) 544-8345

www.legalink.com

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

```
 1
 2   A P P E A R A N C E S:
 3        PAUL HASTINGS JANOFSKY & WALKER LLP
          Attorneys for Plaintiff
 4                3579 Valley Centre Drive
                  San Diego, California 92130
 5
          BY:    COLBERN C. STUART III, ESQ.
 6
 7        LaBELLA & McNAMARA, LLP
          Attorneys for Defendants
 8                401 West "A" Street
                  San Diego, California 92101
 9
          BY:    ANDREW W. ROBERTSON, ESQ.
10
11        WALTON & ASSOCIATES
          Attorneys for the Witness
12                402 West Broadway, Suite 1210
                  San Diego, California 92101
13
          BY:    EDWARD C. WALTON, ESQ.
14
15   ALSO PRESENT:
16        MATTHEW CHAVEZ, Videographer
          LegaLink Action Video
17
18
19
20
21
22
23
24
25
```

Exh C Pg 9

2

Michael A. Bego                    2/19/04                    Lindows v. Xandros

```
 1
 2          THE VIDEOGRAPHER:  This is video          18:16:02
 3   operator speaking, Matthew Chavez, of LegaLink   18:16:06
 4   Action Video, 420 Lexington Avenue, New York, New 18:16:10
 5   York.  Today is February 19, 2004, and the time  18:16:12
 6   is 6:14 p.m.                                      18:16:14
 7          We are at the offices of Paul             18:16:16
 8   Hastings, 75 East 55th Street, New York, New     18:16:20
 9   York, to take the videotape deposition of Michael 18:16:22
10   Bego, in the matter of Lindows.com versus        18:16:26
11   Xandros, Incorporated, in the United States      18:16:30
12   District Court, Southern District of California, 18:16:32
13   Case No. 02 CV 2460.                             18:16:36
14          Would counsel please voice identify       18:16:38
15   themselves for the record.                       18:16:40
16          MR. STUART:  This is Cole Stuart.         18:16:42
17   I'm counsel for the plaintiff, Lindows.com, Inc. 18:16:46
18          MR. WALTON:  Edward Walton, Walton &      18:16:48
19   Associates, attorney for deponent, Michael Bego. 18:16:52
20          MR. ROBERTSON:  Andy Robertson,           18:16:56
21   LaBella and McNamara, for Xandros, Roseman, LGP. 18:17:02
22          THE VIDEOGRAPHER:  Would the court        18:17:04
23   reporter, Jack Finz, of LegaLink, swear the      18:17:06
24   witness.                                         18:17:14
25
```

EXH C PG 10

3

Michael A. Bego                           2/19/04                    Lindows v. Xandros

```
 1
 2              M I C H A E L       B E G O,
 3   having been first duly sworn by the Notary Public
 4   (Jack Finz), was examined and testified as
 5   follows:
 6              EXAMINATION BY MR. STUART:              18:17:16
 7        Q.    Good afternoon, Mr. Bego.   I          18:17:18
 8   introduced myself earlier.  My name is Cole       18:17:20
 9   Stuart.  I'm counsel for the plaintiff in this    18:17:22
10   matter, Lindows.com, Inc.  How are you?           18:17:26
11        A.    Good.                                  18:17:26
12        Q.    Good.  Have you ever had your          18:17:28
13   deposition taken before?                          18:17:30
14        A.    Never.  Never ever.                    18:17:30
15        Q.    Before we get started then, let me     18:17:32
16   address with you a few of the rules of the road   18:17:36
17   that witnesses need to be aware of.               18:17:36
18              The first is you have just taken an    18:17:40
19   oath, and that was an oath to tell the truth, the 18:17:42
20   whole truth and nothing but the truth, and you    18:17:44
21   should take that oath with the same seriousness   18:17:46
22   and solemnity as if you were in a court of law.   18:17:50
23   Even though we are in a law office today and you  18:17:52
24   are in New York and we are in San Diego,          18:17:54
25   California, that doesn't mean that that oath      18:17:56
```

EXH **C** PG **4**

4

```
 1              MICHAEL A. BEGO
 2   means anything less than if you were sitting in a      18:18:00
 3   witness chair in a court of law.                       18:18:02
 4              Do you understand that?                      18:18:02
 5        A.    Absolutely.                                  18:18:02
 6        Q.    We are conducting this deposition by         18:18:06
 7   video conference today.  Normally depositions are      18:18:10
 8   conducted in person.  Because of the technology        18:18:12
 9   involved, and because of just normal issues            18:18:18
10   relating to human interaction, we may not              18:18:22
11   completely understand each other.  You may not         18:18:24
12   completely understand my question, I may not           18:18:26
13   completely understand your answer.  Let's try to       18:18:28
14   work together to make sure that you understand         18:18:32
15   fully my question, and if you don't understand my      18:18:34
16   question, please let me know, and I will repeat        18:18:38
17   it and try to word it in a way that is clear to        18:18:42
18   you.                                                    18:18:42
19              Do you understand that?                      18:18:42
20        A.    Yes.                                         18:18:44
21        Q.    In order that we are able to                 18:18:46
22   understand each other, it is important that you        18:18:48
23   make sure and let me finish the question before        18:18:52
24   you begin answering.  It's a common occurrence         18:18:56
25   with human conversation where you will understand      18:18:58
```

EXH C PG 12

5

```
 1                MICHAEL A. BEGO
 2   where my question is going and you will want to      18:19:00
 3   answer it before I end my question.  However, as     18:19:04
 4   you can tell, the court reporter sitting in front    18:19:06
 5   of you is making a transcript of everything          18:19:08
 6   that's said in both of the rooms here today, and     18:19:12
 7   it makes it very difficult for that court            18:19:14
 8   reporter to make a complete record of everything     18:19:16
 9   that's said if more than one person is speaking      18:19:18
10   at a time.                                           18:19:20
11              Do you understand that?                   18:19:20
12       A.    Yes.  I assume we all let everybody        18:19:22
13   else finish.                                         18:19:24
14       Q.    That's right.  And I will do the same      18:19:26
15   with you.                                            18:19:26
16       A.    Yes.                                       18:19:26
17       Q.    And if I run over you, it's not           18:19:28
18   because I am trying to be mean or rude.  It's       ·18:19:32
19   simply a mistake on my part.  And I will try to      18:19:36
20   let you finish all of your answers.                  18:19:38
21              Okay?                                     18:19:38
22       A.    Yes.                                       18:19:40
23       Q.    That brings me to the next issue.  It      18:19:44
24   is important that you answer audibly.  You nodded    18:19:46
25   your head there very briefly.  I can see that.       18:19:50
```

Exh _C_ Pg 13

6

| | | |
|---|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | However, the court reporter has a very difficult | 18:19:52 |
| 3 | time identifying nods of the head on the record. | 18:19:54 |
| 4 | So it's very important that you answer questions | 18:19:56 |
| 5 | with either yes or no, or whatever answer is | 18:19:58 |
| 6 | appropriate, but that answer must be audible. | 18:20:02 |
| 7 | Do you understand? | 18:20:02 |
| 8 | A.   Yes.  You don't put down if there is | 18:20:06 |
| 9 | a nod, do you?  If you see it?  No. | 18:20:12 |
| 10 | Q.   All right.  Do you understand the | 18:20:18 |
| 11 | rules as I have explained them to you? | 18:20:20 |
| 12 | A.   Yes. | 18:20:20 |
| 13 | Q.   Do you have any questions? | 18:20:20 |
| 14 | A.   No.  If I do in the future, I'll | 18:20:26 |
| 15 | ask.  But right now I don't. | 18:20:28 |
| 16 | Q.   I'm sorry, could you repeat -- | 18:20:30 |
| 17 | A.   I said right now I don't.  If I do in | 18:20:32 |
| 18 | the future, I will ask, but right now I don't. | 18:20:36 |
| 19 | Q.   Fair enough. | 18:20:36 |
| 20 | Can you please state your full name? | 18:20:40 |
| 21 | A.   Michael Anton Bego. | 18:20:42 |
| 22 | Q.   Mr. Bego, where is your current | 18:20:44 |
| 23 | residence? | 18:20:44 |
| 24 | A.   267 -- I've got to look it up. | 18:20:48 |
| 25 | 267 West 25th Street, New York, New | 18:21:06 |

EXH C PG 14

7

```
1                    MICHAEL A. BEGO
2    York 100, I believe it's 11.                      18:21:10
3         Q.    How long have you lived at 267 West    18:21:14
4    25th Street?                                      18:21:16
5         A.    September 1 of 2003.                   18:21:18
6         Q.    Since when?                            18:21:22
7         A.    September 1 of 2003.                   18:21:22
8         Q.    Where did you live prior to September  18:21:26
9    21, 2002?                                         18:21:28
10        A.    241 West 13th Street, apartment 1,     18:21:30
11   New York, New York 10011.                         18:21:32
12        Q.    When did you begin living at that      18:21:34
13   address?                                          18:21:34
14        A.    Let's see.  It would have been         18:21:36
15   October 25 of, I believe, 2001.                   18:21:44
16        Q.    And prior to that address, where did   18:21:50
17   you live?                                         18:21:50
18        A.    Prior to that address I lived at 515   18:21:54
19   East 82nd Street, Apartment 3B, New York, New     18:21:58
20   York 100, I believe it's 28.                      18:22:02
21        Q.    And when did you begin living there?   18:22:04
22        A.    It would have been the year prior, so  18:22:10
23   it would have been October 2000 -- no, you know   18:22:16
24   what, I think I actually moved in there around    18:22:20
25   July of 2000.                                     18:22:24
```

EXH **C** PG **15**

8

```
 1                    MICHAEL A. BEGO

 2          Q.    Since July of 2000, have you had any      18:22:30

 3   other residences?                                      18:22:32

 4          A.    No permanent ones.                        18:22:34

 5          Q.    Have you ever lived in Canada?            18:22:36

 6          A.    What do you mean by live?                 18:22:38

 7          Q.    Have you ever maintained a residence      18:22:42

 8   in Canada or have you ever identified a place          18:22:48

 9   where you could be reached for an extended period      18:22:50

10   of time in Canada, let's say?                          18:22:52

11          A.    Well, at one point I was traveling        18:22:54

12   there on almost a weekly basis, although I             18:22:56

13   wouldn't have considered it my permanent               18:22:58

14   residence.                                             18:23:00

15          Q.    And was that since July of 2000 that      18:23:04

16   you were traveling to Canada on a weekly basis?        18:23:06

17          A.    Not necessarily weekly but, you know,     18:23:10

18   at some points it was almost weekly.  Yes, it was      18:23:14

19   since July 2000.                                       18:23:14

20          Q.    And was that in relation with your        18:23:18

21   work on behalf of one or more of the defendants        18:23:22

22   in this action?                                        18:23:22

23          A.    Yes.                                      18:23:22

24          Q.    What was the address that you were        18:23:26

25   residing at temporarily while you were in Canada?      18:23:28
```

EXH ∁ PG 16

9

| | | |
|---|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | A.    It would have been one of probably | 18:23:30 |
| 3 | eight different hotels.  If you give me a | 18:23:34 |
| 4 | website, I could look them up for you, but I | 18:23:38 |
| 5 | don't remember them offhand. | 18:23:38 |
| 6 | Q.    That's okay.  What I was asking about | 18:23:42 |
| 7 | was a specific residence.  Was there an apartment | 18:23:44 |
| 8 | or a house or a condominium or some other more | 18:23:50 |
| 9 | permanent form of residence that you were using? | 18:23:52 |
| 10 | A.    In terms of a residence, no. | 18:23:54 |
| 11 | Q.    Only hotels while you were visiting | 18:24:00 |
| 12 | Canada; correct? | 18:24:00 |
| 13 | A.    Yes.  Yes. | 18:24:02 |
| 14 | Q.    Where do you currently work? | 18:24:06 |
| 15 | A.    At Vincent Longo, Inc. | 18:24:10 |
| 16 | Q.    Can you spell Longo? | 18:24:12 |
| 17 | A.    L-o-n-g-o. | 18:24:14 |
| 18 | Q.    What is Vincent Longo, Inc.? | 18:24:16 |
| 19 | A.    Consumer goods. | 18:24:18 |
| 20 | Q.    What is your position at Vincent | 18:24:20 |
| 21 | Longo, Inc.? | 18:24:22 |
| 22 | A.    Vice president. | 18:24:22 |
| 23 | Q.    Just vice president, not vice | 18:24:26 |
| 24 | president of a particular division? | 18:24:28 |
| 25 | A.    I am vice president of operations. | 18:24:32 |

ExH C PG 17

10

```
 1              MICHAEL A. BEGO

 2      Q.    Vice president of operations?          18:24:34

 3      A.    Yes.                                   18:24:34

 4      Q.    Is that your official title?           18:24:36

 5      A.    I'm not sure if it's vice president    18:24:38

 6  or vice president of operations.  I don't think  18:24:42

 7  it's materially different.                       18:24:44

 8      Q.    And what are your duties and           18:24:46

 9  responsibilities at Vincent Longo, Inc.?         18:24:50

10      A.    I run the operations.                  18:24:50

11      Q.    And what's the nature of Vincent       18:24:54

12  Longo, Inc.'s business?                          18:24:56

13      A.    Consumer goods.                        18:24:58

14      Q.    Can you be more specific?              18:25:00

15      A.    Cosmetics.                             18:25:02

16      Q.    Anything else?                         18:25:04

17      A.    No.  No.                               18:25:06

18      Q.    How long have you been working at      18:25:10

19  Vincent Longo, Inc.?                             18:25:10

20      A.    I started full-time November 1.        18:25:12

21      Q.    Of 2003?                               18:25:14

22      A.    Yes.                                   18:25:16

23      Q.    Prior to November 1, 2003, did you     18:25:20

24  have a job?                                      18:25:20

25      A.    No full-time job.  No.  No.  I mean,   18:25:28
```

ExH __C__ PG __18__

11

Michael A. Bego                   2/19/04                   Lindows v. Xandros

```
1              MICHAEL A. BEGO
2  I consulted, but I didn't have a full-time job.      18:25:32
3      Q.    For any time prior to November 1,          18:25:36
4  2003?                                                18:25:36
5      A.    Well, beside -- oh, I mean I used to       18:25:40
6  work at Linux Global Partners and Xandros.           18:25:46
7      Q.    We will get to that in a minute.           18:25:48
8  What I would like to do is work reverse              18:25:52
9  chronological order back through your job            18:25:54
10 history.  So --                                      18:25:56
11     A.    My current job -- sorry, I didn't          18:25:58
12 mean to interrupt you, but I know what you want.     18:26:00
13 My current full-time job began November 1.           18:26:02
14 Before that, there's a little bit of                 18:26:06
15 disagreement, but the last job that I had before     18:26:10
16 that would have been Linux Global Partners.  I       18:26:16
17 was vice president there until -- I mean, I've       18:26:20
18 got a paper stating -- you know, they signed a       18:26:22
19 paper saying it was until August.  They also are    18:26:26
20 telling me, however, that it was only till the       18:26:28
21 end of May.  So that's sort of gray.                 18:26:32
22     Q.    Okay.  Let me break that down.             18:26:36
23           Prior to Vincent Longo, you worked         18:26:40
24 for Linux Global Partners; correct?                  18:26:42
25     A.    Yes.  And also Xandros.                    18:26:46
```

Exh C Pg 19

12

```
 1              MICHAEL A. BEGO

 2       Q.    Let's stick with Linux Global          18:26:52

 3   Partners.  We have to do this bit-by-bit.        18:26:54

 4       A.    Well, they are sort of simultaneous,   18:26:56

 5   just so you know.                                18:26:58

 6       Q.    Fair enough.  Let's stick with Linux   18:27:00

 7   Global Partners and we will go to Xandros, Inc., 18:27:02

 8   and/or Xandros Corp., and you can tell me the    18:27:04

 9   dates that you worked with them, and if they     18:27:06

10   overlapped the dates that you worked for LGP,    18:27:10

11   that's fine.  We will deal with that.  Okay?     18:27:10

12       A.    Yes.                                   18:27:12

13       Q.    When did you begin working for Linux   18:27:16

14   Global Partners?                                 18:27:16

15       A.    July 2000.                             18:27:20

16       Q.    You mentioned that there was a         18:27:22

17   dispute as to dates.  Is that the date that's in 18:27:22

18   dispute?                                         18:27:22

19       A.    No.                                    18:27:22

20       Q.    The date that's in dispute is the --   18:27:26

21       A.    Not that it's in dispute, but I think  18:27:28

22   it's safer to say that there's multiple answers. 18:27:32

23       Q.    Okay.                                  18:27:32

24       A.    One answer would be, I think I had a   18:27:36

25   letter, that I don't have on me, but I think it  18:27:38
```

Exh C Pg 20

13

| | | |
|---|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | was on or about August 8 that I was still working | 18:27:40 |
| 3 | there.  However, I know there also is a potential | 18:27:44 |
| 4 | to consider that I only worked there till May | 18:27:46 |
| 5 | 2003. | 18:27:48 |
| 6 | Q.    All right.  And the August 8 date | 18:27:54 |
| 7 | was -- | 18:27:54 |
| 8 | A.    I guess as far as I'm concerned, | 18:27:56 |
| 9 | stick with the August date. | 18:27:56 |
| 10 | Q.    Let me ask if you wouldn't mind | 18:28:02 |
| 11 | letting me complete the question.  You are | 18:28:06 |
| 12 | accurately anticipating where the question is | 18:28:10 |
| 13 | going, but that's exactly the warning that I gave | 18:28:12 |
| 14 | you earlier.  It is important for the sanity of | 18:28:14 |
| 15 | the court reporter that you let me finish | 18:28:16 |
| 16 | speaking before you begin your answer.  Okay? | 18:28:18 |
| 17 | A.    Okay. | 18:28:18 |
| 18 | Q.    Thank you. | 18:28:20 |
| 19 | So as you sit here today, then, you | 18:28:24 |
| 20 | believe you ceased working at Linux Global | 18:28:28 |
| 21 | Partners as of August 8, 2003; correct? | 18:28:30 |
| 22 | A.    Well, like I said before, it's not | 18:28:32 |
| 23 | like yes/no.  There's disagreement over that. | 18:28:36 |
| 24 | There's disagreement over that.  So at some point | 18:28:42 |
| 25 | between May 2003 and August 8.  I've got, you | 18:28:48 |

EXH C PG 21

14

```
 1                MICHAEL A. BEGO
 2   know, paper stating that they are interested in      18:28:50
 3   retaining me as late as August 8.  However, they     18:28:54
 4   also -- I mean, they also maintain that I wasn't     18:28:58
 5   working, you know, at the end of, I believe it       18:29:00
 6   was May 2003.  So it's not a yes/no.                 18:29:04
 7        Q.    If I understand you correctly, then,      18:29:06
 8   by "they," you mean Linux Global Partners;           18:29:08
 9   correct?                                             18:29:10
10        A.    Correct.                                  18:29:10
11        Q.    Linux Global Partners is asserting        18:29:12
12   that you no longer worked for them after some        18:29:14
13   date in May of 2003; correct?                        18:29:16
14        A.    That's not actually entirely true        18:29:18
15   either, because one of the co-chairmen sees it       18:29:22
16   one way and the other disagrees.  So one side is     18:29:26
17   saying I was working there August 8, the other       18:29:28
18   thinks it was May.  I think I was working            18:29:30
19   pretty -- I think I was still involved with the      18:29:34
20   company through July, and you can pick whichever     18:29:36
21   date you want.  I mean, you can't pick whichever     18:29:40
22   date you want, but it's not like clearcut thing.     18:29:44
23        Q.    Let's nail it down.  Which of the         18:29:44
24   co-founders believes that you ceased working         18:29:48
25   there in May of 2003?                                18:29:48
```

ExH C PG 22

15

| | | |
|---|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | A.    Berenstein. | 18:29:50 |
| 3 | Q.    And which of the co-founders believes | 18:29:52 |
| 4 | that you ceased working there in August of 2003? | 18:29:54 |
| 5 | A.    According to signed papers, Roseman. | 18:30:00 |
| 6 | Q.    And what are the papers you are | 18:30:02 |
| 7 | referring to? | 18:30:02 |
| 8 | A.    Just a letter.  There's just a letter | 18:30:06 |
| 9 | that he wrote that stated that I was working | 18:30:06 |
| 10 | there until August 8. | 18:30:10 |
| 11 | Q.    And your allegation is that you | 18:30:12 |
| 12 | stopped working there sometime in July of 2003; | 18:30:14 |
| 13 | correct? | 18:30:14 |
| 14 | A.    Yes.  Well, in July 2003 I was still | 18:30:16 |
| 15 | actively participating -- I was still actively | 18:30:22 |
| 16 | participating in July 2003. | 18:30:24 |
| 17 | Q.    And this is apparently the subject of | 18:30:26 |
| 18 | an ongoing dispute between you and LGP; correct? | 18:30:30 |
| 19 | A.    Correct. | 18:30:30 |
| 20 | Q.    What was your position or positions | 18:30:32 |
| 21 | at Linux Global Partners? | 18:30:34 |
| 22 | A.    Only one position, and it was vice | 18:30:36 |
| 23 | president. | |
| 24 | Q.    Vice president? | 18:30:40 |
| 25 | A.    Yes. | 18:30:42 |

EXH **C** PG **23**

16

| | | |
|---|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | Q.    Was that your official title? | 18:30:42 |
| 3 | A.    Yes. | 18:30:44 |
| 4 | Q.    And were you involved in a particular | 18:30:48 |
| 5 | division or area? | 18:30:50 |
| 6 | A.    Well, there were only three of us so | 18:30:52 |
| 7 | there weren't really different divisions.  And | 18:30:54 |
| 8 | I'd say because there were only three of us, I | 18:30:58 |
| 9 | think you got involved, you know, in a variety | 18:31:00 |
| 10 | of, you know, all different aspects of the firm | 18:31:02 |
| 11 | at any one point in time.  Not all, but a large | 18:31:08 |
| 12 | extent. | 18:31:08 |
| 13 | Q.    By three of you, I assume you are | 18:31:12 |
| 14 | referring to the other two being Will Roseman and | 18:31:16 |
| 15 | Fred Berenstein; correct? | 18:31:18 |
| 16 | A.    Correct. | 18:31:18 |
| 17 | Q.    And what's your understanding of | 18:31:20 |
| 18 | their positions or roles with LGP? | 18:31:22 |
| 19 | A.    Their titles were co-chairmen, and | 18:31:26 |
| 20 | their roles -- I mean, standard corporate roles | 18:31:32 |
| 21 | for that type of firm.  I mean, I don't want to | 18:31:36 |
| 22 | go through and speak for them in terms of what | 18:31:38 |
| 23 | their responsibilities and roles were.  I mean, I | 18:31:40 |
| 24 | could, but I assume you already asked them that. | 18:31:44 |
| 25 | I mean, like -- | |

ExH C PG 24

17

| | | |
|---|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | Q.    I did indeed.  My question though was | 18:31:48 |
| 3 | what was your understanding of their roles. | 18:31:48 |
| 4 | A.    They were co-chairmen.  They were | 18:31:52 |
| 5 | basically, you know, in charge of running the | 18:31:54 |
| 6 | company. | 18:31:54 |
| 7 | Q.    Did they have, as far as you are | 18:31:56 |
| 8 | concerned, did they have any -- did they occupy | 18:31:58 |
| 9 | any officerships or directorships? | 18:32:00 |
| 10 | A.    My understanding is that from the | 18:32:04 |
| 11 | time that I started till the time that I left | 18:32:06 |
| 12 | they both were co-chairmen and hence directors. | 18:32:10 |
| 13 | I believe Rick was president and secretary.  Will | 18:32:18 |
| 14 | might have been treasurer.  And I don't place, | 18:32:20 |
| 15 | you know, a large area of confidence in those | 18:32:22 |
| 16 | specific roles.  But, you know, my memory serves | 18:32:26 |
| 17 | me that they were both directors and officers of | 18:32:30 |
| 18 | Linux Global Partners for the entire tenure of my | 18:32:34 |
| 19 | stay there. | 18:32:34 |
| 20 | Q.    And you held no other positions or | 18:32:36 |
| 21 | officerships or directorships, other than vice | 18:32:40 |
| 22 | president, with LGP; correct? | 18:32:42 |
| 23 | A.    And I wouldn't even say no other | 18:32:44 |
| 24 | directorships because I wasn't a director or an | 18:32:46 |
| 25 | officer of Linux Global Partners.  No other | 18:32:50 |

Exh C PG 25

18

| | |
|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | titles or -- yes, no other titles or -- and I | 18:32:54 |
| 3 | have had no directorships or officerships of | 18:32:58 |
| 4 | Linux Global Partners. | 18:33:00 |
| 5 | Q.    The vice presidency was not an | 18:33:02 |
| 6 | officership; correct? | 18:33:04 |
| 7 | A.    Correct. | 18:33:04 |
| 8 | Q.    And what was your level of | 18:33:06 |
| 9 | compensation at LGP? | 18:33:06 |
| 10 | A.    It started at 90,000, and then I was | 18:33:10 |
| 11 | raised to 140,000.  Yes, basically I started at | 18:33:14 |
| 12 | 90 and I was raised to 140. | 18:33:16 |
| 13 | Q.    When did that raise occur? | 18:33:18 |
| 14 | A.    Within a month or two of I would -- a | 18:33:26 |
| 15 | month or two of -- one second. | 18:33:30 |
| 16 | 2001, like around -- I believe around | 18:33:52 |
| 17 | March of 2001. | 18:33:54 |
| 18 | Q.    And was the raise concurrent with any | 18:33:58 |
| 19 | promotion or was it just a simple increase in the | 18:34:02 |
| 20 | amount of compensation? | 18:34:02 |
| 21 | A.    It was an overdue adjustment.  No | 18:34:06 |
| 22 | change in role. | 18:34:10 |
| 23 | Q.    Were you also given any type of | 18:34:12 |
| 24 | nonmonetary compensation?  Other than typical | 18:34:14 |
| 25 | benefits, such as health insurance, did you | 18:34:16 |

Exh C Pg 26

19

```
 1                    MICHAEL A. BEGO
 2   receive stock options or stock?              18:34:18
 3        A.    Not from Linux Global Partners,   18:34:20
 4   although I did from Will Roseman and Rick    18:34:26
 5   Berenstein.                                  18:34:28
 6        Q.    You received -- what did you receive   18:34:30
 7   from Will Roseman and Fred Berenstein?       18:34:34
 8        A.    They gave me a portion of their   18:34:36
 9   participation in the company.                18:34:38
10        Q.    By the company, you mean LGP?     18:34:44
11        A.    Linux Global Partners.           18:34:46
12        Q.    By LGP, you understand that I mean   18:34:50
13   Linux Global Partners?                       18:34:52
14        A.    Yes.  We can say it's safe going  18:34:54
15   forward to call it LGP.                      18:34:56
16        Q.    Okay, thank you.                  18:34:58
17              They actually gave you stock?     18:34:58
18        A.    Yes.                              18:35:00
19        Q.    And when did they give you stock in   18:35:02
20   Linux Global Partners?                       18:35:04
21        A.    I have to go through my records.  18:35:06
22   There are a couple of different points.  But it   18:35:08
23   was all -- it wasn't in the last year.  I really   18:35:14
24   have to go through my records.               18:35:18
25        Q.    But this was stock in their personal   18:35:20
```

EXH _C_ PG 27

20

Michael A. Bego                    2/19/04                    Lindows v. Xandros

```
 1              MICHAEL A. BEGO

 2   accounts, not stock directly from Linux Global      18:35:24

 3   Partners; correct?                                  18:35:24

 4        A.    This was their shares -- this was        18:35:26

 5   their personal shares of Linux Global Partners      18:35:28

 6   that they gave to me.                               18:35:30

 7        Q.    Why did they give you their personal     18:35:32

 8   shares?                                             18:35:34

 9           MR. WALTON:  Objection.  Calls for          18:35:36

10   speculation.  If you know, if you have some basis   18:35:38

11   to tell him why, then you can tell him that.  If    18:35:42

12   you don't know, you don't know.                     18:35:44

13        A.    I mean -- I mean, if I don't have to     18:35:52

14   answer a question, I would just as soon not         18:35:54

15   answer it.                                          18:35:56

16           MR. WALTON:  It's not that you don't        18:35:56

17   have to answer it.  He has asked you a question     18:36:00

18   that I have made an objection to on the grounds     18:36:02

19   that it calls for speculation on your part.  If     18:36:04

20   you know, if you have a basis for answering this    18:36:06

21   question, go ahead.                                 18:36:06

22           THE WITNESS:  So I guess I would be         18:36:10

23   speculating as to their real motives for giving     18:36:12

24   me the stock.  I could speculate, but it would be   18:36:14

25   speculation.                                        18:36:16
```

Exh C Pg 28

21

1           MICHAEL A. BEGO

2      Q.    Did they tell you why they were          18:36:16

3  giving you their personal shares of stock in LGP?  18:36:20

4      A.    If they gave me specific reasons why     18:36:24

5  they did, I don't recall.                          18:36:24

6      Q.    Do you have an understanding as to       18:36:28

7  why you received Mr. Roseman's and/or Mr.          18:36:34

8  Berenstein's personal shares of LGP stock?         18:36:38

9      A.    Do I have an understanding?              18:36:40

10     Q.    Yes.                                      18:36:40

11     A.    No.  I think it's all back to -- you     18:36:44

12  know, I think it's all back to speculating on     18:36:46

13  what their motivations were.                       18:36:48

14     Q.    When did they give you their personal    18:36:50

15  shares of stock?                                   18:36:52

16     A.    Again, going back to my previous         18:36:54

17  answer, I would have to go through and look at     18:36:56

18  the records and the dates.  I'd say not in the    18:37:00

19  last year.  Not in the last year, but at a couple 18:37:04

20  of points before then.                             18:37:06

21     Q.    I'm sorry, a couple of points before     18:37:10

22  then?                                              18:37:10

23     A.    Yes.  So not in the last year.  Not      18:37:14

24  in the last year.                                  18:37:14

25     Q.    Okay.  So it would have been sometime    18:37:18

ExH C PG 29

22

```
 1                    MICHAEL A. BEGO

 2   in 2002 then?                                    18:37:20

 3        A.    Yes.   In 2001 and -- yes.  I guess   18:37:26

 4   that would mean it would be between 2000 and     18:37:30

 5   2002.                                            18:37:30

 6        Q.    And in what form did they convey the  18:37:32

 7   stock to you?  Was it in the form of an endorsed 18:37:34

 8   stock certificate, or did they transfer it       18:37:38

 9   directly from their personal brokerage accounts? 18:37:40

10        A.    No, stock certificates.  It's not a   18:37:42

11   listed stock.  It was a stock certificate.       18:37:46

12        Q.    So it was a stock certificate that    18:37:52

13   had initially or previously been issued to either 18:37:52

14   Mr. Berenstein or Mr. Roseman, and then they     18:37:54

15   endorsed it and handed it over to you; correct?  18:37:58

16        A.    I don't know that they -- I don't     18:38:00

17   know what they had before me.                    18:38:02

18        Q.    All right.  But you received stock     18:38:06

19   certificates?                                    18:38:06

20        A.    I received certificates, yes.         18:38:08

21        Q.    Was it from both Mr. Berenstein and   18:38:10

22   Mr. Roseman that you received certificates?      18:38:12

23        A.    Yes.                                  18:38:12

24        Q.    And let's talk about Mr. Berenstein.  18:38:14

25   How many shares did you receive from Mr.         18:38:16
```

EXH C PG 30                                            23

```
 1              MICHAEL A. BEGO
 2   Berenstein?                                    18:38:18
 3        A.    I'd have to go through and look.    18:38:20
 4        Q.    Can you give me your best           18:38:24
 5   recollection as you sit here today?            18:38:26
 6        A.    You want me to guess?               18:38:28
 7        Q.    No.   I want you to give me your best  18:38:30
 8   recollection, if you can, of how many shares.  18:38:34
 9   Was it more than a thousand shares?            18:38:36
10        A.    Yes.  It was more than a thousand and  18:38:38
11   it was less than 500,000.  I mean, they gave me  18:38:42
12   different numbers at different times.  So       18:38:44
13   specifically how many did Rick give me -- and it  18:38:48
14   didn't -- like I don't think -- and to be honest,  18:38:50
15   they have been sitting in the safety deposit box,  18:38:54
16   so it's hard for me just to -- you know, I can   18:39:00
17   guess approximately, but I don't know how many  18:39:02
18   specifically Rick gave me.                      18:39:04
19        Q.    How many times did Mr. Berenstein    18:39:06
20   give you stock certificates?                    18:39:08
21        A.    Again, I'd have to look.  I'd say    18:39:14
22   more than once, and I'd say -- you know, more   18:39:18
23   than once, less than five times.  Maybe twice.  18:39:20
24        Q.    How about Mr. Roseman?              18:39:22
25        A.    Same.  Same answer.                 18:39:24
```

EXH C PG 31

24

```
 1              MICHAEL A. BEGO

 2        Q.    Did they give them to you together or    18:39:26

 3   separate, at separate times?                        18:39:28

 4        A.    I am not sure.  I believe it was         18:39:32

 5   roughly at the same time.  But I'm not a hundred    18:39:36

 6   percent positive.                                   18:39:38

 7        Q.    And can you give me your best            18:39:42

 8   estimate as to -- and these stock certificates      18:39:44

 9   are now sitting, I believe you said, in a safe      18:39:46

10   deposit box?                                        18:39:48

11        A.    Correct.                                 18:39:48

12        Q.    Where is that safe deposit box?          18:39:50

13        A.    It's at Citibank.                        18:39:52

14        Q.    Citibank in --                           18:39:54

15        A.    Manhattan.                               18:39:56

16        Q.    Manhattan?                               18:39:56

17        A.    Yes.                                     18:39:56

18        Q.    Do you have an account with Citibank?    18:40:00

19        A.    Yes.                                     18:40:00

20        Q.    Do you know the approximate -- and       18:40:04

21   this was, by the way, all the stock certificates   18:40:08

22   we are talking about now were certificates in      18:40:10

23   LGP; correct?                                       18:40:10

24        A.    Correct.                                 18:40:12

25        Q.    Do you know approximately how many       18:40:12
```

EXH **C** PG 32

25

```
 1              MICHAEL A. BEGO

 2    shares of LGP that you were given total by Mr.          18:40:18

 3    Berenstein or Mr. Roseman?                              18:40:20

 4         A.    I would say approximately 850,000.           18:40:26

 5    Approximately 840,000, maybe.                           18:40:28

 6         Q.    And what is the nominal value of             18:40:34

 7    those shares?                                           18:40:34

 8         A.    Since I --                                   18:40:40

 9              MR. WALTON:  Objection, vague and             18:40:42

10    ambiguous as to what you mean by nominal.  Do you       18:40:44

11    mean book value, or latest market value?  What          18:40:48

12    time are you valuing it for these questions?            18:40:52

13         Q.    Do the shares indicate a value on the        18:40:54

14    face?                                                   18:40:54

15         A.    No idea.                                     18:40:54

16         Q.    Do you have any understanding as to          18:41:00

17    the current value of those shares?                      18:41:02

18         A.    My understanding is that it's close          18:41:06

19    to zero.  Although I don't know.  I don't work          18:41:10

20    there anymore, but, I mean, I don't work there          18:41:14

21    anymore so all I know is what they tell me, but         18:41:18

22    they effectively tell me that the company is            18:41:20

23    really not worth very much.                             18:41:22

24         Q.    And at any time when Mr. Berenstein          18:41:28

25    or Mr. Roseman gave these shares to you, did they       18:41:30
```

EXH C PG 33

26

|     | MICHAEL A. BEGO |          |
| --- | --- | --- |
| 1   | MICHAEL A. BEGO |          |
| 2   | ever tell you why they were giving you these | 18:41:34 |
| 3   | shares? | 18:41:34 |
| 4   | A.    They may have.  But, again, this was | 18:41:36 |
| 5   | two years ago, so in regards to like if they | 18:41:40 |
| 6   | listed specific reasons -- | 18:41:44 |
| 7   | Q.    Did you understand that it was for | 18:41:46 |
| 8   | compensation for your work on behalf of LGP? | 18:41:48 |
| 9   | A.    No.  I was paid -- I mean, I was paid | 18:41:52 |
| 10  | salary, so it wasn't part of my standard salary, | 18:41:56 |
| 11  | which it didn't impact at all.  But I think it's | 18:42:00 |
| 12  | normal -- I also think it's normal to receive | 18:42:04 |
| 13  | shares in, you know, startup companies, | 18:42:06 |
| 14  | technology companies.  So it's probably something | 18:42:08 |
| 15  | in the lines of, you know, that typical type of | 18:42:10 |
| 16  | incentive. | 18:42:12 |
| 17  | Q.    So these were more or less bonuses or | 18:42:18 |
| 18  | incentive bonuses or rewards for your hard work | 18:42:22 |
| 19  | and diligent work? | 18:42:24 |
| 20  | A.    I wouldn't even say that.  I mean, | 18:42:26 |
| 21  | for example, when you start a company, you are | 18:42:28 |
| 22  | often given, you know, options and shares in | 18:42:30 |
| 23  | advance of your performance.  So... | 18:42:40 |
| 24  | Q.    But as far as you are concerned, | 18:42:42 |
| 25  | these related in some way to your work on behalf | 18:42:46 |

Exh C Pg 34

27

| | | |
|---|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | of LGP; correct?  For example, they weren't | 18:42:50 |
| 3 | giving them to you to pay off a gambling debt or | 18:42:54 |
| 4 | because you taught their son to play piano, for | 18:42:58 |
| 5 | instance? | |
| 6 | A.    No, they didn't give it to me in | 18:43:00 |
| 7 | exchange for anything else. | 18:43:04 |
| 8 | Q.    And while working at LGP, where were | 18:43:06 |
| 9 | your offices? | 18:43:08 |
| 10 | A.    Let's see.  In July of 2000 they | 18:43:12 |
| 11 | were -- one sec. | 18:43:18 |
| 12 | Okay, I don't have the number in my | 18:43:28 |
| 13 | Palm Pilot, so maybe roughly, or not accurate, | 18:43:32 |
| 14 | but they started out -- in July of 2000 they were | 18:43:38 |
| 15 | at -- they were at 79th Street and Lexington. | 18:43:44 |
| 16 | And then they moved -- they moved to 730 Fifth | 18:43:50 |
| 17 | Avenue, which might have been a year later.  It | 18:43:58 |
| 18 | might have been July of 2001.  And I could be off | 18:44:04 |
| 19 | by six months here. | 18:44:04 |
| 20 | And they moved from 730 Fifth | 18:44:10 |
| 21 | Avenue -- and I'm talking about full-time | 18:44:12 |
| 22 | offices.  I think at any one point in time we | 18:44:14 |
| 23 | worked out of other people's offices.  For | 18:44:18 |
| 24 | example, people that were helping raise money, or | 18:44:20 |
| 25 | people we were doing business with.  There were | 18:44:24 |

Exh ⌣ PG 35

28

1　　　　　　　MICHAEL A. BEGO

2　other offices that we worked out of.　　　　18:44:26

3　　　　　But in terms of our principal　　　　18:44:28

4　offices, it would have been 79th Street and　18:44:30

5　Lexington, 730 Fifth Avenue, at the intersection　18:44:36

6　of 57th Street, and most recently 41 East 11th　18:44:46

7　Street in New York.  We actually had like a　18:44:50

8　one-month stay at a place called Power Space,　18:44:54

9　before we found the space at 41 East 11th, and　18:45:00

10　Power Space is located -- I believe it's 770　18:45:02

11　Broadway, which is at the corner of Broadway and　18:45:06

12　maybe it's 9th Street, and it was on the second　18:45:12

13　floor.　　　　　　　　　　　　　　　　　18:45:14

14　　　　Q.　　When did you move into the 41 East　18:45:18

15　11th Street location?　　　　　　　　　　18:45:20

16.　　　.A.　　I mean, it could have been -- I mean,　18:45:42

17　I'd say plus or minus six months to October　18:45:46

18　2002.  But, I mean, it's quite a while ago, so I　18:45:52

19　really, you know, can't say for sure.　　　18:45:54

20　　　　Q.　　And is the 41 East 11th Street the　18:46:02

21　current location of LGP?　　　　　　　　18:46:06

22　　　　A.　　To my knowledge, yes.　　　　18:46:08

23　　　　Q.　　All right.  You mentioned you also　18:46:18

24　worked for a Xandros entity.　　　　　　18:46:22

25　　　　A.　　Yes.　　　　　　　　　　　18:46:22

EXH C PG 36

29

```
 1              MICHAEL A. BEGO

 2        Q.    Have you ever worked for Xandros        18:46:24

 3   Corporation?

 4        A.    Have I ever worked for Xandros          18:46:28

 5   Corporation?                                       18:46:28

 6        Q.    Yes.                                     18:46:28

 7        A.    Yes.                                     18:46:28

 8        Q.    And when did you begin working for       18:46:32

 9   Xandros Corporation?                               18:46:32

10        A.    I began with the inception of the        18:46:34

11   company in May 2001.                               18:46:38

12        Q.    And when did you cease working for       18:46:44

13   Xandros Corporation?                               18:46:44

14        A.    Around the time that I stopped with      18:46:48

15   Linux Global Partners.  I would say it's probably  18:46:54

16   safe to say I stopped around June of 2003.         18:46:56

17        Q.    What was your job title at Xandros       18:47:04

18   Corporation?

19        A.    When I started there, I was -- let's     18:47:10

20   see.  I think I was president, and I think I was   18:47:20

21   also -- I was also a director.  And then I         18:47:24

22   resigned from those titles in the summer of 2002,  18:47:32

23   around July.  But I still was acting as the VP of  18:47:38

24   sales and marketing.                               18:47:40

25        Q.    After you resigned in the summer of      18:47:44
```

EXH C PG 37

30

```
 1                MICHAEL A. BEGO
 2   2002?                                      18:47:44
 3        A.    Yes.  So I still maintained an active    18:47:46
 4   role with the company, but I resigned my director    18:47:50
 5   and officer positions.                     18:47:50
 6        Q.    And you continued acting as VP of    18:47:58
 7   sales and marketing?  You were just an employee    18:48:00
 8   of Xandros Corporation; correct?           18:48:06
 9             MR. WALTON:  Objection.  Misstates    18:48:10
10   his testimony.  It's argumentative.        18:48:12
11        Q.    You can answer.                 18:48:12
12             MR. ROBERTSON:  Objection.  He never    18:48:14
13   said he was an employee.                   18:48:14
14        Q.    Were you an employee of Xandros    18:48:18
15   Corporation?  Let me restate that, I'm sorry.    18:48:20
16             As vice president of sales and     18:48:20
17   marketing, were you an employee of Xandros    18:48:22
18   Corporation?                               
19        A.    Since that's a legal question, I    18:48:26
20   guess you'd have to define employee.  I mean, was    18:48:30
21   I assisting the company?  Yes.  I don't know how    18:48:34
22   you define employee.                       18:48:34
23        Q.    Did they pay you?               18:48:36
24        A.    No.                            18:48:38
25             MR. WALTON:  When you say "they," do    18:48:40
```

EXH C PG 38

31

```
 1                 MICHAEL A. BEGO

 2    you mean did Xandros Corporation pay him?  Is        18:48:44

 3    that what you are asking?                            18:48:44

 4            MR. STUART:  Yes.                             18:48:46

 5            MR. WALTON:  Did you understand his           18:48:46

 6    question to be that?                                 18:48:50

 7        A.   I have received no compensation from        18:48:52

 8    Xandros Corporation.                                 18:48:52

 9        Q.   Where was Xandros Corporation's             18:48:56

10    offices located between May of 2001 and June of      18:49:02

11    2003?                                                18:49:02

12        A.   Well, from May 2001 it was -- didn't        18:49:08

13    have any formal location at all.  One sec.           18:49:12

14            And then we moved -- I think we              18:49:18

15    started at 1410 Blair Place, Suite 600, Ottawa,      18:49:24

16    Ontario K-1J 99, Canada.  And we might have          18:49:30

17    gotten the office on or around August of that        18:49:34

18    same year.                                           18:49:34

19        Q.   Of 2001?                                    18:49:38

20        A.   Um-hum.                                     18:49:40

21            MR. WALTON:  Is that yes?                    18:49:44

22            THE WITNESS:  That's yes.  Sorry.            18:49:46

23        Q.   And did Xandros Corporation maintain        18:49:48

24    offices at any other address, apart from 1410        18:49:52

25    Blair Place?                                         18:49:52
```

ExH C PG 39

                                                              32

```
 1              MICHAEL A. BEGO

 2        A.    I know that they have moved to a new        18:49:54

 3   location, which I don't know -- I don't know the       18:50:00

 4   address.  So they are currently somewhere else.        18:50:02

 5        Q.    Do you know when that move occurred?         18:50:04

 6        A.    I believe it occurred early 2003.           18:50:22

 7   Although I would not say that, you know, again          18:50:26

 8   plus or minus six months.                              18:50:28

 9        Q.    Did it occur prior to your ceasing          18:50:32

10   working in June of 2003?                                18:50:34

11        A.    Yes, I believe so.  I believe it was        18:50:38

12   around June, and I hadn't been going up there          18:50:44

13   lately -- I'm sorry, not June.  I believe it           18:50:46

14   happened a few months before I left.                   18:50:48

15        Q.    And have you ever worked as vice            18:51:00

16   president of sales and marketing or as the             18:51:00

17   president and director of Xandros Corporation at       18:51:02

18   either of those locations?                             18:51:04

19        A.    At 1410 Blair Place, I did.                 18:51:06

20        Q.    And what type of work did you do            18:51:10

21   there?                                                  18:51:10

22        A.    Well, I mean, I was the president of        18:51:14

23   the company.  I founded it.  You know, when the        18:51:18

24   company didn't exist, I founded it.  I along with      18:51:24

25   Will Roseman and Rick Berenstein negotiated some       18:51:28
```

Exh __C__ PG __40__

33

```
1                MICHAEL A. BEGO

2   of the deals up front that got the company going,      18:51:32

3   that acquired the company's initial intellectual       18:51:36

4   property, you know, worked with them in                18:51:38

5   recruiting the first set of the team, and had          18:51:42

6   various operational responsibilities and various       18:51:44

7   sales and marketing -- I don't even know if they       18:51:50

8   call them responsibilities, but I, you know,           18:51:52

9   acted -- yes, I basically had a variety of             18:51:56

10  operations and sales and marketing roles.              18:51:58

11       Q.    Approximately how much time did you         18:52:00

12  spend working at the Blair Place location as a         18:52:06

13  president, director or VP of sales and marketing       18:52:10

14  of Xandros Corporation?                                18:52:12

15       A.    I mean, when everything got up --           18:52:14

16  could you repeat the question?                         18:52:16

17       Q.    Yes.  Approximately how much time did       18:52:18

18  you spend working at 1410 Blair Place as a VP of       18:52:22

19  sales and marketing or as president and a              18:52:24

20  director of Xandros Corporation?                       18:52:26

21       A.    So you are really asking how much           18:52:28

22  time I spent there.  I would guess -- I would          18:52:32

23  estimate that I probably made somewhere between        18:52:36

24  20 and 40 trips to Ottawa for, you know, an            18:52:42

25  average duration of two to three days.                 18:52:44
```

EXH _C_ PG 41

34

Michael A. Bego                    2/19/04                    Lindows v. Xandros

```
 1                  MICHAEL A. BEGO

 2       Q.     Each?                              18:52:46

 3       A.     Yes.                               18:52:48

 4       Q.     All right.  And the new location that   18:52:54

 5   you can't remember where it is that was --    18:52:58

 6       A.     It's in Ottawa.  I don't know the --    18:53:00

 7   I'm sorry, I interrupted you.  Sorry.         18:53:02

 8       Q.     The new location that Xandros       18:53:04

 9   Corporation moved to in 2003, you mentioned   18:53:08

10   that's in Ottawa?                             18:53:10

11       A.     Yes, I was just going to add that.  18:53:12

12   It's not that I don't know where it is.  It's   18:53:14

13   just that I don't recall the address.  Yes, it's   18:53:16

14   definitely in Ottawa, and I just don't know the   18:53:20

15   address.                                      18:53:20

16       Q.     Have you ever spent any time working   18:53:22

17   as VP of sales and marketing or as a president   18:53:26

18   and director of Xandros Corporation at that new   18:53:30

19   address?                                      18:53:30

20       A.     Never.                            18:53:30

21       Q.     Did you have any kind of contract   18:53:32

22   with Xandros Corporation?                     18:53:34

23       A.     Other than the, you know, the signed   18:53:36

24   papers for my directorship and officership, no.   18:53:40

25       Q.     Did you receive any other type of   18:53:44
```

ExH C PG 42

35

```
 1                    MICHAEL A. BEGO
 2   compensation from Xandros Corporation, such as        18:53:48
 3   stock options or stock?                               18:53:52
 4        A.    No.                                        18:53:52
 5        Q.    Are you a shareholder in Xandros           18:53:56
 6   Corporation now?                                      18:53:56
 7        A.    Not directly.                              18:53:58
 8        Q.    Indirectly?                                18:54:02
 9        A.    Through Linux Global Partners.             18:54:04
10        Q.    I'm not sure I understand.  Do you         18:54:08
11   hold stock certificates in Xandros Corporation?       18:54:12
12        A.    No.                                        18:54:14
13        Q.    When say through Linux Global              18:54:16
14   Partners, are you saying --                           18:54:18
15        A.    Sorry.                                     18:54:20
16        Q.    Are you saying that because Linux          18:54:22
17   Global Partners is an indirect parent corporation     18:54:24
18   of Xandros Corporation, and because you own           18:54:26
19   shares in Linux Global Partners, thereby you are      18:54:30
20   an indirect owner of Xandros Corporation?            18:54:32
21             MR. ROBERTSON:  I object to the             18:54:34
22   question.  It's vague, assumes facts not in           18:54:36
23   evidence.                                             18:54:36
24        Q.    Is that your testimony?                    18:54:38
25             MR. ROBERTSON:  Compound.                   18:54:38
```

EXH C PG 43

36

|   |   |   |
|---|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | Q.    You can answer the question. | 18:54:40 |
| 3 | A.    I'll answer the question, but what | 18:54:42 |
| 4 | just happened? | 18:54:44 |
| 5 | MR. WALTON:  Mr. Robertson makes an | 18:54:46 |
| 6 | objection to the question.  Do you understand the | 18:54:48 |
| 7 | question? | 18:54:48 |
| 8 | THE WITNESS:  I believe I do.  But | 18:54:54 |
| 9 | maybe I'm wrong. | 18:54:56 |
| 10 | A.    Just to restate my understanding is | 18:54:58 |
| 11 | you had asked if I own -- I guess I don't own | 18:55:02 |
| 12 | stock in Xandros Corporation. | 18:55:04 |
| 13 | Q.    Do you have any other interest in | 18:55:10 |
| 14 | Xandros Corporation in the form of a derivative? | 18:55:14 |
| 15 | A.    By derivative, you mean -- | 18:55:18 |
| 16 | Q.    Well, a stock option or another form | 18:55:26 |
| 17 | of nonownership-type interest. | 18:55:28 |
| 18 | A.    Well, I don't have any stock | 18:55:30 |
| 19 | options.  But a nonownership interest, I don't | 18:55:34 |
| 20 | know what that would be. | 18:55:36 |
| 21 | Q.    You said that you did not directly | 18:55:38 |
| 22 | own stock in Xandros Corporation; correct? | 18:55:40 |
| 23 | A.    Correct. | 18:55:42 |
| 24 | Q.    Do you indirectly own stock in | 18:55:44 |
| 25 | Xandros Corporation? | 18:55:44 |

EXH C PG 44

37

```
1                    MICHAEL A. BEGO

2         A.    How do you define indirectly?        18:55:48

3         Q.    Those were your words.  By           18:55:54

4    indirectly, I mean by some means other than     18:55:56

5    directly, by directly holding shares in the     18:56:00

6    corporation.                                     18:56:00

7         A.    I don't own it through another        18:56:02

8    person.  I mean, there's different ways -- I told 18:56:06

9    you before I own stock in Linux Global Partners,  18:56:08

10   but I don't own any other -- besides for that, I  18:56:12

11   have no other interest or shares or options or    18:56:18

12   anything else relating to Xandros Corporation.    18:56:20

13        Q.    And have you ever owned any shares in  18:56:30

14   Xandros Corporation?                              18:56:30

15        A.    I'm sorry.  Could you repeat the       18:56:36

16   question?                                         18:56:36

17        Q.    Have you ever owned any shares in      18:56:38

18   Xandros Corporation?                              18:56:40

19        A.    No, never.                             18:56:40

20        Q.    Let's talk about Xandros, Inc.  Do     18:56:54

21   you know of an entity named Xandros, Inc.?        18:56:58

22        A.    Of course.                             18:57:00

23        Q.    Is there a relationship between        18:57:00

24   Xandros Corporation and Xandros, Inc., and LGP?   18:57:06

25        A.    Yes, there is.                         18:57:06
```

Exh C PG 45

38

```
 1              MICHAEL A. BEGO
 2       Q.    Could you describe the relationship        18:57:08
 3  between Xandros, Inc., and Xandros Corporation?        18:57:08
 4       A.    Xandros, Inc., is a U.S. Delaware           18:57:12
 5  corporation that owns 100 percent of the stock of      18:57:14
 6  Xandros Corporation.                                   18:57:16
 7       Q.    And what's the relationship between         18:57:18
 8  Xandros, Inc., and LGP?                                18:57:20
 9       A.    LGP was the -- I guess it was the           18:57:26
10  founding parent of Xandros, that provided, you         18:57:30
11  know, initial capital to get the company going,        18:57:32
12  as well as thought leadership.                         18:57:36
13       Q.    By thought leadership, what to you          18:57:38
14  mean?                                                  18:57:40
15       A.    Well, I guess -- I mean, Linux Global       18:57:44
16  Partners as the parent company of Xandros did a        18:57:46
17  number of things to get the company started and        18:57:48
18  helped it, you know, helped it attempt to achieve      18:57:54
19  success.                                               18:57:56
20       Q.    How did LGP help Xandros, Inc.,             18:58:00
21  attempt to achieve success?                            18:58:02
22       A.    Well, I think from the beginning LPG        18:58:04
23  helped put together the vision for what Xandros        18:58:08
24  could be long-term.  Based on the vision, LGP          18:58:12
25  helped provide and raised capital for Xandros.         18:58:20
```

EXH C PG 46

39

Michael A. Bego                          2/19/04                          Lindows v. Xandros

```
 1                    MICHAEL A. BEGO

 2   LGP helped recruit people to be employees of        18:58:26

 3   Xandros.  LGP offered strategic relationships        18:58:30

 4   that it had with people in the Linux community,      18:58:36

 5   the fundraising community, the software              18:58:38

 6   community, the community of potential customers,     18:58:42

 7   you know, as well as developers, all of which,       18:58:46

 8   you know, it introduced to help Xandros out.         18:58:54

 9            It also provided the services of the        18:58:58

10   three LGP employees, Berenstein, Roseman and         18:59:04

11   myself, you know, to act in various regards,         18:59:08

12   assisting in -- you know, assisting in the           18:59:14

13   running and success of Xandros.                      18:59:16

14       Q.    And have you ever acted as an              18:59:20

15   employee of Xandros, Inc.?                           18:59:22

16            MR. WALTON:  And I take it you are          18:59:24

17   defining that again as was he ever paid by           18:59:26

18   Xandros, Inc.?                                       18:59:28

19            MR. STUART:  No.                            18:59:28

20            MR. WALTON:  Then I will object on          18:59:32

21   the grounds it calls for a legal conclusion.  He     18:59:34

22   has already stated that he doesn't have a good       18:59:36

23   understanding of what you mean by the word           18:59:38

24   employee.  So you will need to help him with         18:59:40

25   that.                                                18:59:40
```

                           Exh C Pg 47
                                                              40

```
 1              MICHAEL A. BEGO
 2       Q.    Do you know what the word employee        18:59:42
 3   means, Mr. Bego?                                    18:59:42
 4       A.    I personally do, and if I saw you on      18:59:44
 5   the corner of the street, we could have a fine      18:59:48
 6   conversation.  But depending how you define         18:59:50
 7   things, I don't know what the technicalities of     18:59:54
 8   it are, so I don't want to give you a wrong         18:59:56
 9   answer.                                             18:59:56
10       Q.    Let's you and I have a conversation       18:59:58
11   like we are having a conversation on the street.    19:00:00
12       A.    Okay.                                     19:00:00
13       Q.    Are you an employee or have you ever      19:00:02
14   been an employee of Xandros, Inc.?                  19:00:04
15       A.    I have been.  I would say I have been     19:00:06
16   because I was a director and officer of Xandros,    19:00:08
17   Inc., and that's -- yes.  I mean, I guess if you    19:00:12
18   are a director -- yes, I would say I was            19:00:16
19   absolutely an employee.                             19:00:18
20       Q.    And you were a director and officer?      19:00:22
21       A.    Yes.                                      19:00:24
22       Q.    You mentioned; correct?                   19:00:26
23       A.    Yes.                                      19:00:26
24       Q.    During what period of time were you a    19:00:28
25   director of Xandros, Inc.?                          19:00:30
```

EXH _C_ PG **48**

41

```
1                 MICHAEL A. BEGO

2        A.    Since the founding of the company in      19:00:32

3   May 2001, until I resigned in June 2002, plus or     19:00:40

4   minus a month.                                       19:00:42

5        Q.    And during what period of time were       19:00:46

6   you an officer of Xandros, Inc.?                     19:00:48

7        A.    The same period.  The first question      19:00:50

8   was when I was a director?                           19:00:52

9        Q.    Yes.                                       19:00:54

10       A.    Yes.  So I was a director and officer      19:00:56

11  for the same period of time.                         19:00:56

12       Q.    And what officership did you hold?         19:00:58

13       A.    Definitely president.  I believe Rick      19:01:04

14  was treasurer -- Rick was secretary.  I believe      19:01:10

15  Will was treasurer.  So maybe just president.        19:01:20

16  Although I don't recall if I had a different one      19:01:22

17  as well.                                             19:01:22

18       Q.    So president was the only officership      19:01:34

19  you held for Xandros, Inc.; correct?                 19:01:36

20       A.    I believe so.  It's possible I was        19:01:40

21  secretary, but I don't recall.                       19:01:42

22       Q.    Would there be documents in existence     19:01:44

23  that would reflect the tenure of your                19:01:46

24  officerships?                                         19:01:48

25       A.    Absolutely.                               19:01:50
```

Exh C Pg 49

42

| | | |
|---|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | Q.    And what would those documents be? | 19:01:52 |
| 3 | A.    Well, there would have been the | 19:01:52 |
| 4 | minute books of the company.  There would have | 19:01:54 |
| 5 | been the corporate records held by Fraser, Milner | 19:02:00 |
| 6 | & Casgrain, who were our attorneys.  As I was | 19:02:02 |
| 7 | the, you know, acting as president, I was signing | 19:02:04 |
| 8 | officer for both the Xandros Corp. and Xandros, | 19:02:10 |
| 9 | Inc., so we provided documents to Royal Bank of | 19:02:12 |
| 10 | Canada, which was our bank, had to give them | 19:02:16 |
| 11 | statements from the law firm that confirmed my | 19:02:18 |
| 12 | directorships, so they should have copies. | 19:02:20 |
| 13 | Yes.  So basically, you know, the | 19:02:24 |
| 14 | copies of the minute books and whatever legal | 19:02:26 |
| 15 | documents are associated with that. | 19:02:28 |
| 16 | And you could also probably | 19:02:30 |
| 17 | corroborate that with, you know, two years of | 19:02:34 |
| 18 | signing papers, along with the other directors, | 19:02:40 |
| 19 | the other directors and officers of the company. | 19:02:42 |
| 20 | Q.    Was there a -- when you say the | 19:02:44 |
| 21 | minute books, did Xandros, Inc., keep regular | 19:02:48 |
| 22 | minute books? | 19:02:50 |
| 23 | A.    Yes. | 19:02:50 |
| 24 | Q.    Was there a period of time -- was | 19:02:54 |
| 25 | there a regular officer meeting or board of | 19:02:58 |

Exh C Pg 50

43

```
 1                    MICHAEL A. BEGO
 2        A.    Yes.  I mean, I believe they would        19:04:12
 3   have to because they are different legal             19:04:14
 4   entities.                                            19:04:14
 5        Q.    Did you --                                19:04:16
 6        A.    To answer your question, I actually       19:04:18
 7   don't recall, but I'm sure that they would have      19:04:22
 8   had to.  I'm sure that we did.                       19:04:24
 9        Q.    All right.  So you never saw a minute     19:04:26
10   book kept by Xandros Corporation that was            19:04:28
11   distinct from a minute book kept by Xandros,         19:04:32
12   Inc.?                                                19:04:32
13        A.    No, I'm sure that I did see distinct      19:04:34
14   minute books.  I just don't recall.  You know,       19:04:38
15   there were a great deal of different papers and      19:04:40
16   minute books and like corporate records, and I       19:04:46
17   don't recall if they were separate but I'm quite     19:04:48
18   certain that they would have had to be.              19:04:50
19        Q.    What other corporate records do you       19:04:54
20   recall seeing?  And let's go back and refer to       19:04:56
21   Xandros, Inc.  What other corporate records of       19:05:00
22   Xandros, Inc., do you recall seeing?                 19:05:02
23        A.    By corporate records, you mean            19:05:04
24   like -- I assume you mean legal things, not bank     19:05:06
25   statements, not --                                   19:05:08
```

Exh C Pg 52

45

Michael A. Bego                          2/19/04                    Lindows v. Xandros

| | | |
|---|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | Q.    Well, you used the term corporate | 19:05:08 |
| 3 | records.  And so I want to know what you mean by | 19:05:12 |
| 4 | that term. | 19:05:12 |
| 5 | A.    Corporate records, you know, would be | 19:05:18 |
| 6 | things that go in the minute book.  You know, if | 19:05:24 |
| 7 | there were postings for directorships, if there | 19:05:28 |
| 8 | were any resolutions that we would have made, | 19:05:30 |
| 9 | bylaws.  You know, the standard -- basically, the | 19:05:40 |
| 10 | standard things that go into your minute books. | 19:05:42 |
| 11 | Q.    I understand the standard things that | 19:05:44 |
| 12 | might go into a minute book.  My question, | 19:05:46 |
| 13 | though, is you mentioned that you had seen lots | 19:05:48 |
| 14 | of corporate records on behalf of Xandros, Inc. | 19:05:52 |
| 15 | A.    Well, I'm not saying specifically | 19:05:54 |
| 16 | Inc. and corporate.  But, I mean, I was the lead | 19:05:58 |
| 17 | person that worked with the attorneys that | 19:06:00 |
| 18 | managed the paperwork for both Inc. and Corp.  So | 19:06:02 |
| 19 | whatever papers there were I should have seen. | 19:06:06 |
| 20 | Q.    Mr. Bego, I am going to ask that you | 19:06:10 |
| 21 | allow me to finish my question before you begin | 19:06:12 |
| 22 | your answer. | 19:06:12 |
| 23 | A.    I'm sorry.  There was a pause. | 19:06:14 |
| 24 | Q.    I apologize.  You might just wait | 19:06:16 |
| 25 | just very briefly when you think that my question | 19:06:24 |

ExH C PG 53

46

```
 1              MICHAEL A. BEGO

 2   is over, just to be sure it is.              19:06:24

 3              What I am asking you, sir, is what    19:06:30

 4   corporate records on behalf of Xandros, Inc.,   19:06:32

 5   have you seen?                               19:06:34

 6        A.    I've seen -- I mean, I don't recall  19:06:36

 7   the exact list.  I remember -- I mean, this goes  19:06:40

 8   back two years and, like I mentioned before,   19:06:42

 9   there was a lot of paperwork.  I remember      19:06:44

10   bylaws.  I remember seeing who signed the       19:06:48

11   director and officer papers.  Beyond that, I    19:06:56

12   don't recall.

13        Q.    You mentioned bank statements?        19:06:58

14        A.    Yes.  But I don't think -- I wouldn't  19:07:02

15   consider those corporate records, from a legal   19:07:06

16   standpoint.                                  19:07:06

17        Q.    And I believe you mentioned you were  19:07:08

18   the primary person in charge of maintaining this  19:07:10

19   paperwork?                                   19:07:12

20        A.    Yes.                              19:07:12

21        Q.    As you sit here today, do you recall  19:07:14

22   any other files and records that were kept on a  19:07:18

23   regular basis by Xandros, Inc.?                19:07:24

24        A.    Like any other files or records?    19:07:26

25        Q.    Yes.                              19:07:26
```

Exh C PG 54

47

```
 1              MICHAEL A. BEGO
 2       A.    There were quite a number.  Xandros,        19:07:30
 3  Inc., was the U.S. entity, and Xandros Corp. was       19:07:34
 4  the Canadian entity, so all business that was          19:07:38
 5  done in Canada in Canadian dollars was done out        19:07:42
 6  of Xandros Corp.  However, we did have employees       19:07:44
 7  in the U.S. -- employees, or at least                  19:07:50
 8  consultants.  I think they were consultants,           19:07:54
 9  maybe employees.  So there were, you know, each        19:07:56
10  hour related agreements related to Xandros, Inc.       19:08:04
11  There were transactions between Xandros Corp. and      19:08:06
12  Xandros, Inc.  Sales that were done in the             19:08:10
13  U.S. -- like most of the sales and marketing           19:08:14
14  would have been all related to Xandros, Inc.           19:08:22
15            So, yes, I mean, there's a wide range        19:08:26
16  of, you know, a wide range of activity around          19:08:28
17  Xandros, Inc.                                          19:08:30
18       Q.    Can you just give me a general              19:08:32
19  description of the categories of documents and         19:08:34
20  records that were maintained by Xandros, Inc.?  I      19:08:38
21  am not asking you to enumerate every single            19:08:42
22  document.  I am asking for categories.                 19:08:44
23       A.    Okay.  I would say legal.  You know,        19:08:46
24  back to my old -- I mean, legal/corporate, back        19:08:50
25  to like the minute books, and things like that.        19:08:52
```

Exh C Pg 55

48

```
 1              MICHAEL A. BEGO

 2              Banking, sales, marketing, HR.  Those      19:09:00

 3  are a few that come to mind.                           19:09:02

 4       Q.    Any others?                                 19:09:04

 5       A.    Those are a few that come to mind.          19:09:06

 6       Q.    Any others that come to mind as you         19:09:08

 7  sit here?                                              19:09:08

 8       A.    I mean, you could probably say news,        19:09:26

 9  community.  Those would be a couple more.              19:09:30

10       Q.    Any others?                                 19:09:34

11       A.    That's what I can think of right now.       19:09:44

12       Q.    Very well.  If I asked you the same         19:09:48

13  questions about Xandros Corporation as to what         19:09:50

14  types of records were kept by Xandros                  19:09:54

15  Corporation, would your answer be any different        19:09:54

16  than your answer regarding Xandros, Inc.?              19:10:00

17       A.    The only qualifications that I would        19:10:02

18  give is that Xandros Corp. -- I mean, I guess          19:10:10

19  depending on how you looked at things, some of         19:10:12

20  the sales and marketing activities that we did         19:10:14

21  only in Canada, those could have fallen through        19:10:18

22  the Xandros Corporation.  And the last two that I      19:10:22

23  mentioned, in terms of documents or records kept       19:10:26

24  around community or news events, or whatnot,           19:10:28

25  those probably could apply to both.                    19:10:32
```

Exh C PG 50

49

```
 1              MICHAEL A. BEGO
 2        Q.   All right.                              19:10:36
 3             Have you read any of the depositions    19:10:40
 4    that have been taken in this case?               19:10:42
 5        A.   I browsed through them.  I browsed       19:10:46
 6    through them, but I didn't go through them in    19:10:48
 7    great detail.                                    19:10:50
 8        Q.   You browsed through both the            19:10:54
 9    deposition transcript of Mr. Berenstein and Mr.  19:10:56
10    Roseman?                                         19:10:56
11        A.   Briefly.                                19:10:58
12        Q.   Why did you browse through the          19:11:06
13    transcripts?                                     19:11:06
14        A.   Why did I browse through them?          19:11:08
15        Q.   Yes, sir.                               19:11:08
16        A.   Okay.  I was sent them, and out of      19:11:12
17    curiosity.                                       19:11:14
18        Q.   What was your purpose in looking        19:11:14
19    through these deposition transcripts?            19:11:16
20        A.   Curiosity.                              19:11:20
21        Q.   Any other purpose?                      19:11:22
22        A.   I guess I was curious what -- I mean,   19:11:30
23    I was curious what questions were being asked.  I 19:11:34
24    was curious, you know, what was being answered.  19:11:36
25    I certainly can't say that I read through the    19:11:38
```

EXH **C** PG **57**

50

```
 1                    MICHAEL A. BEGO
 2   entire things.  I mean, obviously, if there's          19:11:42
 3   questions that would pertain to me, I definitely       19:11:44
 4   would have read that if I saw my name somewhere.       19:11:46
 5            But that's basically it.                      19:11:48
 6        Q.    And when did you read these                 19:11:50
 7   deposition transcripts?                                19:11:50
 8        A.    I'd have to go to Andy Robertson and        19:11:54
 9   ask him when he sent them to me.  I would say it       19:11:58
10   was within a week of when I received them from         19:12:00
11   him.                                                   19:12:00
12        Q.    Can you give me just your best              19:12:02
13   estimate as to what period of time that was?          19:12:04
14        A.    It could have been over the -- it           19:12:10
15   could have been September or October or                19:12:12
16   November.  It was not in the last two months, I       19:12:16
17   don't think.                                           
18        Q.    Do you have Mr. Berenstein's                19:12:20
19   deposition transcript in front of you?                 19:12:24
20        A.    Yes.                                        19:12:24
21        Q.    Can you turn to page 13 of Mr.              19:12:34
22   Berenstein's transcript.                               19:12:36
23        A.    Yes.                                        19:12:36
24        Q.    Can you read for me the question that       19:12:44
25   begins on line 5?                                      19:12:46
```

Exh C Pg 58

51

```
 1                    MICHAEL A. BEGO
 2        A.    There's two line 5's.              19:12:48
 3        Q.    There are?                         19:12:52
 4        A.    Oh, I've got -- which page 13 do you   19:12:54
 5   mean?  There's a page 13 listed from the bottom   19:12:58
 6   of the pages, and then there's like --        19:13:02
 7        Q.    The 13 I am referring to is in the 19:13:04
 8   bottom right-hand corner of the transcript.   19:13:06
 9        A.    I have nothing on the bottom       19:13:08
10   right-hand corners.                           19:13:10
11        Q.    I'm sorry.                          19:13:10
12        A.    I've got two different -- there's two  19:13:14
13   different page listings.  One goes every page 19:13:16
14   there's a number, and the other has like two  19:13:20
15   pages per page.                               19:13:20
16        Q.    It looks like you have a condensed 19:13:24
17   transcript.  In the boxes that have two pages per  19:13:30
18   page, is there a number in the lower right-hand    19:13:32
19   corner of those boxes?                        19:13:34
20        A.    No.                                19:13:36
21        Q.    If you look on the right side of   19:13:46
22   those boxes, do you see a time signature or a 19:13:52
23   time stamp that would begin, and it's a series of  19:13:56
24   three numbers separated by two colons?        19:13:58
25        A.    On the page that I have open -- I  19:14:02
```

ExH ⊂ PG 59

52

```
1                MICHAEL A. BEGO

2   don't see any boxes.  I see sections of text but      19:14:04

3   I don't see boxes.  And I see not one time stamp      19:14:08

4   on the page that I'm looking at.                      19:14:10

5             MR. STUART:  Let's go off the               19:14:12

6   record.                                               19:14:12

7             THE VIDEOGRAPHER:  Going off the            19:14:14

8   record.  The time is 7:12.                            19:14:16

9             (A recess was taken.)          .           19:25:40

10            THE VIDEOGRAPHER:  We are back on the       19:29:58

11  record.  The time is 7:28.                            19:30:02

12            BY MR. STUART:                              19:30:08

13     Q.    Mr. Bego, off the record we had a            19:30:10

14  chance to review some of the deposition               19:30:12

15  transcripts, and it appears that you have an          19:30:16

16  unformatted version of the official transcript,      19:30:22

17  and that's the document that you have before you,    19:30:24

18  and we have attempted to help you decipher the        19:30:26

19  page numbering of the official transcript versus     19:30:30

20  the page numbering of the file that was printed       19:30:36

21  out that you have in front of you.                    19:30:38

22            So what I'm going to do is refer you        19:30:40

23  to page 13 of the official transcript.  The first    19:30:46

24  full question on that page that was addressed to      19:30:50

25  Mr. Berenstein was, "Has Mr. Bego, to your           19:30:54
```

Exн C PG 66

53

| | | |
|---|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | knowledge, ever been an officer or a director of | 19:30:56 |
| 3 | Xandros, Inc.?" And his answer was "No." | 19:31:00 |
| 4 | Do you see that? | 19:31:02 |
| 5 | A. Yes. | 19:31:04 |
| 6 | Q. Do you disagree with Mr. Berenstein's | 19:31:08 |
| 7 | answer? | 19:31:08 |
| 8 | A. Obviously. | 19:31:10 |
| 9 | Q. Do you know why Mr. Berenstein would | 19:31:14 |
| 10 | have answered the question in that way? | 19:31:16 |
| 11 | MR. WALTON: Objection; calls for | 19:31:18 |
| 12 | speculation. There's no foundation. | 19:31:20 |
| 13 | Q. Answer the question. | 19:31:20 |
| 14 | A. Do you want me to speculate? | 19:31:22 |
| 15 | Q. No. I want you to give me your best | 19:31:24 |
| 16 | understanding as to why Mr. Berenstein may have | 19:31:28 |
| 17 | answered the question that way. | 19:31:28 |
| 18 | A. The only reasons I can think of were | 19:31:32 |
| 19 | he was -- he was very confused for several | 19:31:38 |
| 20 | years. He had -- either he was very confused, he | 19:31:44 |
| 21 | didn't understand the question, or he was | 19:31:46 |
| 22 | speaking untruthfully. | 19:31:52 |
| 23 | You also have to understand that for | 19:31:54 |
| 24 | two years we signed 20 documents side-by-side -- | 19:31:58 |
| 25 | you know, probably more than 20 documents | 19:32:00 |

Exh C Pg 61

54

```
 1                MICHAEL A. BEGO

 2   side-by-side, where I was signing as president of      19:32:02

 3   Xandros, Inc.  I have absolutely no idea besides,      19:32:12

 4   you know, extreme confusion or speaking               19:32:14

 5   untruthfully why he would say that.                   19:32:18

 6        Q.    By side-by-side, you mean in the           19:32:20

 7   presence of Mr. Berenstein you signed on behalf       19:32:22

 8   of Xandros, Inc., as president?                       19:32:24

 9        A.    Absolutely.  I mean, even I think the      19:32:28

10   strategic agreement, you know, we signed             19:32:32

11   side-by-side there.  I mean, there's 80              19:32:40

12   examples.  And if you look at the legal              19:32:44

13   paperwork, whenever it's available, I'm sure you     19:32:48

14   will see that I was officially -- that was my        19:32:50

15   official role, so I really don't see how -- I        19:32:54

16   mean, he's either just extraordinarily confused      19:32:56

17   or for some reason he's speaking something that      19:33:00

18   he knows to be otherwise.                            19:33:00

19        Q.    Do you believe that he is, as you         19:33:08

20   said, speaking something that he knows to be         19:33:10

21   otherwise?  Do you have any reason to believe        19:33:14

22   that he is not telling the truth?                    19:33:16

23        A.    I don't know why he would say that.       19:33:16

24        Q.    Do you believe that he is not telling     19:33:26

25   the truth?                                           19:33:26
```

EXH C PG 62

55

| | | |
|---|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | A.    I have absolutely no idea why he | 19:33:30 |
| 3 | would say that. | 19:33:30 |
| 4 | Q.    So you do not believe that he was not | 19:33:36 |
| 5 | telling the truth?  Is that your testimony? | 19:33:36 |
| 6 | A.·    No, I'm just saying I don't know. | 19:33:38 |
| 7 | MR. ROBERTSON:  Objection; asked and | 19:33:40 |
| 8 | answered.  Negative pregnant, bad question. | 19:33:44 |
| 9 | MR. STUART:  What's the evidence code | 19:33:48 |
| 10 | for negative pregnant?  I'm not sure. | 19:33:50 |
| 11 | MR. ·ROBERTSON:  You are trying to | 19:33:52 |
| 12 | trick him by doubling back with a negative | 19:33:54 |
| 13 | pregnant. | 19:33:56 |
| 14 | MR. STUART:  No, I'm trying to get | 19:33:58 |
| 15 | him to answer to the question put to him, which | 19:34:02 |
| 16 | is do you believe he was lying, yes or no? | 19:34:04 |
| 17 | MR. WALTON:  He has already answered· | 19:34:06 |
| 18 | the question.  It's asked and answered. | 19:34:06 |
| 19 | MR. ROBERTSON:  Same objection. | |
| 20 | A.    I can repeat it, if you want. | 19:34:08 |
| 21 | Q.    It is a very simple question. | 19:34:10 |
| 22 | A.    To be honest, I don't know. | 19:34:12 |
| 23 | Q.    Do you believe he was lying or you | 19:34:14 |
| 24 | don't? | 19:34:14 |
| 25 | MR. WALTON:  Objection.  That's | 19:34:16 |

EXH C PG 63

56

```
 1              MICHAEL A. BEGO

 2   argumentative.                               19:34:16

 3           MR. ROBERTSON:   Same objection.     19:34:18

 4       Q.   You don't know if he was lying?     19:34:20

 5       A.   I don't know why he would lie.  I   19:34:24

 6   don't know why he would be confused.  I have no  19:34:28

 7   idea.  I mean, I don't see why he would lie and I  19:34:34

 8   don't see how he could not know, so I just have  19:34:36

 9   no idea.                                     19:34:38

10       Q.   You also have before you the Volume 1  19:34:42

11   of the Roseman transcript.  Did you also review  19:34:46

12   this transcript?                             19:34:48

13    .   A.   I probably also browsed through it.  19:34:50

14       Q.   Let's refer to page 20 of the       19:34:54

15   official transcript.                         19:35:16

16       A.   Okay.                               19:35:16

17       Q.   Have you had a chance to review that  19:35:20

18   page?                                        19:35:20

19       A.   Do you want me to read it now?      19:35:24

20       Q.   Yes.  Why don't you review page 20  19:35:28

21   and 21.  And while we are at it, let's read 22 as  19:35:30

22   well.                                        19:35:30

23       A.   So you want me to read 20, 21 and   19:35:38

24   22?                                          19:35:38

25       Q.   Yes, sir.                           19:35:40
```

Exh C Pg 64

57

Michael A. Bego                    2/19/04                    Lindows v. Xandros

| | | |
|---|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | A.    So it ends with "You know, I don't | 19:35:42 |
| 3 | know," and it starts with "No"? | 19:35:46 |
| 4 | Q.    That's right.  You can begin reading | 19:35:48 |
| 5 | at the first full question, which is "I'm going | 19:35:52 |
| 6 | to ask you the same questions." | 19:35:54 |
| 7 | A.    Okay. | 19:35:54 |
| 8 | Now, I have a question. | 19:36:18 |
| 9 | Q.    Yes, sir. | 19:36:20 |
| 10 | A.    It goes Q, A, and then it says Dr. | 19:36:24 |
| 11 | Berenstein.  So was this William Roseman's | 19:36:26 |
| 12 | deposition with Dr. Berenstein there? | 19:36:26 |
| 13 | Q.    That's right. | 19:36:28 |
| 14 | A.    Okay.  So he would like speak up. | 19:36:32 |
| 15 | MR. WALTON:  And those statements, | 19:36:34 |
| 16 | just to further clarify, Mr. Bego, where it says | 19:36:36 |
| 17 | Dr. Berenstein, that is a reference to Dr. | 19:36:38 |
| 18 | Berenstein talking.  So what follows the colon is | 19:36:42 |
| 19 | statements made by Dr. Berenstein during the | 19:36:46 |
| 20 | course of Mr. Roseman's deposition. | 19:36:48 |
| 21 | THE WITNESS:  So just to confirm that | 19:36:50 |
| 22 | I understand this, Will Roseman was asked if | 19:36:52 |
| 23 | anyone besides -- have there been any other | 19:36:56 |
| 24 | officers of Xandros, Inc., and he said that he | 19:36:58 |
| 25 | believed that I was one, and then Mr. Berenstein | 19:37:00 |

ExH C PG 65

58

```
 1              MICHAEL A. BEGO
 2  said that, no, I wasn't one.  And then the A, the       19:37:06
 3  next A, is Will Roseman saying that I was a             19:37:10
 4  director of Xandros Corp. and that he's sorry.          19:37:14
 5       Q.    I don't know if I would agree with           19:37:16
 6  that characterization, but I am just asking you         19:37:18
 7  to read that passage.                                   19:37:20
 8        A.    I just want to make sure I understand       19:37:22
 9  the Qs and As and Dr. Berenstein.  I mean, it           19:37:26
10  just looks like --                                      
11       Q.    Mr. Walton's description of Dr.              19:37:28
12  Berenstein's role was correct, though.  Dr.             19:37:30
13  Berenstein was in the room and said something.          19:37:34
14  The court reporter recorded it, though he wasn't        19:37:40
15  deposed.                                                19:37:40
16        A.    It's just is a little unclear because       19:37:44
17  Will said I'm a director, and then Rick said no,        19:37:48
18  he's not a director, and then Will says oh,             19:37:50
19  sorry, he's not a director.  It's almost like you       19:37:54
20  weren't asking Will, like a ventriloquism.  I           19:37:58
21  just want to make sure I read it right.                 19:38:00
22            Okay, I think I get the gist of it.           19:40:32
23       Q.    I take it you disagree with several          19:40:32
24  of the statements made by Mr. Roseman in those          19:40:34
25  pages as well; correct?                                 19:40:38
```

                                    59

EXH 𝒞 PG 66

```
 1                    MICHAEL A. BEGO

 2              MR. ROBERTSON:  Which statements are        19:40:38

 3   you referring to.                                     19:40:40

 4        A.    Yes.                                        19:40:44

 5        Q.    Is there anything in those three           19:40:46

 6   pages that Mr. Roseman testified to that you          19:40:48

 7   disagree with?                                        19:40:50

 8        A.    There's things that I think are --         19:40:50

 9   there's a couple of instances that I think are        19:40:52

10   incorrect.                                            19:40:54

11        Q.    Let's start with the first one of          19:40:54

12   those couple of instances.                            19:40:56

13        A.    Okay.  So going through on line 3 of       19:41:02

14   page 20, his first answer where he says he            19:41:08

15   believes I was a director, I agree with that.         19:41:10

16              His next answer was he was a               19:41:16

17   director.  I agree with that.                         19:41:18

18        Q.    Wait.  You are referring to line 14?       19:41:24

19        A.    No, line 10.  He says he was a             19:41:28

20   director.  You know, that could be Xandros.           19:41:30

21        Q.    I am only asking you for things you        19:41:32

22   disagree with.                                        19:41:34

23        A.    Disagree with, okay.  I don't want to      19:41:36

24   miss anything, so I'm going to go one-by-one.         19:41:40

25              When he said in line 14 that I was a       19:41:42
```

ExH C PG 67

60

| | | |
|---|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | director of Xandros Corporation, I agree with | 19:41:44 |
| 3 | that. | 19:41:48 |
| 4 | Q.    Mr. Bego, to save time let's focus on | 19:41:50 |
| 5 | what you disagree with. | 19:41:52 |
| 6 | A.    I'm sorry, you are asking what I | 19:41:54 |
| 7 | disagree with, but I have to read every question | 19:41:56 |
| 8 | and every answer to make sure that -- so I can | 19:41:58 |
| 9 | give you the right response, so I don't omit | 19:42:02 |
| 10 | anything. | 19:42:02 |
| 11 | I disagree -- not I disagree, but I | 19:42:18 |
| 12 | believe it is false, in page 20, line 22, when he | 19:42:22 |
| 13 | says no. | 19:42:22 |
| 14 | And I would consequently also find to | 19:42:34 |
| 15 | be false on page 20, line 25, where he says yes. | 19:42:38 |
| 16 | On page 21, line 4, where he says | 19:42:50 |
| 17 | "No," I would disagree with that, or I would -- | 19:42:58 |
| 18 | not disagree with.  I believe that is also | 19:43:00 |
| 19 | false. | 19:43:04 |
| 20 | I don't understand what he's saying | 19:43:08 |
| 21 | in 6.  Because he's just agreeing with you but | 19:43:14 |
| 22 | you weren't saying anything, so I don't know | 19:43:18 |
| 23 | about line 6. | 19:43:20 |
| 24 | And I don't understand what he said | 19:43:24 |
| 25 | in line 6 or 8, I guess, so I don't agree or | 19:43:26 |

Exh C Pg 68

61

```
1                    MICHAEL A. BEGO

2    disagree.  It just doesn't make sense to me.      19:43:30

3            Based on our discussion of employee,     19:44:02

4    I would disagree with page 22 -- not I disagree   19:44:10

5    with, but I think it's false in regards to his    19:44:14

6    response on page 22, line 10, where he says "A.   19:44:20

7    No, I suppose not."                               19:44:22

8        Q.    We can stop there.                      19:44:24

9            Do you have any reason to believe        19:44:26

10   that Mr. Roseman may have been not telling the    19:44:30

11   truth?                                            19:44:30

12       A.    I believe Mr. Roseman definitely --     19:44:36

13   in this case I believe Mr. Roseman was telling    19:44:38

14   the truth like, for example, when he initially    19:44:42

15   said that he believed I was a director of         19:44:44

16   Xandros, Inc., but then maybe when Rick disagreed 19:44:48

17   with him, he questioned his own knowledge and      19:44:50

18   just agreed with Rick but wasn't himself sure.    19:44:54

19           So I think in this case, just going      19:44:56

20   looking at his testimony, it seems more clear     19:45:00

21   that he was not sure himself, so he believed what 19:45:06

22   Rick stated to be fact.                           19:45:06

23       Q.    So you don't believe that Mr. Roseman   19:45:08

24   was not testifying as to what he thought was      19:45:10

25   truthful?  You just believe that he was a little  19:45:14
```

ExH C PG 69

62

Michael A. Bego                    2/19/04                    Lindows v. Xandros

```
 1            MICHAEL A. BEGO

 2  unsure and confused?                          19:45:16

 3      A.    Correct.  I believe he was initially  19:45:18

 4  answering outright, and based on his memory of  19:45:22

 5  events, which was the same as mine, that I was a  19:45:26

 6  director, and that when Rick stated otherwise,  19:45:30

 7  Will deferred to -- you know, Will deferred that  19:45:34

 8  question to Rick.                             19:45:34

 9      Q.    There was no period of time where you  19:45:46

10  were, quote-unquote, loaned to Xandros, Inc., for  19:45:54

11  some temporary basis or temporary authority;  19:45:58

12  correct?                                      19:45:58

13      A.    I don't understand.  You made a     19:46:00

14  statement?  It depends how you define loan.  I  19:46:06

15  mean, I was officially an employee of Linux    19:46:10

16  Global Partners, and I was operating effectively  19:46:12

17  as an employee of Xandros, Inc., as president and  19:46:14

18  director.                                      19:46:14

19      Q.    Let me ask you this:  Do you have --  19:46:26

20  you have obviously had a chance to review your  19:46:28

21  declaration in this matter; correct?          19:46:30

22      A.    I gave it, but I haven't gone through  19:46:34

23  it lately.                                     19:46:34

24      Q.    Why don't you take a look at Exhibit  19:46:38

25  28.                                            19:46:52
```

ExH C PG 70

```
 1              MICHAEL A. BEGO
 2      A.    Okay.                              19:46:52
 3      Q.    Page 1, line -- well, why don't you  19:46:58
 4  read the first full paragraph.              19:47:00
 5      A.    Okay.                              19:47:00
 6      Q.    To line 22, numbered paragraph 1.  19:47:04
 7      A.    "I am currently vice president of  19:47:06
 8  Linux Global Partners --"                   19:47:08
 9            MR. WALTON:  Mike, you can read it to  19:47:10
10  yourself.                                   19:47:12
11            THE WITNESS:  Okay.                19:47:12
12      A.    So just line 1 -- just point 1?    19:47:48
13      Q.    Just paragraph 1.                  19:47:50
14      A.    Gotcha.                            19:47:52
15      Q.    Is there anything in that paragraph  19:47:56
16  that you disagree with as you sit here today?  19:47:58
17      A.    Let's see.  Well, I'm -- I mean,   19:48:02
18  based on the date, you know, I'm obviously not  19:48:04
19  currently a vice president of Linux Global    19:48:06
20  Partners, per my previous testimony, nor am I  19:48:10
21  acting as sales and marketing director of     19:48:12
22  Xandros.                                     19:48:14
23            No.                                19:48:26
24      Q.    So you were the acting president of  19:48:30
25  Xandros from May 2001 through May 2002?  You  19:48:38
```

ExH C PG 11

64

| | | |
|---|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | agree with that? | 19:48:38 |
| 3 |   A.  Yes. | 19:48:38 |
| 4 |   Q.  What do you mean by the acting | 19:48:42 |
| 5 | president?  What's the difference between an | 19:48:44 |
| 6 | acting president and just a president? | 19:48:46 |
| 7 |   A.  Well, I guess I was both.  I mean, in | 19:48:48 |
| 8 | this case I was both, but -- | 19:48:54 |
| 9 |   Q.  What's the difference? | 19:48:56 |
| 10 |   A.  I guess -- what is the difference?  I | 19:49:04 |
| 11 | guess they are really effectively to be the | 19:49:10 |
| 12 | same.  I know that in the -- like I know that the | 19:49:12 |
| 13 | term acting in the military, you can be like an | 19:49:16 |
| 14 | acting lieutenant before you are actually a | 19:49:20 |
| 15 | lieutenant or whatever.  So, you know, in some | 19:49:24 |
| 16 | case you can be acting before you are | 19:49:26 |
| 17 | officially.  In this case, you know, I was acting | 19:49:30 |
| 18 | as president, I was president, both officially, | 19:49:36 |
| 19 | you know, legally, according to things of the | 19:49:38 |
| 20 | corporation, as well as in terms of the roles | 19:49:40 |
| 21 | that I was doing. | 19:49:42 |
| 22 |     I think they could be different in | 19:49:44 |
| 23 | that you could be signed up as president, like | 19:49:46 |
| 24 | many people are in corporations, but they are not | 19:49:50 |
| 25 | actively doing the role.  So I know like, for | 19:49:52 |

EXH C PG 72

65

```
1              MICHAEL A. BEGO

2  example, in some instances people, they are not        19:49:54

3  officially the president, and they don't have the      19:49:56

4  title of president, but they are doing all of the      19:50:02

5  things that, you know, are such a president, and       19:50:06

6  then you can get into problems.  Whereas in this       19:50:08

7  case there's not really a conflict as I was both       19:50:12

8  nominally and in actuality and the president of        19:50:14

9  Xandros, Inc., and Corp.                               19:50:16

10      Q.    So why did you use the term acting          19:50:20

11  rather than just saying you were president?            19:50:22

12      A.    Why not?  There's no reason.                19:50:24

13      Q.    So if you recast that sentence and          19:50:28

14  took the word "acting" out, you believe that that     19:50:32

15  would be accurate as well?                            19:50:32

16      A.    Yes.                                        19:50:38

17      Q.    Did you actually sign some type of          19:50:44

18  contract with Xandros, Inc., when you undertook       19:50:48

19  the officership of president?                         19:50:52

20      A.    I signed the, you know, papers             19:50:54

21  officially declaring me as president and              19:50:58

22  director.  So, yes, I did officially sign papers      19:51:02

23  to that effect.                                       19:51:02

24      Q.    And what would those papers be              19:51:08

25  called?  How would I identify those papers?           19:51:12
```

Exh C PG 73

66

```
1                    MICHAEL A. BEGO

2        A.    I don't know the legal title.  Pardon       19:51:14

3   me, you do law?  I mean, I assume you practice          19:51:18

4   law.  So the standard part of every corporation.        19:51:22

5   I don't know if they are incorporating documents        19:51:24

6   or if they are -- I don't know the official name.       19:51:26

7        Q.    Have you seen that document, you know        19:51:30

8   that there is a document in existence that              19:51:34

9   identifies you as the president of Xandros, Inc.?       19:51:36

10       A.    I know that there was a document at          19:51:38

11  the time that I saw it.  I know that Ed spoke            19:51:40

12  with the lawyer in Canada that handled all of           19:51:44

13  this and he remembers such a document.  I know          19:51:46

14  that Royal Bank of Canada had to see such a             19:51:54

15  document to open up, you know, Xandros,                 19:51:54

16  Incorporated, bank accounts, you know, with me as       19:51:54

17  a signing officer.                                       19:51:56

18            I know that -- I believe Rick and             19:51:58

19  Will also signed comparable documents, and if           19:52:04

20  they were sent the books that contained, you            19:52:06

21  know, that contained this, they saw it.  I              19:52:12

22  believe that -- yes, so I believe that -- yes.          19:52:14

23       Q.    You have seen such a document?               19:52:18

24       A.    Obviously, if I signed it, I've not          19:52:20

25  only seen it, but I've had to use it, you know.         19:52:26
```

EXH C PG 74                                    67

```
 1                 MICHAEL A. BEGO

 2   Yes.                                        19:52:26

 3        Q.    But you don't remember the title of   19:52:30

 4   that document?                              19:52:30

 5        A.    This was -- I mean, this was May   19:52:32

 6   2001.  You know, this was one of many, many   19:52:38

 7   documents.  So, no.  But I'm sure it was a very   19:52:42

 8   standard name and it should be in the minute   19:52:46

 9   books.                                      19:52:46

10        Q.    The document itself should be in the   19:52:48

11   minute books?                               19:52:50

12        A.    It should be.                    19:52:50

13        Q.    When would it have been an entry into   19:52:54

14   the minute books?                           19:52:56

15        A.    May 2001.  I mean, that's -- I don't   19:53:00

16   recall it going in then, but that's when it   19:53:02

17   should be in from.                          19:53:06

18        Q.    All right.  Have you brought any   19:53:10

19   documents with you here today?              19:53:12

20        A.    No.                             19:53:12

21        Q.    Take a look at Exhibit 6.        19:53:20

22        A.    In what?  Oh, Exhibit 6.         19:53:22

23             Are these supposed to be sequential?   19:53:40

24        Q.    I'm sorry, can you say that again?   19:53:42

25        A.    Are these supposed to be -- oh, there   19:53:44
```

EXH C PG 75

68

```
 1                    MICHAEL A. BEGO

 2   it is.  It's on the side.  Okay.              19:53:48

 3        Q.    Do you recognize Exhibit 6?        19:53:52

 4        A.    Yes.  It looks familiar, yes.      19:53:56

 5        Q.    Look at page 4 of Exhibit 6.       19:54:02

 6        A.    Okay.                              19:54:04

 7        Q.    Do you see your signature anywhere on   19:54:08

 8   that page?                                    19:54:08

 9        A.    Yes.                               19:54:08

10        Q.    And you recognize that you were    19:54:12

11   signing on behalf of the maker, Xandros, Inc., a   19:54:16

12   Delaware corporation; correct?               19:54:18

13        A.    Yes.                               19:54:18

14        Q.    And you did, in fact, sign this    19:54:22

15   document, intending to bind Xandros, Inc.;    19:54:28

16   correct?                                      19:54:30

17        A.    Yes.                               19:54:30

18        Q.    You recognize this as a convertible   19:54:32

19   promissory note that was written, made out to   19:54:36

20   Lindows, in exchange for Lindows loaning $250,000   19:54:42

21   to Xandros, Inc.?                             19:54:44

22              MR. ROBERTSON:  I object to the    19:54:46

23   question, assumes facts not in evidence.      19:54:50

24        A.    I'm sorry.  What's going on?       19:54:52

25        Q.    Do you recognize this document as a   19:54:54
```

ExH C PG 76

69

Michael A. Bego                    2/19/04                    Lindows v. Xandros

```
 1              MICHAEL A. BEGO
 2   convertible promissory note?                    19:54:54
 3       A.    That's what it says, yes.             19:54:56
 4       Q.    And do you recall signing this        19:54:58
 5   document?                                        19:54:58
 6       A.    I recall signing a convertible        19:55:02
 7   promissory note, and this is probably -- I mean, 19:55:06
 8   this -- I remember signing a convertible         19:55:08
 9   promissory note.  I don't remember all the text  19:55:12
10   of it, but I don't disagree that this was it.    19:55:14
11       Q.    In fact, do you recall that there      19:55:18
12   were three similar convertible promissory notes  19:55:22
13   that were signed between November 20 and December 19:55:28
14   21 of 2002?                                      19:55:30
15            MR. WALTON:  Objection.  You said       19:55:34
16   three similar ones.  You mean there were three   19:55:36
17   total?                                           19:55:38
18            MR. STUART:  I'm not sure if it makes   19:55:44
19   that much of a difference --                     19:55:44
20            MR. WALTON:  Three notes similar to     19:55:48
21   the one that he is looking at.  So the question  19:55:50
22   is are you talking about four notes or three     19:55:52
23   notes?                                           19:55:54
24            MR. STUART:  Let me rephrase the        19:55:54
25   question.                                        19:55:54
```

Exh C Pg 77

70

```
 1              MICHAEL A. BEGO

 2        Q.    Do you understand that there were        19:55:56

 3   three convertible promissory notes that were made   19:55:58

 4   by Xandros to Lindows in November and December of   19:56:02

 5   2001?                                               19:56:02

 6        A.    I remember that there was the one in     19:56:08

 7   November, and I remember there was going to be      19:56:12

 8   only one other one for -- there was initially       19:56:14

 9   going to be three.  According to the deliverables   19:56:18

10   of the strategic alliance agreement, there was      19:56:22

11   going to be one on the first deliverable of it      19:56:26

12   for 250, which it sounds like, based on -- this     19:56:30

13   one was a November date, you are saying?            19:56:32

14        Q.    No.  My question has nothing to do       19:56:34

15   with what you are saying.  Let me rephrase it.      19:56:38

16              Let's take a look at Exhibit 7.          19:56:48

17        A.    Okay.                                    19:56:50

18        Q.    Do you have that in front of you?        19:56:52

19        A.    Yes.                                     19:56:52

20        Q.    Look at page 4 of Exhibit 7.             19:56:56

21        A.    Okay.                                    19:56:58

22        Q.    Do you recognize your signature          19:57:00

23   anywhere on that page?                              19:57:02

24        A.    Absolutely.                              19:57:02

25        Q.    And you are signing on behalf of         19:57:06
```

EXH C PG 78                                                          71

| | | |
|---|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | Xandros, Inc.; correct? | 19:57:08 |
| 3 | A.    Yes. | 19:57:08 |
| 4 | Q.    And you recognize Xandros, Inc., as | 19:57:10 |
| 5 | the maker of that note; correct? | 19:57:12 |
| 6 | A.    Yes. | 19:57:12 |
| 7 | Q.    Do you understand Exhibit 7 to be a | 19:57:14 |
| 8 | convertible promissory note? | 19:57:16 |
| 9 | A.    That is the title. | 19:57:18 |
| 10 | Q.    And do you understand that the holder | 19:57:20 |
| 11 | of that note was Lindows.com? | 19:57:22 |
| 12 | A.    Holder?  Yes.  That is what it says. | 19:57:26 |
| 13 | Q.    And that reflects a relationship | 19:57:28 |
| 14 | between Lindows.com and Xandros whereby | 19:57:32 |
| 15 | Lindows.com loaned Xandros $250,000 and Xandros, | 19:57:38 |
| 16 | Inc., promised to pay it back; correct? | 19:57:40 |
| 17 | MR. ROBERTSON:  Objection to the form | 19:57:42 |
| 18 | of the question.  It assumes facts not in | 19:57:44 |
| 19 | evidence.  It is asking for a legal conclusion. | 19:57:48 |
| 20 | You are testifying on his behalf. | 19:57:50 |
| 21 | Q.    Do you understand that? | 19:57:52 |
| 22 | MR. WALTON:  The document also speaks | 19:57:58 |
| 23 | for itself. | 19:57:58 |
| 24 | A.    So could you -- you have to repeat | 19:58:00 |
| 25 | the question.  I'm sorry. | 19:58:00 |

Exh __C__ Pg __79__

72

```
 1                  MICHAEL A. BEGO

 2        Q.    Do you know what a note is?              19:58:00

 3        A.    Yes.                                     19:58:00

 4        Q.    Do you understand that there is a        19:58:04

 5  maker of a note and a holder of a note?              19:58:08

 6        A.    Yes.                                     19:58:08

 7        Q.    And do you understand that if I loan     19:58:10

 8  you money and you promise to pay me back, you are    19:58:14

 9  the maker of the note and I'm the holder of the      19:58:16

10  note?                                                19:58:16

11        A.    Yes.                                     19:58:16

12        Q.    Do you understand that this              19:58:18

13  convertible promissory note is a relationship        19:58:24

14  between Lindows.com and Xandros, Inc.?               19:58:28

15        A.    Yes.                                     19:58:28

16        Q.    Whereby Lindows.com loaned Xandros,      19:58:32

17  Inc., $250,000, and Xandros, Inc., promised to       19:58:38

18  pay it back?                                         19:58:38

19              MR. ROBERTSON:  I object to the form     19:58:38

20  of the question.  The document speaks for itself,    19:58:42

21  assuming facts not evidence.                         19:58:44

22        A.    And if you go through and read it,       19:58:46

23  and sort of the way I remember this, is the way      19:58:50

24  that the notes were structured is they were          19:58:52

25  structured as money that Lindows was providing to    19:58:54
```

ExH C PG 80

73

```
 1                    MICHAEL A. BEGO

 2    Xandros because Xandros needed money, and the        19:58:58

 3    intent was that Lindows was going to be owing        19:59:00

 4    Xandros money in the future as a result of           19:59:04

 5    royalties derived from the strategic alliance        19:59:08

 6    agreement, and that -- I don't remember the exact    19:59:10

 7    details, I'd be happy to read it and give you my     19:59:14

 8    impression of this document, but the way that        19:59:16

 9    I --                                                 19:59:16

10        Q.    That's not my question.                    19:59:20

11        A.    Can I just finish the answer?              19:59:22

12              MR. WALTON:  Of course you can             19:59:22

13    finish.  Go ahead.                                   19:59:24

14        A.    Now I'm a little lost on where I           19:59:28

15    was.  But --                                         19:59:32

16        Q.    Why don't you let me ask you the           19:59:34

17    question.                                            19:59:34

18        A.    I can't answer your questions if you       19:59:38

19    interrupt me in the middle.  Now I don't remember    19:59:40

20    where I was going with that.                         19:59:40

21        Q.    Why don't we go to Exhibit 8.              19:59:46

22              Do you have Exhibit 8 in front of          20:00:04

23    you?                                                 20:00:04

24        A.    I do.                                      20:00:06

25        Q.    Please turn to page 4 of Exhibit 8.        20:00:10
```

EXH C PG 81

74

Michael A. Bego                                    2/19/04                              Lindows v. Xandros

```
 1                    MICHAEL A. BEGO

 2        A.     They are not numbered.                    20:00:22

 3        Q.     The first page on top is page 1.          20:00:24

 4        A.     Okay.  So just go through like that.      20:00:28

 5   Okay, I'm on page 4.                                  20:00:30

 6        Q.     The second page is page 2, the third      20:00:32

 7   page is page 3, and the one after that is page        20:00:34

 8   4.                                                    20:00:36

 9        A.     Okay, because it is actually              20:00:36

10   labeled, just so you know, page 29.  It is            20:00:42

11   Exhibit D, page 29.  I believe you are referring      20:00:44

12   to Exhibit D, page 29.                                20:00:46

13        Q.     It has Exhibit D, page 29 on the          20:00:50

14   bottom in the center, that's right.                   20:00:52

15        A.     Yes.  Okay.                               20:00:54

16        Q.     Do you see your signature anywhere on     20:00:56

17   that page?                                            20:00:56

18        A.     Yes.                                      20:00:58

19        Q.     And is it below the words "Maker,         20:01:00

20   Xandros, Inc., a Delaware corporation"?               20:01:02

21        A.     Yes.                                      20:01:02

22        Q.     And you signed this note on behalf of     20:01:04

23   Xandros, Inc., as president; correct?                 20:01:08

24        A.     Correct.                                  20:01:08

25        Q.     Let's go to Exhibit 9.                    20:01:20
```

ExH C PG 82                                                75

| | | |
|---|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | A.    Okay. | 20:01:42 |
| 3 | Q.    Have you ever seen Exhibit 9 before? | 20:01:50 |
| 4 | A.    I don't -- I remember this issue | 20:02:34 |
| 5 | coming up.  Although I don't specifically | 20:02:36 |
| 6 | remember this letter, I don't deny that I | 20:02:40 |
| 7 | received it, either. | 20:02:42 |
| 8 | Q.    You have no specific recollection of | 20:02:44 |
| 9 | receiving it but you are not stating that you | 20:02:44 |
| 10 | didn't receive it; correct? | 20:02:46 |
| 11 | A.    Yes.  I definitely remember that this | 20:02:48 |
| 12 | came up.  I remember this being -- I remember | 20:02:50 |
| 13 | this coming up. | 20:02:52 |
| 14 | Q.    And as of December of 2002, would you | 20:02:58 |
| 15 | have received mail that was addressed to you at | 20:03:02 |
| 16 | 1410 Blair Place, Suite 600, Ottawa, Ontario, | 20:03:08 |
| 17 | Canada? | 20:03:08 |
| 18 | A.    Let's see.  December 2002?  I don't | 20:03:18 |
| 19 | know the last time I was there.  So it's possible | 20:03:20 |
| 20 | that I would not have.  Although -- I don't | 20:03:26 |
| 21 | remember the last time I was at 1410 Blair. | 20:03:28 |
| 22 | Q.    Would you have received mail that was | 20:03:30 |
| 23 | sent to you at 41 East 11th Street, 11th floor, | 20:03:34 |
| 24 | New York, New York? | 20:03:34 |
| 25 | A.    When?  On that date? | 20:03:38 |

EXH C PG 83

76

| | | |
|---|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | I don't remember when we went to 41 | 20:03:40 |
| 3 | East 11th, but if that was the principal place of | 20:03:44 |
| 4 | business of Linux Global Partners at that time, | 20:03:48 |
| 5 | then I would say that, yes, I should have | 20:03:50 |
| 6 | received it. | 20:03:52 |
| 7 | Q.    In or about December of 2002, would | 20:03:52 |
| 8 | you have received mail addressed to you at 300 | 20:03:56 |
| 9 | Earl Grey Drive, Suite 320, Kanata, Ontario? | 20:04:02 |
| 10 | A.    What date was that? | 20:04:04 |
| 11 | Q.    December 2002. | 20:04:06 |
| 12 | A.    What address? | 20:04:06 |
| 13 | Q.    300 Earl Grey Drive, Suite 320, | 20:04:16 |
| 14 | Kanata, Ontario. | 20:04:18 |
| 15 | A.    No, I don't think I would have | 20:04:24 |
| 16 | received that. | 20:04:24 |
| 17 | Q.    Take a look at Exhibit 10.  Do you | 20:04:38 |
| 18 | have that before you? | 20:04:40 |
| 19 | A.    Yes. | 20:04:40 |
| 20 | Q.    Have you ever seen Exhibit 10 before? | 20:04:44 |
| 21 | A.    I would give the same answer to this | 20:05:12 |
| 22 | one as I did the other one, that I don't | 20:05:14 |
| 23 | specifically remember seeing this exact letter, | 20:05:16 |
| 24 | but I do remember this coming up. | 20:05:18 |
| 25 | Q.    And I am going to ask you the same | 20:05:22 |

EXH C PG 84

77

| | | |
|---|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | question with regards to Exhibit 11.  Have you | 20:05:24 |
| 3 | ever seen Exhibit 11 before? | 20:05:28 |
| 4 | A.    11?  Now I'm confused. | 20:05:52 |
| 5 | Q.    Exhibit 11 is a letter dated December | 20:05:54 |
| 6 | 21, 2002. | 20:05:54 |
| 7 | A.    Yes, it's basically the same.  I | 20:06:00 |
| 8 | would give the same answer, that I don't | 20:06:02 |
| 9 | specifically recall seeing this, but I don't deny | 20:06:04 |
| 10 | that I saw it, either.  But I don't deny seeing | 20:06:08 |
| 11 | it, either. | 20:06:08 |
| 12 | Q.    Take a look at Exhibit 13. | 20:06:16 |
| 13 | A.    One sec. | 20:06:32 |
| 14 | Q.    Do you have Exhibit 13? | 20:06:54 |
| 15 | A.    Yes. | 20:06:54 |
| 16 | Q.    Do you recognize it? | 20:06:56 |
| 17 | A.    It sounds familiar, and I don't deny | 20:07:00 |
| 18 | that I wrote it.  Okay. | 20:07:12 |
| 19 | Q.    Do you recognize it? | 20:07:18 |
| 20 | A.    I don't remember this specific | 20:07:22 |
| 21 | letter, but I don't, you know, deny writing it, | 20:07:26 |
| 22 | either. | 20:07:26 |
| 23 | Q.    Do you ever recall signing a copy of | 20:07:34 |
| 24 | this letter? | 20:07:34 |
| 25 | A.    Do I remember signing it, or -- | 20:07:36 |

Exh C Pg 85

78

Michael A. Bego                   2/19/04                   Lindows v. Xandros

| | | |
|---|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | Q.    Yes, sir.  Do you recall signing the | 20:07:40 |
| 3 | copy of this letter? | 20:07:40 |
| 4 | A.    I don't recall signing this specific | 20:07:42 |
| 5 | letter.  But, again, I don't deny that I did.  I | 20:07:46 |
| 6 | just don't remember signing this. | 20:07:46 |
| 7 | Q.    I will represent to you, sir, that | 20:07:50 |
| 8 | all I have of this is an unsigned version.  Are | 20:07:56 |
| 9 | you aware of the existence of a signed version of | 20:07:58 |
| 10 | this letter? | 20:07:58 |
| 11 | A.    No.  I don't -- no. | 20:08:02 |
| 12 | Q.    Did you have anything to do with | 20:08:06 |
| 13 | delivering this letter to Mr. Kagnoff at Brobeck, | 20:08:12 |
| 14 | Phleger & Harrison? | 20:08:12 |
| 15 | MR. WALTON:  Objection.  That's not | 20:08:14 |
| 16 | in evidence that, in fact, it was delivered to | 20:08:16 |
| 17 | Mr. Kagnoff.  I don't know anything about this | 20:08:20 |
| 18 | letter or where it came from, if it's a document | 20:08:22 |
| 19 | production or what.  If you want to make some | 20:08:24 |
| 20 | representation about it, that's fine.  You are | 20:08:26 |
| 21 | assuming that it was delivered to Mr. Kagnoff in | 20:08:30 |
| 22 | the question that you have asked him, and I don't | 20:08:30 |
| 23 | know that to be the truth.  Maybe you and Mr. | 20:08:32 |
| 24 | Robertson know, but I don't know. | 20:08:36 |
| 25 | MR. STUART:  You can object for the | 20:08:38 |

EXH C PG 86

79

```
 1              MICHAEL A. BEGO
 2   record.                                      20:08:38
 3        Q.    Can you answer the question?      20:08:40
 4        A.    Could you repeat it?              20:08:42
 5        Q.    Did you have anything to do with  20:08:42
 6   delivering this letter to Mr. Kagnoff?       20:08:46
 7              MR. WALTON:  Objection; assumes facts 20:08:46
 8   not in evidence.                             20:08:48
 9        A.    I don't recall.                   20:08:48
10        Q.    Do you see at the top of the letter, 20:08:52
11   underneath the date December 27, 2002, it says 20:08:54
12   "Copy by facsimile, original by FedEx."  Did you 20:09:00
13   fax a copy of this letter to Mr. Kagnoff?    20:09:02
14        A.    As I said before, I don't deny having 20:09:08
15   written or been part of this letter, but I don't 20:09:10
16   recall if I -- even if I did write it, I don't 20:09:14
17   remember if I faxed it or if someone else faxed 20:09:16
18   it.  I don't remember.                       20:09:18
19        Q.    So you have no recollection of having 20:09:20
20   faxed this letter to Mr. Kagnoff?            20:09:22
21        A.    No.                               20:09:22
22        Q.    Do you have any recollection of   20:09:22
23   having caused this letter to be placed in a FedEx 20:09:30
24   envelope and delivered to an employee for    20:09:36
25   delivery to Mr. Kagnoff?                     20:09:36
```

Exh C  PG 87

80

```
 1              MICHAEL A. BEGO
 2        A.    I absolutely do not remember doing      20:09:40
 3   that.  Although I don't deny it, I just don't      20:09:48
 4   remember.                                          20:09:48
 5        Q.    Take a look at Exhibit 14.  I am         20:09:50
 6   going to ask you to read the message which says    20:10:02
 7   from Michael Bego to Kevin Carmony, sent on        20:10:06
 8   October 9, 2001.                                   20:10:08
 9        A.    Which exhibit was this?                 20:10:10
10        Q.    Exhibit 14.                             20:10:12
11        A.    Okay.                                   20:10:12
12        Q.    You can read the entire exhibit, but    20:10:14
13   I am going to ask you questions about the text     20:10:20
14   underneath the words "Original Message."           20:10:42
15        A.    Okay.                                   20:11:32
16        Q.    I want to focus on the first sentence   20:11:34
17   in the second paragraph, beginning with "Xandros'  20:11:38
18   capital comes from a $10 million commitment."  As  20:11:44
19   of October 29, 2001, the date of that e-mail, are  20:11:48
20   you aware of whether Linux Global Partners had,    20:11:52
21   in fact, committed $10 million to Xandros, Inc.,   20:11:58
22   or Xandros Corp.?                                  20:12:00
23        A.    They certainly had committed to me      20:12:02
24   that they were intending to put in a total of $10  20:12:06
25   million off of a fund raised that they had         20:12:12
```

ExH C PG 88

81

```
 1              MICHAEL A. BEGO

 2   started that summer.                        20:12:12

 3       Q.    When you say committed to you, are  20:12:14

 4   you saying they told you that they were in the  20:12:16

 5   process of raising money that summer?        20:12:22

 6       A.    Yes.  I mean, they basically had said  20:12:24

 7   that they were raising $10 million initially for  20:12:28

 8   Xandros.                                     20:12:32

 9       Q.    Okay.

10       A.    And there is also a $10 million     20:12:36

11   private placement agreement, I guess it was   20:12:40

12   actually like a legal agreement, that they drew  20:12:44

13   up and had lawyers go over, to raise exactly $10  20:12:48

14   million specifically for Xandros.            20:12:50

15       Q.    When you say "they," are you        20:12:52

16   referring to LGP?                            20:12:54

17       A.    Yes.                               20:12:54

18       Q.    Are you referring to specifically Mr.  20:12:56

19   Berenstein or Mr. Roseman or both?           20:12:58

20       A.    Neither.  Just Linux Global Partners  20:13:04

21   as an entity.  I don't remember who said.  I   20:13:06

22   mean, everyone was in agreement.  It wasn't like  20:13:08

23   one was saying it over the other.  It was the  20:13:12

24   consensus.                                   20:13:12

25       Q.    But you are saying that they had     20:13:16
```

Exh C Pg 89

82

```
 1                 MICHAEL A. BEGO

 2   represented this to you.  You are saying that Mr.        20:13:18

 3   Berenstein or Mr. Roseman had told you that they         20:13:22

 4   were in the process of raising $10 million?              20:13:26

 5        A.    I would say both.                             20:13:28

 6        Q.    They both told you they were in the           20:13:30

 7   process of raising $10 million in capital?               20:13:32

 8        A.    Not only did they tell me, they               20:13:34

 9   showed me private placement documents to that            20:13:36

10   effect.                                                  20:13:36

11        Q.    And what were the private placement           20:13:38

12   documents?  What are the titles of those                 20:13:42

13   documents?                                               20:13:42

14        A.    I don't remember.  I mean, it's a             20:13:48

15   private -- it probably said -- I could guess that        20:13:50

16   it probably said, you know, private placement            20:13:54

17   memorandum, or private placement document.  But          20:13:58

18   you would have to follow up with them on that.           20:14:00

19        Q.    And were the documents, the private           20:14:04

20   placement documents that you saw, did they               20:14:06

21   indicate to you that some venture capitalist or          20:14:10

22   some other entity had, in fact, agreed to give           20:14:18

23   $10 million to LGP?                                       20:14:22

24        A.    Could you restate -- repeat that,             20:14:28

25   please.                                                  20:14:30
```

Exh __C__ PG __90__

83

| | | |
|---|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | Q.    I am trying to understand the nature | 20:14:30 |
| 3 | of the private placement documents that you | 20:14:32 |
| 4 | referred to.  Was it, in fact, an agreement by | 20:14:34 |
| 5 | some venture capitalist or some third party to | 20:14:38 |
| 6 | give some money to LGP? | 20:14:42 |
| 7 | A.    Just to be clear, Linux Global | 20:14:48 |
| 8 | Partners committed providing $10 million to | 20:14:48 |
| 9 | Xandros.  This private placement -- this private | 20:14:52 |
| 10 | placement memorandum was one of the ways that | 20:14:54 |
| 11 | they were going to -- one of but not the sole | 20:14:58 |
| 12 | ways that they were going about raising money to | 20:15:00 |
| 13 | provide it to Xandros. | 20:15:02 |
| 14 | Q.    Okay -- | 20:15:02 |
| 15 | A.    In terms of like the exact specific | 20:15:06 |
| 16 | legality of the document, I do believe it was -- | 20:15:12 |
| 17 | actually it went up to $11 million.  In terms of | 20:15:18 |
| 18 | what commitments lie therein, you really should | 20:15:22 |
| 19 | read it.  I don't recall the specifics. | 20:15:24 |
| 20 | Q.    All right.  So the private placement | 20:15:30 |
| 21 | documents you are referring to didn't necessarily | 20:15:32 |
| 22 | require that LGP take the money that was to be | 20:15:38 |
| 23 | transferred as part of the private placement and | 20:15:40 |
| 24 | satisfy that promise to raise money for Xandros; | 20:15:44 |
| 25 | correct? | 20:15:46 |

EXH C PG 91

84

| | | |
|---|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | A.    I don't recall exactly, but my | 20:15:50 |
| 3 | recollection is that the use of proceeds in the | 20:15:52 |
| 4 | private placement memorandum were for investing | 20:15:56 |
| 5 | into Xandros.  And as I believe it was a legally | 20:16:02 |
| 6 | drafted and signed-off document, that that would | 20:16:04 |
| 7 | be binding.  So -- | 20:16:08 |
| 8 | Q.    It would have been binding -- I'm | 20:16:10 |
| 9 | sorry.  It would have been binding on whom? | 20:16:12 |
| 10 | A.    Linux Global Partners.  So it's not | 20:16:16 |
| 11 | like they could raise the 10 million and invest | 20:16:18 |
| 12 | in a different company.  I believe the use of | 20:16:20 |
| 13 | proceeds for this was specifically for Xandros. | 20:16:24 |
| 14 | Although you don't have to quote me on that.  And | 20:16:28 |
| 15 | like I mentioned before, this was, you know, one | 20:16:28 |
| 16 | of the ways they were raising money for the $10 | 20:16:34 |
| 17 | million that they committed to Xandros to | 20:16:38 |
| 18 | provide. | 20:16:38 |
| 19 | Q.    I'm trying to understand the nature | 20:16:40 |
| 20 | of this private placement memorandum.  This was | 20:16:42 |
| 21 | an agreement signed by someone with authority to | 20:16:46 |
| 22 | LGP making a representation to Xandros; correct? | 20:16:50 |
| 23 | A.    No.  This was a tool from Linux | 20:16:58 |
| 24 | Global Partners to sell stakes in Linux Global | 20:17:04 |
| 25 | Partners for capital to fund the Xandros. | 20:17:08 |

Exh C Pg 92

85

| | | |
|---|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | Q.   So this wasn't a representation to | 20:17:10 |
| 3 | Xandros; correct? | 20:17:12 |
| 4 | MR. WALTON:  Objection, vague and | 20:17:16 |
| 5 | ambiguous as to "this." | 20:17:18 |
| 6 | Q.   The private placement memorandum was | 20:17:20 |
| 7 | not a representation to Xandros; correct? | 20:17:22 |
| 8 | A.   I'd have to read it. | 20:17:24 |
| 9 | MR. WALTON:  It also calls for a | 20:17:26 |
| 10 | legal conclusion. | 20:17:28 |
| 11 | A.   Yes, I'd have to read that. | 20:17:30 |
| 12 | Q.   And you believe this is called the | 20:17:30 |
| 13 | private placement memorandum; correct? | 20:17:32 |
| 14 | A.   Yes. | 20:17:32 |
| 15 | Q.   Were there any other documents that | 20:17:34 |
| 16 | you relied on when you stated in this e-mail that | 20:17:42 |
| 17 | Xandros' capital comes from a $10 million | 20:17:46 |
| 18 | commitment from Linux Global Partners and its VC | 20:17:50 |
| 19 | companies? | 20:17:50 |
| 20 | A.   Numerous -- I mean, there are | 20:17:52 |
| 21 | numerous communications, e-mails, discussion.  It | 20:17:56 |
| 22 | was, you know, the general commitment of Linux | 20:18:00 |
| 23 | Global Partners to provide the funds.  If you are | 20:18:00 |
| 24 | asking me specifically, you know, how many | 20:18:02 |
| 25 | documents, or how many communications, or how | 20:18:06 |

Exh C pg 93

86

```
 1              MICHAEL A. BEGO

 2   many pieces of information there were surrounding      20:18:10

 3   this, you know, I couldn't say specifically how        20:18:12

 4   many or what exactly there were from this three        20:18:14

 5   years ago.  But it was a very major part of both       20:18:22

 6   companies.                                             20:18:22

 7        Q.    I am not referring to                       20:18:24

 8   communications.  I am referring to documents that      20:18:26

 9   were signed by either the VC partners that you         20:18:30

10   referred to or Linux Global Partners, that you         20:18:34

11   relied on when you said that Xandros' capital          20:18:36

12   comes from a $10 million commitment from Linux         20:18:42

13   Global Partners and its VC partners.                   20:18:44

14        A.    I don't recall.                             20:18:44

15        Q.    And you recognize that string in the        20:18:52

16   center of Exhibit 14 that begins with "Original        20:18:54

17   Message" and ends with "Mike" as an e-mail that        20:18:58

18   you send to Kevin Carmony on October 29; correct?      20:19:02

19        A.    I like before -- I don't remember --        20:19:04

20   like I don't remember the exact text and I can't       20:19:06

21   say I remember writing it, but reading it, it          20:19:10

22   sounds roughly accurate to communication that we       20:19:12

23   could have had at that time.                           20:19:14

24        Q.    Take a look at Exhibit 15.  Do you          20:19:22

25   recognize Exhibit 15?                                  20:19:24
```

EXH C PG 94

87

```
 1              MICHAEL A. BEGO

 2        A.    Yes.  It looks -- yes, it looks like        20:19:36

 3   a press release that we made -- yes.                   20:19:40

 4        Q.    By "we made," you mean Xandros              20:19:44

 5   Corporation or Xandros, Inc.?                          20:19:48

 6        A.    I don't know that I -- I guess I            20:19:54

 7   would specify -- it doesn't say here, but I            20:19:56

 8   believe the money that Linux Global Partners           20:19:58

 9   provided wasn't to Xandros, Inc.  I guess it           20:20:02

10   could be both.  I don't know that it necessarily       20:20:04

11   is one or the other, Xandros, Inc., or Xandros         20:20:10

12   Corp.                                                  20:20:10

13        Q.    So the commitment that you referred         20:20:12

14   to in Exhibit 14 was, in fact, a commitment to         20:20:16

15   both Xandros, Inc., and Xandros Corp.?                 20:20:20

16        A.    I mean, the operating company was           20:20:22

17   Xandros Corp., but I think they were                   20:20:26

18   effectively -- they are effectively the same           20:20:30

19   entity.                                                20:20:32

20        Q.    So was the commitment to one or both?       20:20:36

21        A.    I believe legally the commitment was        20:20:58

22   probably to Xandros, Inc., but effectively it was      20:21:02

23   to both.                                               20:21:02

24        Q.    Take a look at Exhibit 16.                  20:21:08

25              The last page of Exhibit 16 is              20:21:20
```

EXH C PG 95

88

1                  MICHAEL A. BEGO

2    numbered page 13.                              20:21:24

3         A.    Yes.                                20:21:30

4         Q.    Do you recognize your signatures on  20:21:34

5    that page?                                     20:21:34

6         A.    Yes.                                20:21:34

7         Q.    You were signing on behalf of Xandros 20:21:38

8    Corporation as president and on behalf of      20:21:40

9    Xandros, Inc., as president; correct?          20:21:42

10        A.    Yes.                                20:21:44

11        Q.    And you recognize this document as   20:22:06

12   the strategic alliance agreement that you      20:22:08

13   referred to earlier in your testimony; correct? 20:22:10

14        A.    That's what it appears to be, yes.   20:22:12

15        Q.    Take a look at Exhibit 17.           20:22:22

16             THE VIDEOGRAPHER:  Counsel, this is   20:22:26

17   the videographer.  I have got five minutes of  20:22:30

18   tape remaining.                                20:22:32

19             MR. STUART:  We are going to take a   20:22:34

20   break and replace it.                          20:22:34

21             THE WITNESS:  And we are going for    20:22:36

22   two hours, is it?                              20:22:38

23             MR. STUART:  Two hours on the         20:22:40

24   record.                                        20:22:40

25             THE VIDEOGRAPHER:  We are going off   20:22:42

EXH _C_ PG _96_

89

```
 1              MICHAEL A. BEGO
 2   the record.  The time is 8:21.              20:22:46
 3              (A recess was taken.)            20:30:04
 4              THE VIDEOGRAPHER:  We are back on the   20:30:06
 5   record.  The time is 8:28, and this is the   20:30:10
 6   beginning of Tape No. 2.                     20:30:10
 7              BY MR. STUART:                    20:30:12
 8        Q.    Mr. Bego -- and, by the way, is it   20:30:20
 9   Bego or Bego?                                20:30:22
10        A.    Bego.                             20:30:22
11        Q.    Mr. Bego, would you please take a   20:30:26
12   look at Exhibit 17.                          20:30:28
13        A.    Okay.                             20:30:30
14        Q.    Do you recognize your signature on   20:30:34
15   page 2 of Exhibit 17?                        20:30:36
16        A.    That does appear to be my signature.   20:30:38
17        Q.    And did you sign on behalf of        20:30:40
18   Xandros, Inc., as president?                 20:30:42
19        A.    That is what it appears to be, yes.   20:30:46
20        Q.    And do you recognize Exhibit 17?     20:30:54
21        A.    I don't deny that we did this,       20:31:20
22   although I don't recall this specific letter.   20:31:24
23   But, you know, it seems consistent with what was   20:31:26
24   going on then.                               20:31:28
25        Q.    You have no recollection of --       20:31:34
```

EXH C PG 97

90

Michael A. Bego                    2/19/04                    Lindows v. Xandros

```
 1              MICHAEL A. BEGO
 2      A.    I'm not saying I have no                    20:31:36
 3   recollection.  I mean, do you want me to read the   20:31:38
 4   whole thing?  If I browse through it -- I'll read   20:31:40
 5   the whole thing and let you know.                   20:31:42
 6              What's the letter agreement?             20:32:12
 7      Q.    Well, that's a good question.              20:32:26
 8      A.    Okay.  I mean, I'm just reading this       20:32:32
 9   because you asked me if I recognize this, and I'm   20:32:34
10   just trying to see if I remember this document.     20:32:36
11              Okay.  I read it.  It looks like         20:35:08
12   something we might have done.  The first point,     20:35:12
13   the amendment of paragraph 2, is rather complex,    20:35:16
14   so I didn't decipher the whole thing just now.      20:35:18
15              But I think you are asking if I          20:35:20
16   recognize this.                                     20:35:22
17      Q.    Yes, sir.                                  20:35:22
18      A.    I don't specifically recall this          20:35:24
19   document, but, again, I don't deny that we wrote    20:35:30
20   this.                                               20:35:32
21      Q.    Do you know what it is?                    20:35:32
22      A.    Again, the part 1, amendment of           20:35:36
23   paragraph 2, is fairly complex, and I'd have        20:35:40
24   to -- I'd have to reread it or look at it a         20:35:44
25   little bit more to be able to explain it.           20:35:46
```

ExH **C** PG **98**

                                                            91

| | | |
|---|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | Q.    You asked a question, what is the | 20:35:52 |
| 3 | letter agreement, and that's in part 1 -- I'm | 20:35:56 |
| 4 | sorry, that's in the first paragraph.  Do you | 20:35:58 |
| 5 | know what the letter agreement that this document | 20:36:04 |
| 6 | refers to, do you know what that letter agreement | 20:36:06 |
| 7 | is? | 20:36:06 |
| 8 | A.    I don't recall.  Although I'm sure at | 20:36:10 |
| 9 | the time Kevin and I must have known what that | 20:36:12 |
| 10 | was.  But right now I certainly cannot recall | 20:36:18 |
| 11 | that. | 20:36:18 |
| 12 | Q.    Do you know what Exhibit 17 is?  Do | 20:36:20 |
| 13 | you recognize it? | 20:36:22 |
| 14 | A.    Like I said before -- I mean, it | 20:36:26 |
| 15 | sounds like something that ties the payment of | 20:36:28 |
| 16 | money to a delivery on the strategic alliance | 20:36:32 |
| 17 | agreement, so from a high level it sounds like | 20:36:36 |
| 18 | that's sort of what it does.  But, I mean, if you | 20:36:44 |
| 19 | want me to explain it to you, I'd have to read it | 20:36:46 |
| 20 | in more depth. | 20:36:48 |
| 21 | Q.    I am just asking you if you recognize | 20:36:50 |
| 22 | the document. | 20:36:50 |
| 23 | A.    And I think my answer from before was | 20:36:52 |
| 24 | that it looks like something that we would have | 20:36:54 |
| 25 | done.  I don't specifically recall this exactly. | 20:36:58 |

EXH C PG 99

92

| | | |
|---|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | In fact, I'd have to go through it and decipher | 20:37:00 |
| 3 | it completely. | 20:37:02 |
| 4 | Q.    All right. | 20:37:04 |
| 5 | A.    So that's it. | 20:37:06 |
| 6 | Q.    And you don't, as you sit here, and | 20:37:08 |
| 7 | after having read this document, you don't know | 20:37:12 |
| 8 | what the letter agreement that it refers to is, | 20:37:18 |
| 9 | either; correct? | 20:37:18 |
| 10 | A.    Like you have asked before, like what | 20:37:20 |
| 11 | were the titles of these different documents that | 20:37:22 |
| 12 | date back three years, I may remember the | 20:37:24 |
| 13 | documents if I saw them, but at this point today | 20:37:28 |
| 14 | I don't remember the titles of all the different | 20:37:30 |
| 15 | documents, you know, from these, you know, 30 | 20:37:34 |
| 16 | exhibits-plus, you know, untold other agreements | 20:37:36 |
| 17 | that were going on at the time.  If you showed me | 20:37:38 |
| 18 | the letter agreement, then I might remember it. | 20:37:42 |
| 19 | Q.    Why don't you take a look at Exhibit | 20:37:46 |
| 20 | 18. | 20:37:46 |
| 21 | A.    Exhibit what? | 20:37:48 |
| 22 | Q.    18. | 20:37:50 |
| 23 | And take a look at page 3 of Exhibit | 20:38:04 |
| 24 | 18. | 20:38:06 |
| 25 | A.    Okay. | 20:38:12 |

Exh C Pg 100

93

```
 1              MICHAEL A. BEGO
 2       Q.    Do you recognize any signature there;        20:38:16
 3  correct?                                                20:38:16
 4       A.    Well, there are no signatures on this        20:38:18
 5  page so there is nothing to recognize.                  20:38:20
 6       Q.    That's right.  There are no                  20:38:22
 7  signatures on that document; correct?                   20:38:24
 8       A.    Yes.                                          20:38:26
 9       Q.    Have you ever seen this document             20:38:26
10  before?                                                 20:38:26
11       A.    Yes, again, this seems fairly -- I           20:39:42
12  don't recall, you know, the exact terms of              20:39:44
13  something like this, but I do remember -- but           20:39:48
14  this is consistent with, you know, things that we       20:39:52
15  were working on at the time, leading up to the          20:39:54
16  signature of the strategic alliance agreement and       20:39:58
17  the notes.                                              20:39:58
18       Q.    Do you believe you have ever signed a        20:40:00
19  document or a copy of this document?                    20:40:02
20       A.    Similar to my other responses, I             20:40:06
21  don't recall signing or not signing, you know,          20:40:12
22  documents from three years ago.                         20:40:14
23       Q.    Have you ever seen --                        20:40:16
24       A.    Like the strategic alliance agreement        20:40:18
25  I remember because that was fairly significant.         20:40:20
```

Exh C Pg 101

94

```
 1                    MICHAEL A. BEGO
 2   But some of these others I don't recall.          20:40:22
 3        Q.    Have you ever seen a copy of this      20:40:24
 4   document with any of the blanks filled in?        20:40:28
 5        A.    I don't recall.                        20:40:30
 6        Q.    Do you believe that anyone signed      20:40:36
 7   this document on behalf of Lindows.com?           20:40:40
 8        A.    I do not know.  I do not know.         20:40:44
 9        Q.    Do you know whether or not this is,    20:40:46
10   in fact, the letter agreement that is referred to 20:40:48
11   in Exhibit 17?                                    20:40:50
12        A.    It's not clear to me that it would     20:40:54
13   be, because it's not entitled letter agreement in 20:40:58
14   capital letters.  I'd have to actually go through 20:41:02
15   in detail the text of this and the text of this   20:41:04
16   to see if they logically tied in to each other,   20:41:08
17   specifically like the amendment of paragraph 2,   20:41:12
18   I'd have to look at paragraph 2 and see if this   20:41:14
19   very closely correlated to that, and that -- I    20:41:20
20   mean, if I had spent some time on it, there may   20:41:22
21   be a correlation between the two, but right now I 20:41:24
22   certainly don't remember.                         20:41:26
23             MR. WALTON:  Let the record reflect     20:41:30
24   that when he said he would have to correlate this 20:41:32
25   to this, he was holding up Exhibits 17 and 18.    20:41:34
```

ExH __C__ PG __102__

95

| 1 | MICHAEL A. BEGO | |
|---|---|---|
| 2 | Is that correct, Mr. Bego? | 20:41:36 |
| 3 | THE WITNESS:   That is correct. | 20:41:38 |
| 4 | Q.    As you sit here, though, you have no | 20:41:44 |
| 5 | understanding as to whether or not Exhibit 18 is, | 20:41:46 |
| 6 | in fact, the letter agreement that is referred to | 20:41:48 |
| 7 | in Exhibit 17; correct? | 20:41:50 |
| 8 | A.    I mean, as I mentioned before, they | 20:41:52 |
| 9 | are fairly complex, so at a cursory glance I | 20:41:56 |
| 10 | can't say.  You know, if I had some time to go | 20:41:58 |
| 11 | through them, I could say what would appear more | 20:42:02 |
| 12 | likely.  But right now I can't say. | 20:42:04 |
| 13 | Q.    Do you have your declaration in front | 20:42:06 |
| 14 | of you?  That's Exhibit 28. | 20:42:10 |
| 15 | A.    Okay. | 20:42:10 |
| 16 | Q.    Take a look at page 2, paragraph 5. | 20:42:16 |
| 17 | Line 24 begins a sentence that starts | 20:42:40 |
| 18 | with "The parties also executed." | 20:42:42 |
| 19 | A.    Okay. | 20:42:44 |
| 20 | Q.    Do you believe that Exhibit 18 is the | 20:42:50 |
| 21 | letter agreement that you referred to in your | 20:42:52 |
| 22 | declaration? | 20:42:52 |
| 23 | A.    I mean, I would have to say that | 20:42:54 |
| 24 | based -- I would have to go through and look at | 20:42:58 |
| 25 | Kevin and my e-mails, but the letter agreement | 20:43:00 |

Exh __C__ Pg __103__

96

```
 1                 MICHAEL A. BEGO

 2  was probably something that Kevin and I faxed          20:43:04

 3  back and forth.  It's probably safe -- I mean,         20:43:08

 4  given that Kevin and I sent this back and forth        20:43:10

 5  and probably spent a couple of weeks negotiating       20:43:12

 6  it, I believe it's safe to say that we would have      20:43:14

 7  executed it.                                           20:43:16

 8       Q.   My question is whether or not Exhibit        20:43:20

 9  18 is the letter agreement that you referred to        20:43:24

10  in your declaration.                                   20:43:26

11            MR. WALTON:  You have the entire             20:43:28

12  declaration in front of you, Mr. Bego, including       20:43:30

13  the exhibits that are attached.                        20:43:32

14       A.   Right.  Let me look at the exhibits          20:43:34

15  that are attached.                                     20:43:36

16            There's Exhibit C.                           20:43:52

17            Exhibit C is part of Exhibit 28, or          20:43:56

18  is Exhibit C separate?                                 20:43:58

19            MR. WALTON:  It's part of Exhibit            20:44:02

20  28.                                                    20:44:02

21       A.   Do you know how -- do you know what          20:44:10

22  page it's on out of the 41 pages?                      20:44:14

23            MR. WALTON:  It's about two-thirds of        20:44:16

24  the way down in the stack that constitutes            20:44:18

25  Exhibit 28, and it says Exhibit C, 1 of 3 at the       20:44:22
```

EXH __C__ PG _104_

97

```
 1                    MICHAEL A. BEGO
 2   bottom of the first page.                        20:44:24
 3        A.    Exhibit A, 33 of 41.  Exhibit B, 4 of  20:44:32
 4   4.  Exhibit C, 3 of 3, okay.                      20:44:34
 5             So Exhibit C, 3 of 3 -- Exhibit C of    20:44:36
 6   Exhibit 28 the same as Plaintiff's Exhibit 18?    20:44:44
 7             MR. WALTON:  That's the question that    20:44:46
 8   Mr. Stuart just put to you.                       20:44:50
 9        A.    These two documents appear to be       20:44:54
10   carbon copies of one another.  These two          20:45:06
11   documents appear to be carbon copies of one       20:45:06
12   another.  Is that the answer?                     20:45:10
13        Q.    My question, Mr. Bego, is, is Exhibit   20:45:12
14   18 the letter agreement that you referred to in   20:45:14
15   paragraph 5 of your declaration?                  20:45:16
16        A.    It would appear to be.                 20:45:20
17        Q.    Do you recall signing Exhibit 18, a    20:45:30
18   copy of Exhibit 18?                               20:45:32
19        A.    Right now I don't recall signing or    20:45:38
20   not signing.                                      20:45:38
21        Q.    Do you recall ever having seen a copy  20:45:42
22   of Exhibit 18 that was signed by Lindows.com?     20:45:44
23        A.    I don't recall.  No, I don't recall.   20:45:48
24   I don't deny that I saw one, but I also don't     20:45:52
25   remember seeing one, either.                      20:45:54
```

EXH C PG 105

98

```
 1                    MICHAEL A. BEGO
 2        Q.     Going back to the first sentence of        20:46:04
 3   paragraph 5 of your declaration, which is Exhibit      20:46:08
 4   28.                                                    20:46:12
 5        A.     The first sentence of paragraph 5 in       20:46:14
 6   Exhibit 28?                                            20:46:16
 7        Q.   · Yes.                                        20:46:18
 8        A.     Okay.                                      20:46:18
 9        Q.     You say "In November 2001 Lindows          20:46:22
10   advanced to Xandros $250,000 as an advance on and     20:46:26
11   a credit to the revenue sharing in the SAA."          20:46:30
12        A.     Yes, I would say -- I mean, I see          20:46:34
13   that, and I think technically speaking that would     20:46:36
14   be -- the 250,000 would naturally be in regards       20:46:42
15   to the note that we looked to earlier.  I don't       20:46:46
16   remember the exact exhibit.  And the notes            20:46:50
17   were -- you know, the notes were part of all that     20:46:54
18   was going on at that time with the SAA.  Although     20:46:56
19   here, if you read it, you could be misled that        20:47:00
20   the 250 was directly part of the SAA, whereas the     20:47:02
21   250 was specified in the note.  But I believe the     20:47:12
22   notes were tied to the revenue sharing from the       20:47:14
23   SAA.  So...                                           20:47:14
24        Q.     You believe that they were tied.  How     20:47:20
25   were they tied?                                       20:47:22
```

Exн __C__ Pɢ _106_

99

Michael A. Bego                    2/19/04                    Lindows v. Xandros

```
1              MICHAEL A. BEGO
2       A.    The deliverables -- so specifically        20:47:26
3  the deliverables to get the payments; the             20:47:30
4  250,000 -- it was initially supposed to be one        20:47:32
5  payment of 250, a second payment of 500, and a        20:47:36
6  third payment of 250, for a total of a million.       20:47:40
7  It was subsequently broken down into four             20:47:42
8  payments of 250, that I'd have to go through all      20:47:44
9  these documents to find them, but I believe that      20:47:46
10 the actual timing of these were specifically tied     20:47:52
11 to deliverables from the SAA.                         20:47:56
12            So it wasn't a coincidence that the        20:47:58
13 first 250 was transferred I think within -- I         20:48:00
14 don't remember exactly, but I think if you look       20:48:02
15 at the dates, you would find that the 250 was         20:48:04
16 transferred within a day of signing of the SAA.       20:48:08
17      Q.    Take a look at Exhibit 6.                   20:48:14
18      A.    Okay.                                       20:48:20
19      Q.    You refer to an advance, Lindows           20:48:36
20 advanced to Xandros $250,000 as an advance on and     20:48:40
21 a credit to the revenue sharing in the SAA in         20:48:42
22 November 2001.  That's sentence 1 in paragraph 5      20:48:46
23 of your declaration.                                  20:48:48
24      A.    Yes.                                        20:48:48
25      Q.    Is Exhibit 6, the note that is             20:48:50
```

Exh __C__ PG __107__

100

|    |                                                              |          |
|----|--------------------------------------------------------------|----------|
| 1  | MICHAEL A. BEGO                                               |          |
| 2  | Exhibit 6, is that what you are saying is an                  | 20:48:54 |
| 3  | advance on and a credit to the revenue sharing in            | 20:48:58 |
| 4  | the SAA?                                                      | 20:48:58 |
| 5  | A.    I would say that, you know, if you                      | 20:49:00 |
| 6  | read it as a legal document, I would have to go              | 20:49:04 |
| 7  | through and see if it referenced the SAA.  But I             | 20:49:06 |
| 8  | know that -- let me see it again.  I mean, as a             | 20:49:10 |
| 9  | legal document, this is, you know, the $250,000              | 20:49:14 |
| 10 | note that was paid on, but I know that when we               | 20:49:18 |
| 11 | were doing the two deals there were clearly --              | 20:49:22 |
| 12 | you know, these promissory notes were                        | 20:49:24 |
| 13 | specifically tied to deliverables from the SAA.             | 20:49:26 |
| 14 | Q.    Is there anything in the promissory                    | 20:49:30 |
| 15 | note that is Exhibit 6 that says it is an advance           | 20:49:32 |
| 16 | on and credit to the revenue sharing in the SAA?           | 20:49:38 |
| 17 | MR. WALTON:  Objection.  The document                        | 20:49:40 |
| 18 | speaks for itself.                                           | 20:49:42 |
| 19 | A.    Yes.  I mean, I could spend 15                          | 20:49:44 |
| 20 | minutes and read it all and tell you that.                   | 20:49:46 |
| 21 | Q.    And what would you be looking for?                      | 20:49:48 |
| 22 | A.    I would be looking for anything in                     | 20:49:50 |
| 23 | this document that referenced the -- well, I                | 20:49:54 |
| 24 | guess, to answer your question, in regards to                | 20:49:56 |
| 25 | whether they are tied or not, I would go to -- to           | 20:50:00 |

Exh __C__ Pg. 108

101

```
 1                    MICHAEL A. BEGO
 2   answer that I would go through here and look for        20:50:04
 3   anything that tied them together.  But then from        20:50:06
 4   my memory, although the -- yes, I would go              20:50:12
 5   through -- in regards to if there is anything in        20:50:14
 6   this document that tells you if it's tied to the        20:50:16
 7   SAA just within this document, you would have to        20:50:20
 8   go through and read it and look for references to       20:50:24
 9   the SAA or the deliverables thereof.                    20:50:26
10        Q.    And by here in this document, you are        20:50:28
11   holding up Exhibit 6; correct?                          20:50:30
12        A.    Correct.                                     20:50:30
13        Q.    And if you went through and didn't           20:50:32
14   find any reference to the SAA or the                    20:50:34
15   deliverables, that would indicate to you that the       20:50:36
16   promissory note is not an advance on or credit to       20:50:38
17   the revenue sharing in the SAA; correct?               20:50:42
18             MR. WALTON:  Objection; calls for a           20:50:42
19   legal conclusion.  It's argumentative.  The            20:50:46
20   documents speak for themselves.                         20:50:52
21        A.    I mean, that alone wouldn't indicate         20:50:54
22   it to me, but -- you know, that alone wouldn't          20:51:00
23   indicate that to me, but in regards to this note,       20:51:00
24   and the rest of the note, then that would, yes,         20:51:00
25   indicate that.                                          20:51:00
```

EXH C PG 109

102

```
 1                    MICHAEL A. BEGO

 2        Q.    And in paragraph 6, the first              20:51:06

 3  sentence, you say in December 2001 Lindows.com        20:51:08

 4  advanced to Xandros an additional $250,000 as an      20:51:12

 5  advance on and a credit to the revenue sharing        20:51:16

 6  SAA.                                                   20:51:16

 7             MR. WALTON:   You are on Exhibit 28         20:51:18

 8  now?                                                   20:51:20

 9             MR. STUART:   Yes, I'm sorry.               20:51:20

10        Q.    Exhibit 28, your declaration,             20:51:24

11  paragraph 6, the first sentence.  It is very          20:51:24

12  similar to the first sentence in Exhibit 28.          20:51:28

13        A.    Yes.   So in regards to what you were     20:51:32

14  saying before about the note, like yes, just          20:51:34

15  based on what the note is, you wouldn't know           20:51:36

16  that.  But, you know, these other documents, you      20:51:38

17  know, we spent weeks on these other documents,        20:51:40

18  going through, there probably were several            20:51:42

19  redlines going back and forth, if you looked          20:51:46

20  through our e-mails.  And the context of              20:51:48

21  everything was that the money was then -- Xandros     20:51:54

22  needed the money, and that it was basically part      20:51:58

23  of the -- you know, they were very much -- like       20:52:02

24  Lindows didn't want to invest in Xandros for          20:52:04

25  investing in Xandros' sake.  Lindows was              20:52:10
```

EXH __C__ PG __110__

103

```
 1                    MICHAEL A. BEGO

 2   providing the capital as a part of the              20:52:12

 3   relationship, part of that being these              20:52:14

 4   contracts.                                          20:52:20

 5          And, yes, I mean, there clearly was a        20:52:24

 6   lot of corroboration and discussion going back      20:52:28

 7   and forth that they were -- that the two were       20:52:32

 8   tied.                                               20:52:34

 9       Q.    I believe you said that if you looked     20:52:36

10   at the note you would not see a reference to the    20:52:42

11   SAA?  Was that your testimony?                      20:52:44

12       A.    No.  I said that if you saw a             20:52:46

13   reference to SAA or deliverables thereof, or        20:52:50

14   things related to that, then that would indicate    20:52:52

15   that according to the note -- that that would       20:52:54

16   indicate that there was nothing in the note         20:52:56

17   specifically that would tie the two.                20:53:00

18       Q.    And if you didn't see a reference to      20:53:02

19   the SAA or deliverables in the note that's          20:53:06

20   referred to in paragraph 6 of your declaration,     20:53:12

21   that would indicate that they weren't tied?         20:53:14

22          MR. WALTON:  Objection.  That assumes        20:53:14

23   facts not in evidence, and it's argumentative,      20:53:18

24   and it does not allow for all the possibilities     20:53:20

25   that there may be for tying the various             20:53:22
```

ExH C Pg 111

104

```
 1              MICHAEL A. BEGO

 2   agreements together.                          20:53:24

 3          MR. ROBERTSON:  I object also.          20:53:28

 4       A.    To answer a question, for example, if   20:53:30

 5   the SAA -- so if the promissory note didn't say   20:53:34

 6   anything, but if the SAA specifically said yes,   20:53:36

 7   it's part of this other promissory note, then    20:53:38

 8   clearly that would -- you know.  So you are just  20:53:42

 9   talking about one possible argument, the fact     20:53:44

10   that it's not there wipes out all the other       20:53:48

11   possible ones.                                    20:53:50

12       Q.    Why don't you take a look at Exhibit   20:53:52

13   7.                                                20:53:52

14       A.    Okay.                                   20:54:02

15       Q.    I am going to ask you the same         20:54:08

16   question about Exhibit 7 as I asked you about     20:54:10

17   Exhibit 6, and that is, that's the document that  20:54:16

18   you are referring to when you say in December of  20:54:18

19   2001 Lindows.com advanced Xandros an additional   20:54:22

20   $250,000 as an advance on and credit to the       20:54:26

21   revenue sharing in the SAA in paragraph 6 of your 20:54:28

22   declaration; correct?                             20:54:32

23       A.    I'd have to -- so, wait.  What are      20:54:34

24   you saying?                                        20:54:34

25       Q.    Paragraph 6 of your declaration         20:54:38
```

ExH **C** PG **112**

105

```
 1              MICHAEL A. BEGO
 2   Xandros who negotiated this arrangement with        20:55:54
 3   Lindows?                                            20:55:54
 4        A.    I believe Will -- I mean, I was very     20:55:58
 5   involved with Will and Rick, and pretty much all    20:56:00
 6   the things that I did, you know, we certainly,      20:56:04
 7   you know, discussed and strategized together        20:56:08
 8   with.  And there probably were also                 20:56:12
 9   communications, and there may have even been        20:56:14
10   trips on behalf of probably more likely Will as     20:56:18
11   well.  So I think in terms of Xandros, general      20:56:22
12   strategy, and things that we did, there was -- I    20:56:26
13   think because I was spending a lot of time in       20:56:28
14   Ottawa, I was the acting agent on a lot of this,    20:56:32
15   but there certainly was a great deal of             20:56:34
16   strategizing and corroboration between the three    20:56:38
17   of us, as well as probably communication between    20:56:42
18   Will, Rick, and Lindows as well.                    20:56:44
19        Q.    Tell us how this arrangement with        20:56:46
20   Lindows came to be.                                 20:56:48
21             MR. STUART:  Objection; vague and         20:56:50
22   ambiguous.                                          20:56:50
23        A.    I mean, basically we first met at        20:56:54
24   some point in San Diego at Linux World.  I don't    20:56:58
25   recall right now exactly how we met.  But they      20:57:02
```

EXH __C__ PG _114_

107

| | | |
|---|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | were interested in -- we were basically | 20:57:04 |
| 3 | interested in doing the same things.  We were | 20:57:08 |
| 4 | much further along from a development | 20:57:10 |
| 5 | standpoint.  They were very competent in their | 20:57:12 |
| 6 | marketing approach.  So based on how we | 20:57:16 |
| 7 | complemented each other and potentially we would | 20:57:18 |
| 8 | have synergies, we began dialogue and eventually | 20:57:20 |
| 9 | negotiations that led up to these contracts that | 20:57:24 |
| 10 | we are discussing. | 20:57:24 |
| 11 | Q.    Apart from all these legal documents, | 20:57:26 |
| 12 | how would you describe what the arrangement was? | 20:57:30 |
| 13 | MR. STUART:  Objection; vague and | 20:57:32 |
| 14 | ambiguous, overbroad. | 20:57:34 |
| 15 | A.    The arrangement around like the | 20:57:36 |
| 16 | strategic alliance agreement? | 20:57:38 |
| 17 | Q.    Yes.  The overall arrangement, would | 20:57:40 |
| 18 | you call it a development deal, was it a | 20:57:42 |
| 19 | strategic alliance?  How would you categorize | 20:57:46 |
| 20 | it? | 20:57:46 |
| 21 | MR. STUART:  Objection; vague and | 20:57:48 |
| 22 | ambiguous, overbroad, assumes facts not in | 20:57:52 |
| 23 | evidence. | 20:57:52 |
| 24 | A.    I mean, it was basically -- I sort of | 20:57:56 |
| 25 | saw it as a partnership of sorts.  Overall the | 20:58:02 |

ExH C PG 115

108

1          MICHAEL A. BEGO

2    goals up front were to combine our, Xandros',          20:58:08

3    engineering expertise and provide that to              20:58:10

4    Lindows, which they would then combine with their      20:58:14

5    marketing expertise to create, you know, a truly       20:58:16

6    powerful Linux solution.  So that's the overview       20:58:24

7    of how -- the initial goal.                            20:58:28

8          Q.    And in response to a question from         20:58:30

9    Mr. Stuart, you made the statement that the notes      20:58:32

10   were clearly tied to deliverables in the SAA.  My      20:58:36

11   question is, could you give us a little better         20:58:38

12   sense, what does deliverable mean?                     20:58:40

13         A.    Okay, in response to that you have to      20:58:42

14   go through and look at the documents, because I'm      20:58:44

15   sure they specify what the deliverables were.          20:58:46

16   But I would define a deliverable as an                 20:58:50

17   accomplishment -- a deliverable is an                  20:58:54

18   accomplishment from an agreement or -- you know,       20:58:58

19   it's like an accomplishment or it's some piece of      20:59:02

20   functionality that you would pass on.                  20:59:04

21         Q.    When you indicated there tied to, I        20:59:10

22   take it that they weren't payable until                20:59:12

23   deliverables were achieved?                            20:59:14

24         A.    My recollection is that the money          20:59:16

25   that we received was timed specifically to us          20:59:20

                                                                      109

EXH C PG 116

```
 1                MICHAEL A. BEGO

 2   delivering functionality to Lindows.com.        20:59:22

 3        Q.    You also made mention of revenue     20:59:28

 4   sharing.  In what way were these three payments 20:59:30

 5   of $250,000 related to revenue sharing?         20:59:34

 6        A.    My recollection of the initial intent 20:59:38

 7   of the arrangement was that Lindows would pay    20:59:42

 8   Xandros royalties against which the promissory   20:59:46

 9   notes -- which could be applied against the      20:59:50

10   promissory notes.                                20:59:52

11        Q.    In your mind, were the payments of    20:59:58

12   250,000, were they advances on royalties?        21:00:02

13        A.    You're asking, in my recollection I   21:00:06

14   think that they were notes unto themselves, and I 21:00:10

15   think I remember that they were also advances on  21:00:12

16   royalties, so I think they were both.             21:00:14

17        Q.    The advances of $250,000, were they   21:00:24

18   related to the strategic alliance agreement?      21:00:26

19        A.    I would say they would have to be     21:00:30

20   because I don't know what else they would be     21:00:32

21   advances against.  Yes.                          21:00:34

22              But there was -- actually there's two 21:00:46

23   sides to that, because I think if you look       21:00:48

24   through the notes in detail, a portion of it was 21:00:50

25   debt of 250 and a portion of it was -- to answer 21:00:54
```

EXH C PG 117

110

```
 1              MICHAEL A. BEGO

 2   your question correctly, a portion of it was debt      21:00:56

 3   and a portion of it was an advance credit.  So I       21:01:02

 4   guess my answer is only for the advance part.          21:01:06

 5        Q.    Let me refer you to Exhibit 28,             21:01:10

 6   paragraph 8.  That's your declaration.                 21:01:16

 7        A.    Exhibit 28.  Okay.                           21:01:26

 8        Q.    I'm going to read paragraph 8 into          21:01:32

 9   the record.  "The three advances of $250,000 each      21:01:36

10   noted above were specifically related to the SAA       21:01:40

11   as they were advances on payments due or to be         21:01:42

12   due under the revenue sharing in the SAA.  Those       21:01:46

13   payments were also tied to the achievement of          21:01:48

14   milestones identified in the SAA."                     21:01:56

15              I just want to confirm with you, as         21:01:58

16   you sit here today, that that's an accurate            21:02:00

17   statement.                                             21:02:02

18        A.    It's accurate, and the only                 21:02:04

19   qualification that I would say is that what I'm         21:02:10

20   applying to the advances, there were two               21:02:14

21   components to the notes, one was an advance and        21:02:18

22   one was a note.  So the $250,000 advances would        21:02:22

23   apply to the advance portion but not to the note       21:02:24

24   portion.                                               21:02:24

25        Q.    A final question.  You made a              21:02:32
```

Exh **C** PG **118**

111

```
1                    MICHAEL A. BEGO
2   statement that Mr. Carmony indicated to you          21:02:34
3   that --                                              21:02:34
4        A.    And that's -- I'm sorry.  Not this        21:02:40
5   question, but just to make sure on the last          21:02:42
6   question that we are clear, this is all based on     21:02:50
7   my recollection.  It is not in going through         21:02:50
8   these notes and deciphering them.  This is a         21:02:50
9   three-year old recollection, or two-year old, or     21:02:50
10  whatever it was.                                     21:02:52
11           MR. ROBERTSON:  I have no further           21:02:54
12  questions.                                           21:02:54
13           EXAMINATION BY MR. STUART:                  21:02:58
14       Q.    Mr. Bego, I'm a little confused by        21:03:00
15  something you just said.  You said that, in          21:03:04
16  response to Mr. Robertson's question about           21:03:08
17  paragraph 8, that there was an advance portion       21:03:12
18  and a note portion.  Advance portion and a note      21:03:18
19  portion of what?                                     21:03:20
20       A.    Of the notes.  I mean, I'd have to go     21:03:22
21  through the details, but I thought that -- I'd       21:03:26
22  have to go through the details, and they are         21:03:28
23  obviously fairly complex, but I remember that        21:03:32
24  there was a note portion that was payable and an     21:03:34
25  advance portion against royalties.  And the          21:03:40
```

EXH C PG 119

112

```
 1              MICHAEL A. BEGO

 2   specifics of which, you know, I don't recall        21:03:42

 3   specifics, and we would have to go through and      21:03:46

 4   decipher the notes.  But I'm sure they speak for    21:03:48

 5   themselves.                                          21:03:48

 6        Q.    And it is the advance portion of the     21:03:52

 7   notes that you were referring to in paragraph 8     21:03:54

 8   of your declaration, where you say that they were   21:03:58

 9   specifically related to the SAA?                     21:04:00

10        A.    And like I'm saying, this is all --      21:04:02

11   yes, that's -- yes.  And like I'm saying, it's      21:04:06

12   all very -- this is quite a while ago and I'd       21:04:10

13   have to go through the details of all the notes     21:04:12

14   to verify all that.  But that's sort of what I      21:04:18

15   remember.                                            21:04:18

16        Q.    And the corollary to that is the note    21:04:20

17   portion of the advances were not specifically       21:04:26

18   related to the SAA?                                  21:04:28

19        A.    You'd have to go through and look.       21:04:30

20   I'm sure they speak for themselves.                 21:04:32

21        Q.    Why don't you take a look at Exhibit     21:04:34

22   6 and show me where Exhibit 6 states that it is     21:04:42

23   an advance on the revenue sharing agreement in      21:04:52

24   the SAA.                                             21:04:54

25        A.    Yes, it may have been -- I thought       21:06:58
```

ExH C PG 120

113

| | | |
|---|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | there was -- was there another note or another | 21:07:00 |
| 3 | letter in conjunction with this $250,000 note | 21:07:06 |
| 4 | that represented an advance? | 21:07:08 |
| 5 | Q.   Why don't you answer the question | 21:07:10 |
| 6 | that I put to you first.  Do you see anywhere in | 21:07:12 |
| 7 | this Exhibit 6 that says that the $250,000 that's | 21:07:18 |
| 8 | reflected in there is intended to be an advance. | 21:07:22 |
| 9 | on payments due under revenue sharing in the | 21:07:26 |
| 10 | SAA? | 21:07:26 |
| 11 | MR. ROBERTSON:  Objection.  The | 21:07:28 |
| 12 | document speaks for itself. | 21:07:32 |
| 13 | A.   Looking through it right now, I do | 21:07:34 |
| 14 | not see that. | 21:07:36 |
| 15 | Q.   You asked the question if there was | 21:07:42 |
| 16 | another document that might reflect that.  Is | 21:07:44 |
| 17 | there such a document? | 21:07:46 |
| 18 | A.   I do remember that -- or I'm pretty | 21:07:52 |
| 19 | sure I recall that there was a payment against | 21:08:00 |
| 20 | advance royalties associated with the investment | 21:08:04 |
| 21 | that they made, and I don't see it here, but I do | 21:08:06 |
| 22 | remember us going through that. | 21:08:08 |
| 23 | Q.   It's not in this Exhibit 6, though; | 21:08:12 |
| 24 | correct? | 21:08:12 |
| 25 | A.   Yes.  I'm looking through it right | 21:08:14 |

ExH _C_ PG _12_

114

1                    MICHAEL A. BEGO

2     now.  I do not see it.                           21:08:16

3         Q.    I am asking the same question with     21:08:18

4     regard to Exhibit 7.                             21:08:20

5         A.    Nor 7, nor 8.                          21:08:20

6         Q.    And Exhibit 8.  Why don't you take a   21:08:24

7     look at those.                                   21:08:26

8         A.    I mean, the documents speak for        21:08:28

9     themselves, but at first glance I do not see it. 21:08:30

10        Q.    Why don't you take a moment and tell   21:08:38

11    me if you see any language that indicates to you 21:08:46

12    that the Exhibit 6, 7 and 8 are advances on the  21:08:54

13    revenue sharing in the SAA.                      21:08:56

14        A.    Yes, I remember a different -- yes,    21:09:18

15    to be honest, I remember there being something,  21:09:20

16    and maybe there's a different agreement, but I   21:09:24

17    don't see a reference to this being a prepayment, 21:09:28

18    you know, in 8, either.                          21:09:30

19        Q.    Same question with regards to 7.       21:09:32

20        A.    I'm glancing through it right now.  I  21:10:20

21    do not see it.                                   21:10:22

22        Q.    So Exhibit 6, 7 and 8 in fact don't    21:10:24

23    indicate that they were advances to the revenue  21:10:28

24    sharing agreement in the SAA; correct?           21:10:30

25             MR. ROBERTSON:  Objection.  The         21:10:30

EXH __C__ PG 122

115

```
 1                MICHAEL A. BEGO

 2   documents speak for themselves.                    21:10:32

 3        A.    Yes, like you say, the documents         21:10:34

 4   speak for themselves, and looking through them      21:10:38

 5   now I don't see that.                               21:10:38

 6        Q.    Do you know of any -- you mentioned       21:10:42

 7   there are some other documents that are relevant    21:10:42

 8   in this regard.  Do you know what those documents   21:10:46

 9   are?                                                21:10:46

10        A.    Like I mentioned, it's been quite a      21:10:48

11   while, but I do remember  that there was -- I do    21:10:50

12   remember that there was a credit from the money     21:10:52

13   that they gave us that would be applied             21:10:54

14   towards -- applied against royalties.               21:11:00

15        Q.    Do you know if that credit occurred      21:11:02

16   after the making of the three notes?               21:11:06

17        A.    I believe it would have had to           21:11:08

18   have -- I believe that that would have had to       21:11:12

19   have occurred simultaneously, but I don't -- you    21:11:18

20   know, I don't recall exactly.  I don't recall       21:11:18

21   exactly.                                            21:11:18

22        Q.    And any of the documents that you        21:11:26

23   have seen, had a chance to review here today, are   21:11:28

24   those the documents that you referred to as         21:11:34

25   advances on the revenue sharing in the SAA?         21:11:38
```

Exh __C__ Pg __123__

116

```
 1              MICHAEL A. BEGO

 2      A.    Can you restate that?              21:11:40

 3      Q.    You have looked over quite a number  21:11:44

 4  of documents here today.                     21:11:44

 5      A.    Yes.                               21:11:48

 6      Q.    I am just asking you if -- since   21:11:50

 7  Exhibit 6, 7 and 8 don't indicate that they were  21:11:52

 8  advances on the revenue sharing in the SAA, are  21:11:56

 9  there any other documents that you looked at  21:11:58

10  today that indicate that Exhibit 6, 7 or 8 are  21:12:02

11  advances under the revenue sharing agreement in  21:12:06

12  the SAA?                                     21:12:08

13      A.    In terms of advances -- I don't    21:12:10

14  recall having seen -- I don't recall in what I  21:12:10

15  looked at today and having seen something that  21:12:12

16  referred to the money as an advance.          21:12:22

17          MR. STUART:  Nothing further.        21:12:24

18          EXAMINATION BY MR. ROBERTSON:        21:12:26

19      Q.    Just to clarify, were the notes we  21:12:30

20  have been discussing here part of the overall  21:12:32

21  arrangement that you began discussing with    21:12:34

22  Lindows at the Linux conference in 2001?      21:12:38

23          MR. STUART: Objection.  It's vague,  21:12:40

24  ambiguous, it's overbroad, assumes facts not in  21:12:44

25  evidence.                                     21:12:44
```

EXH C PG 124

117

Michael A. Bego                                2/19/04                        Lindows v. Xandros

```
1                    MICHAEL A. BEGO
2       A.    Well, I don't believe that that        21:12:44
3   initially came up at the Linux conference.  But,  21:12:48
4   you know, I would state that they were part of    21:12:50
5   the overall agreement that we were putting forth  21:12:54
6   through later October and November.               21:12:56
7             MR. ROBERTSON:  Thank you.              21:12:58
8             EXAMINATION BY MR. WALTON:              21:13:00
9       Q.    Mr. Bego, the only question I have      21:13:02
10  for you is in Exhibit 6 and Exhibit 7 there is a  21:13:08
11  paragraph 1.3.                                    21:13:10
12      A.    Yes.                                    21:13:18
13      Q.    What does that refer to?                21:13:20
14      A.    The letter --
15            MR. STUART:  Objection.  It assumes     21:13:28
16  facts not in evidence.                            21:13:30
17            MR. WALTON:  I'm sorry, I didn't hear   21:13:32
18  you because of the objection of counsel, but you  21:13:34
19  go ahead and answer.                              21:13:34
20      A.    That refers to a certain letter         21:13:36
21  agreement dated November 20 -- dated November,    21:13:40
22  underscore, between the holder and the maker.  It 21:13:44
23  was referring to the letter agreement which, you  21:13:46
24  know -- it was referring to the letter agreement. 21:13:48
25      Q.    When you answered the question that     21:13:54
```

Exh C Pg 125

118

```
 1                    MICHAEL A. BEGO
 2  Mr. Stuart put to you about what's on the face of      21:13:56
 3  the agreement, you were answering literally as to      21:14:00
 4  what just literally appeared on the face of the        21:14:04
 5  agreement in terms of whether there is any             21:14:06
 6  language in the document which speaks to               21:14:08
 7  advances; is that right?                               21:14:08
 8       A.    Correct.                                    21:14:08
 9            MR. STUART:  Objection; assumes facts        21:14:12
10  not in evidence, and asked and answered.               21:14:14
11            MR. WALTON:  I don't have any other          21:14:18
12  questions.                                             21:14:18
13            EXAMINATION BY MR. STUART:                   21:14:18
14       Q.    To follow up on Mr. Robertson's             21:14:22
15  question, you mentioned that -- you said that          21:14:30
16  there was an overall arrangement.  Your testimony      21:14:32
17  was earlier that the negotiations that began at        21:14:34
18  the Linux conference in the summer ultimately          21:14:38
19  resulted in the entering of the parties drafting       21:14:42
20  these documents, including the SAA; correct?           21:14:46
21       A.    Correct.                                    21:14:46
22       Q.    Is there any part of this overall           21:14:52
23  arrangement that Mr. Robertson referred to that        21:14:54
24  was not reflected in the SAA or the other              21:15:00
25  documents you have seen here today?                    21:15:02
```

Exh C Pg 126

119

```
 1                  MICHAEL A. BEGO
 2         A.    So you're asking me if the general        21:15:04
 3   line of discussions that we had, if there are any     21:15:06
 4   other documents, other than what I see right          21:15:08
 5   here?                                                 21:15:10
 6         Q.    Yes, sir.                                 21:15:10
 7         A.    And I'd have to go back to things         21:15:12
 8   that I've said previously.  I do remember that        21:15:16
 9   there was some agreements that we went through,       21:15:18
10   and that the money that they gave us represented     21:15:20
11   an advance against royalties, and I would also       21:15:26
12   say that, this being three years ago, there could    21:15:28
13   have been, you know, five documents that we          21:15:32
14   signed that I wouldn't miss being here but could     21:15:36
15   very well have existed.                              21:15:36
16         Q.    As you sit here today, are you aware      21:15:38
17   of any other documents, either -- let me rephrase    21:15:44
18   that.                                                21:15:44
19              As you sit here today, are you aware       21:15:46
20   of any other agreements between Lindows and          21:15:48
21   Xandros Corp. or Xandros, Inc., that reflect any     21:15:52
22   or part of this overall arrangement, other than      21:15:56
23   those that we have looked at today?                  21:15:56
24         A.    I'd say -- I mean, you are asking me      21:16:00
25   what else there could be.  There could be --         21:16:02
```

Exh C Pg 127

120

```
 1              MICHAEL A. BEGO
 2   there are certainly lots of e-mails, lots of        21:16:04
 3   phone calls.  I know they took lots of notes, as    21:16:08
 4   well as, you know, I'm sure I did.                   21:16:12
 5       Q.    I'm asking --                              21:16:14
 6       A.    I'd have to go through and go through      21:16:16
 7   all the terms of all the different agreements        21:16:18
 8   and, you know, write down on a different piece of    21:16:20
 9   paper my memory of all of the different terms        21:16:24
10   that we had, and see if there are holes missing,     21:16:26
11   and then I could say that maybe there is             21:16:26
12   something missing.  It's very difficult --           21:16:30
13       Q.    You make this question a lot more          21:16:30
14   complex than I intend for it to be and I             21:16:34
15   apologize.                                           21:16:34
16             My question is, as you sit here            21:16:36
17   today, right now, do you have a recollection in      21:16:38
18   your head, can you identify any agreements, not      21:16:40
19   e-mails, not notes, not Powerpoint presentations,    21:16:46
20   agreements, signed by Lindows, Xandros, Inc.,        21:16:54
21   and/or Xandros Corp., that reflect part of what      21:16:56
22   Mr. Robertson refers to as an overall                21:17:00
23   arrangement?                                         21:17:00
24       A.    As I sit here right at this moment,        21:17:08
25   nothing comes to mind.                               21:17:12
```

EXH C PG 128

121

1              MICHAEL A. BEGO

2        Q.    Okay, thank you.                    21:17:16

3              And to follow up on Mr. Walton's    21:17:16

4    question, you mentioned that the paragraph 1.3 in    21:17:22

5    Exhibit 6 refers to a letter agreement.  Do you    21:17:28

6    know what that is?                    21:17:28

7        A.    I would believe -- I mean, based on    21:17:36

8    going through everything right now, I would    21:17:38

9    believe it would refer to Exhibit -- is it    21:17:46

10   maybe -- it looks like it may agree to Exhibit    21:17:50

11   18, but I think what you really need to do is you    21:17:54

12   need to sit down and look at Exhibit 17 and 18,    21:17:56

13   because 17 also refers to a letter agreement, and    21:18:00

14   specifically an amendment to it, and I would look    21:18:02

15   to see if item 1 from Plaintiff's Exhibit 17    21:18:06

16   appears to modify item 2 from Exhibit 18, and if    21:18:12

17   it does, I would say that that should refer to    21:18:16

18   the letter agreement.  And I definitely do    21:18:22

19   remember, you know, some of the things that we    21:18:24

20   talked about in Exhibit 18.                    21:18:26

21        Q.    Okay.                    21:18:32

22        A.    So, I mean, that's what I would do if    21:18:36

23   you want to get to the bottom of that.                    21:18:36

24        Q.    And as you sit here today, you have    21:18:40

25   not done that and you are not prepared to state    21:18:42

EXH C PG 129

122

```
1              MICHAEL A. BEGO

2   that the letter agreement refers to Exhibit 18;        21:18:44

3   correct?                                               21:18:44

4        A.    It would take me some time to go            21:18:46

5   through all of this to be able to certify that.        21:18:48

6        Q.    And, in fact, the paragraph that Mr.        21:18:56

7   Walton referred to mentions that the letter            21:19:00

8   agreement reflects a future investment in the          21:19:08

9   maker by the holder; correct?                          21:19:10

10             MR. WALTON:  Objection.  That               21:19:12

11  misstates the entirety of what is stated there.        21:19:20

12  You quoted a portion of it.                            21:19:24

13       Q.    Why don't you take a look at                21:19:24

14  paragraph 1.3 of Exhibit 6.                            21:19:28

15       A.    Okay.  Could you repeat the                 21:19:28

16  question?                                              21:19:30

17       Q.    Paragraph 1.3 doesn't reference the         21:19:32

18  letter agreement that talks about advances on the      21:19:36

19  revenue sharing in the SAA, does it?                   21:19:42

20             MR. WALTON:  Objection.  That assumes       21:19:44

21  facts not in evidence.  Without looking at the         21:19:46

22  letter agreement you wouldn't know that.               21:19:48

23       Q.    My question is regarding paragraph          21:19:50

24  1.3.  Paragraph 1.3 doesn't refer to a letter          21:19:52

25  agreement that discusses, relates to, advances on      21:20:02
```

Exh C PG 130

123

```
 1              MICHAEL A. BEGO
 2   the revenue sharing agreement in the SAA?        21:20:06
 3           MR. WALTON:  Objection.  It's           21:20:06
 4   argumentative because it doesn't characterize the 21:20:10
 5   letter agreement at all.                        21:20:10
 6      Q.    Okay.  You can answer the question.    21:20:16
 7      A.    Getting back to the letter agreement,  21:20:18
 8   it goes back to the future point of first       21:20:20
 9   spending the time to go through this and, you    21:20:24
10   know, verify which is the letter agreement,      21:20:26
11   potentially being Exhibit 18, and then once you  21:20:30
12   identified the letter agreement, then you can go 21:20:32
13   through and certify or answer your question.     21:20:34
14      Q.    Why don't we read through the           21:20:38
15   paragraph together.  It says, paragraph 1.3,     21:20:42
16   Exhibit 6, says, "Of even date herewith, the     21:20:46
17   holder and Xandros Corporation, a wholly-owned   21:20:48
18   subsidiary of the maker, are entering into a side 21:20:52
19   letter agreement regarding this note and future  21:20:56
20   investments in the maker by the holder."         21:21:00
21   Correct?                                        21:21:00
22      A.    So you're just asking me to certify     21:21:14
23   what it says?                                   21:21:16
24      Q.    Yes.  Is that what it says?            21:21:18
25      A.    It says "Of even date herewith, the    21:21:20
```

EXH __C__ PG __131__

124

```
 1                  MICHAEL A. BEGO
 2   holder and Xandros Corporation, a wholly-owned          21:21:24
 3   subsidiary of the maker, are entering into a side       21:21:28
 4   letter agreement regarding this note and future         21:21:30
 5   investments in the maker by the holder."                21:21:32
 6        Q.    It doesn't say that that letter              21:21:34
 7   agreement references or is regarding advances on        21:21:38
 8   the revenue sharing in the SAA, does it?                21:21:40
 9        A.    It does not say that.                        21:21:42
10             MR. STUART:  Nothing further.                 21:21:46
11             MR. WALTON:   Let's straighten this           21:21:50
12   out.                                                    21:21:50
13             EXAMINATION BY MR. WALTON:                    21:21:52
14        Q.    Mr. Bego, this convertible promissory        21:21:54
15   note, that is titled as such, Plaintiff's Exhibit       21:21:58
16   6, contains paragraph 1.3 which you and Mr.             21:22:02
17   Stuart just agreed that it says what it says;           21:22:06
18   correct?                                                21:22:06
19        A.    Yes.                                         21:22:06
20        Q.    Now, assume with me for a minute that        21:22:08
21   Exhibit 18, as you suggested, is the side letter        21:22:12
22   agreement referred to in paragraph 1.3 of Exhibit       21:22:16
23   6.  Just assume that to be true.                        21:22:18
24        A.    Yes.                                         21:22:18
25             MR. STUART:  Objection.  It assumes           21:22:20
```

EXH C PG 132

125

| | | |
|---|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | facts not in evidence. | 21:22:22 |
| 3 | Q.    Take a look at paragraph 4 on page 2 | 21:22:24 |
| 4 | of the side letter agreement and read that to | 21:22:26 |
| 5 | yourself, of Exhibit 18. | 21:22:30 |
| 6 | A.    Okay. | 21:22:34 |
| 7 | Q.    All right.  You notice it starts out | 21:22:38 |
| 8 | "The principal amount of the note," and if you | 21:22:40 |
| 9 | go back to see, that's a capitalized "note," so | 21:22:42 |
| 10 | it is a defined term within this letter | 21:22:44 |
| 11 | agreement, and if you go back to the first | 21:22:46 |
| 12 | paragraph, it talks about that certain | 21:22:48 |
| 13 | convertible promissory note, the note of even | 21:22:50 |
| 14 | date. | 21:22:52 |
| 15 | A.    Yes. | 21:22:52 |
| 16 | Q.    All right.  And this 1.3 refers to a | 21:22:58 |
| 17 | side letter agreement regarding this note, | 21:23:02 |
| 18 | meaning Exhibits 6 itself. | 21:23:02 |
| 19 | A.    Yes. | 21:23:04 |
| 20 | Q.    And future investments in the maker | 21:23:04 |
| 21 | of the note. | 21:23:06 |
| 22 | A.    Yes. | 21:23:06 |
| 23 | Q.    Now, assuming, and counsel has | 21:23:08 |
| 24 | objected, but assuming for a moment that, in | 21:23:16 |
| 25 | fact, Exhibit 18 is that side letter agreement, | 21:23:18 |

ExH **C** PG **133**

126

| | | |
|---|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | is paragraph 4 a reference to the advance part of | 21:23:22 |
| 3 | the deal that you have talked about? | 21:23:22 |
| 4 | MR. STUART:  Assumes facts not in | 21:23:24 |
| 5 | evidence, is vague and ambiguous. | 21:23:26 |
| 6 | A.    Yes.  I mean, that is how it reads. | 21:23:28 |
| 7 | And I do remember there being that component to | 21:23:30 |
| 8 | the deal -- I do remember there being that | 21:23:36 |
| 9 | component to the deal. | 21:23:36 |
| 10 | Q.    Thank you. | 21:23:42 |
| 11 | A.    But, I mean, you have to go through | 21:23:46 |
| 12 | it all. | 21:23:46 |
| 13 | EXAMINATION BY MR. STUART: | 21:23:48 |
| 14 | Q.    Mr. Bego, one more question.  I | 21:23:50 |
| 15 | believe your testimony was that you have never | 21:23:52 |
| 16 | seen nor recall signing a signed version of | 21:23:54 |
| 17 | Exhibit 18; correct? | 21:23:56 |
| 18 | A.    I didn't say that I never -- I don't | 21:24:02 |
| 19 | recall.  Like I said with all of these, except | 21:24:04 |
| 20 | for like the strategic alliance agreement and a | 21:24:06 |
| 21 | couple of other significant things, I don't | 21:24:10 |
| 22 | recall specifically signing this or seeing one | 21:24:12 |
| 23 | from Lindows or not seeing one. | 21:24:14 |
| 24 | Q.    So you have no recollection as to | 21:24:16 |
| 25 | whether or not you have signed it or have seen a | 21:24:18 |

EXH C PG 134

127

```
 1              MICHAEL A. BEGO
 2   signed copy by any party; correct?              21:24:22
 3              MR. ROBERTSON:  He didn't say that.  21:24:24
 4              MR. WALTON:  He didn't say that.     21:24:26
 5   Objection; misstates his testimony and it's     21:24:30
 6   argumentative.                                  21:24:30
 7              MR. STUART:  Well, I'm unclear what
 8   his testimony is.
 9        Q.   Can you help me out then?  Have you   21:24:34
10   seen a signed copy of Exhibit 18?               21:24:36
11        A.   I don't recall having seen it, but    21:24:38
12   I'm not denying that I haven't.                 21:24:40
13        Q.   As you sit here now, you do not       21:24:42
14   recall ever having seen a signed copy of Exhibit 21:24:44
15   18?                                             21:24:44
16              MR. ROBERTSON:  You are just asking  21:24:48
17   the same question.  He already answered it.  It's 21:24:50
18   asked and answered.                             21:24:50
19        A.   I mean, to repeat it, I don't recall  21:24:52
20   having seen it, but I don't deny that I didn't   21:24:56
21   see one, either.                               21:24:56
22        Q.   As you sit here today, you do not     21:24:58
23   recall having signed a copy of Exhibit 18?      21:25:00
24              MR. ROBERTSON:  Objection; asked and 21:25:02
25   answered.                                       21:25:02
```

EXH C PG 135

128

| | | |
|---|---|---|
| 1 | MICHAEL A. BEGO | |
| 2 | A.    I do not recall signing it.  I do not | 21:25:08 |
| 3 | recall signing it, although I don't deny that I | 21:25:10 |
| 4 | signed it.  But I do remember there being some of | 21:25:16 |
| 5 | these -- I do remember some of these terms being | 21:25:18 |
| 6 | an aspect of the deal that we did agree to. | 21:25:20 |
| 7 | So whether it was in this or | 21:25:26 |
| 8 | something else, I definitely remember there being | 21:25:28 |
| 9 | an aspect of the deal that involved an advance | 21:25:34 |
| 10 | against royalties. | 21:25:34 |
| 11 | Q.    And is there a document that you have | 21:25:36 |
| 12 | with you here today that reflects a signed | 21:25:40 |
| 13 | agreement between the parties in that regard? | 21:25:42 |
| 14 | A.    The only way that you would get to | 21:25:46 |
| 15 | that is if -- well, I guess in the fact that 17 | 21:25:54 |
| 16 | refers to the letter agreement, if you went | 21:25:56 |
| 17 | through and deciphered that the letter agreement | 21:25:58 |
| 18 | was Exhibit 18, and I think 17 was signed -- I | 21:26:02 |
| 19 | mean, the only ones that would attest to it are | 21:26:06 |
| 20 | 17, 6, 7 and 8, to the extent that they reference | 21:26:10 |
| 21 | the letter agreement, and the fact that you are | 21:26:12 |
| 22 | entering into it. | 21:26:14 |
| 23 | MR. STUART:  All right.  Thank you, | 21:26:18 |
| 24 | Mr. Bego. | 21:26:20 |
| 25 | MR. ROBERTSON:  Thanks a lot, Mr. | 21:26:22 |

EXH C PG 136

129

Michael A. Bego                          2/19/04                    Lindows v. Xandros

1                         MICHAEL A. BEGO

2   Bego.                                                    21:26:22

3              THE VIDEOGRAPHER:  Going off the             21:26:36

4   record, the time is 9:25, and this is the end of        21:26:38

5   Tape No. 2.                                              21:26:38

6              (Time noted:  9:25 p.m.)                      21:26:40

7

8                         _____

9                         MICHAEL A. BEGO

10

11  Subscribed and sworn to before me

12  this _____ day of _____, 2004.

13

14  _____

15

16

17

18

19

20

21

22

23

24

25

                                                                    130

EXH C PG 137

1   COLBERN C. STUART III (SBN 177897)
    JAMES CONLEY (SBN 216639)
2   PAUL HASTINGS JANOFSKY & WALKER LLP
    12390 El Camino Real
3   San Diego, California 92130
    Telephone: (858) 720-2500
4   Facsimile: (858) 720-2555

5   Attorneys for Plaintiff
    LINDOWS.COM, INC.

6

7

8                   UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10

11   LINDOWS.COM, INC., a Delaware corporation,       Case No. 02 CV 2460 BTM(RBB)

12                   Plaintiff,                        **PLAINTIFF LINDOWS.COM, INC'S
                                                       RE-NOTICE OF 30(b)(6) DEPOSITION
13          v.                                         DEFENDANT XANDROS, INC.**

14   XANDROS, INC., a Delaware corporation;
     LINUX GLOBAL PARTNERS, INC., a
15   Delaware corporation; MICHAEL BEGO, an
     individual; WILLIAM JAY ROSEMAN, an
16   individual,

17                   Defendants.

18

19          PLEASE TAKE NOTICE that pursuant to Rule 30(b)(6) of the Federal Rules of Civil

20   Procedure, Plaintiff Lindows.com, Inc. ("Lindows") will take the deposition of Defendant

21   XANDROS, INC. ("Xandros") at the offices of Paul, Hastings, Janofsky & Walker LLP, 75 E.

22   55th Street, 1st floor, New York, NY 10022, commencing on October 24, 2003, at 3:00 p.m. until

23   5:00 p.m..

24          The subject matter of the deposition is set forth herein. Xandros is required to designate,

25   pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, one or more officers, directors,

26   employees or other persons who will testify on its behalf regarding the subject matter listed herein.

27   The deposing party intends to record the deponent's testimony conventional and real time (through

28   instant visual display of the testimony) stenographic means.

ExH. D PG 138

02 CV 2460 BTM(RBB)

1          Pursuant to Rule 34 of the Federal Rules of Civil Procedure defendant Xandros, Inc. is

2   requested to produce for inspection and copying by plaintiffs' within 30 days after service of this

3   request, Documents designated herein which are in the possession, custody or control of the

4   defendant, and/or its agents, including but not limited to its attorneys and/or accountants.

5   **DEFINITIONS**

6       1.    "YOU" and "YOUR" shall mean and include named Defendant Xandros, Inc., and

7   any subsidiaries, divisions, branches, affiliates, predecessors or successors in business, parents, and

8   wholly or partially owned entities of Xandros or any present or former agents, employees, officers,

9   directors, insurance companies, attorneys, accountants, investigators, and consultants of the

10   foregoing.

11       2.    "ROSEMAN," shall mean and include named Defendant William Jay Roseman, and

12   any other entity or entities acting on your behalf.

13       3.    "LGP" shall mean and include named Defendant Linux Global Partners, Inc., and

14   any, divisions, branches, affiliates, predecessors or successors in business, parents, and wholly or

15   partially owned entities of LGP or any present or former agents, employees, officers, directors,

16   insurance companies, attorneys, accountants, investigators, and consultants of the foregoing.

17       4.    "BEGO" shall mean and include named Defendant Michael Bego and any other

18   entity or entities acting on his behalf.

19       5.    "LINDOWS," shall mean and include named Plaintiff Lindows.com, Inc.

20       6.    "CONVERTIBLE SECURITIES" shall mean and include the convertible

21   promissory notes and notes November 20, 2001, December 6, 2001 and December 21, 2001.

22       7.    "SAA" shall mean and include Strategic Alliance Agreement attached as exhibit

23   "A" to the Declaration of Michael Bego in Support of Motion to Compel Arbitration and Dismiss

24   or Stay Action.

25       8.    "UNSIGNED LETTER" shall mean and refer to the unsigned and undated

26   document attached as Exhibit "C" to the Declaration of Michael Bego.

27       9.    "AMENDMENT" shall mean and refer to exhibit "E" to the Declaration of Michael

28   Bego in Support of Motion to Compel Arbitration and Dismiss or Stay Action.

10.     "DOCUMENT" and "DOCUMENTS" shall mean any and all written and graphic matter, however produced or reproduced, and each and every thing from which information can be processed or transcribed.  DOCUMENT includes, without limitation, originals or copies of correspondence, memoranda, notes, records, books, papers, telegrams, telexes, dictation or other audio tapes, video tapes, computer tapes, computer disks, hard drives or databases, computer printouts, microfilm, microfiche, worksheets, diaries, calendars, photographs, charts, brochures, drawings, sketches and all other writings or drafts thereof, whether handwritten, typewritten, printed, photocopied, photographed, or electronically created or recorded (such as emails and voice mail).  Any Document with marks such as initials, comments or notations of any kind is not deemed to be identical to one produced without such marks and is to be produced as a separate document.  Where there is any question about whether a tangible document falls within the definition of DOCUMENT and DOCUMENTS, such tangible item shall be produced.

11.     "RELATING TO" shall mean concerning, referring to, describing, evidencing, constituting, containing, discussing, identifying, or otherwise prepared in connection with the matter as well as direct references to the subject matter set forth in each request.

12.     "IDENTIFY" or "IDENTIFICATION" shall mean:

A.     When referring to a person, to provide, to the extent known, the person's full name, present or last known address, and when referring to a natural person, the present or last known place of employment.  When identifying a present or ex-Delphi employee, further provide his/her current or last title, dates of employment and current or last division or facility including the location of that division and/or facility.  Once a person has been identified in accordance with this paragraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

B.     When referring to documents, to provide, to the extent known, information about the (i) type of document; (ii) its general subject matter; (iii) the date of the document; (iv) author(s), addressee(s) and recipient(s). and (v) its location, and if its present location is unknown, then its last known location (identifying it as its last known location and the date(s) it was known to be at that location).

Exh **D** Pg **140**

## 30 (b)(6) DEPOSITION TOPICS

**TOPIC NO. 1:**

The negotiation, content, making, terms and intent RELATING TO the SAA, UNSIGNED LETTER, AMENDMENT and CONVERTIBLE SECURITIES.

**TOPIC NO. 2:**

The relationship between BEGO, ROSEMAN, Frederick Berenstein, LGP and XANDROS and each of them.

**TOPIC NO. 3:**

The relationships between Michael Bego, William Roseman, LGP and Xandros in order to evaluate these parties' standing to seek enforcement of the arbitration clause of the SAA and, if so, whether there exists an Agreement to arbitrate this dispute as between these parties and Lindows.

**TOPIC NO. 4:**

Whether there exists an agreement between XANDROS and LINDOWS to arbitrate the dispute which is the subject of this action.

**TOPIC NO. 5:**

Whether there exists an agreement between LINDOWS and any other party to this action including BEGO, ROSEMAN, and LGP to arbitrate this dispute which is subject of this action.

**TOPIC NO. 6:**

The existence of all documents consisting of or RELATING TO the SAA, UNSIGNED LETTER, AMENDMENT and CONVERTIBLE SECURITIES.

**TOPIC NO. 7:**

Whether there exists an agreement related to the purported "Letter Agreement" and, if so, the content of that Agreement.

**TOPIC NO. 8:**

The three Promissory Notes dated November 20, 2001, December 6, 2001 and December 21, 2001, including Xandros' or LGP's payment or lack of payment under such Notes and the reasons or rationale therefore.

EXH **D** PG **141**

02 CV 2460 BTM(RBB)

1  **TOPIC NO. 9:**

2      The identity, title, position and authority of any officers, employees and agents of

3  XANDROS and LGP from August 2001 to the present.

4  **TOPIC NO. 10:**

5      The amount of any claim for offset or any other counterclaim which Xandros now has or

6  will assert against Plaintiff.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1                 <u>**DOCUMENTS REQUESTED**</u>

2   **REQUEST FOR PRODUCTION NO. 1:**

3          All DOCUMENTS that evidence, refer or relate to whether there exists an agreement to

4   arbitrate the dispute which is the subject of this action between XANDROS, LGP, BEGO,

5   ROSEMAN, and LINDOWS.

6   **REQUEST FOR PRODUCTION NO. 2:**

7          All DOCUMENTS that constitute, evidence, refer, relate to or determine the relationships

8   between BEGO, ROSEMAN, LGP, XANDROS and each of them .

9   **REQUEST FOR PRODUCTION NO. 3:**

10          All DOCUMENTS that constitute, evidence, refer, relate to or determine whether there

11   exists an agreement related to the purported "UNSIGNED LETTER" and, if so, the subject of such

12   an agreement.

13   **REQUEST FOR PRODUCTION NO. 4:**

14          All DOCUMENTS consisting of or RELATING TO contracts, agreements, letters of

15   agreement, side letters of agreement, including but not limited to any amended versions of

16   or amendments to any such document, whether in draft, final, revised, or executed, unexecuted, or

17   pending form, between YOU and LINDOWS.

18   **REQUEST FOR PRODUCTION NO. 5:**

19          All DOCUMENTS consisting of or RELATING TO contracts containing an agreement to

20   arbitrate between YOU and any other entity, including but not limited to LINDOWS.

21   **REQUEST FOR PRODUCTION NO. 6:**

22          All DOCUMENTS consisting of or RELATING TO contracts which do not contain an

23   agreement to arbitrate between YOU and any other entity, including but not limited to LINDOWS.

24

25   Dated:  October 21, 2003            PAUL, HASTINGS, JANOFSKY & WALKER LLP

26

27                      By:_____

28                       COLBERN C. STUART, III
                         Attorneys for Plaintiff LINDOWS.COM, INC.

                Exh D  Pg 143

                                  02 CV 2460 BTM(RBB)

1   COLBERN C. STUART III (SBN 177897)
    JAMES CONLEY (SBN 216639)
2   PAUL HASTINGS JANOFSKY & WALKER LLP
    12390 El Camino Real
3   San Diego, California 92130
    Telephone: (858) 720-2500
4   Facsimile: (858) 720-2555

5   Attorneys for Plaintiff
    LINDOWS.COM, INC.

6

7

8                   UNITED STATES DISTRICT COURT

9                 SOUTHERN DISTRICT OF CALIFORNIA

10

11  LINDOWS.COM, INC., a Delaware corporation,    Case No. 02 CV 2460 BTM(RBB)

12                  Plaintiff,                     **PLAINTIFF LINDOWS.COM, INC'S
                                                   RE-NOTICE OF 30(b)(6) DEPOSITION
13          v.                                     DEFENDANT LINUX GLOBAL
                                                   PARTNERS, INC.**
14  XANDROS, INC., a Delaware corporation;
    LINUX GLOBAL PARTNERS, INC., a
15  Delaware corporation; MICHAEL BEGO, an
    individual; WILLIAM JAY ROSEMAN, an
16  individual,

17                  Defendants.

18

19

20          PLEASE TAKE NOTICE that pursuant to Rule 30(b)(6) of the Federal Rules of Civil

21  Procedure, Plaintiff Lindows.com, Inc. ("Lindows") will take the deposition of Defendant Linux

22  Global Partners, Inc. ("Linux") at the offices of Paul, Hastings, Janofsky & Walker LLP, 75 E.

23  55th Street, 1st floor, New York, NY 10022, commencing on October 24, 2003, at 3:00 p.m. until

24  5:00 p.m..

25          The subject matter of the deposition is set forth herein.  Linux is required to designate,

26  pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, one or more officers, directors,

27  employees or other persons who will testify on its behalf regarding the subject matter listed herein.

28

                          Exh E PG 144

                                                              02 CV 2460 BTM(RBB)

1  The deposing party intends to record the deponent's testimony conventional and real time (through

2  instant visual display of the testimony) stenographic means.

3  **DEFINITIONS AND INSTRUCTIONS**

4  1.  "Lindows," shall mean and include named Plaintiff Lindows.com, Inc., and any

5  subsidiaries, divisions, branches, affiliates, predecessors or successors in business, parents, and

6  wholly or partially owned entities of Lindows or any present or former agents, employees, officers,

7  directors, insurance companies, attorneys, accountants, investigators, and consultants of the

8  foregoing.

9  2.  "Xandros," shall mean and include named Defendant Xandros, Inc., and any

10  subsidiaries, divisions, branches, affiliates, predecessors or successors in business, parents, and

11  wholly or partially owned entities of Xandros or any present or former agents, employees, officers,

12  directors, insurance companies, attorneys, accountants, investigators, and consultants of the

13  foregoing.

14  3.  "LGP" shall mean and include named Defendant Linux Global Partners, Inc., and

15  any subsidiaries, divisions, branches, affiliates, predecessors or successors in business, parents,

16  wholly or partially owned entities of LGP or any present or former agents, employees, officers,

17  directors, insurance companies, attorneys, accountants, investigators, and consultants of the

18  foregoing.

19  4.  "SAA" shall mean and include _____

20  5.  "Agreement" shall mean and refer to

21  6.  "Letter Agreement" shall mean and refer to the

22  **30 (b)(6) DEPOSITION TOPICS**

23  **TOPIC NO. 1:**

24  Whether there exists an Agreement to arbitrate this dispute as between Xandros and

25  Lindows.

26  **TOPIC NO. 2:**

27  The relationships between Michael Bego, William Roseman, LGP and Xandros in order to

28  evaluate these parties' standing to seek enforcement of the arbitration clause of the SAA and, if so,

1    whether there exists an Agreement to arbitrate this dispute as between these parties and Lindows.

2    **TOPIC NO. 3:**

3            Whether there exists an agreement related to the purported "Letter Agreement" and, if so,

4    the content of that Agreement.

5    Dated:  October 20, 2003                    PAUL, HASTINGS, JANOFSKY & WALKER LLP

6

7                                               By:_____
                                                    COLBERN C. STUART, III
8                                               Attorneys for Plaintiff LINDOWS.COM, INC.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ExH E PG 146

3                                        02 CV 2460 BTM(RBB)

# LA BELLA & McNAMARA, LLP

March 5, 2004

**Andrew W. Robertson**
arobertson@labellamcnamara.com

*Via Facsimile & U.S. Mail*

Colbern C. Stuart, III, Esq.
Paul, Hastings, Janofsky & Walker, LLP
3579 Valley Centre Drive
San Diego, CA  92130

Re:  Lindows v. Xandros

Dear Cole:

Given the concern over Mr. Berenstein's confusion as to the titles held by Mike Bego and in response to your request of yesterday, we have sought again to confirm with the Company the existence of any documents responsive to Paragraph 2 of Plaintiff's Request to Produce as limited by Magistrate Brooks' Minute Order of 8/14/03. Paragraph 2 sought documents that "constitute, evidence, refer, relate to or determine the relationships between Bego, Roseman, LGP and Xandros…"

With the exception of Mr. Berenstein's deposition (which was in part adopted by Will Roseman), Defendants position has consistently been: Bego was employed by LGP and sometimes referred to as a VP Marketing although he was never an officer of LGP; Bego had the title of President and a board member of Xandros, Inc and Xandros Corp from their inception through June, 2002. The various Defendants responses to Request fro Admission and Interrogatories have so recited.

At no time has any Defendant questioned or challenged Bego's authority to bind Xandros and clearly Lindows had no questions about it. Hence, we do not see it as a major issue, particularly given that Berenstein had good reason to have faulty recollection – he acknowledged in his deposition that he was deathly ill during most of 2001 and was not involved in the details.



LA BELLA &
McNAMARA, LLP

Colbern C. Stuart, III
March 5, 2004
Page 2

In any event, the following additional documents do provide some confirmation of Bego's official titles:

Original By-Laws dated 8/23/01 which call for the signature of Bego as Secretary, but are unsigned. The restated By-Laws as of 3/10/03 were previously provided;

Undated Director's and Officer's Register for Xandros, Inc.and Xandros Corp. This was provided to the Company by Canadian counsel for Xandros Corp. We do not know the foundational facts as to who prepared or when. The Register for Xandros, Inc. appears incomplete, but does recite Bego as President and a Director.

8/23/01 Action by Unanimous Consent In Lieu of Organizational Meeting of Xandros, Inc. which shows Bego as President and Director.

We can confirm again that the Company has located no Minutes responsive to Plaintiff's document requests.

This would appear to put to rest, for purposes of the arbitration motion, questions you may have as to whether Mr. Bego was, in fact, President of Xandros, Inc and Xandros Corp. at the time of the SAA. Dr. Berenstein's recollection was apparently imperfect, understandably so given his health issues.

Please call if you have any questions.

Sincerely,

Andrew W. Robertson

AWR:jch

cc:    Ed Walton

ЕхН F PG 148

**Paul, Hastings, Jan.      , & Walker LLP**
12390 El Camino Real, San Diego, CA 92130
telephone 858-720-2500 / facsimile 858-720-2555 / internet www.paulhastings.com

# Paul Hastings

Atlanta
Beijing
Hong Kong
London
Los Angeles
New York
Orange County
San Diego
San Francisco
Stamford
Tokyo
Washington, D.C.

(858)720-2820
colestuart@paulhastings.com

July 25, 2003

45326.00004

**VIA FACSIMILE**

Andrew W. Robertson
LaBella & McNamara
401 West "A" Street
Suite 2300
San Diego CA 92101

Re:    *Lindows.com, Inc. v. Xandros, Inc., et al.*
       USDC Case No. 02 CV 2460 BTM(RBB)

Dear Mr. Robertson:

Today we received your responses and objections of your clients to the pending written discovery. Despite the fact that we have given your clients three extensions of time to respond to the discovery propounded in May of this year, your clients have chosen to provide no substantive response to the pending discovery, but has only filed objections thereto.

Your clients' complete lack of substantive response is plainly unacceptable and constitutes an abuse of discovery. Moreover, we believe that your signature upon these documents may be a violation of F.R.C.P. Rule 11, which, as you are aware, proscribes the use of discovery "for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." It appears beyond reasonable dispute that these pleadings were filed in an attempt to cause unreasonable delay, to harass, and for other improper purpose.

As I advised in our teleconference this afternoon, I will be filing a motion to compel with the Court next week. I will also be seeking sanctions against your client for the completely inadequate response. Per local rules we are required to meet and confer in person prior to filing of the motion. Please indicate no later than Tuesday, July 29, 2003 when you will be available to meet regarding these issues.

EXH **G** PG **149**

Andrew W. Robertson
July 25, 2003
Page 2

I look forward to your prompt reply.

Sincerely,

Colbern C. Stuart III
for PAUL, HASTINGS, JANOFSKY & WALKER LLP

EXH G PG 150

**ꟼaul**Hastings

Paul, Hastings, Janofsky & Walker LLP
12390 El Camino Real, San Diego, CA 92130
telephone 858-720-2500 / facsimile 858-720-2555 / internet www.paulhastings.com

Atlanta
Beijing
Hong Kong
London
Los Angeles
New York
Orange County
San Diego
San Francisco
Stamford
Tokyo
Washington, D.C.

(858) 720-2820
colestuart@paulhastings.com

August 19, 2003                                               45326.00004

Via Facsimile

Andrew W. Robertson, Esq.
La Bella & McNamara, LLP
401 West "A" Street, Suite 2300
San Diego, CA  92101

Re:    *Lindows.com v. Xandros*
       Case No. 02-CV 2460BTM (RBB)

Dear Mr. Robertson:

This will confirm our agreement and the Court's direction at the 8/14/03 discovery
conference.

The Court directed that Plaintiff Lindows.com choose ten requests for production of
documents per defendant which each defendant is required to respond to.  Responsive
documents will include all documents created or in existence between the dates of
August 1, 2001 to December 31, 2001.  No other restrictions were imposed on the
document requests.

Therefore, please respond as follows:

Defendants Bego and Roseman:

Only six requests for production were served on Messrs. Bego and Roseman.  Therefore,
please respond fully to all six requests with all documents responsive to the requests as
written which were created or in existence between August 1, 2001 and December 31,
2001.

Defendant Xandros:

Please respond fully to Request Nos. 1, 2, 14, 18, 26, 29, 31, 32, 35 and 38 as written.

Defendant LGP:

Please respond fully to Request Nos. 1, 2, 4, 12, 14, 18, 26, 29, 32 and 38.

EXH __ PG _15_

SAN/72375.1

**Paul**Hastings

Andrew W. Robertson, Esq.
August 19, 2003
Page 2

Regarding Special Interrogatory Responses, we agreed and the Court ordered that all defendants will respond to all requests with information accurate as between 8/01/01 and 12/31/01. With regard to Special Interrogatory 7 ("power to bind"), we agreed to limit the response to "employees, officers, principal, directors or agents with the power to bind YOU at any time (1) between 8/1/01 and 12/31/01 and (2) to agreements such as the SAA, Promissory Notes, letter agreements and arbitration clauses, including the entities' names, titles, current and past addresses, dates of service, and terms of service. Similar time and subject matter limits were accepted on Interrogatory Nos. 9 ("authorized to act on your behalf").

I understand that the Court has issued an Order that is not as explicit on these points as is my description above. I believe we should contact the Court to advise that the Order is inconsistent with the agreements reached with the Court last week. Please advise if you are available this afternoon or tomorrow morning to call the Court with me.

Very truly yours,

Colbern C. Stuart III
for PAUL, HASTINGS, JANOFSKY & WALKER LLP

CCS/cal

Exh **H** Pg **152**

# LA BELLA &
# MCNAMARA, LLP

Mr. Colbern Stuart III
August 19, 2003
Page 1

August 19, 2003

**Andrew W. Robertson**
arobertson@labellamcnamara.com

***Via Facsimile and U.S. Mail***

Colbern C. Stuart, III
Paul Hastings Janofsky & Walker, LLP
12390 El Camino Real
San Diego, CA 92130

    **Re:**   ***Lindows. com v. Xandros***
        **Our File No. 1033.001**

Dear Cole:

    I acknowledge receipt of your letter of today regarding further discovery in this matter. Unfortunately, I must lodge my view that your letter does not completely reflect "our agreement" or the Court's direction. Although the Court's Minute Order only speaks directly to the Request for Production, the date and subject matter limitations were also expressly extended to the Interrogatories.

    Here is my summary of what was resolved at the meeting with Magistrate Brooks on August 14.

Interrogatories

    Bego and Roseman. Your presentation related only to Nos. 2 and 4. We have answered 1, 3, 5, and 6. Hence Bego and Roseman will provide answers to 2 and 4 with the limitations imposed by the court - for the time period 8/1/01 through 12/31/01 and as to the Strategic Alliance Agreement, promissory notes, side agreements, and similar items.

    Xandros. Your presentation related to Nos 2, 4, 7, 8, and 9. We have answered 1,3,5, and 6. Hence Xandros will provide answers to 2, 4, 7, 8, and 9 with the same time and subject matter limitations.

    LGP. Your presentation related to Nos. 2, 4, 7, and 8. We have answered 1,3, 5, and 6. Hence LGP will provide answers to 2, 4, 7, and 8 with the same time and subject matter limitations.

EXH $\underline{I}$ PG $\underline{153}$

Los Angeles
TEL 619-696-9200 FAX 619-696-9269
4705 LAUREL CANYON BLVD., SUITE 205 STUDIO CITY, CA 91607

www.labellamcnamara.com

San Diego
TEL 619-696-9200 FAX 619-696-9269
401 WEST A STREET, SUITE 2500 SAN DIEGO, CA 92101

# LA BELLA & MCNAMARA, LLP

Mr. Colbern Stuart III
August 19, 2003
Page 2


Requests to Produce

Bego and Roseman. Your submission only invoked Nos 2 and 4. We responded to 1 and 3 and you withdrew 5 and 6. Hence Bego and Roseman will produce documents responsive to Nos 2 and 4 with the same time and subject matter limitations. Your restatement of the time limitation to documents "which were created or were in existence between August 1, 2001 and December 31, 2001" is not consistent with the court's discussion – the Court's limitation was to documents created during that period.

Xandros. Now that you have identified your chosen ten (1, 2, 14, 18, 26, 29, 31, 32, 35, and 38), we will produce as to those with the same time and subject matter limitations.

LGP. Now that we have your chosen ten (1, 2, 4, 12, 14, 18, 26, 29, 32, and 38), we will produce as to those with the same time and subject matter limitations.

As to the time of such responses, I had initially suggested we could get it done by Friday, August 22. As you know, however, the electrical black out in the East prevented me from communicating with my clients about the discovery conference until yesterday. Given that it is now Tuesday evening, I am departing for a family vacation on Friday, and we appear to have some remaining disputes, Friday is just not realistic. We will get the materials to you in advance of the telephonic depositions now scheduled for September 4 and 5.

If you wish to convene a conference call with the Court for clarification, I will certainly participate.


Sincerely,

Andrew W. Robertson

AWR:ap


EXH I PG 154



# LA BELLA & MCNAMARA, LLP

August 20, 2003

**Andrew W. Robertson**
arobertson@labellamcnamara.com

*Via Facsimile and U.S. Mail*

Colbern C. Stuart, III
Paul Hastings Janofsky & Walker, LLP
12390 El Camino Real
San Diego, CA  92130

     **Re:**   ***Lindows. com v. Xandros***
             **Our File No. 1033.001**

Dear Cole:

     Further to our conversation of this afternoon, I have again reviewed the Court's Order and the subject discovery.  In our view, the Magistrate was clear that responses to Interrogatories and Requests to Produce were to be limited by time and subject matter.  Our start point remains that all responses are subject to both limitations. But, we will accommodate you as to (1) requests re agency and (2) requests where the subject matter limitation can not reasonably be applied. To that end, we submit the amendments below to our letter of yesterday.

Interrogatories

     As to No 4 to Bego and Roseman and Nos 4 and 8 to Xandros and LGP, we will remove the subject matter limitation of SAA, etc.

Requests to Produce

     As to LGP, we will remove the subject matter limitation as to Nos 2, 12, 14, 18, 32, and 38. As to 1, 4, 26, and 29 the subject matter limitation is appropriate and consistent with the Court's direction.

     As to Xandros, we will remove the subject matter limitation as to Nos 2, 14, 18, 32, 35, and 38. As to 1, 26, 29, 31, the subject matter limitation is appropriate and consistent with the Court's s direction.

Sincerely,

Andrew W. Robertson

AWR:ap

ExH __J__ PG _165_

Los Angeles
TEL 619-696-9200 FAX 619-696-9269
4705 LAUREL CANYON BLVD., SUITE 203 STUDIO CITY, CA 91607
www.labellamcnamara.com

San Diego
TEL 619-696-9200 FAX 619-696-9269
401 WEST A STREET, SUITE 2300 SAN DIEGO, CA 92101

MAR. 7. 2002   2:43PM   MILNER CASGRAIN                       NO. 1704 -- P. 3

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 08/23/2001
010419333 - 3420430

## CERTIFICATE OF INCORPORATION
## OF
## XANDROS, INC.

### ARTICLE I

The name of this corporation is Xandros, Inc. (the "Corporation").

### ARTICLE II

The address of the registered office of the Corporation in the State of Delaware is 2711 Centerville Road, Suite 400 in the City of Wilmington, County of New Castle, Delaware 19808. The name of its registered agent at such address is Corporation Service Company.

### ARTICLE III

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware.

### ARTICLE IV

This Corporation is authorized to issue one class of stock to be designated "Common Stock." The total number of shares which the Corporation is authorized to issue is Sixty Million (60,000,000) shares, all of which shall be Common Stock, par value $0.001 per share.

### ARTICLE V

The name and mailing address of the incorporator is Ashok K. Lalwani, Brobeck, Phleger & Harrison LLP, Two Embarcadero Place, 2200 Geng Road, Palo Alto, California 94303.

### ARTICLE VI

Except as otherwise provided in this Certificate of Incorporation, in furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, repeal, alter, amend and rescind any or all of the Bylaws of the Corporation.

EXH **K** PG **156**

## ARTICLE VII

The number of directors of the Corporation shall be fixed from time to time by, or in the manner provided in, the Bylaws or amendment thereof duly adopted by the Board of Directors or by the stockholders.

## ARTICLE VIII

Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

## ARTICLE IX

Meetings of stockholders may be held within or without the State of Delaware, as the Bylaws may provide. The books of the Corporation may be kept (subject to any provision contained in the statutes) outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws of the Corporation.

## ARTICLE X

A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived any improper personal benefit. If the Delaware General Corporation Law is amended after approval by the stockholders of this Article to authorize corporation action further eliminating or limiting the personal liability of directors then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the Delaware General Corporation Law as so amended.

Any repeal or modification of the foregoing provisions of this Article X by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

## ARTICLE XI

The Corporation shall, to the fullest extent authorized under the laws of the State of Delaware, as those laws may be amended and supplemented from time to time, indemnify any director made, or threatened to be made, a party to an action or proceeding, whether criminal, civil, administrative or investigative, by reason of being a director of the Corporation or a predecessor Corporation or, at the Corporation's request, a director or officer of another Corporation, provided, however, that the Corporation shall

indemnify any such agent in connection with a proceeding initiated by such agent only if such proceeding was authorized by the Board of Directors of the Corporation. The indemnification provided for in this Article XI shall: (i) not be deemed exclusive of any other rights to which those indemnified may be entitled under any bylaw, agreement or vote of stockholders or disinterested directors or otherwise, both as to action in their official capacities and as to action in another capacity while holding such office, (ii) continue as to a person who has ceased to be a director, and (iii) inure to the benefit of the heirs, executors and administrators of such a person. The Corporation's obligation to provide indemnification under this Article XI shall be offset to the extent of any other source of indemnification or any otherwise applicable insurance coverage under a policy maintained by the Corporation or any other person.

Expenses (including attorneys' fees) incurred by a director of the Corporation in defending a civil or criminal action, suit or proceeding by reason of the fact that he or she is or was a director of the Corporation (or was serving at the Corporation's request as a director or officer of another corporation) shall be paid by the Corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director to repay such amount if it shall ultimately be determined that he or she is not entitled to be indemnified by the Corporation as authorized by relevant sections of the General Corporation Law of State of Delaware. Notwithstanding the foregoing, the Corporation shall not be required to advance such expenses to an agent who commences any action, suit or proceeding as a plaintiff unless such advance is specifically approved by a majority of the Board of Directors or who is a party to an action, suit or proceeding brought by the Corporation and approved by a majority of the Board of Directors of the Corporation which alleges willful misappropriation of corporate assets by such agent, disclosure of confidential information in violation of such agent's fiduciary or contractual obligations to the Corporation or any other willful and deliberate breach in bad faith of such agent's duty to the Corporation or its stockholders.

The foregoing provisions of this Article XI shall be deemed to be a contract between the Corporation and each director who serves in such capacity at any time while this Article XI is in effect, and any repeal or modification thereof shall not affect any rights or obligations then existing with respect to any state of facts then or theretofore existing or any action, suit or proceeding theretofore or thereafter brought based in whole or in part upon any such state of facts.

The Board of Directors in its discretion shall have power on behalf of the Corporation to indemnify any person, other than a director, made a party to any action, suit or proceeding by reason of the fact that he or she, his or her testator or intestate, is or was an officer or employee of the Corporation.

In addition to the indemnification rights of directors, officers, employees or agents of the Corporation, the Board of Directors in its discretion shall have the power on behalf of the Corporation to indemnify any other person made a party to any action, suit or proceeding who the Corporation may indemnify under Section 145 of the General Corporation Law of the State of Delaware.

SDMA\DOCS\PALLIB\1\30459810

Exh __K__ Pg _158_

## ARTICLE XII

The Corporation expressly elects not to be governed by Section 203 of the General Corporation Law of the State of Delaware.

## ARTICLE XIII

Whenever a compromise or arrangement is proposed between this Corporation and its creditors or any class of them and/or between this Corporation and its stockholders or any class of them, any court of equitable jurisdiction within the State of Delaware may, on the application in a summary way of this Corporation or of any creditor or stockholder thereof or on the application of any receiver or receivers appointed for this Corporation under §291 of the General Corporation Law of the State of Delaware or on the application of trustees in dissolution or of any receiver or receivers appointed for this Corporation under §279 of the General Corporation Law of the State of Delaware order a meeting of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this Corporation, as the case may be, to be summoned in such manner as the said court directs. If a majority in number representing three fourths in value of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this Corporation, as the case may be, agree to any compromise or arrangement and to any reorganization of this Corporation as consequence of such compromise or arrangement, the said compromise or arrangement and the said reorganization shall, if sanctioned by the court to which the said application has been made, be binding on all the creditors or class of creditors, and/or on all the stockholders or class of stockholders, of this Corporation, as the case may be, and also on this Corporation.

## ARTICLE XIV

The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon stockholders herein are granted subject to this reservation.

IN WITNESS WHEREOF, the undersigned has executed this Certificate this 23rd day of August, 2001.

Ashok K. Lalwani
Incorporator

** TOTAL PAGE. 25 **

# BYLAWS
## OF
## XANDROS, INC.

## ARTICLE I
### OFFICES

Section 1.   The registered office of the corporation shall be in the City of Wilmington, County of New Castle, State of Delaware.

Section 2.   The corporation may also have offices at such other places both within and without the State of Delaware as the Board of Directors may from time to time determine or the business of the corporation may require.

## ARTICLE II
### MEETINGS OF STOCKHOLDERS

Section 1.   All meetings of the stockholders for the election of directors shall be held at such place and time and, within or without the State of Delaware, as may be fixed from time to time by the Board of Directors and stated in the notice of the meeting.   Meetings of stockholders for any other purpose may be held at such time and place, within or without the State of Delaware, as shall be stated in the notice of the meeting or in a duly executed waiver of notice thereof.

Section 2.   Annual meetings of stockholders shall be held at such date and time as shall be designated from time to time by the Board of Directors and stated in the notice of the meeting, at which they shall elect by a plurality vote a board of directors, and transact such other business as may properly be brought before the meeting.

Section 3.   Written notice of the annual meeting stating the place, date and hour of the meeting shall be given to each stockholder entitled to vote at such meeting not fewer than ten (10) nor more than sixty (60) days before the date of the meeting.

Section 4.   The officer who has charge of the stock ledger of the corporation shall prepare and make, at least ten days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten days prior to the meeting, either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or, if not so specified, at the place where the meeting is to be held.   The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.

1 .

Section 5.  Special meetings of the stockholders, for any purpose or purposes, unless otherwise prescribed by statute or by the certificate of incorporation, may be called by the president and shall be called by the president or secretary at the request in writing of a majority of the Board of Directors or the Chairman, or at the request in writing of stockholders owning at least a majority of the entire capital stock of the corporation issued and outstanding and entitled to vote.  Such request shall state the purpose or purposes of the proposed meeting.

Section 6.  Written notice of a special meeting stating the place, date and hour of the meeting and the purpose or purposes for which the meeting is called, shall be given not fewer than ten (10) nor more than sixty (60) days before the date of the meeting, to each stockholder entitled to vote at such meeting.

Section 7.  Business transacted at any special meeting of stockholders shall be limited to the purposes stated in the notice.

Section 8.  The holders of fifty percent (50%) of the stock issued and outstanding and entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders for the transaction of business except as otherwise provided by statute or by the certificate of incorporation.  If, however, such quorum shall not be present or represented at any meeting of the stockholders, the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented.  At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally notified.

Section 9.  When a quorum is present at any meeting, the vote of the holders of a majority of the stock having voting power present in person or represented by proxy shall decide any question brought before such meeting, unless the question is one upon which by express provision of the statutes or of the certificate of incorporation, a different vote is required, in which case such express provision shall govern and control the decision of such question.

Section 10.  Unless otherwise provided in the certificate of incorporation, each stockholder shall at every meeting of the stockholders be entitled to one vote in person or by proxy for each share of the capital stock having voting power held by such stockholder, but no proxy shall be voted on after three years from its date, unless the proxy provides for a longer period.

Section 11.  Unless otherwise provided in the certificate of incorporation, any action required to be taken at any annual or special meeting of stockholders of the corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.  Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing.

2

EXH **L** PG **161**

## ARTICLE III
## DIRECTORS

Section 1. The Board of Directors shall initially consist of three (3) persons and shall thereafter be determined by resolution of the Board of Directors or by the stockholders at the annual meeting of the stockholders, except as provided in Section 2 of this Article, and each director elected shall hold office until his or her successor is elected and qualified. Directors need not be stockholders.

Section 2. Vacancies and new created directorships resulting from any increase in the authorized number of directors may be filled by a majority of the directors then in office, though less than a quorum, or by a sole remaining director, and the directors so chosen shall hold office until the next annual election and until their successors are duly elected and shall qualify, unless sooner displaced. If there are no directors in office, then an election of directors may be held in the manner provided by statute. If, at the time of filling any vacancy or any newly created directorship, the directors then in office shall constitute less than a majority of the whole board (as constituted immediately prior to any such increase), the Court of Chancery may, upon application of any stockholder or stockholders holding at least a majority of the total number of the shares at the time outstanding having the right to vote for such directors, summarily order an election to be held to fill any such vacancies or newly created directorships, or to replace the directors chosen by the directors then in office.

Section 3. The business of the corporation shall be managed by or under the direction of its board of directors which may exercise all such powers of the corporation and do all such lawful acts and things as are not by statute or by the certificate of incorporation or by these bylaws directed or required to be exercised or done by the stockholders.

### MEETINGS OF THE BOARD OF DIRECTORS

Section 4. The Board of Directors of the corporation may hold meetings, both regular and special, either within or without the State of Delaware.

Section 5. The first meeting of each newly elected Board of Directors shall be held at such time and place as shall be fixed by the vote of the stockholders at the annual meeting and no notice of such meeting shall be necessary to the newly elected directors in order legally to constitute the meeting, provided a quorum shall be present. In the event of the failure of the stockholders to fix the time or place of such first meeting of the newly elected Board of Directors, or in the event such meeting is not held at the time and place so fixed by the stockholders, the meeting may be held at such time and place as shall be specified in a notice given as hereinafter provided for special meetings of the Board of Directors, or as shall be specified in a written waiver signed by all of the directors.

Section 6. Regular meetings of the Board of Directors may be held without notice at such time and at such place as shall from time to time be determined by the board.

Section 7. Special meetings of the board may be called by the president on one (1) day notice to each director by mail or twenty-four (24) hours notice to each director either

3

EXH L PG 162

personally or by facsimile, telephone or electronic notice; special meetings shall be called by the president or secretary in like manner and on like notice on the written request of the Chairman or of two (2) directors unless the board consists of only one director, in which case special meetings shall be called by the president or secretary in like manner and on like notice on the written request of the sole director.

Section 8. At all meetings of the board a majority of the directors shall constitute a quorum for the transaction of business and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board of Directors, except as may be otherwise specifically provided by statute or by the certificate of incorporation. If a quorum shall not be present at any meeting of the Board of Directors, the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

Section 9. Unless otherwise restricted by the certificate of incorporation or these bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all members of the board or committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the board or committee.

Section 10. Unless otherwise restricted by the certificate of incorporation or these bylaws, members of the Board of Directors, or any committee designated by the Board of Directors, may participate in a meeting of the Board of Directors, or any committee, by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

## COMMITTEES OF DIRECTORS

Section 11. The Board of Directors may, by resolution passed by a majority of the whole board, designate one or more committees, each committee to consist of one or more of the directors of the corporation. The board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.

In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not he or she or they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member.

Any such committee, to the extent provided in the resolution of the Board of Directors, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the corporation, and may authorize the seal of the corporation to be affixed to all papers which may require it, except as may otherwise be prohibited by the certificate of incorporation or applicable law. Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the Board of Directors.

Section 12. Each committee shall keep regular minutes of its meetings and report the same to the Board of Directors when required.

### COMPENSATION OF DIRECTORS

Section 13. Unless otherwise restricted by the certificate of incorporation or these bylaws, the Board of Directors shall have the authority to fix the compensation of directors. The directors may be paid their expenses, if any, of attendance at each meeting of the Board of Directors and may be paid a fixed sum for attendance at each meeting of the Board of Directors or a stated salary as director. No such payment shall preclude any director from serving the corporation in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed like compensation for attending committee meetings.

### REMOVAL OF DIRECTORS

Section 14. Unless otherwise restricted by the certificate of incorporation or these bylaws, any director or the entire Board of Directors may be removed, with or without cause, by the holders of a majority of shares entitled to vote at an election of directors.

### ARTICLE IV
### NOTICES

Section 1. Whenever, under the provisions of the statutes or of the certificate of incorporation or of these bylaws, notice is required to be given to any director or stockholder, it shall not be construed to mean personal notice, but such notice may be given in writing, by mail, addressed to such director or stockholder, at his or her address as it appears on the records of the corporation, with postage thereon prepaid, and such notice shall be deemed to be given at the time when the same shall be deposited in the United States mail. Notice to directors may also be given by telegram.

Section 2. Whenever any notice is required to be given under the provisions of the statutes or of the certificate of incorporation or of these bylaws, a waiver thereof in writing, signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent thereto.

### ARTICLE V
### OFFICERS

Section 1. The officers of the corporation shall be chosen by the Board of Directors and shall be a president, treasurer and a secretary. The Board of Directors may elect from among its members a Chairman of the Board and a Vice Chairman of the Board. The Board of Directors may also choose one or more vice-presidents, assistant secretaries and assistant treasurers. Any number of offices may be held by the same person, unless the certificate of incorporation or these bylaws otherwise provide.

Section 2. The Board of Directors at its first meeting after each annual meeting of stockholders shall choose a president, a treasurer, and a secretary and may choose vice presidents.

Section 3. The Board of Directors may appoint such other officers and agents as it shall deem necessary who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the board.

Section 4. The salaries of all officers and agents of the corporation shall be fixed by the Board of Directors.

Section 5. The officers of the corporation shall hold office until their successors are chosen and qualify. Any officer elected or appointed by the Board of Directors may be removed at any time by the affirmative vote of a majority of the Board of Directors. Any vacancy occurring in any office of the corporation shall be filled by the Board of Directors.

## THE CHAIRMAN OF THE BOARD

Section 6. The Chairman of the Board, if any, shall preside at all meetings of the Board of Directors and of the stockholders at which he or she shall be present. He or she shall have and may exercise such powers as are, from time to time, assigned to him by the board and as may be provided by law.

Section 7. In the absence of the Chairman of the Board, the Vice Chairman of the Board, if any, shall preside at all meetings of the Board of Directors and of the stockholders at which he or she shall be present. He or she shall have and may exercise such powers as are, from time to time, assigned to him by the board and as may be provided by law.

## THE PRESIDENT AND VICE-PRESIDENTS

Section 8. The president shall be the chief executive officer of the corporation; and in the absence of the Chairman and Vice Chairman of the Board he or she shall preside at all meetings of the stockholders and the Board of Directors; he or she shall have general and active management of the business of the corporation and shall see that all orders and resolutions of the Board of Directors are carried into effect.

Section 9. He or she shall execute bonds, mortgages and other contracts requiring a seal, under the seal of the corporation, except where required or permitted by law to be otherwise signed and executed and except where the signing and execution thereof shall be expressly delegated by the Board of Directors to some other officer or agent of the corporation.

Section 10. In the absence of the president or in the event of his or her inability or refusal to act, the vice-president, if any, (or in the event there be more than one vice-president, the vice-presidents in the order designated by the directors, or in the absence of any designation, then in the order of their election) shall perform the duties of the president, and when so acting, shall have all the powers of and be subject to all the restrictions upon the president. The vice-presidents shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

PALUBIMICATU304601.03

Exh ∟ PG 165

## THE SECRETARY AND ASSISTANT SECRETARY

Section 11.  The secretary shall attend all meetings of the Board of Directors and all meetings of the stockholders and record all the proceedings of the meetings of the corporation and of the Board of Directors in a book to be kept for that purpose and shall perform like duties for the standing committees when required.  He shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors or president, under whose supervision he shall be.  He shall have custody of the corporate seal of the corporation and he, or an assistant secretary, shall have authority to affix the same to any instrument requiring it and when so affixed, it may be attested by his signature or by the signature of such assistant secretary.  The Board of Directors may give general authority to any other officer to affix the seal of the corporation and to attest the affixing by her signature.

Section 12.  The assistant secretary, or if there be more than one, the assistant secretaries in the order determined by the Board of Directors (or if there be no such determination, then in the order of their election) shall, in the absence of the secretary or in the event of his inability or refusal to act, perform the duties and exercise the powers of the secretary and shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

## THE TREASURER AND ASSISTANT TREASURERS

Section 13.  The treasurer shall have the custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the corporation in such depositories as may be designated by the Board of Directors.

Section 14.  He or she shall disburse the funds of the corporation as may be ordered by the Board of Directors, taking proper vouchers for such disbursements, and shall render to the president and the Board of Directors, at its regular meetings, or when the Board of Directors so requires, an account of all his or her transactions as treasurer and of the financial condition of the corporation.

Section 15.  If required by the Board of Directors, he or she shall give the corporation a bond in such sum and with such surety or sureties as shall be satisfactory to the Board of Directors for the faithful performance of the duties of his or her office and for the restoration to the corporation, in case of his or her death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in his or her possession or under his or her control belonging to the corporation.

Section 16.  The assistant treasurer, or if there shall be more than one, the assistant treasurers in the order determined by the Board of Directors (or if there be no such determination, then in the order of their election) shall, in the absence of the treasurer or in the event of his or her inability or refusal to act, perform the duties and exercise the powers of the treasurer and

shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

## ARTICLE VI
## CERTIFICATE OF STOCK

Section 1. Every holder of stock in the corporation shall be entitled to have a certificate, signed by, or in the name of the corporation by, the Chairman or Vice Chairman of the Board of Directors, or the president or a vice-president and the treasurer or an assistant treasurer, or the secretary or an assistant secretary of the corporation, certifying the number of shares owned by him or her in the corporation.

Certificates may be issued for partly paid shares and in such case upon the face or back of the certificates issued to represent any such partly paid shares, the total amount of the consideration to be paid therefor, and the amount paid thereon shall be specified.

If the corporation shall be authorized to issue more than one class of stock or more than one series of any class, the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualification, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or back of the certificate which the corporation shall issue to represent such class or series of stock, provided that, except as otherwise provided in Section 202 of the General Corporation Law of Delaware, in lieu of the foregoing requirements, there may be set forth on the face or back of the certificate which the corporation shall issue to represent such class or series of stock, a statement that the corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

Section 2. Any of or all the signatures on the certificate may be facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the corporation with the same effect as if he or she were such officer, transfer agent or registrar at the date of issue.

## LOST CERTIFICATES

Section 3. The Board of Directors may direct a new certificate or certificates to be issued in place of any certificate or certificates theretofore issued by the corporation alleged to have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen or destroyed. When authorizing such issue of a new certificate or certificates, the Board of Directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed certificate or certificates, or his or her legal representative, to advertise the same in such manner as it shall require and/or to give the corporation a bond in such sum as it may direct as indemnity against

EXH L PG 167

any claim that may be made against the corporation with respect to the certificate alleged to have been lost, stolen or destroyed.

## TRANSFER OF STOCK

Section 4. Upon surrender to the corporation or the transfer agent of the corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignation or authority to transfer, it shall be the duty of the corporation to issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books.

## FIXING RECORD DATE

Section 5. In order that the corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholder or any adjournment thereof, or to express consent to corporate action in writing without a meeting, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board of Directors may fix, in advance, a record date, which shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting, nor more than sixty (60) days prior to any other action. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

## REGISTERED STOCKHOLDERS

Section 6. The corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, and to vote as such owner, and to hold liable for calls and assessments a person registered on its books as the owner of shares and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Delaware.

## ARTICLE VII
## GENERAL PROVISIONS

### DIVIDENDS

Section 1. Dividends upon the capital stock of the corporation, subject to the provisions of the certificate of incorporation, if any, may be declared by the Board of Directors at any regular or special meeting, pursuant to law. Dividends may be paid in cash, in property, or in shares of the capital stock, subject to the provisions of the certificate of incorporation.

Section 2. Before payment of any dividend, there may be set aside out of any funds of the corporation available for dividends such sum or sums as the directors from time to time, in their absolute discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the corporation, or for

9

EXH L PG 168

such other purposes as the directors shall think conducive to the interest of the corporation, and the directors may modify or abolish any such reserve in the manner in which it was created.

## CHECKS

Section 3. All checks or demands for money and notes of the corporation shall be signed by such officer or officers or such other person or persons as the Board of Directors may from time to time designate.

## FISCAL YEAR

Section 4. The fiscal year of the corporation shall be fixed by resolution of the Board of Directors.

## SEAL

Section 5. The Board of Directors may adopt a corporate seal having inscribed thereon the name of the corporation, the year of its organization and the words "Corporate Seal, Delaware". The seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

## INDEMNIFICATION

Section 6. The corporation shall, to the fullest extent authorized under the laws of the State of Delaware, as those laws may be amended and supplemented from time to time, indemnify any and all persons whom it shall have power to indemnify against any and all of the costs, expenses, liabilities or other matters incurred by them by reason of having been officers, directors, employees, or other agents of the corporation, any subsidiary or undertaking of the corporation, a predecessor corporation or any other corporation for which such persons acted in such capacity at the request of the corporation.

## PROXIES IN RESPECT OF SECURITIES OF OTHER CORPORATIONS

Section 7. Unless otherwise provided by resolution adopted by the Board of Directors, the Chairman, the president, or vice president may from time to time appoint an attorney or attorneys or agent or agents, of the corporation, in the name and on behalf of the corporation to cast the votes which the corporation may be entitled to cast as the holder of stock or other securities or other interest in any other corporation or entity, any of whose stock or other securities or other interest may be held by the corporation, at meetings of the holders of the stock or other securities or other interest of such other corporation or entity, or to consent in writing, in the name of the corporation as such holder, to any action by such other corporation or entity, and may instruct the person or persons so appointed as to the manner of casting such votes or giving such consent, and may execute or cause to be executed in the name and on behalf of the corporation and under its corporate seal, or otherwise, all such written proxies or other instruments as he may deem necessary or proper in the premises.

## INTERESTED DIRECTORS

Section 8. No contract or other transaction between the corporation and any other corporation shall be affected and invalidated by the fact that any one or more of the directors of

FALLIBRIHCM\\13N4601.03

EXH L PG 169

the corporation is or are interested in or is a director or officer or are directors or officers of such other corporation, and any director or directors, individually or jointly, may be a party or parties to or may be interested in any contract or transaction of the corporation or in which the corporation is interested; and no contract, act or transaction of the corporation with any person or persons, firm or corporation shall be affected or invalidated by the fact that any director or directors of the corporation is a party or are parties to or interested in such contract, act or transaction, or in any way connected with such person or persons, firms or associations, and each transaction, or in any way connected with such person or persons, firms or associations, and each and every person who may become a director of the corporation is hereby relieved from any liability that might otherwise exist from contacting with the corporation for the benefit of himself, any firm, association or corporation in which he may be in any way interested.

Section 9. Any transaction questioned in any stockholders' derivative suit on the grounds of lack of authority, defective or irregular execution adverse interest of a director, officer or stockholder, nondisclosure, miscomputation, or the application of improper principles or practices of accounting, may be ratified before or after judgment by the Board of Directors or by the stockholders in case less than a quorum of directors are qualified, and, if so ratified, shall have the same force and effect as if the questioned transaction had been originally duly authorized, and said ratification shall be binding upon the corporation and its stockholders and shall constitute a bar to any claim or execution of any judgment in respect of such questioned transaction.

## ARTICLE VIII
## AMENDMENTS

Section 1. These bylaws may be altered, amended or repealed or new bylaws may be adopted by the stockholders or by the Board of Directors, when such power is conferred upon the Board of Directors by the certificate of incorporation at any regular meeting of the stockholders or of the Board of Directors or at any special meeting of the stockholders or of the Board of Directors if notice of such alteration, amendment, repeal or adoption of new bylaws be contained in the notice of such special meeting. If the power to adopt, amend or repeal bylaws is conferred upon the Board of Directors by the certificate or incorporation it shall not divest or limit the power of the stockholders to adopt, amend or repeal bylaws.

PALLIBINHGMI304MI1.03

EXH L PG 170

CERTIFICATE OF SECRETARY
OF
XANDROS, INC.

The undersigned, Michael Bego, hereby certifies that he is the duly elected and acting Secretary of Xandros, Inc., a Delaware corporation (the "Corporation"), and that the Bylaws attached hereto constitute the Bylaws of said Corporation as duly adopted by an action by written consent in lieu of an organizational meeting by the Board of Directors dated August 23, 2001.

IN WITNESS WHEREOF, the undersigned has hereunto subscribed his name this 23rd day of August, 2001.

Michael Bego
Secretary

## DIRECTORS' REGISTER

| NAME | RESIDENCE ADDRESS | DATE BECAME A DIRECTOR | | | DATE CEASED TO BE A DIRECTOR | | |
|---|---|---|---|---|---|---|---|
| | | DA | MO | YR | DA | MO | YR |
| William Roseman | 411 Jefferson Street<br>Carlstadt NJ 07072 | 23 | 08 | 01 | | | |
| Michael Bego | 1-241 West 13th Street<br>New York NY 10011 | 23 | 08 | 01 | | | |
| Frederick Berenstein | 200 East 62nd Street<br>New York NY 10021 | 23 | 08 | 01 | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Exh L Pg 172

# OFFICERS' REGISTER

| NAME | OFFICE HELD | DATE BECAME AN OFFICER | | | DATE CEASED TO BE AN OFFICER | | |
|---|---|---|---|---|---|---|---|
| | | DA | MO | YR | DA | MO | YR |
| William Roseman | Chairman | 23 | 08 | 01 | | | |
| William Roseman | Chief Executive Officer | 23 | 08 | 01 | | | |
| Michael Bego | President | 23 | 08 | 01 | | | |
| Michael Bego | Secretary | 23 | 08 | 01 | | | |
| Frederick Berenstein | Chief Operating Officer | 23 | 08 | 01 | | | |
| Frederick Berenstein | Chief Technology Officer | 23 | 08 | 01 | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

EXH L PG 173

# DIRECTORS' REGISTER

## XANDROS CORPORATION

| NAME | RESIDENCE ADDRESS | DATE BECAME A DIRECTOR | | | DATE CEASED TO BE A DIRECTOR | | |
|---|---|---|---|---|---|---|---|
| | | DA | MO | YR | DA | MO | YR |
| Thomas F. Reaume | 493 Thessaly Circe<br>Ottawa ON K1H 5W8 | 07 | 05 | 01 | 23 | 11 | 01 |
| Michael A. Bego | 1-241 West 13th Street<br>New York NY 10011 | 23 | 11 | 01 | 14 | 06 | 02 |
| Ming Poon | 18 Westmeath Crescent<br>Kanata ON K2K 3B1 | 23 | 11 | 01 | 24 | 06 | 02 |
| William A. Roseman | 411 Jefferson Street<br>Carlstadt NJ 07072 | 23 | 11 | 01 | | | |
| Dr. Frederick Berenstein | 200 East 62nd Street<br>New York NY 10021 | 23 | 11 | 01 | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

ExH _L_ PG _174_

# OFFICERS' REGISTER

## XANDROS CORPORATION

| NAME | OFFICE HELD | DATE BECAME AN OFFICER | | | DATE CEASED TO BE AN OFFICER | | |
|---|---|---|---|---|---|---|---|
| | | DA | MO | YR | DA | MO | YR |
| Michael A. Bego | President | 07 | 05 | 01 | 14 | 06 | 02 |
| Thomas F. Reaume | Secretary | 07 | 05 | 01 | 29 | 05 | 02 |
| Dr. Frederick Berenstein | Secretary | 29 | 05 | 02 | | | |
| Dr. Frederick Berenstein | President | 14 | 06 | 02 | | | |
| Dr. Frederick Berenstein | Chairman | 14 | 06 | 02 | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

ExH L PG 175