USDC SCAN INDEX SHEET










```
JAH     9/30/04    13:30
3:02-CV-02460    LINDOWS.COM INC V. XANDROS INC
*80*
*O.*
```

04 SEP 29 PM 3: 23

[DISTRICT OF CALIFORNIA]

BY:                                          DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINDOWS.COM, INC., a Delaware corporation,<br><br>         Plaintiff,<br><br>vs.<br><br>XANDROS, INC., a Delaware corporation; LINUX GLOBAL PARTNERS, INC., a Delaware corporation; MICHAEL BEGO, an individual; WILLIAM JAY ROSEMAN, an individual,<br><br>         Defendants. | CASE NO. 02CV2460 BEN (RBB)<br><br>**ORDER GRANTING DEFENDANTS' RENEWED MOTION TO COMPEL ARBITRATION AND DISMISS OR STAY ACTION (Docket No. 46)** |

## I.

## INTRODUCTION.

Plaintiff Lindows.com ("Lindows") filed a First Amended Complaint, alleging violations of the Securities Exchange Act of 1934, fraud, negligent misrepresentation, breach of contract, and rescission naming Xandros, Inc. ("Xandros"), Linux Global Partners, Inc. ("LGP"), Michael Bego ("Bego"), and William Jay Roseman ("Roseman") as defendants. (See, First Amended Complaint at 3-13.) In lieu of filing an answer, Defendants moved to compel arbitration and dismiss or stay this action pending the resolution of arbitration proceedings on February 19, 2003. Plaintiff filed an opposition and sought oral argument. Judge Moskowitz held a hearing and took the motion

- 1 -

ENTERED ON 9/30/04   02cv2460

80

under submission on May 7, 2003.[1] After conducting a discovery conference, Magistrate Judge Brooks granted Plaintiff's request for pre-answer discovery and allowed depositions of Bego, Roseman, Kevin Carmony ("Carmony"), Frederick Berenstein ("Berenstein"), and Rule 30(b)(6) designees for Xandros and LGP.[2] Upon stipulation the motion was withdrawn without prejudice to renewing the motion to allow the parties to discuss settlement. On January 20, 2004, Plaintiff filed an opposition to the motion and objections to evidence submitted by Defendants. On March 22, 2004, supplemental opposition and support memoranda were filed by Plaintiff and Defendants, respectively. For reasons that follow, Defendants' Motion is **GRANTED**.

## II.

## FACTS.

The following facts are taken from Plaintiff's First Amended Complaint. See, U.S. v. LSL Biotechnologies, 2004 WL 1782915 at *23,---F.3d---(9th Cir. August 11, 2004) (The Court is "required to 'presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the non-moving party.' ") (Citations omitted).

In November 2001, Lindows and Xandros entered into a series of agreements whereby Lindows would fund the development of, and eventually distribute, Linux computer software developed by Xandros. At least two of these agreements were signed on November 20, 2001: a Strategic Alliance Agreement ("SAA") and a Convertible Promissory Note for $250,000. The SAA contained an arbitration provision,

> 16.3 Arbitration. Except that the parties shall be entitled to apply to the courts for mandatory or injunctive equitable relief, *any controversy or claim arising out of or relating to this Agreement, or the breach thereof, will be settled by arbitration* before three (3) arbitrators in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the reward rendered by the arbitrators may be entered in any court having jurisdiction thereof. Arbitrators shall be entitled to grant equitable relief as well as damages. The arbitration will be held in San Diego, California. See, SAA at 10-11. (emphasis added).

On December 6 and 21, 2001, the parties signed two more Promissory Notes whereby Lindows would provide Xandros with two more allotments of $250,000 each.

---

[1] Judge Moskowitz set an evidentiary hearing, however it was not held.

[2] Kevin Carmony is the President and Chief Operating Officer of Lindows. Frederick Berenstein is Co-founder, Co-chairman and President/Chief Executive Officer of LGP.

On December 23, 2002, Lindows served its complaint on Xandros for violation of the Securities and Exchange Act of 1934, fraud, negligent misrepresentation, breach of contract, and rescission. On February 19, 2003, Xandros filed the instant motion to compel arbitration pursuant to the provision of the SAA. Lindows opposes, claiming that it is not suing under the SAA, but suing solely on the Promissory Notes, which are independent contracts completely separate from the SAA and which do not contain any arbitration clauses.

As noted above, Lindows alleges violations of Section 10(B) of the 1934 Act and Rule 10B-5 in its First Cause of Action. Specifically, it claims "Defendants [Xandros and LGP] acted knowingly or in such a reckless manner so as to intentionally or recklessly misrepresent the facts...with the intent or expectation that Plaintiff Lindows.com would rely on such misrepresentations and enter into the Agreements." (See, First Amended Complaint ¶ 38.) Lindows alleges that "Defendant LGP is a company which owns a number of companies which develop, manufacture, or sell Linux-based applications or services. LGP is the owner of Defendant Xandros." Id. at 2.

In its Second Cause of Action, Lindows alleges "At the time that each of Bego, Roseman, LGP and Xandros made, acknowledged, or approved each of the above-referenced representations, each of them knew that the representations were in fact false and misleading." (See, First Amended Complaint ¶ 43.) In its Third Cause of Action, Plaintiff alleges that Bego, Roseman, LGP and Xandros breached its duty to Lindows to provide full and truthful disclosure of all relevant facts relating to the financial health of Xandros, including facts relating to the relationship between LGP and Xandros. (See, First Amended Complaint ¶ 49.)

Lindows claims breach of contract against Defendant Xandros in its Fourth Cause of Action. In particular, Lindows claims "The Convertible Securities required Defendant Xandros to make payment in the amount of $250,000, in addition to interest in the amount of 8% per annum, on the "Due Date"...As of this date, Defendant Xandros has failed and refused to pay any sums due, including but not limited to the principal...in addition to any and all interest..." (See, First Amended Complaint ¶ 57-61.)

Lindows brings its Fifth Cause of Action under Cal.Civ.Code § 1689 (b)(1). (See, Id. ¶ 72.) As support, Lindows alleges "[It] justifiably relied on the misrepresentations in executing the Convertible Securities such that any consent to enter into the Convertible Securities given by Lindows.com was in fact induced by the fraudulent misrepresentations and the nondisclosure of material facts, entitling Lindows.com to rescind the Agreements to California Civil Code § 1689 (b)(1)." (Id. ¶ 69.)

## III.

## STANDARD OF REVIEW.

"[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614 (1985). The court must make this determination by applying the federal substantive law of arbitrability. Id. (citations omitted). The federal substantive law of arbitrability established a clear federal policy favoring arbitration. See e.g., Shearson/American Exp., Inc. v. McMahon, 482 U.S. 220 (1987)(citing Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1, 23 (1983)).

As with any contract, the parties' intention to arbitrate controls. See Republic of Nicaragua, 937 F.2d 469, 479 (9th Cir. 1991).[3] Although a party cannot be required to arbitrate a claim that it has not agreed to arbitrate, courts are to construe arbitration agreements broadly in favor of coverage. AT & T Tech., Inc. v. Communications Workers of Am., 475 U.S. 643, 648-50 (1986). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone, 460 U.S. at 24-25. "The standard for demonstrating arbitrability is not a high one." See Republic of Nicaragua, 937 F.2d at 475.[4]

---

[3] Arbitration is a matter of contract, and a party cannot be required to submit any dispute to arbitration which he has not agreed to submit. AT & T Technologies, Inc., v. Communications Workers, 475 U.S. 643 (1986). Before a party to a lawsuit can be ordered to arbitrate, there should be an express, unequivocal agreement to that effect. Three Valleys Mun. Water Distr. v. E.F. Hutton & Co., Inc., 925 F.2d 1136, 1141 (9th Cir. 1991).

[4] See e.g., Prograph Int'l Inc. v. Brahydt, 928 F. Supp. 983, 989 (N.D.Cal. 1996)(interpreting virtually identical language expansively); J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A., 863 F.2d 315, 321 (4th Cir. 1988)(holding that an arbitration agreement providing that "[a]ll disputes arising in connection with the present contract shall be finally settled" by arbitration was sufficiently

Upon finding that the parties agreed to arbitrate, "a district court has little discretion to deny an arbitration motion, since the [Arbitration] Act is phrased in mandatory terms." Id. at 475.[5] The courts must "rigorously enforce agreements to arbitrate." Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213 (1985).[6] Therefore, the role of the court is "directly limited to determining arbitrability and enforcing agreements to arbitrate." Republic of Nicaragua, at 478. The merits of the claim and defense must be left to the arbiter. Id.

## IV.

## DISCUSSION.

### A. The Scope of the Strategic Alliance Agreement's Arbitration Clause Encompasses Plaintiff's Claims

Defendants argue an order compelling arbitration is appropriate, because all claims contained in the First Amended Complaint arise out of and relate to the SAA which contains an arbitration clause. (Defs' Memo of P & As in Support of Motion to Compel at 1). Defendants

---

broad in scope to include claims for unfair trade practices, libel, and defamation); Good(E) Bus. Sus., Inc. v. Raytheon Co., 614 F. Supp. 428, 429 (W.D. Wis.1985)(holding that an arbitration clause providing for arbitration of disputes "arising in connection with" the agreement was broad enough to cover all claims of misrepresentation.").

[5] The Federal Arbitration Act ("FAA") embodies a clear federal policy in favor of arbitration. It provides that written agreements to arbitrate disputes which arise out of the contract "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

Section 4 of the Act provides that the United States District Court "shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement" if the court, after hearing the parties, is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not an issue." 9 U.S.C. § 4. The Court must stay trial of the action provided that "the applicant for the stay is not in default in proceeding with such arbitration." Id. § 3. The FAA applies to all contracts involving commerce. Section 2 of the FAA provides that a written agreement to arbitrate in a contract involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." See Id. § 2. The FAA governs if the underlying contract facilitates interstate commercial transactions or directly or indirectly affects commerce between the states. Prima Paint Corp., v. Flood & Conklin Mfg. Co., 388 U.S. 395, 401-02 n.7 (1967). In this case, since Xandros, a Delaware corporation, is a software developer, which does business in Delaware and California, and the SAA is a "transaction involving commerce," the Court finds that the FAA governs the scope and construction of the arbitration provision between agreement with plaintiff. Mediterranean Enterprises, Inc. v. SAAngyong Corp., 708 F.2d 1458, 1463 (9th Cir. 1983).

[6] As the Court has recognized, [T]he Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has signed." Id. at 218.

1  assert that "Plaintiff ignores the Strategic Alliance Agreement all together and seeks to break apart
2  and litigate selective parts of the alliance." (Defs' Memo of P & As in Support of Motion to
3  Compel at 1). Defendants contend that the Promissory Notes were integrated parts of the SAA,
4  noting that the first note was signed on the same day as (and actually was a precondition of) the
5  SAA. Defendants claim that in conjunction with the SAA, the parties signed a Side Letter
6  Agreement regarding future investment dated November 2001 which specifically mentions that the
7  first note was issued in conjunction with the SAA. (Defs' Memo of P & As in Support of Motion
8  to Compel at 2). Defendants argue that this Side Letter sets forth only the timing of payment
9  installments and potential future investment in Xandros.

10  While Plaintiffs do not deny that an arbitration clause exists in the SAA, they do oppose
11  Defendant's assertion that the clause is so broad as to extend to the notes and letters. On this issue,
12  Plaintiffs assert that their practice is to only include arbitration agreements in matters where the
13  task to be performed are complex and Lindows might itself become a defendant. In its Opposition,
14  Plaintiff assert that the SAA and Promissory Notes are not related instruments, and that there was
15  no intent to incorporate them. Plaintiff argues that "The Notes were intentionally drafted to be
16  independent legal instruments which do not reference or incorporate the Strategic Alliance
17  Agreement..., and in fact contain integration clauses which establish them as independent legal
18  instruments...Lindows *consciously chose not to include an arbitration clause in any of the Notes*."
19  (Plaintiff's Supplemental Opposition at 2). Plaintiff contends that consistent with their company
20  policy not to include an arbitration clause when contractual performance was straightforward, they
21  sought an arbitration clause only in the SAA because it imposed complex duties on Lindows, but
22  no such clause was required in the Notes since the performance was considered simple. Id.

23  "[S]ince the issue of arbitrability is to be determined by the contract entered into by the
24  parties, the task before [the] court remains one of contractual interpretation." Republic of
25  Nicaragua, at 477 (internal quotations and citations omitted). The Court's inquiry must turn on the
26  intent of the parties. Teamsters Local 315 v. Union Oil Co. of Cal., 856 F. 2d 1307, 1313 (9th
27  Cir.1988)(citing Syufy Enters. v. N. Cal. State Ass'n of IATSE Locals, 631 F. 2d 124, 126 (9th
28  Cir.1980).

The Ninth Circuit has determined that a "significant" difference exists between broad arbitration clauses which direct to arbitration disputes "arising out of or *relating to*" the contract, and narrow arbitration clauses, which direct to arbitration only those disputes "arising hereunder" Mediterranean Enterprises, Inc. v. SAAngyong Corp. 708 F.2d 1458, 1464 (9th Cir. 1983)(emphasis added). Narrow arbitration clauses are intended to cover only those disputes "relating to the interpretation and performance of the contract itself, "whereas broad clauses contemplate coverage of "matters or claims independent of the contract or collateral thereto." Id. at 1463-64. The clause in the SAA arbitration provision in this case reads "any controversy or claim arising out of or *relating to* this Agreement, or the breach thereof, will be settled by arbitration" (emphasis added). This clause language clearly falls within the Ninth Circuit's definition of a broad arbitration clause. i.e., the plaintiff language of the SAA signaled that the parties intended the arbitration clause to cover a broad scope of disputes relating to the SAA.

The documents themselves are telling. To begin, the Plaintiff's assertions are unsupported by the SAA itself. The arbitration clause in the SAA agreement encompasses the subsequent agreements (the Note agreements and letters). The first Convertible Promissory Note is dated on November 20, 2001 (the same date of the SAA) while the second Note is dated December 6, 2001. Next, the Side Letter contains language which Defendants claims support their argument: that the Notes were part of the revenue sharing plan in the SAA, and as such, disputes over the Notes are arbitrable as well. Defendants describe this alleged linkage in detail. First, it concerns future investments by Lindows in Xandros and specifically states that "[t]his Agreement [is] being entered into in connection with that certain Alliance Agreement...of even date herewith between Sub and Lindows, and that certain Convertible Promissory Note...of even date herewith issued by Xandros to Lindows in the principle amount of Two Hundred Fifty Thousand Dollars ($250,000)."[7] Second, the Side Letter provides that if Xandros meets certain deadlines for its

---

[7] The Side Letter states in relevant part,

...This Agreement in being entered into in connection with that certain Strategic Alliance Agreement (the "Strategic Agreement") of even date herewith between Sub and Lindows, and that certain Convertible Promissory Note (the "Note") of even date herewith issued by Xandros to Lindows in the principal amount of Two Hundred Fifty

-7-  02cv2460

software delivery–the Preview Release–Lindows will invest up to $500,000 more. Third, the Side Letter states that the principal amount of the Notes "shall be credited as pre-payment amounts as owed by Lindows to Sub pursuant to Section 4 Revenue Sharing of the Strategic Agreement..." (Defs' Reply Memo in Support of Motion to Compel at 3-5.)[8]

Finally, Defendants have produced an Amendment of Letter Agreement, dated December 6, 2001, which mentions the first Side Letter and is signed by both parties. See, Cariaga v. Local No. 1184 Laborers Intn'l Union of North America, 154 F.3d 1072, 1074 (9th Cir.1998)("[u]nder California law, for one contract document to incorporate another document by reference, the reference to the incorporated document must be clear and unequivocal"). Defendants assert that this second side letter, amending the first side letter, confirms that the Convertible Note transaction was part of an integrated alliance because it incorporates the terms for the SAA, specifically references the second Convertible Note in the amount of $250,000, audits the deliver day for the Preview Release as defined in the SAA, and reduces the amount of the Preview Release Investment to $250,000.[9]

---

Thousand Dollars ($250,000). (See. Decl. of M. Bego in Support of Motion to Compel Arbitration and Stay Action, Ex. C at 1.)

[8] Section 4 provides,

<u>Credit Toward Revenue Sharing</u>. The principal amount of the Note, the Preview Release Investment Amount (if any) and the Xandros Operating System Investment Amount (if any) shall each be credited as pre-payment amounts as owed by Lindows to Sub pursuant to Section 4 <u>Revenue Sharing</u> of the Strategic Agreements, if any. The Note, the Preview Release Investment and the Xandros Operating System Investment shall collectively be referred to herein as the "Investments." Id. at 2.

[9] The amendment to Paragraph 2 of the Letter Agreement is as follows,

In the event that, during the term of the Strategic Agreement and in no event later than December 12, 2001, the Preview Release (as defined in the Strategic Agreement) is completed by Sub (as contemplated in the Strategic Agreement) and accepted by Lindows, then, upon the written request (the "Preview Release Investment Request") of Xandros delivered to Lindows within seven (7) days after the date of the completion of the Preview Release, Lindows shall invest in Xandros up to Two Hundred Fifty Thousand Dollars ($250,000)(the "Preview Release Investment"), with the exact amount specified in the Preview Release Investment Request (the "Preview Release Investment Amount")...In no event shall Lindows be entitled to make the Preview Release Investment unless (i) the Preview Release is completed during the term of the Strategic Agreement and on or prior to December 12, 2001 and (ii) Xandros delivers to Lindows the Preview Release Investment Request within seven (7) days

1   Certainly, Plaintiff's claims, including fraud, negligent misrepresentation, and breach of
2   contract, all fall squarely within the definition of any controversy or claim arising out of *or relating*
3   *to* the SAA. "[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues
4   should be resolved in favor arbitration." Dean Witter Reynolds, 470 U.S. at 221. In addition, the
5   Ninth Circuit has held that "when international companies commit themselves to arbitrate a
6   dispute, they are in effect attempting to guarantee a forum for any disputes. Such agreements merit
7   great deference, since they operate as both choice-of-forum and choice-of-law provisions, and offer
8   stability and predictability, regardless of the vagaries of local law." Republic of Nicaragua, 937 at
9   478 (citing Scherk v. Alberto-Culver Co., 417 U.S. 506, 518-19 (1974)). Accordingly, the Court
10  finds that the parties to the SAA intended the scope of their arbitration clause to encompass
11  Plaintiff's claims against Defendants.

### B. Defendants Have Standing to Compel Arbitration

Defendants argue that the although Defendant LGP, Bego, and Roseman are not parties to the SAA, they are entitled to the benefit of the arbitration clause, because LGP is the alter ego of Xandros, and Bego and Roseman are agents of both Xandros and LGP. (Defs' Reply Memo in Support of Motion to Compel at 1.) In its Opposition, Plaintiff argues that it only entered into the SAA and the Notes with Xandros, Inc., (Michael Bego, President), not any of the other three defendants: LGP, Roseman, an individual, or Bego, an individual. As such, Plaintiff asserts that only Xandros has standing to compel arbitration under, or to otherwise benefit from, the SAA. (Plaintiff's Opposition at 2). However, as discussed below, the Court finds that all three parties have standing to compel arbitration.

#### i. Principal/Agent Theory

Agents can benefit from arbitration provisions that are binding on their principals. See e.g.,

---

after the date of the completion of the Preview Release." (See. Decl. of M. Bego in Support of Motion to Compel Arbitration and Stay Action, Ex. E at 1-2.).

This Amendment of Letter Agreement also includes this clause,

3.   Entire Agreement. This Amendment, together with the Letter Agreement, as amended herein, constitutes the full and entire understanding and agreement between the parties with regard to the subjects hereof and thereof. Id. at 2.

Paracor Finance, Inc. v. General Elec. Capital Corp. 96 F. 3d 1151, 1160 (9th Cir.1996); Three Valleys Mun. Water Dist. v E.F. Hutton & Co., 925 F.2d 1136, 1147 (9th Cir. 1991); Britton v. Co-op Banking Group, 916 F.2d 1405 (9th Cir. 1990); Lorber Industries of Cal. v. Los Angeles Printworkers Corp., 803 F. 523 (9th Cir. 1986). "Federal courts have consistently afforded agents, employees, and representatives the benefit of arbitration agreements entered into by their principals to the extent that the alleged misconduct relates to their behavior as officers or directors or in their capacities as agents of the corporation. Creative Telecommunications Inc. v. Breeden, 120 F. Supp.2d 1225, 1240-41 (D. Hawai'i 1997)(citations omitted). "[I]f the rule was otherwise, a party could easily 'avoid the practical consequences of an agreement to arbitrate by naming non-signatory parties in their individual capacities only [and] the effect of the rule requiring arbitration would, in effect, be nullified.'" Id.

Here, despite the fact that Bego signed the SAA as "President of Xandros Corporation," Plaintiff argues that he has no standing to compel arbitration because he did not hold that title at the time of signing. They refute Bego's claim that he was President of Xandros, Inc. and cite as support testimony from Xandros witnesses revealing that Bego was never an officer, director or employee of Xandros, and therefore they argue he never had the authority to enter into the contract. (Plaintiff's Opposition at 2).

An agent's actual authority can be either express or implied. Cal.Civ.Code § 2316 ("Actual authority is such as a principal intentionally confers upon the agent, or intentionally, or by want of ordinary care, allows the agent to believe himself to possess."). According to Defendants, LGP's Bego was "loaned" to Xandros, Corp. "Bego was always an employee of LGP, but he also served as interim President and director of Xandros, Inc. and Xandros Corp..." (See, Decl. of F. Berenstein in Support of Motion to Compel Arbitration and Stay Action at 2.) In support of their claim that Defendant Bego was authorized to sign the SAA on behalf of Xandros, Defendants provide a copy of "Action by Unanimous Written Consent in Lieu of the Organizational Meeting By the Board of Directors of Xandros, Inc." dated August 23, 2001, confirming that Bego was the

initial President and Secretary of Xandros.[10] Id. The Consent expressly authorized Bego, Roseman, and Berenstein to act on behalf of the Corporation, including the authority to negotiate and enter into all business contracts. As such, Bego, as acting President of Xandros, Inc. and Xandros Corp., excercised the authority given to him under the Consent when he signed the SAA.

Further, Defendant Bego states in his declaration that he was acting Sales & Marketing director and acting president of Xandros, Inc. and Xandros Corp. from May 2001 to May 2002, and that at the time he was Xandros' acting President, he negotiated the arrangement with Lindows and recites that all three $250,000 Notes from Xandros, Inc. to Lindows were all signed by him as part of that alliance. (Defs' Reply Memo in Support of Motion to Compel at 4.) "Neither Xandros Corp., Xandros, Inc. (non-party), LGP nor [Frederick Berenstein, Chairman of Xandros and co-Chairman of LGP] personally have ever challenged or questioned the authority of Mr. Bego to enter into the SAA and the Promissory Notes." (See, Decl. of F. Berenstein in Support of Motion to Compel Arbitration and Stay Action at 2;3.) Based on this evidence, the Court finds that Bego was an employee of LGP duly authorized to enter into the SAA agreement, in his capacity as Xandros'acting President.

Under similar reasoning, Roseman, a non-signatory to the SAA also has standing to compel arbitration because he is being sued for his conduct as then Chairman and Chief Executive Officer of Xandros.[11] A non-signatory can invoke the protections of an arbitration clause "when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract. Westmoreland v. Sadoux, 299 F.3d 462, 467 (5th Cir. 2002). In its Second Cause of Action, Plaintiff alleges "At the time that each of Bego, Roseman, LGP and Xandros made, acknowledged, or approved each of the above-referenced representations, each of them knew that the representations were in fact false and misleading." (See, First Amended Complaint ¶ 43.) In its Third Cause of Action, Plaintiff alleges that Bego, Roseman, LGP and

---

[10] The Consent was also signed by William Jay Roseman, then Chairman and Chief Executive Officer, and Frederick Berenstein, Chief Operating Officer and Chief Technology Officer (non-party).

[11] LGP and Roseman were not parties to the SAA or Notes. Roseman is now Director of Xandros, Inc.

Xandros breached its duty to Lindows to provide full and truthful disclosure of all relevant facts relating to the financial health of Xandros, including facts relating to the relationship between LGP and Xandros. Id. ¶ 49. Thus, the Court finds that Bego and Roseman have standing to compel arbitration under the SAA.

### ii. Alter Ego Theory

Defendants argue that LGP, as the parent company of Xandros, may enforce the arbitration provision even though it is not a party to the SAA. (Defs' Reply Memo in Support of Motion to Compel at 4).

Under the alter ego theory, a parent corporation may be held liable for the acts of its subsidiary, where a subsidiary is a mere business conduit for the parent or where there is such unity of interest and ownership that the individuality or separateness of the two corporations have ceased. Baker v. Raymond Intern., Inc. 656 F.2d 173 (5th Cir. 1981).[12]

Here, Linux Global Partners is a holding company which invests in Linux developers, including Xandros. Plaintiff itself alleges that "Defendant LGP is a company which owns a number of companies which develop, manufacture, or sell Linux-based applications or services. LGP is the owner of Defendant Xandros." (See, First Amended Complaint at ¶ 9-10). The unity of interest and ownership between LGP and Xandros was so strong that Bego was assigned from LGP to serve as interim President and director of Xandros, Inc. and Xandros Corp. (See, Decl. of F. Berenstein in Support of Motion to Compel Arbitration and Stay Action at 2.) The alleged wrongdoing of LGP arose out of the SAA, and the claims against LGP was for its alleged conduct as the parent company of Xandros. It bears repeating, that the parties intended the arbitration clause to be broad, encompassing "any controversy or claim arising out of or relating to the SAA." (See, SAA at 10). Accordingly, the Court finds that permitting LGP, as the alter ego of Xandros, to compel arbitration is consistent with the broad language of the clause and with Plaintiff's claims, since they are based on the same facts and are inherently inseparable from the business relationship between Plaintiff and Xandros. Therefore, the Court finds that all named defendants have

---

[12] Neilson v. Unition Bank for California, N.A., 290 F.Supp. 2d 1101(C.D. Cal. 2003); Dominguez v. Payne, 112 S.W. 3d 866 (Tex.App.Corpus Christi 2003), reh'g overruled, (Sept. 11, 2003).

adequately established a claim of standing to enforce the right to compel arbitration under the SAA provision.

### C. The Court May Grant a Stay Pending Arbitration or Dismiss the Action

The Federal Arbitration Act ("FAA") provides that where the court determines that an arbitration clause exists, court proceedings must be stayed to permit arbitration,

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms for the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration. 9 U.S.C. § 3.

Federal courts have interpreted this provision to "enable litigation to be stayed pending arbitration even if only one of the issues in the litigation is subject to an agreement to arbitrate." IDS Life Ins. Co. v. SunAmerica, Inc., 103 F.3d 524, 529 (7th Cir. 1996). "[T]he decision to stay the litigation of non-arbitrable claims or issues is a matter largely within the district court's discretion to control its docket." American Recovery Corp. v. Computerized Thermal Imaging, Inc., 96 F.3d 88 (4th Cir. 1996). Moreover, if non-arbitrable issues depend on arbitrable issues, or if resolution of arbitrable issues would render the district court's ruling on the non-arbitrable issues unnecessary, "litigation on the non-arbitrable issues should be stayed pending arbitration." Summer Rain v. The Donning Company/Publishers, Inc., 964 F.2d 1455, 1461 (4th Cir. 1992) (holding that the district court should stay litigation pending arbitration of arbitrable issues where non-arbitrable litigation may become unnecessary).

But the Ninth Circuit has also declared that while Section 3 of the FAA mandates a stay and not dismissal, federal district courts still maintain discretion to dismiss rather than stay an action. Sparling v. Hoffman Construction Co., Inc., 864 F.2d 635, 638 (9th Cir. 1988)(holding that district court acted within its discretion and did not err in dismissing plaintiffs' claims since arbitration clause required submission of all claims to arbitration); Martin Marietta Aluminum, Inc., v. General Electric Co., 586 F.2d 143 (9th Cir. 1978)(affirming district court's grant of summary judgment where the contract provided that a request for arbitration within six months after a controversy arose was a condition precedent to the institution of litigation and where "'[t]he

1  language contained in the arbitration provision is sufficiently broad to bar all of plaintiff's
2  claims.'") Id. at 147-48 (quoting the district court opinion); Boston Telecomm. Group, Inc. v.
3  Tohmatsu, 278 F. Supp. 2d 1041, 1049 (N.D. Cal. 2003)(granting defendants' motion to dismiss in
4  favor of compelling arbitration on the basis that all of plaintiffs' claims fall within scope of
5  arbitration clause). Other authorities have similarly allowed dismissal based on the logic that
6  staying an action when all the issues raised are arbitrable and must be submitted to arbitration
7  would serve "no purpose." See Alford v. Dean Witter Reynolds, Inc., 975 F.2d 1161, 1049 (5th Cir.
8  1992) "The weight of authority clearly supports dismissal of the case when *all* of the issues raised
9  in the district court must be submitted to arbitration." Id. (citations omitted).

10  Against this backdrop, and as previously discussed, the Court in the instant case has
11  determined that all of the parties' disputes, including the alleged violations of the Securities
12  Exchange Act of 1934, fraud, negligent misrepresentation, breach of contract, and recision found
13  in Plaintiff's First Amended Complaint, should be submitted to arbitration. As such, the Court
14  finds it unnecessary to stay the present proceedings since retaining jurisdiction will serve no
15  purpose.[13] Accordingly, the Court will not retain jurisdiction pending the completion of
16  arbitration.[14]

**V.**

**CONCLUSION.**

For reasons set forth above, Defendants' Motion is **GRANTED**. All claims in this action are dismissed without prejudice.

**IT IS SO ORDERED.**

DATED: 9/28/04

ROGER T. BENITEZ
United States District Judge

cc: All parties and respective counsel

---

[13] See Hoffman v. Fidelity and Deposit Co., 734 F. Supp. 192 (D.N.J. 1990)(retaining jurisdiction would serve no purpose as both claims will be determined in the arbitration); Sea-Land Service, Inc. v. Sea-Land of Puerto Rico, Inc., 636 F. Supp. 750 (D.C. Puerto Rico 1986).

[14] Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1, 13 (1983).